### JUDGE PAULEY

David A. Kochman (DK1809)
Peter C. Gourdine (PG6016)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel:    (212) 521-5400
Fax:    (212) 521-5450



**14 CV   1210**

Peter M. Ellis (*pro hac vice to be filed*)
Leonard E. Hudson (*pro hac vice to be filed*)
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
Tel:    (312) 207-1000
Fax:    (312) 207-6400

*Attorneys for Plaintiffs*
*The UPS Store, Inc.,*
*United Parcel Service, Inc., and*
*United Parcel Service of America, Inc.*

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

|  |  |
|---|---|
| THE UPS STORE, INC.; UNITED PARCEL SERVICE, INC.; and UNITED PARCEL SERVICE OF AMERICA, INC., | Case No. _____ |
| *Plaintiffs,* |  |
| v. | **VERIFIED COMPLAINT** |
| ROBERT HAGAN; THOMAS HAGAN; RIDGE ASSETS, INC.; 3A, INC.; RIDGEPAC, INC.; TANMOR, INC.; RIDGE LOGISTICS, LLC; TOMMYS DOC SQUAD, LLC; RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC; TOMPACK, LLC; BIGPACK LLC; and NYPS, LLC, |  |
| *Defendants.* |  |

------------------------------------------------------------- x

Plaintiffs The UPS Store, Inc. ("TUPSS"), United Parcel Service, Inc. ("UPS"), and

United Parcel Service of America, Inc. ("UPS of America") by their attorneys, Reed Smith LLP,

bring this action for trademark infringement, breach of contract, for damages, and for injunctive

and other relief, against defendants Ridge Assets, Inc., 3A, Inc., Ridgepac, Inc., Tanmor, Inc., Ridge Logistics LLC, Tommys Doc Squad LLC, Ridgedown, Inc., Robpack, LLC, Ridge Pen LLC, Tompack LLC, and Bigpack LLC (collectively, the "Former Franchisees"), defendant NYPS, LLC, and the ultimate owners and guarantors of the Former Franchisees, individual defendants Robert Hagan and Thomas Hagan (collectively, the "Hagans"), and allege as follows:

## INTRODUCTION

1.      TUPSS is the leading franchisor of The UPS Store® branded postal, packaging, business and communication retail service centers throughout the United States.  UPS is an interstate carrier providing transportation and related services to shippers, including The UPS Store® centers.

2.      The Hagans, through their companies, the Former Franchisees, operated eleven TUPSS franchised centers (the "Former Centers") in New York, New York, pursuant to a written franchise agreement for each center (the "Franchise Agreements").  In connection with each of the Franchise Agreements, the Former Franchisees also entered into a written The UPS Store® Franchisee UPS Incentive Program Contract Carrier Agreement ("Contract Carrier Agreement") with UPS for shipping services to and from the locations of the Former Centers.  Collectively, the Former Centers comprised about one-fifth of all TUPSS franchise locations in the Manhattan area.

3.      In the summer of 2013, TUPSS received information from one of the Hagans' former employees concerning alleged unethical sales practices at the Former Centers.  Over the following months, TUPSS' Security Department investigated the matter and discovered that the Former Centers engaged in a practice of charging customers more than the UPS maximum retail rate in violation of the Franchise Agreements and the Contract Carrier Agreements.  Although

TUPSS and UPS had every right to terminate the Franchise Agreements and Contract Carrier Agreements, TUPSS and UPS issued a notice of default and warned the Former Franchisees that any further instances of misconduct would result in the termination of the agreements.

4.     Instead of using this "second chance" to correct their ways, the defendants began a course of self-destruction. After filing a lawsuit against other Manhattan area TUPSS franchisees, the defendants staged a coordinated "shut down" of all eleven Former Centers, in which they closed all the stores for a day and posted a copy of the summons from that lawsuit near the door of each store. Because that conduct violated numerous provisions of the Franchise Agreements and constituted an intentional attempt to injure TUPSS' brand, TUPSS issued a second notice of default – the second such notice in two months.

5.     Making matters worse, in December 2013 the defendants stopped paying UPS for the shipping services it was providing to the Former Centers. By February 5, 2014, the Former Franchisees owed UPS hundreds of thousands of dollars for unpaid shipping services provided to the eleven stores. As a result of the Former Franchisees' failure to pay required shipping fees, UPS was forced to terminate the Contract Carrier Agreements for each of the Former Centers.

6.     On February 5, 2014, TUPSS terminated the Franchise Agreements for each of the Former Centers due to the Former Franchisees' numerous material breaches of the Franchise Agreements, including:  failing to provide UPS shipping services at the Former Centers, failure to timely meet financial obligations, failing to keep the Former Centers open and operating during required business hours, use of unauthorized signage in violation of TUPSS' center image specifications, engaging in conduct with the deliberate intent of damaging TUPSS' brand and reputation, and, in many instances, charging customers in excess of UPS maximum retail rates.

7.     As a result of the termination of the Franchise Agreements, the Former

Franchisees and the Hagans owe TUPSS approximately $44,157.35 for monthly royalties and technical development and support fees due as of February 20, 2014. Additionally, the Former Franchisees, the Hagans, and NYPS, LLC also owe TUPSS another $130,794.55 due as of February 20, 2014 on a promissory note.

8.     As a result of the termination of the Franchise Agreements, the Former Franchisees and the Hagans are required to honor certain post-termination provisions, including, but not limited to, their covenant not to display the UPS trademarks without authorization or operate a competing business within the formerly protected franchise territories. But, despite the termination of the Franchise Agreements, the Hagans continue to display the UPS trademarks and operate "a full service independent parcel shipping/receiving, and mailboxes store" at the location of at least one of the Former Centers, in direct and material breach of their post-termination obligations.

9.     Accordingly, TUPSS, UPS, and UPS of America file this action to enjoin the defendants from their unauthorized display and use of the UPS trademarks, enforce TUPSS' rights under the Franchise Agreements and related agreements, and recover the sums they are owed from the defendants as a result of the defendants' breaches of the contractual obligations and other wrongful conduct.

## PARTIES

10.     Plaintiff TUPSS is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6060 Cornerstone Court West, San Diego, California 92121. TUPSS is a wholly owned subsidiary of United Parcel Service, Inc., a Delaware corporation. TUPSS is the world's largest franchisor of independently owned and operated postal, packaging, shipping, business, and communication retail service centers, under

The UPS Store® mark, with more than 800,000 mailbox holders in the United States and thousands of locations offering mail and parcel receiving, packaging, and shipping services and providing small businesses with a wide range of products and services in this District, across the United States and Canada.

11.     Plaintiff UPS is a corporation organized and existing under the laws of the State of Ohio with its principal place of business at 55 Glenlake Pkwy NE, Atlanta, GA 30328 Georgia.  UPS is a wholly owned subsidiary of United Parcel Service, Inc., a Delaware corporation and the largest express carrier and largest package delivery business in the world. UPS provides shipping services for documents and packages in this District, across the United States and throughout the world.  In 2009, United Parcel Service, Inc., a New York Corporation, was merged into UPS.

12.     Plaintiff UPS of America is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 55 Glenlake Parkway NE, Atlanta, Georgia 30328.  UPS of America is a wholly owned subsidiary of United Parcel Service, Inc., a Delaware corporation.  UPS of America is the owner of the marks at issue in this case and licenses those marks to TUPSS.

13.     Defendant Robert Hagan is a citizen and resident of New Jersey.  Robert Hagan directly or indirectly owns a 50% interest in each of the Former Franchisees.

14.     Defendant Thomas Hagan is a citizen and resident of New Jersey.  Thomas Hagan directly or indirectly owns the remaining 50% interest in each of Former Franchisees.

15.     Defendant Ridge Assets, Inc. is a corporation organized under the laws of New York with its principal place of business in New York, New York.  Ridge Assets, Inc. is the former franchisee of The UPS Store® Center No. 0523, located at 1202 Lexington Avenue, New

York, NY 10028.

16.     Defendant 3A, Inc. is a corporation organized under the laws of New York with its principal place of business in New York, New York.  3A, Inc. is the former franchisee of The UPS Store® Center No. 0561, located at 1636 Third Avenue, New York, NY 10128.

17.     Defendant Ridgepac, Inc. is a corporation organized under the laws of New York with its principal place of business in New York, New York.  Ridgepac, Inc. is the former franchisee of The UPS Store® Center No. 1141, located at 331 W. 57th Street, New York, NY 10019.

18.     Defendant Tanmor, Inc. is a corporation organized under the laws of New York with its principal place of business in New York, New York.  Tanmor, Inc. is the former franchisee of The UPS Store® Center No. 1227, located at 527 Third Avenue, New York, NY 10016.

19.     Defendant Ridge Logistics LLC is a limited liability company organized under the laws of New York with its principal place of business in New York, New York.  Its only members are Robert Hagan and Thomas Hagan.  Ridge Logistics LLC is the former franchisee of The UPS Store® Center No. 1382, located at 1562 First Avenue, New York, NY 10028.

20.     Defendant Tommys Doc Squad LLC is a limited liability company organized under the laws of New York with its principal place of business in New York, New York.  Its only members are Robert Hagan and Thomas Hagan.  Tommys Doc Squad LLC is the former franchisee of The UPS Store® Center No. 4311, located at 303 Park Avenue South, New York, NY 10010.

21.     Defendant Ridgedown, Inc. is a corporation organized under the laws of New York with its principal place of business in New York, New York.  Ridgedown, Inc. is the

former franchisee of The UPS Store® Center No. 5308, located at 342 Broadway, New York, NY 10013.

22.     Defendant Robpack LLC is a limited liability company organized under the laws of New York with its principal place of business in New York, New York.  Its only members are Robert Hagan and Thomas Hagan.  Robpack LLC is the former franchisee of The UPS Store® Center No. 5613, located at 328 Eighth Avenue, New York, NY 10001.

23.     Defendant Ridge Pen LLC is a limited liability company organized under the laws of New York with its principal place of business in New York, New York.  Its only members are Robert Hagan and Thomas Hagan.  Ridge Pen LLC is the former franchisee of The UPS Store® Center No. 6280, located at 1474 Third Avenue, New York, NY 10028.

24.     Defendant Tompack LLC is a limited liability company organized under the laws of New York with its principal place of business in New York, New York.  Its only members are Robert Hagan and Thomas Hagan.  Tompack LLC is the former franchisee of The UPS Store® Center No. 6281, located at 222 Eight Avenue, New York, NY 10011.

25.     Defendant Bigpack LLC is a limited liability company organized under the laws of New York with its principal place of business in New York, New York.  Its sole member is non-party NYPS, LLC.  Bigpack LLC is the former franchisee of The UPS Store® Center No. 6283, located at 694 Tenth Avenue, New York, NY 10019.

26.     Defendant NYPS, LLC is a limited liability company organized under the laws of New York with its principal place of business in New York, New York.  NYPS, LLC own three of the Former Franchisees.  Its only members are Robert Hagan and Thomas Hagan.

## JURISDICTION AND VENUE

27.     The Court has original subject matter jurisdiction over this civil action under 28

U.S.C. §§ 1331, 1338 and 1367, in that this is a civil action involving claims arising under the laws of the United States, including an Act of Congress relating to trademarks, and wherein all other claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy.

28.     The Court also has original subject matter jurisdiction of this action under 28 U.S.C. § 1332, in that this is a civil action between citizens of different States and wherein the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

29.     Venue is proper in this Court under 28 U.S.C. § 1391 because the defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## TUPSS' FRANCHISE BUSINESS

30.     TUPSS was founded in 1980 and has continuously conducted its business involving the franchising of a standard, unique, and uniform system for conducting business then-known as Mail Boxes Etc.® Centers throughout the United States.  TUPSS' authorized franchise centers offer and provide services including: mailbox services with 24 hour access; copy services; binding and laminating services; specialty paper services; fax services; postal services; parcel shipping; freight shipping; packaging services; sale of shipping, packaging, mailing supplies, and office supplies; printing services; notary services; passport photograph services; computer time rental; online services; among other services, all identified and promoted to the general public under certain trademarks, service marks, and trade names, including The UPS Store®.

31.     UPS of America is the owner of, *inter alia*, the following trademark and service mark registrations issued by the United States Patent and Trademark Office for the following

trademarks and service marks, which have not been canceled, are now and have been valid at all times pertinent, and are in full force and effect (collectively referred to herein as the "Marks"):

| REGISTRATION/ APPLICATION NUMBER | DESCRIPTION OF MARK | PRINCIPAL OR SUPPLEMENTAL REGISTER | REGISTRATION DATE | CLASS |
|---|---|---|---|---|
| 78/818,815 | TUPSS | Principal | Pending | 35,39 |
| 2,884,954 | THE UPS STORE | Principal | Sept. 14, 2004 | 9, 35, 38, 39 |
| 76/442,507 | UPS STORE | Principal | Pending | 9 |
| 76/491,153 | UPS STORE | Principal | Pending | 35, 39 |
| 78/818,815 | TUPSS | Principal | Pending | 36 |
| 2,978,624 | UPS & Stylized Shield Device (b/w) | Principal | July 26, 2005 | 36 |
| 2,978,625 | UPS & Stylized Shield Device (color) | Principal | July 26, 2005 | 39 |
| 2,867,999 | UPS & Stylized Shield Device (b/w) | Principal | July 27, 2005 | 39 |
| 2,868,000 | UPS & Stylized Shield Device (color) | Principal | July 27, 2004 | 9, 16, 22, 35, 38, 42 |
| 2,973,108 | UPS & Stylized Shield Device (b/w) | Principal | July 19, 2005 | 9, 16, 25, 35, 38, 42 |
| 2,981,794 | UPS & Stylized Shield Device (color) | Principal | August 2, 2005 | 9, 16, 25, 35, 38, 42 |
| 2,973,599 | UPS & Stylized Shield Device (color) | Principal | July 19, 2005 | 35, 36, 41 |
| 2,965,392 | UPS & Stylized Shield Device (b/w) | Principal | July 5, 2005 | 35, 36, 41 |
| 78/441,655 | UPS & Stylized Shield Device (b/w) | Principal | October 17, 2006 | 24, 28 |

32.     UPS of America's registration of the Marks with the United States Patent and

Trademark Office grants them "incontestable" status under the Lanham Act, 15 U.S.C. §1065.

33.     UPS of America has given notice to the public of the registration of the Marks as provided in 15 U.S.C. § 1111.

34.     UPS of America is the current owner of the Marks listed above and has licensed the use of those Marks through affiliates to TUPSS.

35.     TUPSS has used the Marks in interstate commerce in connection with the promotion, sale and licensing of The UPS Store® Centers and the advertisement, promotion and sale of postal, business and communication services and related products offered by those Centers throughout the United States.

36.     The advertisement, promotion, and sale of postal, packaging, shipping, business, and communications services and related products offered by TUPSS and its authorized franchisees under the Marks have met with widespread success and have established goodwill of inestimable value among consumers throughout the United States.

37.     TUPSS grants franchises to qualified persons to own and operate franchise centers at specific locations and licenses its authorized franchisees' use of its proprietary trade names, trademarks and service marks, logos, know-how and expertise in connection therewith within an exclusive territory designated in the franchise agreement.

38.     TUPSS provides its franchisees with proprietary property, equipment, and information, including its confidential TUPSS operating manuals, for use exclusively in connection with the operation of a franchised The UPS Store® Center.

39.     With thousands of The UPS Store® franchisees nationwide, TUPSS is the predominant leader in the industry.  Through its more than 30 years of experience, TUPSS has developed unique, proprietary business knowledge upon which the franchisee business model is

specifically formulated.  This information is shared with TUPSS' carefully selected franchisees through training and continuous business support, and provides the foundation upon which TUPSS franchisees successfully operate postal, packaging, shipping, business, and communications centers in markets throughout the United States.

40.     TUPSS' business formula is based on its proven system of location, reliability, and convenience. Over time, substantial customer goodwill and brand awareness builds in association with each TUPSS Center selling TUPSS products and providing TUPSS services to a reliable customer base in close proximity to that center.

## THE PARTIES' FRANCHISE RELATIONSHIP

41.     Between March 28, 2008 and September 29, 2012, TUPSS and the Former Franchisees entered into a written Franchise Agreements for each of eleven The UPS Store® Centers in the Manhattan area of New York, New York.  The Franchise Agreements are substantively identical in all material and relevant respects.  True and correct copies of the Franchise Agreements are attached as **Exhibits 1 through 11**.

42.     Included as exhibits to, and incorporated by reference into, each of the Franchise Agreements, and executed at or about the same time, were related agreements with TUPSS including, but not limited to, a written Non-Competition and Non-Solicitation Agreement ("NCNSA").  Each NCNSA is the same in all material and relevant respects.  The NCNSAs are Exhibit D to each respective Franchise Agreement attached hereto as **Exhibits 1 through 11**. The NCNSAs the Hagans executed in connection with Former Center No. 1141 are also excerpted and attached hereto as **Exhibit 12**.

43.     The NCNSAs are governed by the laws of the State where the corresponding Former Centers are located, *i.e.*, by the laws of New York.

44.     Under the NCNSA, each of the Hagans agreed, among other things, that upon termination of the Franchise Agreements they would "not directly (or indirectly, such as through corporations or other entities controlled by [Robert Hagan or Thomas Hagan] or by or through or in conjunction with any other individual person or persons" do any of the following:

> for a two (2) year period following the Conclusion of the Franchise Agreement . . . and without geographic restriction, divert or attempt to divert any business or customer of any Center to any competitor, or do anything injurious or prejudicial to the goodwill associated with [TUPSS'] proprietary Marks or [TUPSS'] System;

> \*       \*       \*

> own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, make loans to, or have any interest in any business which is the same or competitive with, or substantially similar to any Mail Boxes Etc. or The UPS Store Center, and which is located within what was formerly the protected franchise territory granted under the Franchise Agreement corresponding to this Agreement (with such restriction limited to a two (2) year period following the Conclusion of the Franchise Agreement corresponding to this Agreement).

45.     The NCNSA also requires that, during the two (2) year period immediately following the termination of the Franchise Agreement, the Hagans would not "divert or attempt to divert any business or customer of any Center to any competitor, or do anything injurious or prejudicial to the goodwill associated with [TUPSS'] proprietary Marks or [TUPSS'] System."

46.     Although the Franchise Agreement allowed the Former Franchisees to use the Marks during its term, TUPSS reserved wide-ranging control over the use of the Marks.  The license to use the Marks contained *inter alia*, the following conditions:

    a.  TUPSS reserved the right to control the Former Franchisee's use of the Marks;

    b.  The Marks could not be used in the name of the legal entity formed to operate the franchise;

    c.  The Former Franchisees acknowledged the validity of the Marks and acknowledged that the Marks are the property of UPS; and

- 12 -

     d.   The Former Franchisees agreed not to infringe upon, harm or contest TUPSS'

rights to the Marks in any way.

47.    The Former Franchisees also agreed that the goodwill arising from the use of the

Marks belonged to TUPSS and would revert back to TUPSS in the event that the Franchise

Agreement was terminated for any reason.  In addition, the Former Franchisees agreed that, upon

termination of the Franchise Agreement, they would change their business names and delete any

reference to the Marks from their business names.

48.    Pursuant to the Franchise Agreements, TUPSS provided the defendants with a

variety of services and training developed through TUPSS' efforts and experience, including

training that was conducted in San Diego, California. The services and training that were

provided by TUPSS were intended to teach franchisees how to establish and operate a successful

business and to further the overall interests of the franchise system.

49.    Specifically, TUPSS provided two weeks of extensive in-house training in San

Diego, California, and thereafter, many hours of in-store training to the defendants and their

franchise's managers.

50.    In exchange for this training, know-how, use of the Marks, and continuing

operational assistance, the Former Franchisees agreed to pay continuing monthly royalty and

other fees.  All monthly royalties were paid directly to TUPSS at its principal place of business

in San Diego, California.

51.    In addition, the Former Franchisees agreed to pay local marketing fees and

national advertising fees.

52.    The Franchise Agreement required the Former Franchisees to operate the Former

Centers in compliance with the current standards and specifications set forth in TUPSS'

confidential Operations Manual, as modified from time to time.

53.     The confidential Operations Manual, developed through more than 30 years of experience, are provided in hard copy to franchisees but are maintained by password protection on exclusive systems and expressly outline the business information and know-how necessary for successfully operating a The UPS Store® center, including business modeling, pricing, marketing strategies, and other proprietary TUPSS information.

54.     In the Franchise Agreements, the Former Franchisees agreed that, upon termination thereof, among other things, they would immediately cease operations of the Former Centers, cease use of the TUPSS System and Marks in any form, cease holding themselves out as TUPSS franchisees, cease all use, or identification in any business name, of the words "The UPS Store" or "UPS", or "Store" or "Mail" or "Boxes" or "Etc." or the combined letters "MBE", and to take such action as TUPSS may require to accomplish the foregoing.

55.     In the Franchise Agreements, the Former Franchisees agreed that, upon termination thereof, they would return to TUPSS or its designee all manuals, proprietary hardware, software, computer disks and all other trade secrets and other confidential information and instructions delivered to them, and all copies thereof, and certify the deletion of all electronic copies of the forgoing.

56.     In the Franchise Agreements, the Former Franchisees agreed that, upon termination thereof, they would immediately pay all sums due to TUPSS, including all sums required to satisfy in full all obligations, trade accounts, promissory notes, financing agreements and equipment leases owing to TUPSS.

57.     In the Franchise Agreements, the Former Franchisees further acknowledged and agreed that termination of Franchisee's Agreements extinguished all intangible franchise rights

that were formerly held by the Former Franchisees.

58.     Included as exhibits to, and incorporated by reference into, the Franchise Agreements, and executed at or about the same time, was a related agreement with UPS, namely the Contract Carrier Agreement for each of the Former Centers.  Each of the eleven Contract Carrier Agreements is substantively identical in all material and relevant respects.  The Contract Carrier Agreements are Exhibit K to each respective Franchise Agreement attached hereto as **Exhibits 1 through 11**.

59.     The Contract Carrier Agreements set forth the terms for UPS providing shipping services to the Former Centers, including setting the maximum UPS retail rates for shipping services.

60.     Pursuant to the Contract Carrier Agreement for each of the Former Centers, the Former Franchisees agreed to timely pay all charges owed to UPS for services rendered.

61.     Included as exhibits to, and incorporated by reference into, the Franchise Agreements, and executed at or about the same time, were Continuing Personal Guarantees executed by Robert Hagan and Thomas Hagan, in which they each personally guaranteed the Former Franchisees' performance of the obligations under the Franchise Agreements.  Each of the Continuing Personal Guarantees is substantively the same in all material and relevant respects.  The Continuing Personal Guarantees are Exhibit A to each respective Franchise Agreement attached hereto as **Exhibits 1 through 11**.

62.     Additionally, on or about September 20, 2012, all of the defendants jointly and severally made out a Secured Promissory Note to TUPSS in which they promised to repay to TUPSS the principal amount of $150,000 plus interest.  A true and correct copy of the Secured Promissory Note is attached hereto as **Exhibit 13**.

63.    In the Franchise Agreements and related exhibits, the Former Franchisees agreed that if TUPSS instituted legal action against the franchisee for breach of the Franchise Agreement, the defendants would be responsible to pay TUPSS' reasonable attorneys' fees and costs.

64.    In the NCNSA, the Hagans agreed to pay all of TUPSS' costs and expenses, including reasonable attorneys' fees, incurred in enforcing the NCNSA.

65.    In the Contract Carrier Agreement, the Former Franchisees agreed to pay all of UPS' costs and expenses, including reasonable attorneys' fees, incurred as a result of, among other things, the Former Franchisees' noncompliance with UPS' requirements or misconduct in connection with processing packages.

## THE BREACH AND TERMINATION OF THE FRANCHISE AGREEMENTS

66.    On July 8, 2013, one of the Hagans' former employees informed TUPSS that he was concerned about unethical sales practices at the Former Centers, including but not limited to charging customers in excess of maximum UPS retail shipping rates.

67.    The normal practice at a The UPS Store® center is to obtain a UPS shipping price using proprietary shipping software and then enter that price in the point-of-sale system.

68.    The former employee told TUPSS, however, that employees at the Former Centers were instructed to "make up [their] own price and to mark up the shipping by at least $20." To avoid scrutiny by the customers, the employees were instructed to tell the customers that the tracking numbers for their shipment would be provided via electronic mail so that the customers would not be given the shipping program receipt in violation of the TUPSS operation standards.

69.    The employees of the Former Centers were paid a bonus based on how much they

overcharged.

70.    Immediately thereafter, in July 2013, a TUPSS executive visited one of the Former Centers to conduct a "mystery shop" and was overcharged for UPS shipping services in the manner described by the Hagans' former employee.

71.    In August 2013, TUPSS' Security Departments performed multiple "mystery shops" at each of the Former Centers.  During these "mystery shops," TUPSS' security personnel were systematically overcharged for UPS shipping services at nine of the eleven Former Centers.

72.    In September 2013, TUPSS' Security Department reviewed a sampling of the August 2013 shipping data from certain of the Former Centers and discovered hundreds of instances of overcharging.

73.    On November 6, 2013, TUPSS sent the Hagans a Cease and Desist Letter reminding them of the importance of The UPS Store® brand and demanding that the Former Centers immediately cease and desist overcharging customers.  A true and correct copy of the November 6, Cease and Desist Letter is attached as **Exhibit 14**.

74.    On November 12, 2013, TUPSS representatives met with the Hagans at TUPSS' headquarters in San Diego, California.  During that meeting, the Hagans were again reminded of the importance of the TUPSS and UPS brands and that compliance with TUPSS' operational standards was not optional.

75.    On December 12, 2013, TUPSS and UPS issued a Notice of Material Default for nine of the eleven Former Centers as a result of overcharging at those locations, which overcharging constituted material defaults of the Franchise Agreements and Contract Carrier Agreements for those nine of the Former Centers.  A true and correct copy of the December 12, 2013 Notice of Material Default is attached as **Exhibit 15**.

76.     In mid-December 2013, all of the Former Franchisees stopped paying shipping charges they owed to UPS for shipping services UPS was providing to the Former Centers.

77.     Notwithstanding the Former Franchisees' failures to timely pay shipping charges owed to UPS, UPS, in good faith, continued to provide shipping services to the Former Centers.

78.     On or about January 3, 2014, the defendants filed a lawsuit in New York state court against other TUPSS franchisees in the Manhattan area, alleging, among other things, that those franchisees had defamed the defendants.

79.     On Wednesday, January 15, 2014, the defendants staged a coordinated "shut down" of all eleven Former Centers.  Although the Franchise Agreement and applicable TUPSS' standards required the Former Centers to be open and operating for normal business on that day, the defendants instead closed all eleven stores and prominently displayed a copy of the summons from their state court lawsuit near the door of each store.

80.     On January 17, 2014, TUPSS issued a Notice of Material Default for all eleven of the Former Centers as a result of the Former Franchisees' failure to keep the Former Centers open and operating during required business hours on January 15, 2014 and intentionally engaging in conduct at all eleven Former Centers with the intent, and ultimate result, of harming TUPSS' brand and reputation.  True and correct copies of TUPSS' January 17, 2014 Notices of Material Default are attached hereto as **Exhibit 16**.

81.     Meanwhile, the Former Franchisees continued to fail to pay the shipping charges owed to UPS for shipping services it was providing to the Former Centers.  By January 18, 2014, the Former Franchisees owed UPS no less than $172,013.58 in unpaid shipping charges.

82.     On or about January 28, 2014, UPS issued a Demand for Payment to the Former Franchisees, in which UPS, in good faith, stated that it would not suspend shipping services to

the Former Centers provided that the Former Franchisees pay at least a portion of the outstanding

shipping charges to UPS by February 3, 2014. A true and correct copy of the Demand for

Payment is attached hereto as **Exhibit 17**.

83.     The Former Franchisees did not respond to the Demand for Payment.

84.     By February 5, 2014, the Former Franchisees owed UPS in excess of $200,000 in

unpaid shipping charges.

85.     On February 5, 2014, UPS issued a Notice of Material Default and Termination of

the Contract Carrier Agreement for each of the Former Centers as a result of the Former

Franchisees' failures to pay the shipping charges owed to UPS. All eleven of UPS' February 5,

2014 Notices of Material Default and Termination are identical in all material and relevant

respects. True and correct copies of UPS' February 5, 2014 Notices of Material Default and

Termination are attached hereto as **Exhibit 18**.

86.     Also on February 5, 2014, after the termination of the Contract Carrier

Agreements by UPS, TUPSS issued a Notice of Material Default and Termination of the

Franchise Agreement for each of the Former Centers as a result of the Former Franchisees'

numerous material breaches of the Franchise Agreements, including:  failing to provide UPS

shipping services at the Former Centers, failure to timely meet financial obligations, failing to

keep the Former Centers open and operating during required business hours, use of unauthorized

signage in violation of TUPSS' center image specifications, engaging in conduct with the

deliberate intent of damaging TUPSS' brand and reputation, and, in many instances,

overcharging customers. All eleven of TUPSS' February 5, 2014 Notices of Material Default

and Termination are identical in all material and relevant respects.  True and correct copies of

TUPSS' February 5, 2014 Notices of Material Default and Termination are attached hereto as

**Exhibit 19**.

87.     The Former Franchisees failed to submit royalty reports to TUPSS for January

and February 2014.

88.     As a result of the termination of the Franchise Agreements, the Former

Franchisees and the Hagans owe TUPSS an estimated combined total of an amount exceeding

$44,157.35 for monthly royalties and technical development and support fees due as of February

20, 2014.

89.     As a result of the termination of the Franchise Agreements, the Former

Franchisees, NYPS, LLC and the Hagans owe TUPSS an amount exceeding approximately

$130,794.55 due as of February 20, 2014 on the Secured Promissory Note.

## DEFENDANTS VIOLATE THEIR POST-TERMINATION OBLIGATIONS

90.     Despite the termination of the Franchise Agreements, the defendants continue to

display the Marks at the Former Centers, damaging the goodwill associated with the Marks as

well as the Plaintiffs' brands and reputations.

91.     Additionally, despite the termination of the Franchise Agreements, Robert and

Thomas Hagan continue to own, maintain, engage in, be associated with, advise, assist, invest in,

or have an interest in a business (the "Competitive Business") at the location of Former Center

No. 1141 which is the same or competitive with, or substantially similar to an authorized The

UPS Store® Center, in direct and material breach of their post-termination obligations pursuant to

the NCNSA.

92.     Specifically, TUPSS discovered signage posted at the location of Former Center

No. 1141, describing Robert and Thomas Hagan's efforts to operate "a full service independent

parcel shipping/receiving, and mailboxes store" at that location.  A true and correct copy of that

signage is attached hereto as **Exhibit 20**.

93.     On February 12, 2014, TUPSS sent the defendants a Cease and Desist Letter reminding the defendants of their post-termination obligations under the Franchise Agreements and NCNSA and demanding that the defendants comply with those post-termination obligations, including by ceasing display of the Marks and operation of the Competitive Business at the location of Former Center No. 1141.  A true and correct copy of TUPSS' February 12, 2014 Cease and Desist Letter is attached hereto as **Exhibit 21**.

94.     The defendants have neither responded to the February 12, 2014 Cease and Desist Letter nor ceased their breach of the post-termination covenants.  Instead, defendants continue to display the Marks and operate the Competitive Business.

95.     The unauthorized display of the valuable Marks harms the plaintiffs' brands and causes customer confusion as to the viability of the TUPSS franchise system.

96.     In continuing in their unauthorized display of the valuable Marks, the defendants are usurping the goodwill associated therewith, for the benefit of themselves and the Competitive Business.

97.     In connection with the Franchise Agreements, the Former Franchisees executed a Lease Addendum for the locations of the Former Centers, in which the Former Franchisees agreed to assign their rights in the leases for those locations to TUPSS.  (*See* Exhibit I to each of the Franchise Agreements.)  TUPSS has requested that the Former Franchisees honor those agreements, but the Former Franchisees have as yet declined to respond to TUPSS' request.

98.     In light of the defendants' conduct in continuing to operate the Competitive Business at the location of Former Center No. 1141 and their failure to honor the Lease Addendums, there is a substantial risk that the defendants also intend to operate competing

businesses at the other remaining ten locations, in further violation of the NCNSA.

## FIRST CLAIM FOR RELIEF
### Lanham Act – Trademark Infringement

99.     UPS of America repeats and re-alleges each of the foregoing paragraphs of this Verified Complaint as and for this paragraph, as if fully set forth herein.

100.    The defendants acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the Marks, and are likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(l).

101.    As a direct and proximate result of the Hagans' infringement, UPS of America has been substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

102.    UPS of America has no adequate remedy at law because the Marks are unique and represent to the public UPS of America's identities, reputation, and goodwill, such that damages alone cannot fully compensate UPS of America for the Hagans' misconduct.

103.    Unless enjoined by the Court, the defendants will continue to use and infringe the Marks, to UPS of America's irreparable injury.  This threat of future injury to UPS of America's business identities, goodwill, and reputation require injunctive relief to prevent the Hagans' continued use of the Marks, and to ameliorate and mitigate UPS of America's injuries.

## SECOND CLAIM FOR RELIEF
### Lanham Act – Unfair Competition

104.    The Plaintiffs repeat and re-allege each of the foregoing paragraphs of this Verified Complaint as and for this paragraph, as if fully set forth herein.

105.    The defendants' acts, practices, and conduct constitute unfair competition, and false or misleading descriptions or representations of fact, in that they are likely to cause

confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties, and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of 15 U.S.C. § 1125(a).

106.    As a direct and proximate result of the defendants' infringement, the Plaintiffs have been and are likely to be substantially injured in their business, including their goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

107.    The Plaintiffs have no adequate remedy at law because the Marks are unique and represent to the public the Plaintiffs' identity, reputation, and goodwill, such that damages alone cannot fully compensate the Plaintiffs for the defendants' misconduct.

108.    Unless enjoined by the Court, the defendants will continue to use and infringe the Marks, to the Plaintiffs' irreparable injury.  This threat of future injury to the Plaintiffs' business identity, goodwill, and reputation requires injunctive relief to prevent the defendants' continued use of the Marks, and to ameliorate and mitigate the Plaintiffs' injuries.

### THIRD CLAIM FOR RELIEF
#### Lanham Act – Unfair Dilution & Tarnishment

109.    The Plaintiffs repeat and re-allege each of the foregoing paragraphs of this Verified Complaint as and for this paragraph, as if fully set forth herein.

110.    The Marks are famous marks with distinctive quality, thereby qualifying the Marks for protection from dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

111.    The defendants' unauthorized use of the Marks has and will continue to lessen the capacity of the famous and distinctive Marks to distinguish the goods and services allocated with them from those sold by others under the same name and brand.

112.    By reason of the defendants' ongoing and continuing misconduct, the Plaintiffs have suffered and, unless the defendants' misconduct is enjoined, will continue to suffer

irreparable harm for each day that the defendants continue to infringe upon and dilute  and tarnish the Marks.

113.   The Plaintiffs have no adequate remedy at law because the harm they have suffered and will continue to suffer is difficult to quantify, such that damages alone cannot fully compensate the Plaintiffs for unlawful use of the Marks.

### FOURTH CLAIM FOR RELIEF
### Common Law Trademark Infringement

114.   The Plaintiffs repeat and re-allege each of the foregoing paragraphs of this Verified Complaint as and for this paragraph, as if fully set forth herein.

115.   As has been stated more fully herein, the Plaintiffs have a valid, protectable interest in the Marks.

116.   The defendants' unauthorized and intentional continued use of the Marks in connection with the Former Centers violates the Plaintiffs' protectable interest in the Marks and is likely to cause consumer confusion.

117.   Unless enjoined, the defendants will continue to infringe on the Marks by continuing to hold their business out as an authorized TUPSS franchise.

118.   By reason of the defendants' ongoing and continuing misconduct, the Plaintiffs have suffered and, unless the defendants' misconduct is enjoined, will continue to suffer irreparable harm for each day that the defendants continue to infringe upon and dilute the Marks.

119.   The Plaintiffs have no adequate remedy at law because the harm they have suffered and will continue to suffer is difficult to quantify, such that damages alone cannot fully compensate the Plaintiffs for the unlawful use of the Marks.

### FIFTH CLAIM FOR RELIEF
### Breach of Contract – Franchise Agreements & NCNSA
### (Post-Termination Covenants)

120.    TUPSS repeats and re-alleges each of the foregoing paragraphs of this Complaint as and for this paragraph, as if fully set forth herein.

121.    The Franchise Agreements and the NCNSAs are valid contractual agreements.

122.    The Former Franchisees and the Hagans have materially breached their post-termination obligations pursuant to the Franchise Agreement and NCNSA for Center No. 1141.

123.    Specifically, the Hagans have materially breached the Franchise Agreement and NCNSA for Center No. 1141 by continuing to own, maintain, engage in, be associated with, advise, assist, invest in, or have an interest in a Competitive Business at the same location of Former Center No. 1141 despite the termination of the Franchise Agreements.

124.    Additionally, the Hagans have also materially breached the Franchise Agreement and NCNSA for Center No. 1141 by diverting or attempting to divert the business and customers of Former Center No. 1141 to the Competitive Business.

125.    The Hagans' conduct in this regard is a further breach of the Franchise Agreement and NCNSA for Center No. 1141 because it is injurious and prejudicial to the goodwill associated with TUPSS' proprietary Marks and System.

126.    The Hagans and the Former Franchisees have breached the post-termination provisions of the Franchise Agreements and the NCNSAs by failing to return TUPSS' manuals and other confidential and proprietary information upon termination of the Franchise Agreements.

127.    The Former Franchisees have breached their post-termination obligation under the Franchise Agreement to complete the de-identification of the locations of the Former Centers.

128.    TUPSS has no adequate remedy at law because the harm it has suffered and will continue to suffer is difficult to quantify, such that damages alone cannot fully compensate

TUPSS for its loss.

129.    Unless enjoined and ordered by the Court to restrain the defendants from breaching their post-termination obligations under the Franchise Agreements and the NCNSAs, the Hagans and the Former Franchisees' breaches will continue to cause TUPSS to suffer irreparable harm.

### SIXTH CLAIM FOR RELIEF
### Common Law Unfair Competition

130.    TUPSS repeats and re-alleges each of the foregoing paragraphs of this Verified Complaint as and for this paragraph, as if fully set forth herein.

131.    The defendants obtained TUPSS' proprietary information, system, and know-how as duly authorized franchisees of TUPSS.  The Franchise Agreements authorizing the use of such information contained an express obligation to keep this information in confidence and restricted the disclosure of TUPSS' proprietary system of business and know-how, including TUPSS' confidential information and trade secrets.

132.    The defendants agreed to be bound by the use and disclosure prohibitions upon signing the Franchise Agreements.

133.    The defendants have used, or imminently will use, and inevitably will use TUPSS' System, trade secrets and confidential information, without TUPSS' authorization, in soliciting and servicing customers and otherwise competing against TUPSS and its franchise network.

134.    The defendants' unauthorized continued use of TUPSS' System, trade secrets and confidential information violates TUPSS' protectable interest in its trade secrets and confidential information.

135.    The defendants' unlawful business practice of intentionally using TUPSS'

System, trade secrets and confidential information, even though the Franchise Agreements and the NCNSAs prohibit such use, is an effort to usurp TUPSS' goodwill and reputation.

136.    This usurpation of TUPSS' goodwill and reputation not only harms TUPSS, but also constitutes a means of unfair competition against TUPSS and its properly-sanctioned franchisees.

137.    By reason of the defendants' ongoing and continuing misconduct, TUPSS has suffered and, unless the defendants' misconduct is enjoined, will continue to suffer irreparable harm for each day that the Hagans continues to compete unfairly with TUPSS.

138.    TUPSS has no adequate remedy at law because the harm it has suffered and will continue to suffer is difficult to quantify, such that damages alone cannot fully compensate it for the defendants' unfair competition.

## SEVENTH CLAIM FOR RELIEF
### Common Law Misappropriation – Trade Secrets

139.    TUPSS repeats and re-alleges each of the foregoing paragraphs of this Verified Complaint as and for this paragraph, as if fully set forth herein.

140.    TUPSS' business involves the franchising of a unique and valuable system for conducting businesses known as The UPS Store® Centers.  TUPSS has developed its unique, valuable, and proprietary business knowledge and system through more than 30 years of experience. TUPSS licenses its carefully selected, authorized franchisees' use of its, among other things, proprietary business system, know-how, and expertise in connection therewith within an exclusive territory designated in the franchise agreement.  TUPSS also provides its franchisees with proprietary property, equipment, and information, including its TUPSS operating manuals, for use exclusively in connection with the operation of a franchised The UPS Store® Center.

141.    TUPSS' proprietary system and way of doing business are unavailable to and

protected from acquisition by unauthorized persons. The details of TUPSS' proprietary system are not in the public domain nor readily ascertainable by third parties. In fact, information regarding the TUPSS system is only available to franchisees through exclusive training conducted at TUPSS University in San Diego, California. Furthermore, proprietary information regarding how to run a TUPSS franchise is only available on TUPSS' secure intranet website. Finally, upon the termination of the franchise relationship, all proprietary information is required to be immediately returned to TUPSS.

142.    The defendants obtained TUPSS' proprietary information, system, and know-how as duly authorized franchisees of TUPSS. The Franchise Agreements authorizing the use of such information contained an express obligation to keep this information in confidence and restricted the disclosure of TUPSS' proprietary system of business and know-how, including TUPSS' confidential information and trade secrets.

143.    The defendants agreed to be bound by the use and disclosure prohibitions upon signing the Franchise Agreements.

144.    The defendants subsequently misappropriated TUPSS' trade secrets by failing to return the confidential manuals and business computers to TUPSS and thereafter allowed TUPSS' proprietary information to be used by the Hagans to, among other things, solicit business customers.

145.    The defendants' misappropriation of TUPSS' trade secrets was intentional, willful, and malicious and diminishes the value of TUPSS' confidential information and franchise network.

146.    TUPSS has no adequate remedy at law because the harm it has suffered and will continue to suffer is difficult to quantify, such that damages alone cannot fully compensate

TUPSS for its loss.

147.    Unless enjoined and ordered by the Court to restrain from breaching their post-termination obligations under the Franchise Agreement and the NCNSA, the defendants' conduct will continue to cause TUPSS to suffer irreparable harm.

### EIGHTH CLAIM FOR RELIEF
#### Conversion

148.    TUPSS repeats and re-alleges each of the foregoing paragraphs of this Verified Complaint as and for this paragraph, as if fully set forth herein.

149.    TUPSS has an immediate right to possession of its proprietary Point of Sale system and other proprietary property, equipment and information, including TUPSS' operating manuals and materials bearing the "The UPS Store®" name and Marks.

150.    The Former Franchisees and the Hagans have failed and refused to return all of TUPSS' property, thereby depriving TUPSS of its right to possession.

151.    The actions of the Former Franchisees and the Hagans are willful and without the consent of TUPSS.

152.    The Former Franchisees and the Hagans have converted TUPSS' property to their own commercial use, causing damages to TUPSS.

### NINTH CLAIM FOR RELIEF
#### Breach of Contract – Franchise Agreements
#### (Royalties & Fees)

153.    TUPSS repeats and re-alleges each of the foregoing paragraphs of this Complaint as and for this paragraph, as if fully set forth herein.

154.    The Franchise Agreements are valid contractual agreements.

155.    TUPSS has performed all of its obligations under the Franchise Agreements.

156.    Upon termination of the Franchise Agreements the Former Franchisees were

required to immediately pay all sums due to TUPSS.

157.    In breach of the Franchise Agreements, the Former Franchisees have failed to pay TUPSS all sums due.

158.    As of February 20, 2014, the Former Franchisees owed TUPSS amounts exceeding approximately the following for unpaid royalties and technical development and support fees, plus applicable interest:

| Former Franchisee | Former Center No. | Amount |
|---|---|---|
| Ridge Assets, Inc. | 523 | $7,435.08 |
| 3A, Inc. | 561 | $3,474.57 |
| Ridgepac, Inc. | 1141 | $5,215.08 |
| Tanmor, Inc. | 1227 | $3,615.53 |
| Ridge Logistics LLC | 1382 | $4,650.47 |
| Tommys Doc Squad LLC | 4311 | $4,703.18 |
| Ridgedown, Inc. | 5308 | $3,831.68 |
| Robpack, LLC | 5613 | $4,391.28 |
| Ridge Pen, LLC | 6280 | $2,292.52 |
| Tompack LLC | 6281 | $2,700.08 |
| Bigpack, LLC | 6283 | $1,847.88 |
| *Total* | | *$44,157.35* |

159.    Pursuant to the Continuing Personal Guarantees, Robert Hagan owes TUPSS an estimated amount exceeding approximately $44,157.35 as of February 20, 2014 plus applicable interest for the Former Franchisees' unpaid royalties and technical development and support fees.

160.    Pursuant to the Continuing Personal Guarantees, Thomas Hagan owes TUPSS an estimated amount exceeding approximately $44,157.35 as of February 20, 2014 plus applicable interest for the Former Franchisees' unpaid royalties and technical development and support fees.

161.    As a direct and proximate result of the Former Franchisees' breaches of the Franchise Agreements and the Hagans breaches of the Continuing Personal Guarantees, TUPSS has suffered damages in an estimated amount exceeding approximately $44,157.35, plus applicable interest.

162.    In addition to the foregoing amounts, the Former Franchisees and the Hagans owe TUPSS additional amounts for lost profits.

### TENTH CLAIM FOR RELIEF
### Breach of Contract – Promissory Note

163.    TUPSS repeats and re-alleges each of the foregoing paragraphs of this Complaint as and for this paragraph, as if fully set forth herein.

164.    The Secured Promissory Note is a valid contractual agreement.

165.    TUPSS has performed all of its obligations under the Secured Promissory Note.

166.    All of the defendants are Makers of the Secured Promissory Note, with joint and several liability thereunder.

167.    As a result of the termination of the Franchise Agreements, the entire amount owed under the Secured Promissory Note became immediately due and payable.

168.    Further, the Secured Promissory Note provided that the entire unpaid balance thereunder would be immediately due and payable without demand or notice if, among other things, in TUPSS' sole opinion the financial responsibility of the Makers became impaired or unsatisfactory to TUPSS, or the Makers failed to pay any financial obligation whatsoever owing to TUPSS.

169.    The Makers failed to pay their financial obligations owed to TUPSS.

170.    In TUPSS' sole opinion the financial responsibility of the Makers became impaired prior to February 5, 2014.

171.   The amount due and payable from the defendants to TUPSS under the Secured Promissory Note as of February 20, 2014 exceeded $130,794.55, plus applicable interest accruing thereafter.

172.   As a direct and proximate result of the defendants' breach of the Secured Promissory Note, TUPSS has suffered damages in an amount exceeding $130,444.70, plus applicable interest.

### ELEVENTH CLAIM FOR RELIEF
#### Breach of Contract – Contract Carrier Agreements
#### (Shipping Charges)

173.   UPS repeats and re-alleges each of the foregoing paragraphs of this Complaint as and for this paragraph, as if fully set forth herein.

174.   The Contract Carrier Agreements are valid contractual agreements.

175.   The Former Franchisees breached the Contract Carrier Agreements by failing to timely pay UPS for shipping services rendered.

176.   As of February 20, 2014, the Former Franchisees owed UPS amounts exceeding the following for unpaid shipping services, plus applicable interest:

| Former Franchisee | Former Center No. | Amount |
|---|---|---|
| Ridge Assets, Inc. | 523 | $30,306.42 |
| 3A, Inc. | 561 | $13,392.79 |
| Ridgepac, Inc. | 1141 | $31,727.31 |
| Tanmor, Inc. | 1227 | $16,221.08 |
| Ridge Logistics LLC | 1382 | $33,710.60 |
| Tommys Doc Squad LLC | 4311 | $20,403.13 |
| Ridgedown, Inc. | 5308 | $20,947.80 |
| Robpack, LLC | 5613 | $20,928.13 |
| Ridge Pen, LLC | 6280 | $18,170.18 |
| Tompack LLC | 6281 | $10,606.66 |
| Bigpack, LLC | 6283 | $11,145.19 |
| | | *$227,559.29* |

| Total | | |
|---|---|---|

177.    Pursuant to the Continuing Personal Guarantees, as of February 20, 2014, Robert Hagan owes UPS an amount exceeding $227,559.29 for the Former Franchisees' unpaid shipping charges, plus applicable interest.

178.    Pursuant to the Continuing Personal Guarantees, as of February 20, 2014, Thomas Hagan owes UPS an amount exceeding $227,559.29 for the Former Franchisees' unpaid shipping charges, plus applicable interest.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray for the following relief against the defendants:

(a) Preliminary and permanent injunctive relief enjoining the defendants and each of their agents, servants and employees, and those persons in active concert or participation with them from:

      i.   using or displaying the Marks, or any other logos, symbols or trade dress affiliated with TUPSS, UPS, or UPS of America, or any of them, in connection with advertising, distribution, or display for sale of any product or service associated with the Former Centers;

      ii.  making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that the Former Centers are in any manner, directly or indirectly, associated, affiliated, connected with, licensed, sponsored, authorized or approved by TUPSS, or UPS, or UPS of America, or any of them;

      iii. taking any action, directly or indirectly in any form or manner whatsoever that is likely to dilute the distinctive quality of the famous registered Marks or otherwise taking any action likely to cause tarnishment or disparagement to the business reputations of TUPSS, UPS, or UPS of America, or any of them;

      iv.  otherwise infringing TUPSS', UPS', or UPS of America's trade names, trademarks or service marks, or otherwise competing unfairly with them in any manner;

(b) Preliminary and permanent injunctive relief enjoining the defendants, and each of their agents, servants and employees, and those persons in active concert or participation with

any of them from using TUPSS' trade secrets and confidential information in any manner, including but not limited to soliciting customers;

(c) Preliminary and permanent injunctive relief enjoining the defendants, and each of their agents, servants and employees, and those persons in active concert or participation with any of them from using TUPSS' proprietary system or business program in the operation of a competing communications and business services center;

(d) Preliminary and permanent injunctive relief enjoining the defendants, and each of their agents, servants and employees, and those persons in active concert or participation with any of them from:

    i. for a period of two (2) years from the entry of the injunction, being associated, either directly or indirectly, by virtue of being an employee, proprietor, partner, stockholder, agent, principal, owner, part-owner, co-venturer, officer, director, manager, operator, financier, salesman, or other participant or through family relationships, with a competing business within what was formerly the protected franchise territory. A competing business shall be one that is generally engaged in and offers postal, communication and business services and products and related services and products;

    ii. for a period of two (2) years from the entry of the injunction, either directly or indirectly, by virtue of being an employee, proprietor, partner, stockholder, agent, principal, owner, part-owner, co-venturer, officer, director, manager, operator, financier, or other participant or through family relationships, soliciting the business or making contact with customers of a MAIL BOXES ETC. or THE UPS STORE® Center for any competitive business purpose;

(e) Preliminary and permanent injunctive relief ordering the Former Franchisees to immediately:

    i. assign the business telephone number, fax number and any internet e-mail address for the Former Center to TUPSS and to execute any documents which may be necessary or desirable to effect such transfer with the telephone company and domain name registrar; and

    ii. cease possession by returning to TUPSS' corporate headquarters, at the Former Franchisee's cost, all tangible, confidential information and instructions delivered to the Former Franchisees under the Franchise Agreement;

(f) An order requiring the defendants to file with the Court and to serve upon TUPSS' counsel within ten (10) days after entry of any injunction, a written report, under oath, setting forth the manner in which they have complied with that injunction;

(g) Alternatively, damages in the event the Court declines the Plaintiffs' request for equitable relief;

(h) Judgment in favor of TUPSS and against the Former Franchisees requiring payment in full by the Former Franchisees of all amounts owed to TUPSS pursuant to the Franchise Agreements, plus applicable interest;

(i) Judgment in favor of TUPSS and against all defendants, requiring payment in full by the defendants of all amounts owed to TUPSS pursuant to the Secured Promissory Note, plus applicable interest;

(j) Judgment in favor of TUPSS and against the Former Franchisees requiring payment in full by the Former Franchisees of all amounts owed to TUPSS pursuant to the Franchise Agreements, plus applicable interest;

(k) Judgment in favor of UPS and against the Former Franchisees requiring payment in full by the Former Franchisees of all amounts owed to UPS pursuant to the Contract Carrier Agreements, plus applicable interest;

(l) Judgment in favor of TUPSS and UPS and against the Hagans requiring payment in full by the Hagans of all amounts owed to TUPSS and UPS pursuant to the Continuing Personal Guarantees, plus applicable interest;

(m) An award of the Plaintiffs' attorneys' fees and costs; and

(n) Such other and further relief as the Court deems just and proper.


Dated:   New York, New York
         February 25, 2014

                              **REED SMITH LLP**

                              By: _____
                                  David A. Kochman (DK1809)
                                  Peter C. Gourdine (PG6016)
                                  REED SMITH LLP
                                  599 Lexington Avenue
                                  New York, New York 10022
                                  Tel:  (212) 521-5400
                                  Fax:  (212) 521-5450

                                  – and –

                                  Peter M. Ellis (*pro hac vice to be filed*)
                                  Leonard E. Hudson (*pro hac vice to be filed*)
                                  REED SMITH LLP

10 South Wacker Drive
Chicago, IL 60606
Tel:  (312) 207-1000
Fax:  (312) 207-6400

*Attorneys for Plaintiffs*
*The UPS Store, Inc.,*
*United Parcel Service, Inc., and*
*United Parcel Service of America, Inc.*

Case 1:14-cv-01210-WHP   Document 2   Filed 02/25/14   Page 37 of 37

## VERIFICATION

STATE OF CALIFORNIA   )
                                ) SS.
COUNTY OF SAN DIEGO  )

**I, Donald L. Higginson**, declare:

That I am the Senior Vice President of Franchise Relations for The UPS Store, Inc., a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I have read the foregoing Verified Complaint and am informed and believe, and on that ground allege that the matters stated in the Complaint are true. The allegations contained in the Verified Complaint are either within my personal knowledge or are within the corporate knowledge of The UPS Store, Inc. and have been communicated by me to individuals upon whom the company relies and, therefore, I believe them to be true and correct.

I declare under penalty of perjury that the above is true and correct.

Executed this 24th day of February 2014, at San Diego, CA.


**Donald Higginson**