UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE UPS STORE, INC.; UNITED PARCEL SERVICE, INC.; and
UNITED PARCEL SERVICE OF AMERICA, INC.,

              Plaintiffs,

-v-

ROBERT HAGAN; THOMAS HAGAN; RIDGE ASSETS, INC.;
3A, INC.; TANMOR, INC.; RIDGE LOGISTICS, LLC;
RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC;
RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC;
TOMPACK, LLC; BIGPACK, LLC; and NYPS, LLC,

              Defendants.

------------------------------------------------------------------------------x

ROBERT HAGAN; THOMAS HAGAN; RIDGE ASSETS, INC.;
3A, INC.; TANMOR, INC.; RIDGE LOGISTICS, LLC;
RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC;
RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC;
TOMPACK, LLC; BIGPACK, LLC; and NYPS, LLC,

              Counterclaim-Plaintiffs,

-v-

THE UPS STORE, INC.; UNITED PARCEL SERVICE, INC.; and
UNITED PARCEL SERVICE OF AMERICA, INC.,

              Counterclaim-Defendants.

------------------------------------------------------------------------------x

ROBERT HAGAN; THOMAS HAGAN; RIDGE ASSETS, INC.;
3A, INC.; TANMOR, INC.; RIDGE LOGISTICS, LLC;
RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC;
RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC;
TOMPACK, LLC; BIGPACK, LLC; and NYPS, LLC,

              Third-Party Plaintiffs,

-v-

BRADLEY KAPLAN; ABC CORPS 1-8 d/b/a "The UPS Store
Centers 1786, 4386, 4419, 4769, 5158, 5472, 5979, and 6341;
JOHN WONG; ABC CORPS 9-13 d/b/a "The UPS Store Centers
4190, 4248, 5388, 6404, and 6415; KEVIN PANCHMIA; ABC
CORPS 14-17 d/b/a "The UPS Store Centers 5958, 5961, 6374, and
6387"; KETAN SETH; ABC CORPS 18-21 d/b/a "The UPS Store
Centers 0304, 4611, 4754 and 5138"; JEROME TAYLOR; ABC

**14-CV-1210 (WHP)**

*ECF CASE*

**ANSWER WITH COUNTERCLAIMS
AND THIRD-PARTY COMPLAINT**

CORPS 22-25 d/b/a "The UPS Store Centers 0526, 1052, 2992 and 4831"; MARK TAYLOR; ABC CORPS 26-28 d/b/a "The UPS Store Centers 0745, 1083 and 0647"; SHYAM BUXANI; MOHAN BUXANI; DANNY DANSIGNANI; ABC CORPS 29-30 d/b/a "The UPS Store Centers 0444 and 1492"; ABU RAHMAN; ABC CORPS 31-32 d/b/a "The UPS Store Centers 4163 and 5777"; SHUEB CHOUDHURY, ABC CORP 33 d/b/a "The UPS Store Center 5865"; TANI SUSSMAN; ABC CORP 34 d/b/a "The UPS Store Center 4766"; SYLVESTER ONURAH; ABC CORP 35 d/b/a "The UPS Store Center 5017"; OTIS DAVIS; ABC CORP 36 d/b/a "The UPS Store Center 6367"; MARCOS A. LOPEZ; ABC CORP 37 d/b/a "The UPS Store Center 4768"; CHARMAINE RAPHAEL; ABC CORP 38 d/b/a "The UPS Store Center 6166"; MOHAMMED RIAZ; ABC CORP 39 d/b/a "The UPS Store Center 5899; CHAD JAAFAR; ABC CORP 40 d/b/a "The UPS Store Center 5953"; DANNY SPIES; ABC CORP 41 d/b/a "The UPS Store Center 4472"; ED XU; ABC CORP 42 d/b/a "The UPS Store Center 5296"; SANDRA MACHADO; and J&S QUEST SERVICES, LLC d/b/a "The UPS Store Center 5565,

Third-Party Defendants.

--------------------------------------------------------------------------------x

Defendants/Counterclaim-Plaintiffs ROBERT HAGAN ("Rob" or "Robert"); THOMAS HAGAN ("Tom" or "Thomas"); RIDGE ASSETS, INC.; 3A, INC.; TANMOR, INC.; RIDGE LOGISTICS, LLC; RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC; RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC; TOMPACK, LLC; BIGPACK, LLC; and NYPS, LLC (collectively, the "NYPS Stores") by and through their attorneys, STEPHEN J. SAVVA, P.C., as and for their Answer and Affirmative Defenses to the Verified Complaint of the Plaintiffs/Counterclaim-Defendants THE UPS STORE, INC. ("TUPSS"); UNITED PARCEL SERVICE, INC. ("UPS"); and UNITED PARCEL SERVICE OF AMERICA, INC. ("UPSA") (the "Counterclaim-Defendants"), filed February 25, 2014, allege as follows:

## ANSWER TO VERIFIED COMPLAINT

## INTRODUCTION

1.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 1 and therefore deny them.

2.     The Defendants/Counterclaim-Plaintiffs admit that they owned and operated eleven (11) The UPS Store franchise locations in New York County, New York, representing approximately 1/5 of all such locations in New York County.  The Defendants/Counterclaim-Plaintiffs admit that they were a party to certain Franchise Agreements and Carrier Contract Carrier Agreements, but deny the remaining allegations in this paragraph and leave Plaintiffs/Counterclaim-Defendants to their proof regarding same.

3.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3 and therefore deny them. Moreover, although Defendants/Counterclaim-Plaintiffs have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14), neither the individual referenced in this paragraph or any documents relating to this allegation have been disclosed.   The Defendants/Counterclaim-Plaintiffs further deny that the Plaintiffs/Counterclaim-Defendants had "every right" to terminate the Franchise Agreements and Carrier Contract Agreements and that the Hagans were treated appropriately and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

4.    The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 4 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

5.    The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 5 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

6.    The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 6 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

7.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 7 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

8.    The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 8 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

9.    The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 9 and therefore deny them.

10.    The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 10.  However, Defendants/Counterclaim-Plaintiffs admit that TUPSS is a Delaware Corporation with a principal place of business at 6060 Cornerstone West, San Diego, California 92121; that it is a wholly owned subsidiary of UPS; that UPS is a Delaware Corporation; and that TUPSS provides a wide range of products and services and have a physical presence in this District. The Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of the allegations set forth herein.

11.    The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 11.  However,

Defendants/Counterclaim-Plaintiffs admit that UPS is an Ohio Corporation with a principal place of business at 55 Glenlake Pkwy NE, Atlanta, GA 30328; that it is a wholly owned subsidiary of UPS; that UPS is a Delaware Corporation; and that UPS provides a wide range of products and services and have a physical presence in this District. The Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of the allegations set forth herein.

12.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 12 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of the allegations set forth herein.

13.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 13.

14.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 14.

15.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 15.

16.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 16.

17.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 17.

18.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 18.

19.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 19.

20.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 20.

21.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 21.

22.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 22.

23.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 23.

24.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 24.

25.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 25.

26.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 26.

## JURISDICTION & VENUE

27.     Paragraph 27 contains a statement of jurisdiction to which no answer is required. To the extent an answer is required, the Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 27 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

28.     Paragraph 28 contains a statement of jurisdiction to which no answer is required. To the extent an answer is required, the Defendants/Counterclaim-Plaintiffs deny the allegations

set forth in Paragraph 28 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

29.     Paragraph 29 contains a statement of venue to which no answer is required. To the extent an answer is required, the Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

## TUPSS' FRANCHISE BUSINESS

30.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 30 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

31.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 31 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

32.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 32 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

33.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 33 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

34.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 34 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

35.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 35 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

36.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 36 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

37.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 37, except the Defendants/Counterclaim-Plaintiffs admit that TUPSS grants franchises to persons to own and operate franchise centers at specific locations and licenses and authorizes the use of certain marks and materials within a territory designated in the franchise agreement and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of allegations set forth herein.

38.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 38, except the Defendants/Counterclaim-Plaintiffs admit that TUPSS has certain materials and manuals available and requires franchises to purchase certain property, equipment and software, to own and operate franchise centers and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of allegations set forth herein.

39.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 39, and therefore deny them.

40.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 40, and therefore deny them.

## **THE PARTIES' FRANCHISE RELATIONSHIP**

41.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 41 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.

42.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 42 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.

43.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 43 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.

44.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 44 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

45.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 45 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

46.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 46 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

47.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 47 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

48.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 48 - insofar as no

Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

49.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 49 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

50.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 50 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

51.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 51 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the

parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

52.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 52 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

53.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 53 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

54.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 54 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or

sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

55.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 55 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

56.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 56 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

57.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 57 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

58. The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 58 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

59. The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 59 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

60. The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 60 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

61. The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 61 - insofar as no

Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

62. The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 62 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. The Defendants/Counterclaim-Plaintiffs do admit that they received an MBE loan in or around September 2012 in the amount of approximately $150,000. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

63. The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 63 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

64. The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 64 - insofar as no

Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

65.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 65 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaim-Plaintiffs refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof.

### THE BREACH AND TERMINATION OF THE FRANCHISE AGREEMENTS

66.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 66 and therefore deny them. Moreover, although Defendants/Counterclaim-Plaintiffs have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14), neither the individual referenced in this paragraph or any documents relating to this allegation have been disclosed. The Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

67.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 67 and therefore deny them.  There is no "normal practice" identified in any TUPSS materials or manuals regarding obtaining a shipping price and entering it into the point-of-sale system.  The Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof regarding these allegations.

68.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 68 and therefore deny them. Moreover, although Defendants/Counterclaim-Plaintiffs have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14), neither the individual referenced in this paragraph or any documents relating to these allegations have been disclosed.  The Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.   It should be noted, that while the Plaintiffs/Counterclaim-Defendants allege to have contemporaneously possessed this information, they intentionally withheld it and continue to withhold it from the Defendants/Counterclaim-Plaintiffs even after the termination of their franchise agreements.

69.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 69 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

70.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 70 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

71.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 71 and therefore deny them. Moreover, although Defendants/Counterclaim-Plaintiffs have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14) and no information or documents relating to these allegations have been disclosed.   The Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.  It should be noted, that while the Plaintiffs/Counterclaim-Defendants allege to have contemporaneously possessed this information, they intentionally withheld it and continue to withhold it from the Defendants/Counterclaim-Plaintiffs even after they have been de-franchised.

72.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 72 and therefore deny them. Moreover, although Defendants/Counterclaim-Plaintiffs have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14) and no information or documents relating to these allegations have been disclosed.   The Defendants/Counterclaim-Plaintiffs leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.  It should be noted, that while the Plaintiffs/Counterclaim-Defendants allege to have contemporaneously possessed this information, they intentionally withheld it and continue to withhold it from the Defendants/Counterclaim-Plaintiffs even after they have been de-franchised.

73.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 73 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that such a document does exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 73.   On November 6, 2013, TUPSS's Senior Vice President and Chief Operating Officer C. James Hillquist called Thomas Hagan and told him he was emailing him a draft of a document that would be potentially mailed at a later date.  Said document was formally sent after the Defendants/Counterclaim-Plaintiffs travelled to TUPSS Headquarters on November 12, 2013 to mediate their disputes with TUPSS corporate executives and counsel.

74.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 74 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that such a document does exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 74 insofar as they tend to characterize a document that may or may not speak for itself.

75.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 75 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that such a document does exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 75 insofar as they tend to characterize a document that may or may not speak for itself.

76.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 76 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaim-Plaintiffs were driven out of business by the Plaintiffs/Counterclaim-Defendants and by virtue of the restrictions imposed upon them and the tortious manner in which Plaintiffs/Counterclaim-Defendants' interfered with the Hagan's private equity investor, insufficient funds were available to cover all financial obligations of the Hagan's business.

77.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 77 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaim-Plaintiffs were driven out of business by the Plaintiffs/Counterclaim-Defendants and by virtue of the restrictions imposed upon them and the tortious manner in which Plaintiffs/Counterclaim-Defendants' interfered with the Hagan's private equity investor, insufficient funds were available to cover all financial obligations of the Hagan's business.

78.     The Defendants/Counterclaim-Plaintiffs admit the allegations set forth in Paragraph 78 and respectfully refer the Court to the Summons and Verified Complaint in the action entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County, Index No. 650013/14).

79.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 79 and leave the Plaintiffs/Counterclaim-Defendants to their proof.    The Defendants/Counterclaim-Plaintiffs were fully within their rights under the Franchise Agreements to close their stores for one business day to conduct an organizational meeting.  All stores were open for business the next day.

80.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 80 - insofar as no

Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that such a document does exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 80 insofar as they tend to characterize a document that may or may not speak for itself.

81.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 81 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaim-Plaintiffs have not received any invoices or other details regarding any amounts claimed to be owed and whether such amounts are actual or estimated.

82.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 82 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that such a document does exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 82 insofar as they tend to characterize a document that may or may not speak for itself.

83.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 83 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

84.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 84 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaim-Plaintiffs have not received any invoices or other details regarding any amounts claimed to be owed and whether such amounts are actual or estimated.

85.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 85 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File

for this Action - and therefore deny them. To the extent that such documents exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 85 insofar as they tend to characterize documents that may or may not speak for themselves.

86. The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 86 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that such documents exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 86 insofar as they tend to characterize documents that may or may not speak for themselves.

87. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 87 and leave the Plaintiffs/Counterclaim-Defendants to their proof. Moreover, the Plaintiffs/Counterclaim-Defendants suspended the Hagans' access to the computer software and hardware systems at the former store centers making it difficult for them to complete and submit royalty reports. However, at all relevant times, the Plaintiffs/Counterclaim-Defendants had remote access to the Hagan's POS systems and could identify their exact sales.

88. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 88 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaim-Plaintiffs have not received any invoices or other details regarding any amounts claimed to be owed and whether such amounts are actual or estimated.

89. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 89 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaim-Plaintiffs have not received any invoices or other details regarding any amounts claimed to be owed and whether such amounts are actual or estimated.

**DEFENDANTS VIOLATE THEIR POST-TERMINATION OBLIGATIONS**

90.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 90 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

91.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 91 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

92.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 92 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 92 insofar as they tend to characterize documents that may or may not speak for themselves.

93.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 93 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 93 insofar as they tend to characterize documents that may or may not speak for themselves.

94.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 94 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

95.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 95 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

96.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 96 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

97.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 97 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 97 insofar as they tend to characterize documents that may or may not speak for themselves.   Moreover, such alleged "Lease Addendum" documents were never executed by the owners/landlords of the premises leased by the Defendants/Counterclaim-Plaintiffs and thus were not incorporated by reference or otherwise made a part of any of the lease agreements relating to the Former Centers.

98.     The Defendants/Counterclaim-Plaintiffs are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 98 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 98 insofar as they tend to characterize documents that may or may not speak for themselves.   Moreover, such alleged "Lease Addendum" documents were never executed by the owners/landlords of the premises leased by the Defendants/Counterclaim-Plaintiffs and thus were not incorporated by reference or otherwise made a part of any of the lease agreements relating to the Former Centers.

### *FIRST CLAIM FOR RELIEF*
### *Lanham Act – Trademark Infringement*

99.     In response to Paragraph 99, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

100.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 100 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

101.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 101 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

102.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 102 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

103.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 103 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### SECOND CLAIM FOR RELIEF
### *Lanham Act – Unfair Competition*

104.     In response to Paragraph 104, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

105.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 105 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

106.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 106 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

107.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 107 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

108.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 108 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### THIRD CLAIM FOR RELIEF
#### *Lanham Act – Unfair Dilution & Tarnishment*

109.	In response to Paragraph 109, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

110.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 110 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

111.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 111 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

112.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 112 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

113.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 113 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### FOURTH CLAIM FOR RELIEF
#### *Common Law Trademark Infringement*

114.	In response to Paragraph 114, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

115.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 115 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

116.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 116 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

117.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 117 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

118. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 118 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

119. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 119 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### FIFITH CLAIM FOR RELIEF
#### Breach of Contract – Franchise Agreements & NCNSA

120. In response to Paragraph 120, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

121. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 121 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

122. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 122 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

123. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 123 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

124. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 124 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

125. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 125 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

126. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 126 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

127. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 127 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

128.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 128 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

129.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 129 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### SIXTH CLAIM FOR RELIEF
### Common Law Unfair Competition

130.     In response to Paragraph 130, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

131.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 131 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

132.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 132 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

133.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 133 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

134.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 134 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

135.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 135 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

136.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 136 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

137.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 137 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

138.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 138 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

## SEVENTH CLAIM FOR RELIEF
### Common Law Misappropriation – Trade Secrets

139.	In response to Paragraph 139, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

140.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 140 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

141.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 141 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

142.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 142 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

143.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 143 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

144.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 144 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

145.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 145 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

146.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 146 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

147.	The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 147 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

## EIGHTH CLAIM FOR RELIEF
### *Conversion*

148.     In response to Paragraph 148, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

149.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 149 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

150.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 150 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

151.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 151 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

152.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 152 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

## NINTH CLAIM FOR RELIEF
### *Breach of Contract – Franchise Agreements*
### *(Royalties & Fees)*

153.     In response to Paragraph 153, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

154.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 154 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

155.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 155 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

156. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 156 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

157. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 157 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

158. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 158 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

159. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 159 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

160. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 160 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

161. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 161 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

162. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 162 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### TENTH CLAIM FOR RELIEF
### Breach of Contract – Promissory Note

163. In response to Paragraph 163, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

164. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 164 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

165. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 165 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

166.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 166 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

167.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 167 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

168.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 168 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

169.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 169 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

170.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 170 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

171.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 171 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

172.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 172 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### ELEVENTH CLAIM FOR RELIEF
### Breach of Contract – Contract Carrier Agreements
### (Shipping Charges)

173.     In response to Paragraph 173, Defendants/Counterclaim-Plaintiffs incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

174.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 174 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

175.     The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 175 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

176. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 176 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

177. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 177 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

178. The Defendants/Counterclaim-Plaintiffs deny the allegations set forth in Paragraph 178 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

## FURTHER ANSWER AND AFFIRMATIVE DEFENSES

By way of a further Answer and as affirmative defenses, Defendants/Counterclaim-Plaintiffs deny that they are liable to the Plaintiffs/Counterclaim-Defendants on any of the claims alleged and deny that Plaintiffs/Counterclaim-Defendants are entitled to damages, equitable relief, attorneys' fees, costs, pre-judgment interest or to any relief whatsoever, and state as follows:

## FIRST AFFIRMATIVE DEFENSE
### *(Failure to State a Claim)*

179. The Complaint, on one or more counts therein, fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE
### *(Fair Use)*

180. The claims made in the Complaint are barred, in whole or in part, by the doctrines of fair use, nominative fair use and/or descriptive fair use.

## THIRD AFFIRMATIVE DEFENSE
### *(Innocent Infringement)*

181.    The claims made in the Complaint are barred, in whole or in part, because any potential infringement, was innocent, limited in duration and intended to prevent inconvenience to customers.

## FOURTH AFFIRMATIVE DEFENSE
### *(Statute of Limitations)*

182.    The claims made in the Complaint are barred, in whole or in part, by applicable statute of limitations.

## FIFTH AFFIRMATIVE DEFENSE
### *(Laches)*

183.    The claims made in the Complaint are barred, in whole or in part, by doctrine of Laches, in that Plaintiffs/Counterclaim-Defendants unreasonably delayed efforts to enforce their rights, if any, despite full knowledge of the alleged actions of the Defendants/Counterclaim-Plaintiffs.

## SIXTH AFFIRMATIVE DEFENSE
### *(Waiver, Acquiescence & Estoppel)*

184.    Each of the purported claims set forth in the Complaint are barred by the doctrines of waiver, acquiescence and estoppel.

## SEVENTH AFFIRMATIVE DEFENSE
### *(Non-Infringement)*

185.    The Defendants/Counterclaim-Plaintiffs have not infringed any applicable trademarks under federal or state law.

## EIGHTH AFFIRMATIVE DEFENSE
### *(No Causation)*

186. The Plaintiffs/Counterclaim-Defendants' claims against the Defendants/Counterclaim-Plaintiffs are barred because the Plaintiffs/Counterclaim-Defendants' damages, if any, including, but not limited to "damage to the brand," "dilution," "tarnishment," "injury to goodwill," and/or "reputational harm" were not caused by Defendants/Counterclaim-Plaintiffs.

## NINTH AFFIRMATIVE DEFENSE
### *(No Damage)*

187. Without admitting that the Complaint states a claim, there has been no damage to the Plaintiffs/Counterclaim-Defendants brand or business that can be directly attributable to any act or acts alleged against the Defendants/Counterclaim-Plaintiffs in this action. In fact, the Defendants/Counterclaim-Plaintiffs notified Plaintiff TUPSS and its' corporate counsel as early as November 2013 of serious risks to the brand, consumers and the business that required the immediate attention of the Plaintiffs/Counterclaim-Defendants to remedy. At that time, the Defendants/Counterclaim-Plaintiffs were current on all financial obligations to their primary creditors, including the payment of royalties to TUPSS and shipping fees to UPS. Instead of fixing the problems and acting in good faith, the Plaintiffs/Counterclaim-Defendants engaged in a campaign to destroy the Defendants/Counterclaim-Plaintiffs and put them out of business in order to permanently conceal their wrongful conduct so that they could continue reaping the benefits attributable to questionable business practices.

## TENTH AFFIRMATIVE DEFENSE
### *(Unclean Hands)*

188.    The Plaintiffs/Counterclaim-Defendants' claims are barred by the doctrine of unclean hands and inequitable conduct.

## ELEVENTH AFFIRMATIVE DEFENSE
### *(Lack of Irreparable Harm)*

189.    The Plaintiffs/Counterclaim-Defendants' claims for injunctive relief are barred because Plaintiffs/Counterclaim-Defendants cannot show that they are currently suffering or will suffer any future irreparable harm from Defendants/Counterclaim-Plaintiffs' actions.

## TWELFTH  AFFIRMATIVE DEFENSE
### *(Adequacy of Remedy at Law)*

190.    The alleged injury or damage suffered by Plaintiffs/Counterclaim-Defendants, if any, would be adequately compensated by money damages.    Accordingly, Plaintiffs/Counterclaim-Defendants have an adequate remedy at law and are not entitled to seek injunctive relief.

## THIRTEENTH  AFFIRMATIVE DEFENSE
### *(Failure to Mitigate)*

191.    The claims made in the Complaint are barred, in whole or in part, because of the Plaintiffs/Counterclaim-Defendants failure to mitigate damages, if such damages exist.

## FOURTEENTH  AFFIRMATIVE DEFENSE
### *(First Amendment)*

192.    The claims made in the Complaint are barred, in whole or in part, by the First Amendment to the Constitution of the United States of America.

## FIFTEENTH  AFFIRMATIVE DEFENSE
### *(Duplicative Claims)*

193.    Without admitting that the Complaint states a claim, any remedies are limited to the extent that there is sought an overlapping or duplicative recovery pursuant to the various claims against the Defendants/Counterclaim-Plaintiffs for any alleged single wrong.

## SIXTEENTH AFFIRMATIVE DEFENSE
### *(Actions of Others)*

194.    The claims made in the Complaint are barred, in whole or in part, because Defendants/Counterclaim-Plaintiffs are not liable for the acts of others over whom they have no control.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### *(Breach of the Covenant of Good Faith & Fair Dealing)*

195.    The Plaintiffs/Counterclaim-Defendants are estopped from recovery against the Defendants/Counterclaim-Plaintiffs due to their own conduct and actions, including, but not limited to, conduct in violation of the covenant of good faith and fair dealing.  Moreover, the Plaintiffs/Counterclaim-Defendants' conduct was retaliatory, unfair and deceptive.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### *(Fraud)*

196.    The claims made in the Complaint are barred, in whole or in part, because of the Plaintiffs/Counterclaim-Defendants fraudulent conduct against Defendants/Counterclaim-Plaintiffs and the public at large.

## NINETEENTH AFFIRMATIVE DEFENSE
### *(Recoupment/Setoff)*

197.    That the Plaintiffs/Counterclaim-Defendants are in breach of various agreements, including, but not limited to the Franchise Agreements and the Contract Carrier Agreements and

have committed other tortious acts against the Defendants/Counterclaim-Plaintiffs as more particularly stated in the Counterclaims below. Accordingly, Defendants/Counterclaim-Plaintiffs are entitled to a setoff from any monies to which the Plaintiffs/Counterclaim-Defendants may be entitled recover.

## TWENTIETH AFFIRMATIVE DEFENSE
### *(Prevention of Performance)*

198.    That the Plaintiffs/Counterclaim-Defendants claims are barred, in whole or in part, because Defendants/Counterclaim-Plaintiffs' full performance under any existing agreements between the parties was prevented by the Plaintiffs/Counterclaim-Defendants' conduct and the Plaintiffs/Counterclaim-Defendants' imposition of commercially unreasonable systems, hardware, software, training modules, and other sales methods upon TUPSS multiple center owner (MCO) franchisees, such as the Defendants/Counterclaim-Plaintiffs.

## TWENTY-FIRST AFFIRMATIVE DEFENSE
### *(Unjust Enrichment)*

199.    That Plaintiffs/Counterclaim-Defendants would be unjustly enriched if they were awarded the relief requested in the Complaint.

## TWENTY-SECOND AFFIRMATIVE DEFENSE
### *(Failure to Pursue Alternative Dispute Resolution)*

200.    That the Plaintiffs/Counterclaim-Defendants claims are barred and they lack standing to bring claims against the Defendants/Counterclaim-Plaintiffs because they failed to pursue mediation and/or alternative dispute resolution as proscribed in the Franchise Agreements. In contrast, it should be noted that Defendants/Counterclaim-Plaintiffs' identified a dispute, raised that dispute to the Plaintiffs/Counterclaim-Defendants in writing and on November 12, 2012, Defendants/Counterclaim-Plaintiffs travelled to TUPSS Headquarters at

their own cost in an attempt to fully resolve same. Following that meeting, Defendants/Counterclaim-Plaintiffs' made multiple written requests to participate in additional meetings with corporate executives from TUPSS, however each such request was either ignored or denied by the Defendants and their counsel.

## TWENTY-THIRD AFFIRMATIVE DEFENSE
### *(Failure of Conditions Precedent)*

201.    The Defendants/Counterclaim-Plaintiffs have not performed all conditions, covenants and promises required to be performed under the Franchise Agreements, the Contract Carrier Agreements and other applicable statutes, rules and ordinances they are required to follow, and as such they cannot seek to enforce the agreements they themselves failed to abide by.  Moreover, Plaintiffs/Counterclaim-Defendants were obligated to offer a proprietary system of business, know-how and product offerings that were commercially reasonable, fully functional, ethical, transparent and that do not cause violations of any consumer protection laws by multiple center owner franchisees such as the Defendants/Counterclaim-Plaintiffs.  That at the time of each and every claim in the Complaint allegedly arose, the Plaintiffs/Counterclaim-Defendants failed to perform in this regard.  More specifically, Plaintiffs/Counterclaim-Defendants provided franchisees with a sales system that caused widespread fraudulent and deceptive trade practices in the TUPSS Manhattan Area Network.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE
### *(Breaches by Plaintiffs/Counterclaim-Defendants TUPSS and UPS)*

202.    If Defendants/Counterclaim-Plaintiffs allegedly breached any agreements with the Defendants, such breaches are excused because the Plaintiffs'/Counterclaim-Defendants TUPSS and UPS breached such agreements first.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE
### *(Improper Notice)*

203.     The Plaintiffs/Counterclaim-Defendants claims are barred, in whole or in part, because they failed to properly serve the Defendants-Counterclaim-Plaintiffs with the necessary written notices setting forth the full nature of the alleged breaches and/or annexing invoices to support claims for any amounts past due, thus depriving the Defendants-Counterclaim-Plaintiffs of the opportunity to investigate and cure such breaches.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE
### *(Contract Void as Against Public Policy)*

204.     The Plaintiffs/Counterclaim-Defendants claims under the Franchise Agreements and the Contract Carrier Agreements are barred because said agreements are void as against public policy.  More specifically, after Defendants/Counterclaim-Plaintiffs uncovered that it was a nationwide practice at TUPSS for franchisees to add inches to the sides of measured boxes before entering dimensions into the iShip CMS system, to upsell customers by not disclosing UPS Ground as guaranteed service and by otherwise deceiving customers into purchasing higher-cost shipping products that offer little or no benefit to customers.  With respect to the Contract Carrier Agreements, upon information and belief, until and unless a franchisee or customer affirmatively requests a re-rate, even if mis-measured package is identified by the UPS multidimensional laser scanners and found to cost less than what the customer actually paid, UPS either retains the overcharge, or in some cases credits it back to the franchisee without further notice.  Conversely, if a mis-measured package is identified by the UPS multidimensional laser scanners and found to cost more than what the customer actually paid, Defendant UPS automatically re-rates the transaction and bills the franchisee's UPS account for any additional shipping fees that should have been collected from the consumer at the point of sale.

Accordingly, the customer always loses, Defendant UPS always wins and the franchisee always seems to be left somewhere in the middle.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE
### *(Ratification)*

205.     The Complaint is barred in whole or in part by the doctrine of ratification.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE
### *(Violation of New York Franchise Act)*

206.     That the Plaintiffs/Counterclaim-Defendants' violations of the New York Practices Act preclude and otherwise bar their claims for relief.

## ADDITIONAL AFFIRMATIVE DEFENSE
### *(Reservation of Rights)*

207.     Defendants/Counterclaim-Plaintiffs hereby reserve their rights to amend or assert additional affirmative defenses based upon information learned or obtained during discovery.

**WHEREFORE,** Defendants/Counterclaim-Plaintiffs' pray for judgment as follows:

1.   That the Plaintiffs/Counterclaim-Defendants take nothing by way of their Complaint;

2.   That the Complaint, and each and every claim for relief therein, be dismissed with prejudice;

3.   That the Plaintiffs/Counterclaim-Defendants' requests for preliminary and permanent injunction be denied;

4.   Enter a judgment that the Defendants/Counterclaim-Plaintiffs have not infringed the Plaintiffs/Counterclaim-Defendants' trademarks;

5.   Enter a judgment that the Defendants/Counterclaim-Plaintiffs have not diluted the Plaintiffs/Counterclaim-Defendants' trademarks;

6. Enter a judgment that the Defendants/Counterclaim-Plaintiffs have not caused and/or are not likely to cause consumer confusion;

7. That Defendants/Counterclaim-Plaintiffs be awarded their costs of suit incurred herein, including attorneys' fees and expenses; and

8. For such other and further relief the Court deems just and proper.

## FACTS APPLICABLE TO COUNTERCLAIMS & THIRD-PARTY COMPLAINT

Counterclaim-Plaintiffs/Third-Party Plaintiffs ROBERT HAGAN ("Rob" or "Robert");

THOMAS HAGAN ("Tom" or "Thomas"); RIDGE ASSETS, INC.; 3A, INC.; TANMOR, INC.;

RIDGE LOGISTICS, LLC; RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC;

RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC; TOMPACK, LLC; BIGPACK,

LLC;; and NYPS, LLC (the "NYPS Stores"), (collectively "Counterclaim-Plaintiffs" or "the

Hagans"), by and through their attorneys, STEPHEN J. SAVVA, P.C., as and for their

Counterclaims against THE UPS STORE, INC. ("TUPSS"); UNITED PARCEL SERVICE, INC.

("UPS"); and UNITED PARCEL SERVICE OF AMERICA, INC. ("UPSA") (the "Counterclaim-

Defendants") and for their Third-Party Complaint against BRADLEY KAPLAN; ABC CORPS 1-8

d/b/a "The UPS Store Centers 1786, 4386, 4419, 4769, 5158, 5472, 5979, and 6341; JOHN

WONG; ABC CORPS 9-13 d/b/a "The UPS Store Centers 4190, 4248, 5388, 6404, and 6415;

KEVIN PANCHMIA; ABC CORPS 14-17 d/b/a "The UPS Store Centers 5958, 5961, 6374, and

6387"; KETAN SETH; ABC CORPS 18-21 d/b/a "The UPS Store Centers 0304, 4611, 4754 and

5138"; JEROME TAYLOR; ABC CORPS 22-25 d/b/a "The UPS Store Centers 0526, 1052,

2992 and 4831"; MARK TAYLOR; ABC CORPS 26-28 d/b/a "The UPS Store Centers 0745,

1083 and 0647"; SHYAM BUXANI; MOHAN BUXANI; DANNY DANSIGNANI; ABC

CORPS 29-30 d/b/a "The UPS Store Centers 0444 and 1492"; ABU RAHMAN; ABC CORP

31-32 d/b/a "The UPS Store Centers 4163 and 5777"; SHUEB CHOUDHURY, ABC CORP 33

d/b/a "The UPS Store Center 5865"; TANI SUSSMAN, ABC CORP 34 d/b/a "The UPS Store

Center 4766"; SYLVESTER ONURAH; ABC CORP 35 d/b/a "The UPS Store Center 5017";

OTIS DAVIS; ABC CORP 36 d/b/a "The UPS Store Center 6367"; TONY LOPEZ; ABC CORP

37 d/b/a "The UPS Store Center 4768"; CHARMAINE RAPHAEL; ABC CORP 38 d/b/a "The

UPS Store Center 6166"; MOHAMMED RIAZ; ABC CORP 39 d/b/a "The UPS Store Center 5899; CHAD JAAFAR; ABC CORP 40 d/b/a "The UPS Store Center 5953"; DANNY SPIES; ABC CORP 41 d/b/a "The UPS Store Center 4472"; ED XU; ABC CORP 42 d/b/a "The UPS Store Center 5296"; SANDRA MACHADO; and ABC CORP 43 d/b/a "The UPS Store Center 5565 (collectively "Third-Party Defendants" or the "Manhattan Area TUPSS Franchisees"), allege as follows:

<u>**NATURE OF ACTION**</u>

1.      The Hagans' adopt all of the statements contained in the Answer and Affirmative Defenses as if fully written herein at length.

2.      This case and the claims set forth herein involve a pattern of fraud and deceit by The UPS Store, Inc., UPS, Inc., and UPSA, Inc. in conspiracy with the Third-Party Defendant Manhattan Area TUPSS Franchisees and others who sought to and did deceive the Hagans and the public by engaging in unethical business practices resulting in customer overcharges in the State of New York and elsewhere across the United States.  To wit, amongst other things, TUPSS, UPS and UPSA actively encouraged franchisees to systematically over-measure shipping packages and mislead consumers into purchasing unnecessary and more costly shipping products (Air versus Ground) by falsely representing and concealing UPS, Inc.'s delivery date guarantees and shipping services.  The scheme involves a process that was occurring virtually undetected for some time, until it was accidently exposed by Thomas and Robert Hagan as they tried to improve their business operations.

3.      After rapidly growing from just one store in 2008, to eleven of the top grossing stores in the region and twenty percent of the Manhattan Area by 2012, the Hagans found themselves at the center of a secret investigation aimed to de-stabilize their operations and

punish them for refusing to acquiesce with questionable and unethical sales practices imposed by the Counterclaim-Defendants and adopted at virtually all The UPS Store franchise locations in Manhattan and elsewhere across the country.

4.      As the Hagans evaluated the situation, it became apparent that they had drawn attention to themselves because they were unwilling to emulate the sales practices of their Manhattan Area Franchisee counterparts.   More specifically, the Hagans uncovered clear and undeniable patterns of fraudulent and deceptive practices at TUPSS retail stores that were aimed at increasing revenues by deceiving customers into paying more than necessary for shipping services.   These practices include, but are not limited to: (a) intentionally misrepresenting the UPS Ground delivery guarantee; (b) misleading customers about expected delivery dates and times; (c) improperly upselling higher-price shipping options that offer no additional benefits to customers (such as 2nd Day Air when UPS Ground delivers in one day); (d) improperly concealing the existence of cheaper cost shipping services when requested by customers; (e) adding inches to the dimensions of boxes when entering them into the iShip CMS system; and (f) adding weight to boxes when entering them in the iShip CMS system.   The Hagans also learned from inside sources that the above practices had become necessary throughout the TUPSS network because without them, many franchisees would be forced out of business.   Reporting these practices to The UPS Store, Inc. corporate executives and counsel was the right thing to do, but because they were apparently complicit, it ended up costing the Hagans and their families the financial security their business venture was intended to provide them with.

5.      Perhaps the most shocking discovery made by the Hagans was that documenting the existence of the fraudulent, deceptive and unethical practices was as simple as walking into a TUPSS location and shipping a box.   Employees in virtually every Manhattan Area TUPSS

location were so comfortable with the practice of misrepresenting the existence of the UPS Ground guarantee, lying about expected delivery dates, withholding accurate price quotes and over-dimensioning boxes to trigger higher retail billable rates, that they would gladly engage in conversations on the topic and even feign measuring boxes with measuring tapes while adding inches to boxes customers brought in or purchased in the same store.

6.    The existence of these practices is also easily corroborated within the internal records of The UPS Store, Inc., UPS, Inc. and the Manhattan Area Franchisees who receive monthly billing invoices with detailed statements of all shipping activity in a prior month.  These searchable records detail each and every shipping transaction that originates from a TUPSS retail location and permit a review of all relevant aspects of a shipping transaction, such as the tracking number, the shipping address, the amount charged to the customer, the weight and dimension of each box entered by the franchisee into the computer, the incentives paid and any discrepancies found to exist in the actual dimensions and/or actual weights of boxes when they are finally processed by UPS and verified with their multi-dimensional laser device measurement systems. Indeed, if the Counterclaim-Defendants so choose, they can calculate exactly how much a TUPSS franchise location has overcharged customers in any given month.  This is not a speculative allegation, it is a verified fact admitted by the Counterclaim-Defendants in their own Verified Complaint.  More specifically, while the Counterclaim-Defendants have yet to produce any specific evidence demonstrating that the Hagans ever intentionally overcharged customers, Paragraph 72 of the Verified Complaint states that "TUPSS Security reviewed a sampling of the August 2013 shipping data…and discovered hundreds of instances of overcharging."  While the Counterclaim-Defendants may seek to demonize the Hagans as the "bad guys," the fact remains that the Hagans seem to be the only ones at TUPSS willing to go on the record to report the

existence of massive retail rate compliance issues, to complain of selective enforcement and to request help to fix the problems that were preventing them from operating their business successfully.

7.     Almost immediately after the Hagans notified TUPSS corporate executives and counsel of compliance barriers, they were issued a notice of default and told to mind their own business. Indeed, within five short months after raising these issues, the Hagans' $6 Million annual grossing business was gone and all that remained was a lawsuit against them in Federal Court. Because many of the former Hagan Store Centers will likely never be re-opened by the Hagans, money damages are the only remedy available to them to address the immeasurable harm caused by the Counterclaim-Defendants and those working with them.

## FACTUAL BACKGROUND

8.     With the financial support and encouragement of the Counterclaim-Defendants, Plaintiff brothers ROBERT HAGAN ("Robert") and THOMAS HAGAN ("Thomas"), rapidly became one of the largest multiple center owners (individually, an "MCO") of The UPS Store, Inc. ("TUPSS") storefront retail locations in the United States ("store centers"). More specifically, within a five year period between 2008-2012, the Hagans' acquired more than 20% of all store centers in New York County, New York (the "Manhattan Area").

9.     At all relevant times, the Counterclaim-Defendants knew that the Hagans' store centers were not physically operated by them and that as a super-MCO, they would be required to develop a customized management model requiring an operations manager, store managers (overseeing multiple store centers) and hourly associates working inside their store centers. The Hagans used the Counterclaim-Defendants' franchise model, systems, materials and resources to train their employees and build their new store centers.

10. By all accounts, the Hagans were led to believe that they were wildly successful in the implementation of their management model. They received accolades from Tim Davis, the President of TUPSS, as well as encouragement to aggressively continue developing their super-MCO in the form of pre-approvals to open future store centers, sales awards, special recognition at TUPSS Conventions and close to $1 Million in financing from TUPSS in the form of MBE loans.

11. As the Hagans' footprint grew, the TUPSS Manhattan Area Franchisee Representative, Atlantic Mailboxes, Inc. ("Atlantic") and its president, Tripp Singer (collectively "Singer") also benefited. As the Area Franchisee, Singer provided the Hagans' employees with additional training support and compliance assistance. However, soon after the Hagans purchased their tenth location and refinanced their TUPSS debt with an SBA loan underwritten by The Bancorp, the Counterclaim-Defendants appear to have begun secretly working to destabilize the Hagans' business with the intent to take it away from them in order to hand it to other Manhattan Area franchisees.

12. The Hagans seek to recover damages resulting from the Counterclaim-Defendants' wrongful acts intended to, *inter alia*, avoid their contractual obligations, tortuously interfere with their business relationships, irreparably damage their reputations and ultimately cut them out of the shipping business without just compensation. In less than five months, the Counterclaim-Defendants destroyed the Hagans' thriving business, thus depriving them of the financial benefits they deserved from the years of sweat equity and millions of dollars they personally invested and guaranteed to rehabilitate underperforming store centers and build new ones. However, throughout this entire process, the Counterclaim-Defendants were wildly enriched as the Hagans expanded into new territories, paid royalties, shipped tens of thousands of

packages, developed new revenue streams and placed direct pressure on market competitors in the Manhattan Area such as Fedex/Kinkos, Staples and former TUPSS/Mailbox Etc. franchisees against whom the Counterclaim-Defendants chose not to enforce written non-compete and non-solicitation agreements. As set forth in more detail below, the Hagans' dream of expanding their business quickly turned into a nightmare because they refused to acquiesce to the questionable business practices encouraged at TUPSS and UPS.

13.     The Hagans also seek to recover damages resulting from the Counterclaim-Defendants purposeful violation of their First Amendment rights. More specifically, almost immediately after the Hagans voiced their concerns and attempted to fix compliance barriers relating to sales practices in the Manhattan Area Network and elsewhere, the Counterclaim-Defendants swiftly instituted escalating adverse and retaliatory action against them. These actions include, but are not limited to, labeling the Hagans as fraudsters, attempting to have them admit to unspecified non-recourse terminable offenses under the Franchise Agreement, purposefully interfering and destroying their ability to receive credit from their private equity lender and selectively imposing impossible compliance standards upon them so that they would fall terminally behind on their financial obligations, thus creating a pretext for terminating their franchise agreements. It is believed that the Counterclaim-Defendants took extreme actions to curtail the Hagans' speech so they could conceal wrongful business practices known to exist within the Manhattan Area Network and elsewhere.

14.     After terminating the Hagans' franchise agreements and depriving them of the ability to earn a living, the Counterclaim-Defendants took a page out of their playbook and sued them in Federal Court – an apparent common occurrence when looking to exert pressure and silence former franchisees who raise grievances with TUPSS or UPS. However, in this case, the

Hagans' decided to fight back. The question still to be answered is why executives at TUPSS Headquarters and UPS chose to de-franchise the Hagans instead of working collaboratively with them to fix commercially unreasonable systems and eradicate fraudulent and unethical sales practices occurring at TUPSS franchise locations in the Manhattan Area and elsewhere across the United States.

15. The Hagans further seek damages relating to the Counterclaim-Defendants improper refusal to investigate and promptly correct undeniable patterns of fraudulent and deceptive trade practices that were easily verifiable at multiple TUPSS franchise locations. This inaction irreparably tainted and devalued TUPSS franchise locations in the Manhattan Area, making it impossible for the Hagans to sell due to the impossible disclosures that they would have to make in order to sell to an unsuspecting purchaser.

16. Indeed, soon after the Hagans placed the TUPSS on actual notice of specific compliance barriers inherent within the franchise model, the Hagans were threatened, told to mind their own business and directed to implement a completely unattainable "zero tolerance" compliance standard if they wished to remain within TUPSS franchise network. At the same time, Customer Service representatives at TUPSS Headquarters began intentionally escalating claims and customer concerns against them to give the appearance that the Hagans were not operating their business properly. The Counterclaim-Defendants' increasingly aggressive position came as somewhat of a shock to the Hagans, since prior to this time, they were one of the only franchisees in entire network to adopt and implement formal written compliance policies signed by all employees concerning retail rate pricing.

17. As the pressure began mounting against the Hagans, they had no choice but to continue investigating the franchise model to learn why they had been targeted. A deeper look

into the software, hardware, training manuals and information provided by the Area Franchisee, showed that full compliance with respect to retail rate pricing was somewhat impossible, especially in stores where an owner could not be physically present. More specifically, while upgrades to software, hardware, training modules and sales practices to avoid many types of retail rate overcharges were all feasible, for reasons still unknown, The UPS Store, Inc. and UPS refused to implement them or delayed rolling them out (i.e. new software, manager key or approval for non-iShip CMS migration, monthly reporting of improper dimensional overcharges, monthly reporting of improper weight overcharges, blocking the sale of higher-cost Air products where UPS Ground offers the exact same delivery date and time guarantee, properly informing customers at the point of sale, etc.). The only reasonable conclusion the Hagans could reach to explain the Counterclaim-Defendants conscious conduct was that full compliance and transparency must lead to lower revenues. This conclusion was proven to be true as the Hagans were forced to eliminate even non-intentional retail rate deviations.

18.     Because neither TUPSS, nor UPS offered compliance assistance to the Hagans, they were left with very limited options. They had employees sign policy documents, they upgraded security camera systems, they spot checked transactions and they repeatedly instructed all employees to provide customers with complete and accurate information regarding shipping transactions (the "Transparency Sales Model"). As the Hagans suspected, revenues sharply fell. As customers became aware of accurate delivery guarantees, shipping rates and the impact of package measurements and weights on billable rates, they began shipping more frequently via UPS Ground, because it is a reliable, guaranteed service, that in most cases, reaches locations as quickly or within one or two days of the significantly more expensive UPS Air products.

19.    Since the Hagans had always been responsive to prior requests to implement compliance protocols, it seemed strange to them that TUPSS was unwilling to share timely information about any alleged claims of non-compliance occurring at their Store Centers.  More specifically, during the same time period these supposed investigations were occurring, the Hagans had been told by the Area Franchisee Singer that no new retail rate complaints had been received from a single customer.  Nevertheless, the Hagans still found themselves in some form of top-secret investigation launched by TUPSS corporate executives based upon what they now allege was a "tip" from a still-unidentified "former employee" of the Hagans.

20.    Without telling the Hagans anything about this "tip," offering them tangible examples of the non-compliant activities complained of, or providing even the most basic information needed to properly investigate or fix a problem of this nature, the Counterclaim-Defendants sat back and did nothing for several months.  For obvious reasons, this was unacceptable to the Hagans, as it would be to any business owner in the free world who is trying to protect the interests of loyal customers who are the lifeblood of a business and creditors who have entrusted millions of dollars in your business.  By taking no action until the Hagans actually requested a meeting at TUPSS headquarters, TUPSS' amplified the harm to the public, they destroyed the Hagans' relationship with third-party creditors and made it next to impossible for the Hagans to investigate and fix whatever it was alleged that had occurred.

21.    When it became apparent that the Counterclaim-Defendants were intent on taking no action to help the Hagans or to address their legitimate concerns about the non-functional TUPSS MCO model, they were left with no choice but to attempt to operate their eleven (11) store centers under a "zero tolerance" retail rate compliance standard and to identify areas of risk inherent within the flawed TUPSS franchise sales model.  As the Hagans clamped down further

on compliance issues, gross sales plummeted and intense pressure began mounting for the Hagans to stop asking questions about things such as: (a) the impact of entering accurate dimensions and weight on shipping charges; (b) whether or not UPS Ground is a guaranteed service; (c) whether or not 2nd Day Air can be sold when a package is being delivered to a zone where UPS Ground guarantees next day delivery; (d) why 2nd Day Air service is aggressively sold at TUPSS for one-day ground transit deliveries, when that service is not even available via UPS; (e) whether or not customers should be told about the UPS Ground guarantee; and (f) whether or not upselling requires disclosing the existence of all available service options and benefits.

22.     The efforts undertaken by the Hagans to meet the Counterclaim-Defendants "zero tolerance" demands were necessary, but very costly. The Hagans terminated employees, they upgraded in-store security cameras, they hired additional employees, they trained employees on the "Transparency Sales Model" and they tried to do whatever they could to remain fully compliant. Just as in the past, the Counterclaim-Defendants sat back and offered the Hagans no support or suggestions on how to remain compliant and profitable within the existing TUPSS franchise model. The sole recommendation provided by The UPS Store, Inc. and those working with them, was to keep "migrating all shipping transactions from the iShip CMS system to the POS register system" and look at how other franchisees and MCOs are operating.

23.     As the Hagans continued down the path of full compliance, they learned that they had been intentionally deceived by the Counterclaim-Defendants and that no formal policies, procedures, or sales models existed to protect them or the public from the numerous compliance barriers that appear to be intentionally built into the TUPSS franchise system. Indeed, because the Counterclaim-Defendants retain exclusive control over things such as computer software,

hardware systems, multiple dimension measurement devices, the "iShip" billing platform, advertising, shipping guarantees, insurance, fuel surcharges and the manner in which customer service representatives deal with complaints from the public, it became clear that it is virtually impossible for any TUPSS franchisee to completely avoid retail rate compliance issues and remain in business.

24.     The Hagans discovered that in the Manhattan Area and perhaps elsewhere, non-compliance is trained, encouraged and according to TUPSS' Manhattan Area Franchisee's operations manager, it is sometimes necessary for a franchise owner to survive.  The Hagans ultimately learned that there was a preferred method to initiate overcharges at TUPSS and the implementation of the Hagans' "Transparency Sales Model" created a massive problem, because it unintentionally conflicted with it.

25.     The Hagans believe that the Counterclaim-Defendants failed to intervene in the unethical practices reported by them because it was not in their financial interests to do so.  This purposeful inaction was a clear indication to the Hagans' that both TUPSS and UPS care more about revenues than they do about potential damage to the "brand" or customer loyalty.  If the opposite was true, both TUPSS and UPS would have immediately investigated the Hagans claims, confirmed what they said and taken swift action to stop unethical business practices in the Manhattan Area and elsewhere so that integrity could be restored to the franchise.  Instead, the Hagans were targeted because they refused to mind their business and fall in line with the preferred unethical methods of selling shipping products to customers.

26.     The significance of the migration process from iShip CMS to the POS system only became clear to the Hagans after they audited the sales practices in the area and spoke to individuals on the condition of anonymity.  When a franchisee properly migrates a transaction

from the iShip CMS system to the POS system, a customer receipt is generated containing a valid tracking number and shipping rate which appears to be fully compliant. However, in many cases such receipts were found to actually represent overcharges ranging from 50% to 400%. First, if a customer is lied to about the existence of a specific delivery service, the delivery guarantee for that service, or the customer is fraudulently induced to purchase another, significantly more expensive product, the receipt they receive may on its face seem to be "compliant," but in fact, the customer was overcharged. Second, because the customer receipt does not include the dimensions or weight of the package, overcharges can easily be hidden within the iShip software that calculates the billable rate based upon information entered by the franchisee at the point of sale. More specifically, all shipping quotes are calculated based upon the assumption that the franchisee has entered the accurate weight and dimensions of the package into the system. If the weight and dimensions of a package are artificially enhanced, the billable rate can be manipulated upward. The reason this is a preferred method, is because it can only be detected if a customer successfully challenges the calculation of the billable rate, which is virtually impossible unless the customer actually knows that the wrong dimensions and/or weight were entered into the iShip CMS system. Perhaps the most attractive part of this process to the Counterclaim-Defendants is that the UPS multi-dimensional laser measurement system can and often does, detect this type of overcharge at the time the package is processed. As a result, UPS either re-rates the package and issues a credit to the franchisee's shipping account or UPS keep the additional revenue for themselves. Either way, everyone except the customer potentially benefits because higher sales, incentives and royalties are generated. Finally, in the rare instance where a customer complains to UPS or TUPSS, the complaint is diffused or passed off to the Franchise owner who then calls the customer to apologize because they weren't physically

present when the transaction occurred. The discrepancy is then blamed on a data entry mistake or a miscommunication regarding the service requested. In virtually all cases, the inquiry is quickly terminated after the customer is offered a full or partial refund.

27.     The only way such a complex scheme could have been discovered was through reviewing internal records, speaking with key TUPSS personnel and documenting hundreds of transactions to identify clear patterns in what employees are trained to say and do when customers present these issues. It is no coincidence that the Hagans' were singled out for failing to follow the Counterclaim-Defendants preferred sales practices or that the Third-Party Defendants Manhattan Area Franchisees were waiting in the wings to take over the Hagans Store Centers as soon as the termination notices were issued.

28.     Indeed, it should have come as no surprise to any parties in this case that an ongoing investigation was being conducted of the Third-Party Defendants Manhattan Area Franchisees. In fact, the Hagans specifically conveyed this information to TUPSS corporate executives and counsel in San Diego, regional vice presidents, operations managers and consultants at a UPS facility in New Jersey and the Area Franchisee in New York. The Hagans even sent an email to specifically invite TUPSS to begin auditing their eleven store centers to determine whether or not the implementation of the Transparency Sales Model had been effective. Upon information and belief, no action was taken on the part of TUPSS or UPS to investigate the Hagans' concerns between November 2013 and February 5, 2014, the date the Hagan's franchise agreements were unilaterally terminated.

29.     Upon information and belief, a key component within the TUPSS corporate franchise model is to maintain plausible deniability with respect to all retail rate overcharges. By doing this, both TUPSS and UPS retain the ultimate power to terminate franchisees at will.

More specifically, citing non-compliance with the same material terms of TUPSS Franchise Agreement and the UPS Contract Carrier Agreement cited against the Hagans, the Counterclaim-Defendants are empowered to impose whatever unreasonable conditions they seek upon unsuspecting franchisees that become too successful or who refuse to do as they are told. Such conclusion could only be reached after the Hagans reviewed clear and convincing evidence that implicated the Third-Party Defendants Manhattan Area TUPSS Franchisees in what can only be described as systematic dishonest, unethical, fraudulent and deceptive consumer business practices.

30.     The Counterclaim-Defendants have been aware of the existence of retail rate compliance issues in the TUPSS franchise network for some time and they are not limited to transactions occurring in the Manhattan Area. The Counterclaim-Defendants have been repeatedly named in multiple State and Federal lawsuits involving questionable business practices concerning dimensional weight overcharges, selling higher priced "UPS Air" products and then shipping them by Ground (UPS "Air-In-Ground" program) and improperly administering insurance charges to the exclusive detriment of their customers. In many cases, such as the one dealing with the dimensional weight overcharges, although Defendant UPS denied liability, millions of dollars has been paid to settle claims.

31.     TUPSS has also been the target of multiple consumer fraud watch-groups and websites that post grievances by customers. One such grievance posted on a site called "www.RipoffReport.com" caught the Hagans' attention because it included certain facts that were reminiscent of the policies uncovered in the Manhattan Area. On October 23, 2013, a post entitled, "UPS store Deceit Overcharged Intentionally Openly Admitted it was the Owners Policy San Jose California" states:

I ship a lot of items as an Ebay power seller. I had a customer ask for a UPS estimate on a large item. I had my tape measure in my hand and the box measured 42.5" by 14.5" by 14 7/8" They rounded the 42 to 43 which is understandable. But they estimated the box at 16" by 16" on each side when shown both sides were less than 15" the clerk told me that the owner insited they round then add an inch. The estimate increased the dimensional weight be 4 inches and the cost be over $4. The rip off was only 5% but the clerk said he was required to do this on every package that left the store. I have shipped several other packages through this location and never checked the measurement with what was being charged. This location is overcharging every customer on every package and openly admitted it.

I called UPS and they said they have no power over the UPS stores. I could not find the proper chanels to voice my disgust at this business and hope you will get a scale as I wonder now about the weight as well. This is not a place I would do business with again. The staff has always been friendly and when I told the clerk he should not bill me for the larger dimensions he admitted he fealt bad about doing it but was affraid of losing his job and would not bill it for the actual size.
This is a dilema for the employee and this store should be sued I do not knwo how to do that kind of stuff but at least I can warn others about this place perhaps other UPS stores.

I walked out and did not ship with this place.

**Annexed herewith as EXHIBIT "A" is a true copy of the Ripoff Report posting from October 23, 2013 found at http://www.ripoffreport.com/r/UPS-store-/San-Jose-California-95118/UPS-store-Deceit-Overcharged-Intentionally-Openly-Admitted-it-was-the-owners-Policy-San-1094690.** The above website was a clear indication to the Hagans that the sales practices observed within Manhattan had to have been learned through training and not spontaneously conceived by individual franchisees. The Hagans' did not adopt these practices, because they trained their own employees.

32. The Hagans have no doubt that the Counterclaim-Defendants were also fully aware of the widespread compliance barriers within the franchise network. Through the Counterclaim-Defendants' tacit approval of unethical sales methods, they effectively presided over a massive fraud perpetrated upon the public that generated millions of dollars in additional

revenues for UPS, royalties for TUPSS and incentives for the Third-Party Defendant Manhattan Area Franchisees who willfully participated. Ironically, at the same time, citing the need to protect the brand and bring integrity back to the franchise, the TUPSS attacked and de-franchised the Hagans as they struggled to make ends meet by selling UPS products compliantly.

33.     The one key fact that distinguishes this case from all other disputes between the Counterclaim-Defendants and other litigants, is that none have ever travelled to the TUPSS corporate headquarters, sat in their boardroom and begged top company executives and corporate counsel to fix massive fraud problems in the network and implement proper safeguards to prevent retail rate overcharges. The Hagans felt obligated to bring this issue to the attention of TUPSS corporate executives privately. Litigation was always a last resort. The Hagans naively assumed that after investing millions of dollars in the franchise, both TUPSS and UPS would listen and want to see the Hagans' succeed, not fail. However, almost immediately after *requesting* a first meeting, TUPSS accused the Hagans of being engaged in "a widespread pattern of improper and dishonest conduct" and reserved the right to terminate their franchise agreements at will if they did not remain 100% compliant.

34.     With the benefit of hindsight, the significance of the Hagan's meeting at TUPSS' corporate headquarters in San Diego, California cannot be overlooked. On November 9, 2013, Robert Hagan, Thomas Hagan and their counsel flew to San Diego at their own cost for the sole purpose of resolving concerns that had arisen about TUPSS' commitment to work with them collaboratively. On November 12, 2013, the Hagans met with C. James Hillquist – TUPSS Senior Vice President of Global Ops/Chief Operating Officer, Don Higginson – TUPPS Senior Vice President of Franchise Services and Channa Parker Barra - TUPSS Managing Attorney (the "San Diego Meeting"). During that meeting, the Hagans discussed: (a) their compliance efforts

to date; (b) barriers to full compliance; (c) widespread compliance violations occurring within the franchise network; (d) potential solutions to all compliance issues; (e) major deficiencies with TUPSS' MCO program; (f) the need for the Hagans' private equity lender to continue assisting them; and (g) a reasonable action plan to move forward as partners.

35.     The TUPSS corporate executives listened to the Hagans' presentation, reviewed the documents the Hagans compiled for them and told them that they were impressed and satisfied with the new compliance initiatives the Hagans had developed and begun implementing.  However, SVP Don Higginson chuckled and advised his colleagues that if the Hagans are required to follow a fully transparent sales model, in fairness to them, other franchisees would also have to be required to follow suit.  At the time, the Hagans did not quite understand the significance of that comment, however in retrospect, Higginson was likely alluding to the financial impact that implementing a transparent sales model would have across the entire franchise network.  Immediately upon returning from the San Diego Meeting, the Hagans requested a follow-up meeting with Eric Maida - TUPSS Northeast Regional Vice President ("Maida").

36.     On November 19, 2013, Plaintiff Robert Hagan and his counsel met with Maida, Jay Schlessenger – TUPSS Operations Manager for the Northeast Region ("Schlessenger") and Sean O'Neil – TUPSS Franchise Consultant ("O'Neil") at a UPS facility in Secaucus, NJ (the "Maida Meeting").  Robert told Maida about the San Diego Meeting and discussed some of his concerns regarding the lack of support for MCOs, his efforts to enforce compliance and the difficulty of implementing a transparent sales model in an area when other franchisees are being systematically trained and instructed to operate in a non-compliant manner.  Hagan told Maida that training seemed to be a major issue, because in the past, the Hagans had bad experiences

with employees who had worked and been trained at other TUPSS franchise locations.  Maida stated that he had no information about non-compliance at any other store centers in Manhattan and requested that Robert show him tangible proof of non-compliance by another franchisee in the Manhattan Area.  In response, Hagan showed him a POS receipt and a video he personally took detailing a transaction he experienced just a few weeks earlier at a Store Center located on Lexington Avenue in the City, County and State of New York (the "Hagan Video").

37.     Robert explained to Maida that the original purpose behind recording the Hagan Video was to learn techniques from another compliant store to train employees.  Instead, the experience led Hagan to believe that retail rate compliance issues were actually more widespread than individuals at TUPSS had led him to believe.

38.     The Hagan Video showcased multiple examples of non-compliant activities, including repeated misrepresentations about the UPS Ground guarantee, improper upselling/cross-selling techniques, the sale of unnecessary shipping services, the failure to migrate a transaction from the iShip CMS system to the POS System and an improper fee-added overcharge to the maximum UPS retail shipping rate.

39.     Before leaving the UPS facility, Hagan advised and assured Maida that private investigators had begun surveying the Manhattan Area and the extent of the non-compliance was widespread and pervasive in each and every store center.  Just as Robert Hagan did with TUPSS corporate executives in San Diego, he urged Maida to conduct his own internal investigation if he had any doubt as to the veracity of the Hagan Video or any of the claims he made.

40.     Although prior to being shown the Hagan Video, Maida claimed that he took compliance issues very seriously and that he had an affirmative duty to investigate all claims of non-compliance and consumer fraud in the Northeast Region, in the weeks and months following

his personal review of the Hagan Video, neither Maida, nor the Counterclaim-Defendants requested a copy of the video or conducted any follow-up investigation to curtail the sales practices witnessed and reported by Hagan.

41.     In the weeks and months that followed the Maida Meeting, while the Counterclaim-Defendants stood by idly, it is estimated that tens of thousands of TUPSS customers in Manhattan and many more elsewhere were subjected to unethical, dishonest and fraudulent business practices at TUPSS retail locations.  More specifically, evidence compiled by a team of private investigators on multiple dates in the months **after** the San Diego Meeting ***and after*** the Maida Meeting documented every single Third-Party Defendant Manhattan Area Franchisee committing one or more of the following acts: (a) lying about the UPS Ground delivery guarantee; (b) misleading customers about guaranteed delivery dates; (c) improperly upselling higher-price shipping options that offer no additional benefits to customers; (d) improperly concealing the existence of cheaper cost shipping services when requested by customers; (e) adding inches to the dimensions of boxes when entering them into the iShip CMS system; (f) adding weight to boxes when entering them in the iShip CMS system; (g) overcharging customers more than the maximum allowable UPS retail rate; (h) charging customers for accessorial charges they did not request; and (i) otherwise engaging in conduct that appears to be in material breach of TUPPS Franchise Agreements and the UPS Carrier Agreements.

42.     It is also worth noting that following the Maida Meeting, the Counterclaim-Defendants exponentially ramped up efforts to destabilize the Hagan's business and successfully caused their private equity lender, John Penrose ("Penrose"), to stop funding them.  TUPSS

knew that Penrose would cut off funding to their eleven store centers if they were held to impossible and unattainable compliance standards.

43.     Despite dwindling cash reserves, the lack of support from TUPSS, steadily declining sales and the loss of their private equity lender, the Hagans continued to operate their store centers to the best of their ability.  When the Hagans attempted to implement a plan to sell a portion of their stores to consolidate operations, raise cash and partially mitigate damages, they were advised by counsel for TUPSS/UPS that any such sale(s) would require providing both TUPSS and UPS with a general release of all claims.  As a result of the above, the Hagans fell behind on their UPS shipping bills, their rents and other financial obligations.  In sum and substance, the Counterclaim-Defendants and the Third-Party Defendants began to achieve their goal of ridding themselves of the Hagans.

44.     On January 31, 2014, the Hagans served the Counterclaim-Defendants with a Notice of Material Default and demanded that they immediately cease and desist from their wrongful conduct, specifically citing the fraudulent and deceptive trade practices occurring in the Manhattan Area and elsewhere within TUPSS network.   The Counterclaim-Defendants failed to respond to this notice. **Annexed herewith as EXHIBIT "B" is the letter from M. McKew, Esq. to P. Ellis, Esq., dated January 31, 2014.**

45.     On February 5, 2014, the Counterclaim-Defendants advised the Hagans that all eleven of their franchise agreements had been unilaterally terminated without notice or an opportunity to cure and that they were immediately obligated to comply with post termination obligations under the Franchise Agreements, which included shutting down all the stores and not engaging in any competitive business activities.  Presently, all eleven of the Plaintiff's former store centers remain closed.

46.     The Hagans now seek to recover damages from the Counterclaim-Defendants and those working in concert with them for their efforts to systematically convert and transfer the Hagans' business assets without just compensation. Shortly after terminating the Hagans' franchise agreements, the Counterclaim-Defendants started distributing the Hagans' mailbox customers and business to the Third-Party Defendants upon terms that were not disclosed to the Hagans.

47.     Moreover, the Counterclaim-Defendants, the Third-Party Defendants and those working in concert with them, began secretly inducing the Hagans' landlords to expedite the eviction process so that the former store centers, customer lists, equipment, goodwill and business could all be quickly converted without compensating the Hagans. Indeed, upon information and belief, within days after the Counterclaim-Defendants terminated the Hagans' franchise agreements, without the Hagan's knowledge, they began contacting their landlords for the purpose of interfering with their business relationships and hand-picking substitute franchisees to take each of the former Hagan locations, in some cases at reduced rents, in order to trigger "Good Guy" guarantee clauses which would require the Hagans to become personally liable for any shortfall in rent. **Annexed herewith as Exhibit "C" is a true copy of an e-mail from T. Singer to D. Milin (the landlord for former Hagan Center #6283), copying E. Maida (TUPSS Northeast Regional VP), dated February 9, 2014.**

48.     While the Hagans may never fully know the true extent to which they were the victims of retaliation and selective enforcement, what cannot be disputed is that this matter was not properly handled. It is highly irregular for a Vice President of Operations and Chief Operating Officer to travel across the country to perform a personal "mystery shop" at a The UPS Store location and then keep it secret. The Counterclaim-Defendants repeatedly claim that

they were not looking to de-franchise the Hagans, yet their actions all indicate otherwise. Indeed, upon information and belief, the Counterclaim-Defendants even withheld information about their activities from Bancorp, despite their affirmative obligation to immediately notify them in the event of a material change that could adversely impact the SBA loan. Until and unless the Counterclaim-Defendants and Third-Party Defendants are required to fully disclose their internal records and appear for depositions under oath, the true scope of the questionable practices uncovered by the Hagans will never fully be known.

## THE PARTIES

49.     3A, Inc. ("3A") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 1636 Third Avenue, New York, New York.

50.     Tanmor, Inc. ("Tanmor") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 527 Third Avenue, New York, New York.

51.     Ridgepac, Inc. ("Ridgepac") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 331 West 57th St., New York, New York.

52.     Ridge Assets, Inc. ("Ridge Assets") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 1202 Lexington Avenue, New York, New York.

53.     Ridgedown, Inc. ("Ridgedown") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 342 Broadway, New York, New York.

54.     Tommys Doc Squad, LLC ("Tommys") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 303 Park Avenue South, New York, New York.

55.     Ridge Logistics, LLC ("Ridge Logistics") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 1562 First Avenue, New York, New York.

56.     Ridge Pen, LLC ("Ridge Pen") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 1474 Third Avenue, New York, New York.

57.     Tompack, LLC ("Tompack") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 228 Eighth Avenue, New York, New York.

58.     Bigpack, LLC ("Bigpack") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 694 Tenth Avenue, New York, New York.

59.     Robpack, LLC ("Robpack") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 328 Eighth Avenue, New York, New York.

60.     NYPS, LLC ("NYPS") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 331 West 57th St., New York, New York.

61.     Thomas Hagan ("Tom") is, and at all relevant times was, a resident of the State of New Jersey.

62.     Robert Hagan ("Robert") is, and at all relevant times was, a resident of the State of New Jersey.

63.     Tom and Robert each own, and at all relevant times owned, one half of the shares of 3A, Tanmor, Ridgepac, Ridge Assets and Ridgedown.

64.     Robert is, and at all relevant times was, the Secretary and Vice President of 3A, Tanmor, Ridgepac, Ridge Assets and Ridgedown.

65.     Tom is, and at all relevant times was, the President and Treasurer of 3A, Tanmor, Ridgepac, Ridge Assets and Ridgedown.

66.     Tom and Robert each have, and at all relevant times had, a 50% membership interest in NYPS.

67.     Tom and Robert are, and at all relevant times were, the managing members of NYPS, LLC.

68.     NYPS has, and at all relevant times had, a 100% membership interest in Tommys, Ridge Logistics, Ridge Pen, Tompack, Bigpack and Robpack.

69.     NYPS is, and at all relevant times was, the managing member of Tommys, Ridge Logistics, Ridge Pen, Tompack, Bigpack and Robpack.

70.     Upon information and belief, TUPSS is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6060 Cornerstone Court West, San Diego, California 92121. TUPSS is a wholly owned subsidiary of United Parcel Service, Inc., a Delaware corporation. TUPSS is a franchisor of independently owned and operated postal, packaging, shipping, business, and communication retail service centers, under The UPS Store® mark, with hundreds of thousands of mailbox holders in the United States and thousands of locations offering mail and parcel receiving, packaging, and shipping services and

providing small businesses with a wide range of products and services in this District, across the United States and Canada.

71.     Upon information and belief, UPS is a corporation organized and existing under the laws of the State of Ohio with its principal place of business at 55 Glenlake Pkwy NE, Atlanta, GA 30328 Georgia. UPS is a wholly owned subsidiary of United Parcel Service, Inc., a Delaware corporation.  In 2009, United Parcel Service, Inc., a New York Corporation, was merged into UPS.

72.     Upon information and belief, UPSA is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 55 Glenlake Parkway NE, Atlanta, Georgia 30328. UPSA is a wholly owned subsidiary of United Parcel Service, Inc., a Delaware corporation.

73.     BRADLEY KAPLAN ("Kaplan") is an individual who upon information and belief resides in the Town of New Canaan, County of Fairfield, State of Connecticut.

74.     That upon information and belief Kaplan is a The UPS Store multiple center owner in the Manhattan Area who owns eight (8) The UPS Store franchise locations.

75.     That Kaplan, through his corporate entity ABC CORP 1, owns Store Center 1786 located at 603 West 115th Street, in the City, County and State of New York ("Kaplan Center 1786").

76.     That ABC CORP 1, is a domestic business corporation duly organized and existing under the laws of the State of New York.

77.     That ABC CORP 1, is a foreign business corporation duly organized and existing under the laws of the State of New York.

78.     That Kaplan, through his corporate entity ABC CORP 2, owns Store Center 4386 located at 2753 Broadway, in the City, County and State of New York ("Kaplan Center 4386").

79.     That ABC CORP 2, is a domestic business corporation duly organized and existing under the laws of the State of New York.

80.     That ABC CORP 2, is a foreign business corporation duly organized and existing under the laws of the State of New York.

81.     That Kaplan, through his corporate entity ABC CORP 3, owns Store Center 4419 located at 130 Seventh Avenue, in the City, County and State of New York ("Kaplan Center 4419").

82.     That ABC CORP 3, is a domestic business corporation duly organized and existing under the laws of the State of New York.

83.     That ABC CORP 3, is a foreign business corporation duly organized and existing under the laws of the State of New York.

84.     That Kaplan, through his corporate entity, ABC CORP 4, owns Store Center 4769 located at 888-C 8th Avenue, in the City, County and State of New York ("Kaplan Center 4769").

85.     That ABC CORP 4, is a domestic business corporation duly organized and existing under the laws of the State of New York.

86.     That ABC CORP 4, is a foreign business corporation duly organized and existing under the laws of the State of New York.

87.     That Kaplan, through his corporate entity, ABC CORP 5, owns Store Center 5188 located at Toys R Us, 1514 Broadway, in the City, County and State of New York ("Kaplan Center 5188").

88.    That ABC CORP 5, is a domestic business corporation duly organized and existing under the laws of the State of New York.

89.    That ABC CORP 5, is a foreign business corporation duly organized and existing under the laws of the State of New York.

90.    That Kaplan, through his corporate entity, ABC CORP 6, owns Store Center 5472 located at 388 2nd Avenue, in the City, County and State of New York ("Kaplan Center 5472").

91.    That ABC CORP 6, is a domestic business corporation duly organized and existing under the laws of the State of New York.

92.    That ABC CORP 6, is a foreign business corporation duly organized and existing under the laws of the State of New York.

93.    That Kaplan, through his corporate entity, ABC CORP 7, owns Store Center 5979 located at 105 West 86th Street, in the City, County and State of New York ("Kaplan Center 5979").

94.    That ABC CORP 7, is a domestic business corporation duly organized and existing under the laws of the State of New York.

95.    That ABC CORP 7, is a foreign business corporation duly organized and existing under the laws of the State of New York.

96.    That Kaplan, through his corporate entity, ABC CORP 8, owns Store Center 6341 located at 480 6th Avenue, in the City, County and State of New York ("Kaplan Center 6341").

97.    That ABC CORP 8, is a domestic business corporation duly organized and existing under the laws of the State of New York.

98.    That ABC CORP 8, is a foreign business corporation duly organized and existing under the laws of the State of New York.

99. JOHN WONG ("Wong") is an individual who upon information and belief resides in the City, County and State of New York.

100. That upon information and belief Wong is a The UPS Store multiple center owner in the Manhattan Area who owns six (6) The UPS Store franchise locations.

101. That Wong, through his corporate entity ABC CORP 9, owns Store Center 4190 located at 9 East 8th Street, in the City, County and State of New York ("Wong Center 4190").

102. That ABC CORP 9, is a domestic business corporation duly organized and existing under the laws of the State of New York.

103. That ABC CORP 9, is a foreign business corporation duly organized and existing under the laws of the State of New York.

104. That Wong, through his corporate entity ABC CORP 10, owns Store Center 4248 located at 305 West Broadway, in the City, County and State of New York ("Wong Center 4248").

105. That ABC CORP 10, is a domestic business corporation duly organized and existing under the laws of the State of New York.

106. That ABC CORP 10, is a foreign business corporation duly organized and existing under the laws of the State of New York.

107. That Wong, through his corporate entity ABC CORP 11, owns Store Center 5388 located at 319 Lafayette Street, in the City, County and State of New York ("Wong Center 5388").

108. That ABC CORP 11, is a domestic business corporation duly organized and existing under the laws of the State of New York.

109.    That ABC CORP 11, is a foreign business corporation duly organized and existing under the laws of the State of New York.

110.    That Wong, through his corporate entity ABC CORP 12, owns Store Center 6404 located at 71 Broadway, in the City, County and State of New York ("Wong Center 6404").

111.    That ABC CORP 12, is a domestic business corporation duly organized and existing under the laws of the State of New York.

112.    That ABC CORP 12, is a foreign business corporation duly organized and existing under the laws of the State of New York.

113.    That Wong, through his corporate entity ABC CORP 13, owns Store Center 6415 located at 217 Centre Street, in the City, County and State of New York ("Wong Center 6415").

114.    That ABC CORP 13, is a domestic business corporation duly organized and existing under the laws of the State of New York.

115.    That ABC CORP 13, is a foreign business corporation duly organized and existing under the laws of the State of New York.

116.    KEVIN PANCHMIA ("Panchmia") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

117.    That upon information and belief Panchmia is a The UPS Store multiple center owner in the Manhattan Area who owns four (4) The UPS Store franchise locations.

118.    That Panchmia, through his corporate entity ABC CORP 14, owns Store Center 5958 located at 105 East 34th Street, in the City, County and State of New York ("Panchmia Center 5958").

119.    That ABC CORP 14, is a domestic business corporation duly organized and existing under the laws of the State of New York.

120. That ABC CORP 14, is a foreign business corporation duly organized and existing under the laws of the State of New York.

121. That Panchmia, through his corporate entity ABC CORP 15, owns Store Center 5691 located at One Penn Plaza, in the City, County and State of New ("Panchmia Center 5691").

122. That ABC CORP 15, is a domestic business corporation duly organized and existing under the laws of the State of New York.

123. That ABC CORP 15, is a foreign business corporation duly organized and existing under the laws of the State of New York.

124. That Panchmia, through his corporate entity ABC CORP 16, owns Store Center 6374 located at 14 Murray Street, in the City, County and State of New ("Panchmia Center 5899").

125. That ABC CORP 16, is a domestic business corporation duly organized and existing under the laws of the State of New York.

126. That ABC CORP 16, is a foreign business corporation duly organized and existing under the laws of the State of New York.

127. That Panchmia, through his corporate entity ABC CORP 17, owns Store Center 6387 located at 34 Third Avenue, in the City, County and State of New ("Panchmia Center 6387").

128. That ABC CORP 17, is a domestic business corporation duly organized and existing under the laws of the State of New York.

129. That ABC CORP 17, is a foreign business corporation duly organized and existing under the laws of the State of New York.

130.     KETAN SETH ("Seth") is an individual who upon information and belief resides in the City, County and State of New York.

131.     That upon information and belief Seth is a The UPS Store multiple center owner in the Manhattan Area who owns four (4) The UPS Store franchise locations.

132.     That Seth, through his corporate entity ABC CORP 18, owns Store Center 0304 located at 101 West 23rd Street, in the City, County and State of New ("Seth Center 0304").

133.     That ABC CORP 18, is a domestic business corporation duly organized and existing under the laws of the State of New York.

134.     That ABC CORP 18, is a foreign business corporation duly organized and existing under the laws of the State of New York.

135.      That Seth, through his corporate entity ABC CORP 19, owns Store Center 4619 located at 132 East 43rd Street, in the City, County and State of New York ("Seth Center 4619").

136.     That ABC CORP 19, is a domestic business corporation duly organized and existing under the laws of the State of New York.

137.     That ABC CORP 19, is a foreign business corporation duly organized and existing under the laws of the State of New York.

138.     That Seth, through his corporate entity ABC CORP 20, owns Store Center 4754 located at 243 5th Avenue, in the City, County and State of New York ("Seth Center 4754").

139.     That ABC CORP 20, is a domestic business corporation duly organized and existing under the laws of the State of New York.

140.     That ABC CORP 20, is a foreign business corporation duly organized and existing under the laws of the State of New York.

141.     That Seth, through his corporate entity ABC CORP 21, owns Store Center 5138 located at 1357 Broadway, in the City, County and State of New York ("Seth Center 5138").

142.     That ABC CORP 21, is a domestic business corporation duly organized and existing under the laws of the State of New York.

143.     That ABC CORP 21, is a foreign business corporation duly organized and existing under the laws of the State of New York.

144.     JEROME TAYLOR ("J. Taylor") is an individual who upon information and belief resides in the City, County and State of New York.

145.     That upon information and belief J. Taylor is a The UPS Store multiple center owner in the Manhattan Area who owns four (4) The UPS Store franchise locations.

146.     That J. Taylor, through his corporate entity ABC CORP 22, owns Store Center 0526, located at 111 East 14th Street, in the City, County and State of New ("J. Taylor Center 0526").

147.     That ABC CORP 22, is a domestic business corporation duly organized and existing under the laws of the State of New York.

148.     That ABC CORP 22, is a foreign business corporation duly organized and existing under the laws of the State of New York.

149.     That J. Taylor, through his corporate entity ABC CORP 23, owns Store Center 1052 located at 111 East 14th Street, in the City, County and State of New ("J. Taylor Center 1052").

150.     That ABC CORP 23, is a domestic business corporation duly organized and existing under the laws of the State of New York.

151.	That ABC CORP 23, is a foreign business corporation duly organized and existing under the laws of the State of New York.

152.	That J. Taylor, through his corporate entity ABC CORP 24, owns Store Center 2992 located at 2576 Broadway, in the City, County and State of New York ("J. Taylor Center 2992").

153.	That ABC CORP 24, is a domestic business corporation duly organized and existing under the laws of the State of New York.

154.	That ABC CORP 24, is a foreign business corporation duly organized and existing under the laws of the State of New York.

155.	That J. Taylor, through his corporate entity ABC CORP 25, owns Store Center 4831 located at 366 Amsterdam Avenue, in the City, County and State of New ("J. Taylor Center 4831").

156.	That ABC CORP 25, is a domestic business corporation duly organized and existing under the laws of the State of New York.

157.	That ABC CORP 25, is a foreign business corporation duly organized and existing under the laws of the State of New York.

158.	MARK TAYLOR ("M. Taylor") is an individual who upon information and belief resides in the City, County and State of New York.

159.	That upon information and belief M. Taylor is a The UPS Store multiple center owner in the Manhattan Area who owns three (3) The UPS Store franchise locations.

160.	That M. Taylor, through his corporate entity ABC CORP 26, owns Store Center 0745 located at 208 East 51st Street, in the City, County and State of New York ("M. Taylor Center 0745").

161.    That ABC CORP 26, is a domestic business corporation duly organized and existing under the laws of the State of New York.

162.    That ABC CORP 26, is a foreign business corporation duly organized and existing under the laws of the State of New York.

163.    That M. Taylor, through his corporate entity ABC CORP 27, owns Store Center 1083 located at 326 East 65th Street, County and State of New York ("M. Taylor Center 1083").

164.    That ABC CORP 27, is a domestic business corporation duly organized and existing under the laws of the State of New York.

165.    That ABC CORP 27, is a foreign business corporation duly organized and existing under the laws of the State of New York.

166.    That M. Taylor, through his corporate entity ABC CORP 28, owns Store Center 0647 located at 1173A Second Avenue, in the City, County and State of New ("M. Taylor Center 0647").

167.    That ABC CORP 28, is a domestic business corporation duly organized and existing under the laws of the State of New York.

168.    That ABC CORP 28, is a foreign business corporation duly organized and existing under the laws of the State of New York.

169.    SHYAM BUXANI is an individual, who upon information and belief, resides in the City, County and State of New York.

170.    MOHAN BUXANI is an individual, who upon information and belief, resides in the City, County and State of New York.

171.    DANNY DANSIGNANI is an individual, who upon information and belief, resides in the City, County and State of New York.

172.	That upon information and belief SHYAM BUXANI, MOHAN BUXANI and DANNY DANSIGNANI (collectively "Buxani/Dansignani") are The UPS Store multiple center owners in the Manhattan Area who jointly own two (2) The UPS Store franchise locations.

173.	That Buxani/Dansignani, through their corporate entity ABC CORP 29, own Store Center 0444 located at 244 Madison Avenue, in the City, County and State of New York ("Buxani/Dansignani Center 0444").

174.	That ABC CORP 29, is a domestic business corporation duly organized and existing under the laws of the State of New York.

175.	That ABC CORP 29, is a foreign business corporation duly organized and existing under the laws of the State of New York.

176.	That Buxani/Dansignani, through their corporate entity ABC CORP 30, own Store Center 1492 located at 244 Madison Avenue, in the City, County and State of New York ("Buxani/Dansignani Center 1492").

177.	That ABC CORP 30, is a domestic business corporation duly organized and existing under the laws of the State of New York.

178.	That ABC CORP 30, is a foreign business corporation duly organized and existing under the laws of the State of New York.

179.	ABU RAHMAN ("Rahman") is an individual who upon information and belief resides in the City of New York, County of Richmond and State of New York.

180.	That upon information and belief Rahman is a The UPS Store multiple center owner in the Manhattan Area who owns two (2) The UPS Store franchise locations.

181.     That Rahman, through his corporate entity ABC CORP 31, owns Store Center 4163 located at 55 West 116th Street, in the City, County and State of New ("Rahman Center 4163").

182.     That ABC CORP 31, is a domestic business corporation duly organized and existing under the laws of the State of New York.

183.     That ABC CORP 31, is a foreign business corporation duly organized and existing under the laws of the State of New York.

184.     That Rahman, through his corporate entity ABC CORP 32, owns Store Center 5777 located at 1838 2nd Avenue, in the City, County and State of New York ("Rahman Center 5777").

185.     That ABC CORP 32, is a domestic business corporation duly organized and existing under the laws of the State of New York.

186.     That ABC CORP 32, is a foreign business corporation duly organized and existing under the laws of the State of New York.

187.     SHUEB CHOWDHURY ("Chowdhury") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

188.     That upon information and belief Chowdhury owns one (1) The UPS Store franchise location.

189.     That Chowdhury, through his corporate entity ABC CORP 33, owns Store Center 5865 located at 353 Third Avenue, in the City, County and State of New ("Chowdhury Center 5685").

190.     That ABC CORP 33, is a domestic business corporation duly organized and existing under the laws of the State of New York.

191. That ABC CORP 33, is a foreign business corporation duly organized and existing under the laws of the State of New York.

192. TANI SUSSMAN ("Sussman") is an individual who upon information and belief resides in the Town of New Milford, County of Bergen, State of New Jersey.

193. That upon information and belief Sussman owns one (1) The UPS Store franchise location.

194. That Sussman, through his corporate entity ABC CORP 34, owns Store Center 4766 located at 82 Nassau Street, in the City, County and State of New York ("Sussman Center 4766").

195. That ABC CORP 34, is a domestic business corporation duly organized and existing under the laws of the State of New York.

196. That ABC CORP 34, is a foreign business corporation duly organized and existing under the laws of the State of New York.

197. SYLVESTER ONUORAH ("Onuorah") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

198. That upon information and belief Onuorah owns one (1) The UPS Store franchise location.

199. That Onuorah, through his corporate entity ABC CORP 35, owns Store Center 5017 located at 2216 Frederick Douglas Blvd, in the City, County and State of New York ("Onuorah Center 5017").

200. That ABC CORP 35, is a domestic business corporation duly organized and existing under the laws of the State of New York.

201.    That ABC CORP 35, is a foreign business corporation duly organized and existing under the laws of the State of New York.

202.    OTIS DAVIS ("Davis") is an individual who upon information and belief resides in the City, County and State of New York.

203.    That upon information and belief Davis owns one (1) The UPS Store franchise location.

204.    That Davis, through his corporate entity ABC CORP 36, owns Store Center 6367 located at 1732 1st Avenue, in the City, County and State of New York ("Davis Center 6367").

205.    That ABC CORP 36, is a domestic business corporation duly organized and existing under the laws of the State of New York.

206.    That ABC CORP 36, is a foreign business corporation duly organized and existing under the laws of the State of New York.

207.    MARCOS LOPEZ ("Lopez") is an individual who upon information and belief resides in the City, County and State of New York.

208.    That upon information and belief Lopez owns one (1) The UPS Store franchise location.

209.    That Lopez, through his corporate entity ABC CORP 37, owns Store Center 4768 located at 4768 Broadway, in the City, County and State of New York ("Lopez Center 4768").

210.    That ABC CORP 37, is a domestic business corporation duly organized and existing under the laws of the State of New York.

211.    That ABC CORP 37, is a foreign business corporation duly organized and existing under the laws of the State of New York.

212. CHARMAINE RAPHAEL ("Raphael") is an individual who upon information and belief resides in the City, County and State of New York.

213. That upon information and belief Lopez owns one (1) The UPS Store franchise location.

214. That Raphael, through her corporate entity ABC CORP 38, owns Store Center 6166, located at 30 East 125th Street, in the City, County and State of New ("Raphael Center 6166").

215. That ABC CORP 38, is a domestic business corporation duly organized and existing under the laws of the State of New York.

216. That ABC CORP 38, is a foreign business corporation duly organized and existing under the laws of the State of New York.

217. MOHAMMED RIAZ ("Riaz") is an individual who upon information and belief resides in the City, County and State of New York.

218. That upon information and belief Riaz owns one (1) The UPS Store franchise location.

219. That Riaz, through his corporate entity ABC CORP 39, owns Store Center 5899 located at 1397 2nd Avenue, in the City, County and State of New York ("Riaz Center 5899").

220. That ABC CORP 39, is a domestic business corporation duly organized and existing under the laws of the State of New York.

221. That ABC CORP 39, is a foreign business corporation duly organized and existing under the laws of the State of New York.

222. CHAD JAAFAR ("Jaafar") is an individual who upon information and belief resides in the Town of Ridgefield, County of Bergen and State of New Jersey.

223. That upon information and belief Jaafar owns one (1) The UPS Store franchise location.

224. That Jaafar, through his corporate entity ABC CORP 40, owns Store Center 5953 located at 551 West 181st Street, in the City, County and State of New York ("Jaafar Center 0304").

225. That ABC CORP 40, is a domestic business corporation duly organized and existing under the laws of the State of New York.

226. That ABC CORP 40, is a foreign business corporation duly organized and existing under the laws of the State of New York.

227. DANNY SPIES ("Spies") is an individual who upon information and belief resides in the City of Yonkers, County of Westchester and State of New York.

228. That upon information and belief Spies owns one (1) The UPS Store franchise location.

229. That Spies, through his corporate entity ABC CORP 41, owns Store Center 4472 located at 809 West 181st Street, in the City, County and State of New ("Spies Center 4472").

230. That ABC CORP 41, is a domestic business corporation duly organized and existing under the laws of the State of New York.

231. That ABC CORP 41, is a foreign business corporation duly organized and existing under the laws of the State of New York.

232. ED XU ("Xu") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

233. That upon information and belief Xu owns one (1) The UPS Store franchise location.

234. That Xu, through his corporate entity ABC CORP 42, owns Store Center 5296 located at 64 Beaver Street, in the City, County and State of New York ("Xu Center 5296").

235. That ABC CORP 42, is a domestic business corporation duly organized and existing under the laws of the State of New York.

236. That ABC CORP 42, is a foreign business corporation duly organized and existing under the laws of the State of New York.

237. SANDRA MACHADO ("Machado") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

238. That upon information and belief Machado owns one (1) The UPS Store franchise location.

239. That Machado, through her corporate entity J & S QUEST SERVICES, LLC, owns Store Center 5565 located at 1324 Lexington Avenue, in the City, County and State of New York ("Machado Center 5565").

240. That J & S QUEST SERVICES, LLC is a domestic limited liability company organized and existing under the laws of the State of New York.

## JURISDICTION

241. The Court has original subject matter jurisdiction over this civil action pursuant to 28 USC §§ 1331, 1367 and 1983, in that this is a civil action involving claims arising under the laws of the United States. This Court also has jurisdiction under 28 USC §§ 2201 and 2202. Moreover, this Court has supplemental jurisdiction over state law claims, pursuant to 28 U.S.C. § 1367(a).

## VENUE

242.     Venue is proper in this District (1) pursuant to 18 U.S.C. § 1965 (a) in that, upon information and belief, all Counterclaim-Defendants and Third-Party Defendants transact and have transacted their affairs in this District, (2) pursuant to 28 U.S.C. § 1391 (b) in that a substantial part of the events or omissions giving rise to the claims occurred in this District, and (3) pursuant to 28 U.S.C. § 1391(c) in that at least one Counterclaim-Defendant and Third-Party Defendant resides in this District (and venue is not available under 28 U.S.C. § 1391(a) because not all defendants reside in the same state).

## THE UPS STORE BUSINESS

243.     Upon information and belief, in or about 1980, Mail Boxes Etc., Inc. ("MBE") or its predecessor-in-interest began providing packaging, shipping and postal services to customers through a network of retail stores.

244.     Upon information and belief, in or about 2000, there were approximately 4,000 MBE locations worldwide.

245.     Upon information and belief, in or about 2001, United Parcel Service of America, Inc. acquired MBE.

246.     Upon information and belief, United Parcel Service of America, Inc. is a wholly-owned subsidiary of United Parcel Service, Inc. ("UPS").

247.     Upon information and belief, United Parcel Service, Inc. is one of the world's largest package delivery companies.

248.     Upon information and belief, after its acquisition, MBE was a wholly-owned subsidiary of United Parcel Service of America, Inc.

249. Upon information and belief, in or about 2003, United Parcel Service of America, Inc. began the process of rebranding retail stores in the MBE franchise network as "The UPS Store."

250. Upon information and belief, in or about 2012, the United Parcel Service of America, Inc. renamed its wholly-owned subsidiary MBE to TUPSS.

251. Upon information and belief, TUPSS is a wholly-owned subsidiary of United Parcel Service of America, Inc.

252. Upon information and belief, MBE is the predecessor-in-interest to TUPSS.

253. Upon information and belief, TUPSS is presently one of the world's largest franchisor of retail shipping, postal, printing and business service centers.

254. Upon information and belief, each TUPSS retail service center (a "Store Center") exists and operates pursuant to a standard franchise agreement with TUPSS for a ten (10) year term.

255. Upon information and belief, each TUPSS Store Center offers to its customers, postal, packaging, business communication and other goods and services.

256. Upon information and belief, as of April 2014, there are approximately 4,400 TUPSS franchisee locations in the U.S.

257. Upon information and belief, as of February 4, 2014, there were approximately fifty-four (54) TUPSS retail locations in New York County.

258. Upon information and belief, TUPSS actively markets the sale of its franchises, *inter alia*, through its website, www.theupsstore.com, and through its area franchisees.

259.     Upon information and belief, a TUPSS area franchisee or area franchise representative ("Area Franchisee") operates pursuant to an area franchisee agreement with TUPSS ("Area Franchisee Agreement").

260.     Upon information and belief, the Manhattan Area Franchise is Atlantic Mailboxes, Inc. ("Atlantic") and Atlantic's President is Tripp Singer ("Singer").

261.     Atlantic's Area Support Manager in Manhattan is Jose Contreras ("Contreras").

262.     Upon information and belief, the Manhattan Area Franchisee has a contractual responsibility to make sure that a certain number of new store centers open in the Manhattan Area each calendar year.

263.     Upon information and belief, the Manhattan Area Franchisee has a contractual responsibility to make sure that store centers do not close in the Manhattan Area each calendar year.

264.     Upon information and belief, the Manhattan Area Franchisee has a contractual responsibility, *inter alia*, to develop and supervise TUPSS franchisees within the Manhattan Area and in return the Area Franchisee receives royalties on the gross sales and commissions of franchisees in its Area.

265.     Upon information and belief, in or around December 2002, Singer entered into his Area Franchise Agreement with the Counterclaim-Defendants or their predecessors.   As part of Singer's Area Franchise Agreement he was required to maintain the existing number of locations and add a certain number of new locations each year.

266.     Upon information and belief, in or around April 2003, there were approximately 43 TUPSS and/or Mailbox, Etc. locations in the Manhattan Area.

267.     Upon information and belief, in or around December 2011, Singer renewed his Area Franchise Agreement with the TUPSS for a term of ten (10) years.  Upon information and belief, Singer's agreement requires that he open at least one (1) new location each year during the term of the agreement, for a total of ten (10) new locations over the entire term of the agreement.

268.     That upon information and belief, Singer co-signed certain MBE loans issued to the Hagans in connection with store acquisitions because the stores opened by the Hagans helped Singer meet his quota and were necessary for him to renew his Area Franchise Agreement in 2011.

269.     Upon information and belief, once Singer renewed his Area Franchise Agreement, he no longer co-signed loans taken out by the Hagans in connection with any store acquisitions.

## MAXIMUM RETAIL RATES FOR FRANCHISEES

270.     Each of the NYPS Stores' Franchise Agreements incorporates by reference a separate "The UPS Store Franchisee UPS Incentive Program Contract Carrier Agreement" between UPS and each of the NYPS Stores (the "Contract Carrier Agreement") which are generally executed contemporaneously with the NYPS Stores' Franchise Agreements.

271.     That inherent within the Franchise Agreement is an implied duty of good faith and fair dealing on the part of TUPSS.

272.     That inherent within the Franchise Agreement is an implied duty of good faith and fair dealing on the part of UPS.

273.     That inherent within the Franchise Agreement is an implied duty of good faith and fair dealing on the part of UPSA.

274. That inherent within the Carrier Contract Agreement is an implied duty of good faith and fair dealing on the part of TUPSS.

275. That inherent within the Carrier Contract Agreement is an implied duty of good faith and fair dealing on the part of UPS.

276. That inherent within the Carrier Contract Agreement is an implied duty of good faith and fair dealing on the part of UPSA

277. The Contract Carrier Agreement incorporates by reference the UPS Tariff and the UPS Terms and Conditions of Service (the "Tariff") in effect at the time of shipment.

278. The UPS Tariff applies to shipments tendered to UPS for either ground or air transportation.

279. The UPS Airfreight Terms and Conditions applies to shipments tendered to UPS for air transportation.

280. Pursuant to the Contract Carrier Agreement, all TUPSS franchisees agree, *inter alia*, that UPS will be their "preferred and recommended carrier of choice for all small package, ground, air, and international shipments."

281. Pursuant to the Contract Carrier Agreement, all TUPSS franchisees agreed, *inter alia*, that they would not charge customers more than the maximum UPS Retail rates designated by UPS for the various UPS shipping services offered…" (the "Maximum Retail Price").

282. Upon information and belief, for the 12 months ending December 31, 2012, Defendant UPS's average revenue per package for Next Day Air products was approximately $19.93.

283.    Upon information and belief, for the 12 months ending December 31, 2012, Defendant UPS's average revenue per package for Deferred Air products (i.e. 2nd Day Air, Next Day Air Saver) was approximately $13.06.

284.    Upon information and belief, for the 12 months ending December 31, 2012, Defendant UPS's average revenue per package for standard domestic Ground products was approximately $7.89.

285.    Upon information and belief, for the 12 months ending December 31, 2012, Defendant UPS's average revenue per package for international deliveries was approximately $19.13.

## UPS CODE OF BUSINESS CONDUCT

286.    At all relevant times, UPS had a Code of Business Conduct in effect that required it to amongst other things, "conduct business fairly, honestly and ethically" ("Code of Conduct"). The Code of Conduct also states that: "[w]e do not misrepresent our services or products in any sales or promotional efforts." The Code of Conduct further goes on to claim, "We communicate clearly, so that our customers understand the terms of our business relationships, including contracts, performance criteria, schedules, prices and responsibilities." **Annexed herewith as EXHIBIT "D" is a true copy of the UPS Code of Business Conduct published at http://www.ups.com/media/en/code_bus_conduct.pdf.**

287.    The UPS Code of Conduct also addresses the reporting of unethical conduct and retaliation and states as follows:

> **Duty to Disclose**: Any UPS employee or representative who becomes aware of a situation in which he or she believes our legal or ethical responsibilities are being violated, or feels pressured to violate the law or our ethical responsibilities, is required to notify the company of the concern.

> **No Retaliation**: No employee or representative of UPS will be disciplined, lose a job or contract, or be retaliated against in any way for asking questions or voicing concerns about our legal or ethical obligations when acting in "good faith." Good faith does not mean an individual has to be right; but it does mean that the individual must believe that the information provided is truthful.

*See* **Exhibit "B" at p. 2.**

288.     That at all relevant times, the Code of Conduct applied to shipping transactions originating out of TUPSS franchise locations.

289.     That at all relevant times, UPS had adopted the Code of Conduct.

290.     That at all relevant times, TUPSS had adopted the Code of Conduct.

291.     That at all relevant times, UPSA had adopted the Code of Conduct.

292.     That UPS owes a duty of good faith to their account holders and consumers to honor the Code of Conduct when implementing franchise models, systems, software, training and other services being offered to the public.

293.     That UPSA owes a duty of good faith to their account holders and consumers to honor the Code of Conduct when implementing franchise models, systems, software, training and other services being offered to the public.

294.     That TUPSS owes a duty of good faith to their account holders and consumers to honor the Code of Conduct when implementing franchise models, systems, software, training and other services being offered to the public.

295.     That inherent within the Code of Conduct is an implied duty of good faith and fair dealing.

296. That the Counterclaim-Defendants adopted a Corporate Code of Conduct with the intent to cause others to rely upon the promise to conduct business "fairly, honestly and ethically."

297. That the Corporate Code of Conduct required the Counterclaim-Defendants to act fairly, uniformly and justly when enforcing its agreements, including, but not limited to the Franchise Agreement and the Contract Carrier Agreement.

## COUNTER MANIFEST SYSTEM FOR FRANCHISEES

298. Franchisees are required by the Franchise Agreements to use TUPSS Point of Sale ("POS") and Counter Manifest System ("CMS") systems to process and record all customer transactions including shipments.

299. At all relevant times and currently, TUPSS franchisees are required by TUPSS to use the iShip CMS ("iShip").

300. iShip is software licensed to each TUPSS franchisee by iShip, Inc., a wholly-owned subsidiary of UPS.

301. UPS has the ability to modify the shipping services offered through iShip and periodically updates are made without any assistance from TUPSS franchisees.

302. At all relevant times, the iShip CMS and POS system were not fully integrated with each other.

303. At all relevant times, upon entering the customer information, dimensions and weight of a package into the iShip CMS, the franchisee must manually enter the same information into the POS system by typing the price in or using a migration key before a customer receipt can be generated.

304. At all relevant times, the CMS and POS systems are currently designed to allow sales associates to save information in iShip CMS and then later manually enter it into the POS system.

305. At all relevant times, no manager override or key is required to manually enter shipping information and rates into the POS system.

306. At all relevant times, it is not a violation of the Franchise Agreement to manually enter shipping information and rates into the POS system as long as the maximum UPS retail rate is not exceeded.

307. At all relevant times, it is not a violation of the Contract Carrier Agreement to manually enter shipping information and rates into the POS system as long as the maximum UPS retail rate is not exceeded.

308. At all relevant times, there was no reporting mechanism available to TUPSS franchise owners to identify whether the retail rate from iShip CMS has been properly entered into the POS system.

309. At all relevant times, the iShip CMS calculates higher shipping rates for packages delivered to residential addresses versus commercial addresses for TUPSS retail customers.

310. At all relevant times, upon entering an address into the iShip CMS system, it automatically calculates the applicable billable weight.

311. At all relevant times, billable weight for a package is determined based upon a variety of factors, including the type of service selected, the destination and the dimensions and weight of the package.

312. At all relevant times, on average, dimensional weight is used more frequently to calculate the billable weight for packages shipped via UPS Air services.

313.     At all relevant times, on average, actual weight is used more frequently to calculate the billable weight for packages shipped via UPS Ground services.

314.     At all relevant times, there is no method by which the iShip CMS system can confirm that a Franchisee has entered the actual dimensions of a package in the system at the point of sale.

315.     At all relevant times, the iShip CMS system relies upon the honesty and accuracy of a Franchisee to enter the proper dimensions of a package in order to issue an accurate rate quote.

316.     At all relevant times, a Franchisee can cause a retail rate overcharge by purposely entering the wrong dimensions of a package into the iShip CMS system.

317.     At all relevant times, a Franchisee can potentially cause a retail rate overcharge by purposely entering the wrong weight of a package into the iShip CMS system.

318.     At all relevant times, if a scale is connected, iShip CMS system can confirm that a Franchisee has entered the correct weight of a package into the system.  However, the iShip CMS system is designed to allow for the weight to also be manually entered.

319.     Pursuant to the terms of the Franchise Agreement, Maximum Retail Prices and Incentives may differ among franchisees due to various factors, including the differing costs of doing business with different franchisees.

320.     Pursuant to the terms of the Franchise Agreement, TUPSS has the right to increase or decrease Maximum Retail Prices and Incentives.

321.     That at no time between January 1, 2013 and December 31, 2013 did TUPSS or UPS adjust the Maximum Retail Prices for any of the Manhattan Area Franchisees to reflect differing costs of doing business.

322. That at no time between January 1, 2013 and December 31, 2013 did TUPSS or UPS adjust the Incentives for any of the Manhattan Area Franchisees to reflect differing costs of doing business.

323. That between January 1, 2013 and February 5, 2014, all 43 Manhattan Area Franchisees, including the Hagans were subject to the same Maximum Retail Prices.

324. That between January 1, 2013 and February 5, 2014, all 43 Manhattan Area Franchisees, including the Hagans were subject to the same Incentives.

## UPS SHIPPING SERVICES OFFERED BY FRANCHISEES

325. Through its Carrier Contract, each TUPSS franchisee has the capability to offer and sell to its customer UPS shipping services that vary, *inter alia*, by delivery time and cost.

326. UPS guarantees on-schedule delivery of certain UPS Shipping Services including domestic delivery UPS Air Services, UPS 3-Day Select, UPS Hundredweight Service and UPS Ground subject to certain conditions and exclusions in Paragraph 48 of the Tariff.

327. Per Paragraph 48.1 of the Tariff, UPS's guaranteed delivery schedule is available by referencing UPS's website.

328. All shipping services offered by TUPSS retail locations should be verifiable by referencing UPS's website.

329. For example, according to the UPS Website, UPS guarantees that packages shipped via its UPS Next Day Air service will be domestically delivered to the named consignee within one (1) business day.

330. In another example, according to the UPS Website, UPS guarantees that packages shipped via its UPS Ground service will be delivered to the named consignee within one to five days business days, depending on location of consignee.

331. The delivery schedule for UPS Ground service is determined by reference to the UPS Ground service map which is generated from the UPS website based on the Zip Code from which the package is shipped and the date and time the package is processed.

332. Upon information and belief, the UPS website generates the exact same UPS Ground service map for all Zip Codes in Manhattan.

333. The Ground service Map for Manhattan confirms that most UPS Ground deliveries to adjacent states can be guaranteed within one business day. **Annexed herewith as EXHIBIT "E" is the UPS Ground Service Map for Manhattan, current as of April 1, 2014.**

334. Neither the Carrier Contract, nor the Tarrif references UPS offering any particular shipping services exclusively to TUPSS franchisees.

335. At all relevant times, no TUPSS franchisee should be able to sell a customer a shipping product that is not also offered and available via the UPS website.

## CALCULATING RATES FOR UPS SHIPPING SERVICES

336. Pursuant to the Terms and Conditions of Service, the costs of UPS Air services are determined by applying the UPS service rates and charges in effect on the date of the shipment to the shipment's UPS billable weight (lbs).

337. Pursuant to the Terms and Conditions of Service, the UPS billable weight for a shipment by UPS Air service is the greater of the package's dimensional weight or actual weight.

338. Pursuant to the Terms and Conditions of Service, dimensional weight of a shipment by UPS Air service is determined by multiplying, after rounding each dimension, the length (in) by width (in) by height (in) of each package (the packages "Cubic Size") and dividing by 166 (the "Dimensional Weight").

339.     Pursuant to the Tariff, the costs of UPS Ground services are based on UPS service rates and charges in effect on the date of the shipment to the shipment's UPS billable weight (lbs).

340.     The billable weight of a shipment by UPS Ground services is the actual weight (lbs) of the package unless the Cubic Size of the package is greater than 5,184 inches in which case the billable weight is greater of the actual or Dimensional Weight.

341.     Upon information and belief, UPS advertises and charges customers distinct fuel surcharges for packages shipped via Air, however not all packages shipped via Next Day Air, Next Day Air Saver or 2nd Day Air actually travel on an airplane.

342.     Upon information and belief, the fuel surcharge for packages shipped with UPS Air service labels is greater than the fuel surcharge for UPS Ground labels.

343.     Upon information and belief, regardless of whether a package shipped with a UPS Air service label ever enters an airplane, UPS charges customers the more expensive air fuel surcharge.

344.     Upon information and belief, TUPSS franchisees are pressured by the Counterclaim-Defendants to ship packages with Air labels by whatever means necessary.

345.     That as a direct and proximate result of these practices, UPS collects higher fuel surcharges, in many cases for packages that are shipped in trucks via UPS Ground service.

346.     That UPS also generates higher profits and revenues from packages that are shipped via UPS Air services versus UPS Ground.

347.     That UPS is a publicly traded company on the New York Stock Exchange, trading as NYSE: UPS.

348.    That the combined 4,300 TUPSS franchise locations as a group represent one of UPS's largest corporate shipping accounts.

349.    That UPS regularly reports gross sales and earnings to its shareholders.  Included within the gross sales reported by UPS are shipping revenues originating from TUPSS retail locations in the Manhattan Area and elsewhere across the United States.

### UPS SHIPPING RATE VARIABLES

350.    Upon receipt of a package for shipment, all TUPSS franchisees, must properly weigh and then measure, by-hand, the length, width, and height of all packages processed for shipment.

351.    The aforementioned weight and dimensions of every package must always be accurately entered into the iShip CMS system.

352.    The iShip CMS software automatically calculates whether actual weight or dimensional weight is used as the applicable billable weight for each available UPS shipping service.

353.    Based on the billable weight of the package and the consignee's location, the iShip CMS system will automatically generate and display for the franchisee user a list of available shipping quotes for each UPS service option, including the maximum retail rate price for each type of UPS service (the "Retail Rate Quotes").

354.    It is possible for the franchisee user to manipulate the Retail Rate Quotes provided by iShip CMS by manipulating the weight or dimensions of the package before entering them into the iShip CMS system.

355.    Unless a customer is provided with a separate iShip CMS receipt or a printed Retail Rate Quote from the iShip CMS system, a TUPSS retail customer will have no way of

knowing the precise weight and dimensions the franchisee entered into the iShip CMS system before completing the sale.

356.     It is possible for the franchisee user to manipulate the Retail Rate Quotes provided by iShip CMS by changing the designation of a delivery address for a package to be shipped from "residential" to "commercial" and vice versa.

357.     Upon the franchisee's selection of the UPS service options, the shipment information and pricing data can then be "migrated" or transferred electronically to the point-of-sale system ("POS system"), for the cash register transaction with the customer.

358.     Successful migration to POS requires all information to be properly entered into iShip CMS and for the franchisee to follow specific procedures on the computer.

359.     As an alternative, the POS system allows the franchisee user to directly input a shipment price into the POS system without transferring the data from the iShip CMS.  This feature is permitted to allow a customer to pay for a transaction without waiting for an employee to actually finish packaging the box.

360.     With ability to directly input a shipment price into the POS system, a franchisee user is capable of entering a shipping price that is higher or lower than the published UPS Retail Rates.

361.     It is not a violation of any policy or procedure covered by the Franchise Agreement for a franchisee user to directly input a shipment price into the POS system that is lower than the published UPS Retail Rates.

362.     That when a franchisee user directly inputs a shipment price into the POS system, they are not asked to confirm whether or not that price does not exceed the published UPS Retail Rates.

363.    The POS system provided by TUPSS does not include any software or hardware that requires a manager's override for a franchisee user to directly input a shipment price into POS system.

364.    The POS system provided by TUPSS does not include any software or hardware that reconciles and reports to franchise owners how many times shipment prices have been directly entered into the POS system by users versus the migration method from iShip CMS.

365.    It is not a requirement under the Franchise Agreement for franchisees to provide customers with iShip CMS Retail Rate Quotes prior to completing a retail transaction with a customer.

366.    It is not a requirement under the Franchise Agreement for franchisees to provide customers with iShip CMS receipts, together with POS cash register receipts.

## FRANCHISEE SHIPPING INCENTIVES

367.    The NYPS Stores' Carrier Contract Agreements, and upon information and belief the Carrier Contract Agreements with other TUPSS franchisees, include "Incentives" to the franchisees for shipments originating at each franchisee's Store Center.

368.    All TUPSS franchise locations are issued separate shipping account numbers from UPS and receive monthly billing statements detailing all shipping transactions occurring during the billing cycle.

369.    Each month, the UPS shipping invoices are automatically paid via ACH withdrawals taken directly from a bank account designated by the franchisee.

370.    The Incentives are discounts off UPS Retail Rates charged to the franchisee's account.

371.    The percentage of the Incentives varies based on the type of UPS shipping service being sold to a TUPSS customer.

372.    The incentive discount for UPS Air Products is always higher than the incentive discount for UPS Ground service.

373.    The billing process automatically applies the appropriate UPS Retail Rate and then invoices TUPSS franchisees for said shipping services, less the applicable Incentive discount.

374.    If a franchisee incorrectly under-weighs or under-measures the dimensions of a box causing a shortfall in the billable rate charged to the customer versus the actual billable rate that should have been charged and it is discovered by the UPS laser measurement system at processing, the UPS invoice will reflect a debit adjustment ("Rate Adjustment").

375.    If a franchisee incorrectly over-weighs or over-measures the dimensions of a box causing a overage in the billable rate charged to the customer versus the actual billable rate that should have been charged and it is discovered by the UPS laser measurement system at processing, the UPS invoice will reflect a credit adjustment ("Rate Adjustment").

376.    Upon information and belief, some TUPSS franchisees engage third parties to assist them in obtaining downward Rate Adjustments on their UPS shipping bills.

377.    Upon information and belief, Third-Party Defendant KAPLAN engages a third-party service to assist him in obtaining and in fact does obtain downward Rate Adjustments to the UPS bills for his eight (8) TUPSS locations in the Manhattan Area.

378.    Upon information and belief, other Third-Party Defendants engage third-party services to assist them in obtaining and in fact do obtain downward Rate Adjustments to their UPS shipping bills.

379.    That at no time, did the Hagans ever employ a third-party service to assist them in obtaining downward Rate Adjustments to their UPS shipping bills.

380.    Upon information and belief, if a franchisee or customer does not make a timely request for a downward Rate Adjustment, UPS permanently keeps all fees billed based upon the original transaction amount.

381.    Upon information and belief, if a franchisee or customer does not make a timely request for a downward Rate Adjustment, TUPDS permanently keeps all royalties calculated based upon the original transaction amount.

382.    Upon information and belief, when a Rate Adjustment occurs to a TUPSS account, retail customers are not notified.

383.    Upon information and belief, when a Rate Adjustment occurs, TUPSS does not require franchisees to notify retail customers.

384.    Upon information and belief, when a Rate Adjustment occurs, UPS does not require franchisees to notify retail customers.

385.    Upon information and belief, when a Rate Adjustment occurs, UPSA does not require franchisees to notify retail customers.

386.    Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, Defendant TUPSS does not require franchisees to notify retail customers to tell them a credit was issued to the franchisee's account.

387.    Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, Defendant UPS does not require franchisees to notify retail customers to tell them a credit was issued to the franchisee's account.

388.    Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, Defendant UPSA does not require franchisees to notify retail customers to tell them a credit was issued to the franchisee's account.

389.    Upon information and belief, Defendant UPS has no written policy or procedure that it shares with TUPSS franchisees regarding how to handle Rate Adjustments of consumer transactions.

390.    Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, retail customers are not automatically notified.

391.    Upon information and belief, when a Rate Adjustment occurs resulting in an upward adjustment of the shipping charge, retail customers are not automatically notified.

392.    Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, Defendant TUPSS does not refund or adjust its corresponding royalty fee downward.

393.    Any Incentive received by a TUPSS franchisee is part of the franchisees' gross profit.

394.    That TUPSS, UPS, UPSA and the Third-Party Defendants have in their possession searchable records which would permit the calculation of the exact amount of money each customer was overcharged, yet not refunded.

395.    That upon information and belief, the Counterclaim-Defendants and those working in concert with them targeted the Hagans because they stumbled upon the existence of the dimensional overcharge scheme and knew that internal records existed to corroborate everything the Hagans found.

## UP-SELLING TO AIR IS TUPSS BUSINESS MODEL

396.    TUPSS franchisees are repeatedly encouraged to increase revenues by aggressively "up-selling" customers to more costly shipping services and adding accessorial services such as insurance, email notification, delivery confirmation, packing, pick-up and storage.

397.    That in some cases, TUPSS franchisees are encouraged to "up-sell" shipping products that are significantly more expensive, but offer no quantifiable benefit to the customer.

398.    That it is always more expensive to ship a package via UPS Air than UPS Ground, even though in some instances, both services offer the exact same delivery date guarantee.

399.    In some cases, although certain UPS deferred Air shipping services offer the exact same delivery date and time guarantees as UPS Ground shipping services, the UPS deferred Air shipping services are offered and sold by TUPSS franchisees at a higher cost than UPS Ground.

400.    In some cases, although certain UPS deferred Air shipping services such as "2nd Day Air" offer inferior delivery date and time guarantees versus certain UPS Ground shipping services, the UPS 2nd Day Air shipping services are offered and sold by TUPSS franchisees at a higher cost than UPS Ground.

401.    Increased franchisee revenues, result in increased royalties, marketing and advertising fees for TUPSS and Area Franchisees.

402.    That when the Hagans began questioning the "up-selling" methods and practices of TUPSS, they were almost immediately subjected to adverse treatment by the TUPSS.

## THE BUILDING OF THE HAGANS' MCO

403.    Between 2008 and 2012, the Hagans purchased eight (8) existing TUPSS Store

Centers and opened three new (3) TUPSS Store Centers in Manhattan as follows:

| Store | Physical Address | Phone | Fax | Date Acquired/Opened |
|---|---|---|---|---|
| 1227 | 527 3rd Ave<br>New York, NY, 10016 | (212) 683-9634 | (212) 683-9784 | 8/2004 |
| 0561 | 1636 3rd Ave<br>New York, NY, 10128 | (212) 410-7814 | (212) 410-0927 | 4/2008 |
| 0523 | 1202 Lexington Ave<br>New York, NY, 10028 | (212) 439-6104 | (212) 439-6107 | 4/2010 |
| 1141 | 331 W. 57th Street<br>New York, NY, 10019 | (212) 489-8004 | (212) 489-8011 | 7/2009 |
| 5308 | 342 Broadway<br>New York, NY, 10013 | (212) 842-5383 | (212) 842-4986 | 10/2010 |
| 1382 | 1562 1st Ave<br>New York, NY, 10028 | (212) 861-0581 | (212) 861-0588 | 5/2011 |
| 4311 | 303 Park Ave South<br>New York, NY, 10010 | (212) 477-0211 | (212) 477-7366 | 6/2011 |
| 6280 | 1474 3rd Ave<br>New York, NY, 10028 | (212) 288-1103 | (212) 288-1176 | 1/2012 |
| 6281 | 222 8th Ave<br>New York, NY, 10011 | (212) 365-1050 | (212) 365-1053 | 1/2012 |
| 6283 | 694 10th Ave<br>New York, NY, 10019 | (212) 265-1600 | (212) 265-1611 | 2/2012 |
| 5613 | 328 8th Avenue<br>New York, NY 10001 | (212) 337-3104 | (212) 337-3106 | 10/2012 |

*NOTE: Store 1227 was partially owned by Robert Hagan in August 2004 and thereafter

fully acquired by the Hagans in or around July 2008.

404.    The Hagans purchased or opened each of their TUPSS Store Centers in the

Manhattan area with the full encouragement, support, approval and direction of TUPSS, UPS,

UPSA and the Manhattan Area Franchisee Singer.

405.    Acquiring a Store Center requires certain approvals on the part of TUPSS,

including, but not limited to a Buyer Approval Letter.

406.    In or about August 2004, Plaintiff  Robert Hagan, with his then-partner, entered

into a franchise agreement to operate TUPSS Store Center at 527 Third Avenue, New York, New

York ("Store Center 1227").

407.    In or around 2004, there were approximately 42-44 TUPSS and/or Mailboxes,

Etc. franchisees in the Manhattan Area.

408.     It should be noted, that at the time, Mailboxes, Etc. franchisees were not subject to retail rate compliance standards.  More specifically, part of the Mailboxes, Etc. franchise model was that business owners were permitted to set their own margins on shipping products, including services such as UPS Air and UPS Ground.

409.     On or about March 28, 2008, Tom and Robert through their wholly-owned entity 3A, purchased their second TUPSS Store Center in the Manhattan Area and  entered into a ten-year Franchise Agreement with TUPSS's predecessor-in-interest, MBE, to operate Store Center 561 at 1636 Third Avenue, New York, New York ("Store Center 0561").

410.     As of July 1, 2008, Plaintiff Thomas Hagan had bought out the ownership interest of Robert Hagan's partner, and Tom and Robert through their wholly-owned entity, Tanmor, entered into a new ten-year Franchise Agreement with TUPSS's predecessor-in-interest, MBE, to operate Store Center 1227.

411.     The purchases of Store Centers 561 and 1227 were initially self-funded by Counterclaim-Plaintiffs Tom and Robert.

412.     With the purchase of their second TUPSS Store Center, Tom and Robert became an MCO under the terms of the Franchise Agreements.

413.     In 2009 and 2010, TUPSS and Atlantic/ Singer urged Tom and Robert to purchase three (3) underperforming and distressed Store Centers that were not meeting their franchise obligations, including paying royalty fees, shipping fees, taxes, rent and other bills and were thus on the verge of closing and losing their leases.

414.     At no time did the Counterclaim-Defendants, Atlantic or Singer advise the Hagans that the terms of the Franchise Agreement permitted TUPSS to take over these franchise

locations, forcibly assign the leases to substitute franchisees or acquire any assets of the franchisors without compensating these former franchisees.

415.    Indeed, TUPSS and Atlantic/Singer advised the Hagans that the only way they could acquire an outgoing franchisees' business and mailbox customer lists, was to enter into an asset purchase agreement to buy same.

416.    The Hagans had no reason to believe that TUPSS or Atlantic/Singer were misleading them, so they proceeded as recommended and purchased the store centers, with Singer serving as an intermediary.

417.    Moreover, to facilitate the purchases of the three underperforming Store Centers, TUPSS and/or its predecessor-in-interest issued to certain of the Hagans three (3) loans totaling approximately $372,000.

418.    On or about July 10, 2009, Ridgepac, 3A, Tanmor, Tom and Robert signed two secured promissory notes in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for a total of $150,000.

419.    On or about April 3, 2010, Ridge Assets, Ridgepac, 3A, Tanmor, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for $150,000.

420.    On or about August 18, 2010, Ridgedown, Ridge Assets, Ridgepac, 3A, Tanmor, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for $72,000.

421.    With the funds borrowed from TUPSS and/or its predecessor-in-interest, on or about July 7, 2009, Tom and Robert through their wholly-owned entity, Ridgepac, entered into a

ten-year Franchise Agreement with TUPSS's predecessor-in-interest, MBE, to operate Store Center 1141 at 331 West 57th St., New York, New York ("Store Center 1141").

422.    With the funds borrowed from TUPSS and/or its predecessor-in-interest, on or about March 31, 2010, Tom and Robert through their wholly-owned entity, Ridge Assets, entered into a ten-year Franchise Agreement with TUPSS's predecessor-in-interest, MBE, to operate Store Center 523 at 1202 Lexington Avenue, New York, New York. ("Store Center 523").

423.    With the funds borrowed from TUPSS and/or its predecessor-in-interest, on or about September 21, 2010, Tom and Robert through their wholly-owned entity, Ridgedown, entered into a ten-year Franchise Agreement with TUPSS's predecessor-in-interest, MBE, to operate Store Center 5308 at 342 Broadway, New York, New York. ("Store Center 5308").

424.    During a telephone call on or about September 2010, Tom informed Singer and TUPSS representatives Steven D'Andrea, TUPSS Regional Vice President at the time ("Dandrea") and Kevin Pignone, TUPSS Vice President of Business Development at the time, that he and Robert wanted to expand their MCO to ten (10) Store Centers in the Manhattan Area.

425.    During the telephone call, TUPSS and Singer enthusiastically supported the proposed expansion of Tom's and Robert's MCO proposed by Tom.

426.    Contemporaneously, the Hagans developed a plan to finance the rapid expansion of their MCO that included financing the development of additional Store Centers with loans from TUPSS and a private equity lender named John Penrose ("Penrose").

427.    The Hagans shared with TUPSS and Singer the aforementioned plan to finance the expansion of their MCO.

428.     In or about, February 14, 2011, TUPSS issued a press release announcing that, to support the expansion of the TUPSS network, $22.5 million in lending would be available from The Bancorp Inc. ("Bancorp") to fund development of new TUPSS Store Center locations and the transfer of current TUPSS Store Centers to new owners (the "SBA Loan Program").

429.     In or around February 2011, Singer and TUPSS enthusiastically encouraged Tom and Robert to take advantage of the Bancorp SBA Loan Program in connection with the implementation of Tom's and Robert's MCO expansion plan.

430.     In or around March 2011, Tom and Robert received a cash loan of approximately $500,000 from Penrose to fund the development of additional TUPSS Store Centers.

431.     On or about June 8, 2011, in furtherance of the Hagans' MCO expansion in Manhattan, Tom and Robert received from TUPSS and/or its predecessor-in-interest a letter pre-approving them for ownership of up to seven (7) new TUPSS franchise locations.

432.     In or around June 2011, Singer told Tom and Robert that pre-approval of seven (7) locations was a significant departure from TUPSS' normal approval process.

433.     In or around June 2011, Singer told Tom and Robert that pre-approval of seven locations was a good sign that TUPSS was interested in having them become one of the largest MCO's in the entire TUPSS network.

434.     Between May and June 2011, pursuant to the financing approval confirmed in a June 8, 2011 letter, TUPSS and/or its predecessor-in-interest issued to the Hagans two (2) loans totaling $150,000.

435.     On or about May 6, 2011, Ridge Assets, Ridgepac, Tanmor, Ridge Logistics, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for $90,000.

436. On or about June 10, 2011, Ridge Assets, Ridgepac, Ridge Logistics, Ridge Pen, Tommys, NYPS, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for $60,000.

437. Upon information and belief, the two aforementioned promissory notes were co-signed by Atlantic and/or Singer.

438. The Hagans were never told why the Counterclaim-Defendants required Atlantic and/or Singer to co-sign said promissory notes. However, based upon information and belief, it now appears to have been connected to Singer's ongoing negotiations at the time with the Counterclaim-Defendants for the renewal of his Area Franchise Agreement which was expiring on December 31, 2011.

439. Upon information and belief, Singer's Area Franchise Agreement required that he open at least ten (10) new store centers between January 1, 2001 and December 31, 2011.

440. Upon information and belief, the new store centers being developed by the Hagans were necessary for Singer to meet the quota under the Area Franchise Agreement expiring on December 31, 2011.

441. On or about May 31, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Tommys, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to operate Store Center 4311 at 303 Park Avenue South, New York, New York ("Store Center 4311").

442. On or about, September 28, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Ridge Logistics, entered into a ten-year Franchise Agreement with TUPSS predecessor-

in-interest, MBE, to operate Store Center 1382 at 1562 First Avenue, New York, New York ("Store Center 1382").

443.   In or around September, 2011, Tom was informed by Singer and TUPSS Manager of Finance, Jocelyn Sloan, that based on the operational and financial success of the Hagans' NYPS Stores, TUPSS had issued loans that were in excess of TUPSS lending guidelines and practices.

444.   In or around Fall 2011, TUPSS, Singer approved the development by Tom and Robert of three (3) new Store Centers in Manhattan.

445.   At the request of TUPSS and Singer, the three (3) new Store Centers were competitively positioned to specifically compete with former TUPSS franchises that continued to operate independent pack and ship retail store locations in violation of non-compete agreements that TUPSS and UPS either could not or chose not to enforce.

446.   The three locations were also competitively positioned to compete with market competitors of TUSPS and UPS such as Staples and Fed Ex/Kinkos.

447.   The Hagans agreed to embark on this aggressive expansion plan with TUPSS, in reliance upon their promises to provide financial assistance, enhanced support, that they would work to develop the non-existent MCO model and that they would help the Hagans' grow in the franchise network.

448.   In or about Fall 2011, to facilitate and induce the development of three (3) new Store Centers in Manhattan, TUPSS and/or its predecessor-in-interest issued to certain of the Counterclaim-Plaintiffs new loans totaling $300,000.

449.   On or about October 27, 2011, Ridge Assets, Ridgepac, Ridge Logistics, Ridge Pen, Tommys, NYPS, Bigpack, Tompack, Tanmor, Tom and Robert signed two secured

promissory notes in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for a total of $240,000.

450.    On or about November 18, 2011, Ridge Assets, Ridgepac, Ridge Logistics, Ridge Pen, Tommys, NYPS, Bigpack, Tompack, Tanmor, Tom and Robert signed two secured promissory notes in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for a total of $60,000.

451.    Upon information and belief, the aforementioned promissory notes were co-signed by Atlantic and/or Singer.

452.    On or about October 21, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Ridge Pen, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to develop and operate Store Center 6280 at 1474 Third Avenue, New York, New York ("Store Center 6280").

453.    On or about October 27, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Tompack, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to develop and operate Store Center 6281 at 228 Eighth Avenue, New York, New York ("Store Center 6281").

454.    On or about November 21, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Bigpack, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to develop and operate Store Center 6283 at 694 Tenth Avenue, New York, New York ("Store Center 6283").

455.     Between November 2011 and June 2012, the Hagans worked endless hours to diligently build their business and establish new and existing store centers. Throughout this process, TUPSS and Singer appeared supportive as the Hagans worked to establish a multi-center management model that was still nonexistent within the TUPSS franchise system.

456.     More specifically, the franchise materials, operating manuals, computer software, technical systems and infrastructure at TUPSS were all established to exclusively serve single owner-operated store centers. This plagued the Hagans, as they faced the known challenges of operating store centers in neighborhoods with strong market competition.

457.     On or about, January 20, 2012, Atlantic and/or Singer issued an "Area Update" in which other Manhattan franchisees were informed that the Hagans were opening their 8th and 9th locations and that their 10th location was due to open in or around February 2012 (the "January 2012 Update").

458.     Shortly after the January 2012 Update was issued, Singer informed Tom that other Manhattan franchisees began lodging complaints about their Store Centers to Singer and TUPSS headquarters.

459.     Singer told Tom that the aforementioned complainers were simply envious of Tom's and Robert's success.

460.     Singer suggested to Tom that Third-Party Defendant Bradley Kaplan, who was previously the largest MCO in Manhattan with eight (8) stores, was one of the franchisees making the aforementioned complaints.

461.     Since the Hagans had received no inquiries from TUPSS headquarters and because all the feedback they were receiving was positive, they paid no mind to Singer's comments.

462.     In July 2012 Tom and Robert went back to Bancorp and successfully refinanced the debt carried by their existing Store Centers from both TUPSS/MBE and Penrose with a $1,200,000 loan guaranteed by the Small Business Association (the "SBA Loan Refinance"). Upon receiving the loan, TUPSS/MBE, Atlantic and/or Singer had zero debt co-signed with the Hagans.

463.     Prior to the refinance, the Hagans were current on all loans from TUPSS and/or its predecessor-in-interest and Penrose.

464.     Prior to the refinance, the Hagans had not made any late payments on the loans from TUPSS and/or its predecessor-in-interest and Penrose.

465.     Upon the refinancing of the debt on Tom's and Robert's NYPS Stores, Penrose agreed to immediately lend up to an additional $1,000,000 to Tom and Robert for them to develop new Store Centers and continue building an MCO management processes to operate eleven Store Centers.

466.     In or around August 2012, during a lunch meeting with Singer and D'Andrea. Plaintiff Tom informed them that Tom and Robert were looking to expand their Manhattan MCO to twenty (20) Store Centers.

467.     Singer and D'Andrea enthusiastically encouraged Tom's and Robert's expansion of their MCO to twenty (20) store centers.

468.     In or about September 2012, Singer approached Robert and Tom with another opportunity to purchase a severely distressed Store Center owned by Teresa Fung at 328 Eighth Avenue in Manhattan (the "Fung Store Center").

469.     Ms. Fung had become delinquent on her financial obligations and was facing the termination of her franchise agreement and eviction by the landlord.

470. To induce Tom and Robert to purchase the Fung Store Center, TUPSS and Singer distributed "Same Store Sales" comparisons and other financial information that he knew to be inaccurate, inflated and achievable only through non-compliance, so that Tom and Robert could reach quick and unrealistic conclusions about the Fung Store Center's historical sales.

471. In reliance upon the information conveyed to Robert and Tom by Defendant TUPSS and Singer, Tom and Robert through their NYPS Store entities, agreed to purchase the Fung Store Center.

472. Defendant TUPSS and Singer quickly approved the purchase of the Fung Store Center by Tom and Robert.

473. At no time did the TUPSS, UPS, UPSA or Singer inform the Hagans that they in fact had the ability to terminate Fung's franchise agreement and allow the Hagans to take over the location without compensating her.

474. In or around September 2012, to facilitate and induce the purchase of the Fung Store Center, TUPSS and/or its predecessor-in-interest quickly approved a loan of $150,000 to the Hagans.

475. That in connection with the purchase of Store Center 5613, TUPSS issued the Hagans and their purchasing entity a Buyer Approval Letter that was valid as of September 19, 2012.

476. On or about September 19, 2012, Ridge Assets, Ridgepac, Ridge Logistics, Ridge Pen, Tommys, NYPS, Bigpack, Tompack, Tanmor, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for a total of $150,000. Neither Singer, nor Atlantic co-signed this loan.

477. On or about September 19, 2012, with funds from the additional TUPSS loan and the funds made available by Penrose, Tom and Robert through their wholly-owned entity, Robpack, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to operate Store Center 5613 at 328 Eighth Avenue, New York, New York ("Store Center 5613").

478. After the purchase of the Fung Store Center, the NYPS Stores comprised approximately 20.4% of all Manhattan Area TUPSS Store Centers.

479. Almost immediately after purchasing Store Center 5613, the Hagans realized that they had been provided false and inaccurate historical sales information about the location. Moreover, it was discovered that a significant portion of the business conducted at this Store Center was non-compliant and thus not able to be converted by the Hagans upon their purchase. This purchase put a significant financial and operational strain on the Hagans MCO.

480. In or around January 2013, the Manhattan Area Franchisees were strongly encouraged to offer their employees financial incentives in the form of bonuses, if they meet certain sales thresholds.

481. In or around the first week of January 2013, Singer contacted Thomas Hagan and attempted to convince him to institute a bonus program which incentivized employees financially to increase revenues at Store Centers. Singer said he had a detailed spreadsheet that included instructions and sent it to Hagan in an attempt to induce him to adopt it. **Annexed herewith as EXHIBIT "F" is an electronic mail with attached proposed Bonus Schedule from T. Singer to T. Hagan, dated January 9, 2013**.

482. The Hagans' refused to implement the bonus program based upon sales because it incentivized and encouraged overly aggressive and unethical sales practices.

483. Instead, the Hagans focused on creating new revenue streams such as value-added services and bundled transactions for things such as customer pick-ups, messenger services, custom packing and shipping for customers moving in and out of apartments and other large-scale transactions. However, the Hagans struggled to reconcile these services with the commercially unreasonable computer software and hardware systems offered by TUPSS that was incapable of handling these project-priced jobs.

484. On or about April 5, 2013, the Hagans integrated a retail rate compliance policy within its MCO model and employee handbook (the "Pricing Policy"). As part of this program, the written policy document required all employees never to exceed the designated UPS Retail Rate in the iShip CMS system. All employees were required to acknowledge and sign this policy, which clearly states that the failure to comply will result in disciplinary action, which may include termination of employment. The Counterclaim-Defendants were made aware of this policy at the time it was created and copies were sent to Singer and circulated within TUPSS.

485. At all relevant times, Tom and Robert repeatedly informed TUPSS and Singer that the success of the NYPS Stores and the continued growth of their MCO was dependent on receiving proper support from TUPSS and continued credit from private equity lender Penrose.

486. Upon information and belief, Tom's and Robert's average total cost for purchasing or developing their eleven (11) NYPS Stores was approximately $347,250 each.

## CONCERNS ABOUT THE CMS MIGRATION PROCESS

487. On or about April 15, 2013, at the Starbucks at 322 West 57th Street, New York, New York, Tom and an employee of the NYPS Stores, Shahriar Choudhury, met with Singer and Singer's Area Support Representative, Jose Contreras ("Contreras").

488.	At the April 15, 2013 meeting, Singer expressed concern that some of the NYPS Stores were directly entering prices into the POS system instead of migrating them from the iShip CMS system and, as a result, he believed that the prices were deviating from the UPS Retail Rates.

489.	At the April 15, 2013 meeting, Tom offered one possible explanation: that a price may be directly entered into the POS system if the NYPS Stores were bundling pricing for shipping services, with value added services when moving furniture or equipment, a large profit area for the NYPS Stores.

490.	In instances where UPS shipping services were combined with substantial value-added services, Singer suggested that the NYPS Stores price the shipping and value-added services for large transactions in CMS, migrate the itemized shipping-rate prices to the POS System and then ring in the value-added service amounts, but withhold the actual POS receipt from the customer, unless it is actually requested.

491.	In instances wherein UPS shipping services were combined with substantial value added services, Singer also suggested that the NYPS Stores enter into an alternative project price agreement.

492.	At the April 15, 2013 meeting, Singer insisted that the NYPS Stores migrate CMS data to the POS System, because the POS receipt would then indicate that UPS Retail Rates were charged. He added that by doing this it would avoid all problems from the TUPSS and UPS.

493.	In or around April 2013, neither Singer, nor the Defendant informed the Hagans that modifying the actual dimensions and/or weight of packages before entering them into the iShip CMS system was considered by TUPSS as an acceptable method of doing business.

494.    However, in or around April 2013, Singer and his operations manager Jose Contreras were training certain Third-Party Defendant Manhattan Area Franchisees and Third-Party Defendant Manhattan Area Franchisees were in fact adding inches to the dimensions of packages before entering them into the iShip CMS system.

495.    Upon information and belief, in or around April 2013, modifying the actual dimensions and/or weight of packages before entering them into the iShip CMS system was neither seen, nor enforced by TUPSS or UPS as a compliance violation.

496.    In or around April 2013, Singer and his operations manager Jose Contreras were advising and training the Third-Party Defendant Manhattan Area Franchisees to "upsell" higher priced UPS Air products to customers by not disclosing the existence of lower cost UPS Ground services until or unless the customer actually requests the Ground service.

497.    That when shipping UPS Air products such as 2nd Day Air, modifying the dimensions of a package by as little as one inch to the length, width and height, will in most instances cause a higher billable rate to be triggered within the iShip CMS system.

498.    That the Counterclaim-Defendants knew or should have known that franchisees across TUPSS network were systematically exploiting this flaw in the franchise system to increase gross sales and consequently profits.

499.    That even if a customer is provided with an iShip CMS receipt, they would have little chance of ever discovering they were potentially overcharged the true maximum UPS Retail Rate, until or unless they knew the actual weight and dimensions of the package shipped.

500.    At the April 15, 2013 meeting, Tom reminded Singer that Tom and Robert had already begun additional and improved employee compliance training that included the employee's written acknowledgement of their understanding of the policies to prevent

employees from entering incorrect iShip CMS prices into the POS system, completion of training, and the consequences for failure to comply with these policies.

501.    Without any assistance from TUPSS or Singer, the Hagans created and instituted training and policies to help prevent the employees of NYPS Stores from entering incorrect iShip CMS prices into the POS system.

502.    Upon information and belief, at no time were the Hagans accused of intentionally and systematically modifying the dimensions or the weight of packages to deceive customers or trigger higher UPS Retail Rates in the iShip CMS system.

503.    By the end of April 2013, all employees of the NYPS Stores had acknowledged in writing receipt of the training on the NYPS Pricing Policy for UPS Shipping ("the Pricing Policy").

504.    Upon information and belief, the Hagans' Stores were the only TUPSS Store Centers in the Manhattan Area to adopt written retail rate compliance policies signed by employees between January 1 and December 31, 2013.

505.    On or about April 19, 2013, Tom emailed Singer copies of the Pricing Policy documents signed by the employees of the NYPS Stores.

506.    On or about April 24, 2013, at a conference of TUPSS MCO owners in Tarrytown New York, attended by Thomas Hagan and TUPSS Vice President of Global Operations and Chief Operating Officer C. James Hillquist ("Hillquist") and TUPSS Vice President of Sales Chris Adkins ("Adkins"), Adkins declared that he would prefer all future franchises be sold to MCO operators like Tom and Robert (the "April 2013 Conference").

507.    At the April 2013 Conference, the Thomas Hagan was asked to make a presentation to the group about their growth and the MCO model they were building.  After the

meeting, Adkins and Hillquist asked Thomas if he and his brother would meet with the President of TUPSS, Tim Davis ("Davis") to discuss their MCO model and the future of the franchise. Hagan agreed.

508.    On or about April 25, 2013, Davis travelled to Manhattan with Eric Maida (TUPSS Northeast Regional Vice President) and took a tour of the former Hagan Store Center #1141 on West 57th Street.  Thereafter, Tom, Robert, Davis, Maida, Singer and Contreras had lunch at a restaurant known as Kennedys, located on West 57th Street near Store #1141, at which time Tom and Robert shared their model for MCO success (the "April 25th Lunch Meeting").

509.    At the April 25th Lunch Meeting, Davis expressed admiration for the Hagans' MCO model and he requested copies of the materials they used in connection with a presentation they made at the April 2013 Conference.

510.    On or about May 5, 2013, Tom and Robert emailed Davis a copy of their MCO model presentation from the meeting and other materials.  A few hours later, Davis responded to Tom's email: "Thank you, Tom.  I really enjoyed spending time with you and Rob.  I look forward to sharing your materials with UPS as examples of how your team is raising the standard for managing multiple centers.  Regards, Tim." **Annexed herewith as EXHIBIT "G" is a true copy of the email exchanges and attachments from T. Hagan to T. Davis, dated May 5, 2013.**

## THE TOP SECRET INVESTIGATION OF THE HAGANS

511.    Upon information and belief, during the same time that the Hagans were continuing to operate their stores in good faith and building their MCO model with what they believed to be the full support of Tim Davis and the rest of the TUPSS executive team, individuals at TUPSS were conspiring to destroy them.

512.    Upon information and belief, in or around July 2013, the Hagans still had no retail rate customer concerns, which led them to believe that their enhanced compliance policies implemented by the end of April 2013 were working.

513.    However, upon information and belief, in or around July 2013, TUPSS launched a top secret investigation against the Hagans and each of their eleven (11) store centers.

514.    Upon information and belief, the existence of this investigation was kept secret by the Counterclaim-Defendants and any individual who discussed the matter with the Hagans would be subjected to disciplinary action, even Singer. **Annexed herewith as EXHIBIT "H" is a true copy of a letter sent from D. Higginson to T. Singer, dated October 3, 2013.**

515.    According to the Counterclaim-Defendants' Verified Complaint, in or around early July 8, 2013, TUPSS claims to have communicated with a "former employee" of the Hagans to obtain "information…concerning alleged unethical sales practices…" **See Verified Complaint at Paragraph 3.**

516.    Also according to the Verified Complaint, the TUPSS alleges that the "former employee" told TUPSS that employees at the Hagan centers were instructed to "make up [their] own price and to mark up the shipping by at least $20" and that it was a practice not to provide customers with tracking numbers. **See Verified Complaint at Paragraph 68.**

517.    At no time did Robert Hagan or Thomas Hagan ever instruct employees to make up their own price, mark up the shipping by at least $20 or refuse to provide customers with tracking numbers.  In fact, such would be in direct contravention of the Pricing Policy that all employees were required to sign beginning in April 2013.

518.    That if a "former employee" who came to TUPSS was still employed with the Hagans as of May 1, 2013, they would have executed the same written Pricing Policy that directly contradicts the statements allegedly made to TUPSS set forth in the Verified Complaint.

519.    That if the "former employee" was an individual who was let go by the Hagans as part of their initiative to institute a more stringent compliance module, TUPSS knew or should have known that there was a good reason to suspect the motives and veracity of any claims made by this individual.

520.    That if this "former employee" was terminated, they may have been subject to a confidentiality agreement, and by speaking with them, TUPSS may have tortuously interfered with that agreement by not first notifying the Hagans.

521.    That at no time did the Hagans ever pay employees "a bonus based upon how much they overcharged" customers.

522.    That despite multiple written demands and long outstanding subpoenas in a New York State Supreme Court action, TUPSS and UPS have refused to disclose the name of the alleged "former employee", produce documents or identify the exact statements this employee is claimed to have made in connection with the Hagans' store centers. **Annexed herewith as EXHIBIT "I" are true copies of the Subpoenas Duces Tecum issued and served upon TUPSS and UPS, dated February 6, 2014.  Annexed herewith as EXHIBIT "J" is a true copy of the responses and objections of TUPSS and UPS, dated March 10, 2014.**

523.    That upon information and belief, on or about July 16, 2013, C. James Hillquist, the then Vice President of Operations, traveled to New York City and conducted what he claimed was a personal "mystery shop" at two (2) of the Hagans eleven (11) store centers (the "Hillquist Secret Shops").  Hillquist said nothing about these visits to the Hagans until they

contacted him in November 2013 to schedule a meeting at TUPSS corporate headquarters to mediate claims that had arisen. Thereafter, Hillquist told the Hagans that he had a "terrible experience" in one of their stores which "felt dirty" and that he was overcharged. Although Hillquist acknowledged that Hagan brothers were not present during any of his "mystery shops," he inexplicably refused to disclose any particulars about these transactions, including tracking numbers, receipts, the names of employees involved or any other information that would help a franchise owner ascertain exactly what happened.

524. After Counterclaim-Plaintiffs conducted their own internal investigation of the Hillquist Secret Shops, it was determined that the entire matter involved Hillquist's belief that he had been overcharged approximately $4.00 in one of the two transactions.

525. Because more than thirty (30) days had passed since the dated of the alleged Hillquist transaction and when it was first reported, it was impossible for the Hagans to conduct a proper investigation, which would have included immediately questioning the employee and reviewing surveillance footage of transaction to ascertain exactly what happened.

526. The Hagans were never provided with a satisfactory answer about why Hillquist as the Vice President of Operations and Chief Operating Officer of TUPSS would take it upon himself to travel across the country to personally secret shop two (2) of the Hagans' store centers instead of simply engaging a credible independent outside investigator to conduct a proper audit and the share the results.

527. Indeed, according to admissions made by executives at TUPSS, at no time between July 2013 and December 1, 2013, had any outside investigator been engaged by TUPSS or UPS to conduct a compliance audit of any store centers in the Manhattan Area.

528. In the Verified Complaint, the Counterclaim-Defendants allege that in or around August 2013 "TUPSS' Security Departments performed multiple `mystery shops' at each of the Hagans' store centers." Although it is claimed that TUPSS' security personnel were "systematically overcharged for UPS shipping services at nine of the eleven" Hagan store centers, in the almost eight (8) months since these purported "mystery shops" took place, no credible evidence or details surrounding these "mystery shop" transactions has been produced.

529. The one fact that is apparently not disputed by the Counterclaim-Defendants is that they indeed possess the technology and the resources to review samplings of shipping data from various store centers to determine if overcharges occurred.

## THE HAGANS' GOOD FAITH EFFORTS

530. In September 2013, Plaintiff Tom Hagan contacted Hillquist and requested to open a dialogue to discuss issues and obstacles facing the Hagans as they continued to develop their MCO model. Hillquist neither disclosed his "mystery shops," nor any of the purported inquiries by TUPSS' Security Department.

531. On or about September 23, 2013, without the Hagans knowledge, Singer conducted what he later claimed to be an "independent" "mystery shop" of all eleven (11) Hagan Store Centers (the "Singer Mystery Shop"). **Annexed herewith as EXHIBIT "K" is the information produced by T. Singer relating to the Singer Mystery Shop, dated September 23, 2013.**

532. That upon information and belief, Singer and Singer's employee Contreras hired an individual by the name of Dakar Holmes to enter the Hagans' store centers to "mystery shop" them.

533.    That upon information and belief, Dakar Holmes was and still is a longtime friend of Contreras and had worked with him at a store owned by Third-Party Defendant Kaplan, the second-largest competitor MCO in the Manhattan Area.

534.    That upon information and belief, Dakar Holmes worked at one of Third-Party Defendant Bradley Kaplan's store centers approximately five (5) years ago.

535.    That on October 25, 2013, Singer admitted to Robert Hagan that he specifically instructed Contreras to use an individual who was completely unknown to store owners and that had no connection to TUPSS.

536.    That upon information and belief, on or about September 23, 2013, Dakar Holmes went to all eleven (11) of the Hagans' store centers, where he provided false address information and sought to document overcharges at each store center.

537.    Upon information and belief, between September 24, 2013 and September 30, 2013, Dakar Holmes allegedly "mystery shopped" other TUPSS store centers in the Manhattan Area, including two (2) store centers owned by Kaplan.

538.    Upon information and belief, despite Singer claiming that he did the "mystery shop" of the Hagans' store centers to "help them," he transmitted the results of the subjective, flawed and tainted "Singer Mystery Shop" to Hillquist at TUPSS corporate headquarters.

539.    Upon information and belief, the Counterclaim-Defendants sought to permanently conceal the existence of the Singer Mystery Shop from the Hagans.

540.    That on or about October 3, 2013, TUPSS issued Singer a "Violation of Area Franchise Agreement" citing amongst other things, that the disclosure of the Singer Mystery Shop to the Hagans constituted a violation of Atlantic's and Singer's confidentiality obligations

as an Area Franchisee and behavior that reflects "unfavorably on the goodwill associated with the TUPPS franchise system and network." **See Exhibit "C".**

541.     Upon information and belief, despite the flaws in the Singer Mystery Shop, the Counterclaim-Defendants relied upon it and took adverse action against the Hagans based in part or in whole upon its existence.

542.     On October 21, 2013, Plaintiff Robert Hagan and his operations manager Shariar Choudhury met with Contreras for an Area Franchise Meeting at Store Center 4311 located at 303 Park Avenue South in the City, County and State of New York ("Contreras Area Franchise Meeting").

543.     That at the Contreras Area Franchise Meeting, Counterclaim-Plaintiffs learned that Contreras was aware of serious compliance problems existing within TUPSS Manhattan Area Network.

544.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that "the Ground to Air Ratio for New York City is too sensitive" because if that information was made available "you would know who is making money and who is not."

545.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that the reason shipping rates are not locked into the CMS/POS systems is because "you kill the flexibility of what the system is intended to do."

546.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that he personally observed employees at Hagans' Store Centers undercharging customers and leaving "money on the table."

547.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that the MBE model was more profitable and "there are a lot of holes in the MCO model they threw out years ago."

548.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that the Hagans were a "role model MCO" and that "generally speaking, you guys are doing outstanding."

549.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that "there are some minor things to be worked on," but "the issues are more than reachable."

550.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that when dealing with training "you have your way of showing the guys and I have my way of showing the guys."

551.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that "I teach my guys to add an inch [to the dimensions of each side of a box] because if I lose [referring to the UPS laser measurement system], I'm not going to lose big. But does that become an issue when you're not teaching your guys that?"

552.     That upon information and belief, Contreras' statement about whether it "become[s] an issue" if the Hagans are not teaching their employees to add inches, was referring to the fact that the Hagans had begun drawing attention to the issue of dimensional weight overcharges.

553.     That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that trying to upsell a

customer away from UPS Ground to an air product is "almost deceiving the customer" and "a nightmare."

554.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that "if you ship primarily Ground, you will not make money" as a TUPSS franchisee in the Manhattan Area.

555.    On October 22, 2013, Plaintiff Tom Hagan sent Hillquist a follow-up email message requesting an in-person meeting to continue discussing issues relating to building their MCO model. **Annexed herewith as EXHIBIT "L" is a true copy of the email from T. Hagan to J. Hillquist, dated October 22, 2013.**

556.    On October 28, 2013, Singer informed Plaintiff Robert Hagan that "most of our franchisees do not sell [UPS Ground] as a guaranteed service."

557.    On October 28, 2013, Singer informed Plaintiff Robert Hagan that there is no formal answer to the Ground guarantee from the franchise.

558.    On October 28, 2013, Singer informed Plaintiff Robert Hagan that he does not believe that "ethics questions" regarding consumers and "integrity" are specifically covered by the Franchise Agreement.

559.    On October 28, 2013, Singer informed Plaintiff Robert Hagan that he has not been asked to address the issue of consumer fraud by the Franchisor and he will not.

560.    On October 28, 2013, UPS Store Customer Service was contacted to determine whether or not "UPS Ground" is a guaranteed service option. A customer service representative named Daniel confirmed to him that "Ground is a guaranteed service option."

561.    On October 28, 2013, TUPSS Customer Service was contacted to determine whether or not "UPS Ground" is a guaranteed service option. A customer service representative

named Marybeth stated that "Ground is not a guaranteed service" and that it only provides "an expected date of delivery." She also stated, "I promise you sir, I have been doing this business for a long time, you need something overnight and you need something tomorrow, you need Next Day Air." Finally, when asked about why there was a discrepancy between the UPS retail rate and what was charged at a TUPSS, she stated "the rates are different" and "you have to go to a UPS Hub" to obtain one day Ground delivery guarantees.

562.    That upon information and belief, the statements of Marybeth, the Customer Service Representative at TUPSS Corporate Headquarters are a part of the scheme to confuse and deceive consumers who believe they were overcharged.

563.    On October 29, 2013, Plaintiff Robert Hagan sent Tripp Singer an email attaching a sign he wished to place inside all eleven store centers to help engage customers in a fully transparent sales process. **Annexed herewith as EXHIBIT "M" is a true copy of the email with attachments from R. Hagan to T. Singer, dated October 29, 2013.**

564.    On October 30, 2013, Counterclaim-Plaintiffs Thomas Hagan and Robert Hagan attended a Quarterly Area Meeting with their operations manager Shariar Choudhury and their attorney at the UPS Hub located off the West Side Highway in the City, County and State of New York (the "October 2013 Area Meeting").

565.    At the October 2013 Area Meeting, during a question and answer session, Plaintiff Robert Hagan attempted to ask Singer and Maida questions about the UPS Ground Guarantee and how to sell products in a transparent, compliant manner. Singer abruptly cut Robert off and told him to speak with Maida separately after the meeting.

566.    At the October 2013 Area Meeting, Plaintiff Robert Hagan asked Maida whether UPS Ground was a guaranteed delivery service. After Maida checked with consultant O'Neal,

he responded that "Ground was a guaranteed service" and that he would ask Singer to put something out in a future "Area Update."

567.     On October 31, 2013, Singer told Plaintiff Thomas Hagan on the telephone that "I told you guys a couple of years ago that if I had to deal with Rob, I would rather not grow with you in this business."

568.     On October 31, 2013, Singer warned Plaintiff Thomas Hagan on the telephone that he previously told Robert "I think you are going in the wrong direction," when Robert discussed with Singer his ideas for the Transparent Sales Model.  Singer also stated, "Your revenue will be hurting as a result, I promise you that."

569.     On October 31, 2013, Singer told Plaintiff Thomas Hagan on the telephone, "What I suggest to you Tom, is to have a conversation with Rob about the topic he brought up yesterday about when to sell Ground versus Air.  Because that is a discretionary subject that the individual and their team is involved with on a day to day basis with customers, each circumstance being unique."  He also added, "Rob is trying to philosophize with anyone who will listen while he was trying to get the group's attention. `We should all sell only the cheapest option even if there is a more expensive air option to get it there at the same time.'"  Singer also stated: "It's not his place to legislate how other people should do it.  If you do, you will leave a lot of money on the table. It's not the answer for you and it certainly is not the right answer for other people."

570.     On October 31, 2013, Singer explained to Plaintiff Thomas Hagan on the telephone how to upsell a customer as follows: "If the customer didn't specify `the cheapest way possible' you would give them and say, `I could get it to there tomorrow morning' and you give them the Next Day Air price.  If they have sticker shock, you then say `O.K., no problem', you

would give them the next price down.  This upselling significantly increases your chances of profitability."  Singer also added, "The upselling concept is an assumptive close.  You do this in every case, sell the faster, more expensive option…if you show all the options, people by nature will always take the cheapest option."  Singer concluded with, "all the franchisees who have five or more stores are doing it just the way I described."  Singer suggested to Tom, "Let's not tell Rob."

571.    More specifically, upon information and belief, if the Counterclaim-Defendants were to conduct a proper independent audit of their shipping records for just the Manhattan Area between October 14, 2013 and April 1, 2014, they would likely uncover tens of thousands of overcharges by franchisees caused by things such as: (a) dimensional overcharges (i.e. adding inches to actual the dimensions of boxes to trigger a higher billable weight); (b) overweighing of boxes (i.e. adding weight to the actual weight to trigger a higher billable weight); (c) misclassifying the shipping addresses (i.e. intentionally billing a customer for a residential delivery when the package is being delivered to a commercial address); (d) adding unrequested additional services (i.e. accessorial charges); (e) failing to properly migrate from the iShip CMS System to the POS System and artificially inflating the shipping rate; (f) selling a customer "2nd Day Air", "Next Day Air Saver" or "3 Day Select" for a package being delivered to a residential address when UPS Ground guarantees end of day delivery on the same or an earlier date.

572.    As of the date of the filing of this Complaint, the Counterclaim-Defendants have effectively destroyed the Counterclaim-Plaintiffs business.  All eleven (11) store centers have been shut following receipt of termination notices and cease and desist letters threatening imminent injunctive relief if the Counterclaim-Plaintiffs' attempt to continue doing business either as a TUPSS or an independent authorized shipping outlet.

## THE HAGANS' ATTEMPTS TO MEDIATE CLAIMS

573.     In late October 2013, the Hagans took affirmative steps to mediate and resolve their disputes with the Counterclaim-Defendants by requesting an in-person meeting at TUPSS corporate headquarters in San Diego, California. Plaintiff Thomas Hagan contacted Jim Hillquist to request the meeting and it was quickly scheduled for the second week of November 2013.

574.     On November 8, 2013, Plaintiff Robert Hagan sent Jim Hillquist an email attaching a copy of the draft Deck that was going to be used for the meeting in San Diego on November 12, 2013. **Annexed herewith as EXHIBIT "N" is a true copy of the email and attachments sent from R. Hagan to J. Hillquist, dated November 8, 2013.**

575.     On November 11, 2013, Plaintiff Robert Hagan received an email which appeared to indicate that his in-store sign was going to be approved by the Marketing Help Center in six (6) to ten (10) business days. **Annexed herewith as EXHIBIT "O" is a true copy of the email from R. Hagan to H. Rowe, dated November 11, 2013.**

576.     On November 12, 2013, Plaintiff Robert Hagan, Plaintiff Thomas Hagan and their counsel met at TUPSS corporate headquarters with TUPSS Vice President James Hillquist, Senior Vice President Don Higginson and TUPSS counsel Chana Parker Barra (the "San Diego Meeting").

577.     The purpose of the San Diego meeting was to mediate and resolve issues that had arisen and created concerns on the part of the Hagans. More specifically: (a) TUPSS' failure to be transparent regarding their investigations; (b) TUPPS' failure to properly support the Hagans as lead MCOs in TUPSS network; and (c) the damage being caused to the Hagans' relationship with their private equity lender as a result of TUPSS's increasing and unexpected adverse action.

578.     During the first part of the San Diego Meeting, Hillquist asked that the Hagans focus exclusively on the issue of compliance and the efforts being taken to comply with Retail Rate Policies.  The Hagans provided a comprehensive overview of the action taken to date, the challenges inherent within TUPSS franchise model and they requested assistance because compliance is something that all franchisees need to work on every day.  The Hagans also introduced their Transparency Sales Model and advised that they were still waiting for approval on certain aspects of the plan, including some in-store signage that had been submitted to the Marketing Help Center.  In connection with this presentation, the Hagans provided the group with an updated Deck.  **Annexed herewith as EXHIBIT "P" is a true copy of the updated deck distributed at the San Diego Meeting on November 12, 2013.**

579.     The first part of the San Diego Meeting ended on a positive note and it appeared all parties were in agreement that the Transparency Sales Model, if adopted, would fully address the compliance issues raised.  However, the one question raised by Senior Vice President Don Higginson was that if the Hagans were required to adopt such a sales model, wouldn't it have to also be applied to all other franchisees to avoid unfairly prejudicing one franchisee over another.  Higginson's question was never answered.

580.     The second part of the meeting involved discussing unique problems experienced by MCOs because TUPSS has not yet built a platform to service multi-center franchise owners.  The Hagans explained that because the software and hardware systems in place are intended for single-owner/operated store centers, the management of multiple stores, including compliance supervision, is made exponentially more complicated.  Tom Hagan then provided a full consulting analysis of key systems and processes that are not commercially reasonable to support the MCO platform promoted by TUPSS to franchisees.  The Hagans ended the meeting by

reviewing correspondence attached to the deck received from their private equity lender John Penrose to inform and advise them just how dire the situation had become and how critical it was for TUPSS to retain an open and collaborative dialogue with them.

581.     The Hagans left San Diego with one request, a follow-up in-person meeting or telephone conference call within the next thirty (30) days that included their private equity lender so that his confidence could be restored and the Hagans' access to credit could be re-established. All parties left the room with a clear understanding of the expectations on all sides.

582.     On November 12, 2013, Jim Hillquist sent an email to the Hagans thanking them for meeting and stating that he believed that, "we did find common ground to improve the value of our network collectively." **Annexed herewith as EXHIBIT "Q" is a true copy of the email from J. Hillquist to the Hagans, dated November 12, 2013.**

583.     On November 15, 2013, Plaintiff Robert Hagan contacted Singer to advise him that he had begun implementing the Transparency Sales Model in each of their store centers, which included customers being provided with a Pricing Quote and that in the next few days someone from TUPSS could begin auditing them if need be. **Annexed herewith as EXHIBIT "R" is a true copy of the email exchange between R. Hagan and T. Singer, dated November 15, 2013.**

584.     On December 6, 2013, after several weeks had passed without any contact from TUPSS headquarters, Thomas Hagan sent a good faith email to Jim Hillquist, Don Higginson and Channa Parker Barra, copying TUPSS President Tim Davis, Northeast Regional Vice President Eric Maida, Consultant Sean O'Neal and Tripp Singer. The email summarized in relevant part the expectations of the parties following the San Diego Meeting, as well as the efforts undertaken by the Hagans to meet same. Thomas Hagan was concerned that TUPSS had

not upheld its side of the deliverables. **Annexed herewith as EXHIBIT "S" is a true copy of the email from T. Hagan to J. Hillquist, dated December 6, 2013.**

585.    On December 12, 2013, the Counterclaim-Defendants sent the Hagans a Notice of Default for Store Centers 0523, 0561, 1141, 1227, 1382, 4311, 5308, 6280 and 6281 (the "December 2012 Default Notice"). This notice accused the Hagans of material defaults under the Franchise Agreement in nine (9) of their eleven (11) stores and made multiple mischaracterizations of fact regarding the San Diego Meeting. The only two store centers owned by the Counterclaim-Plaintiffs not included were Centers 5613 and 6283.

586.    Coincidently or not, the Tripp Singer "Mystery Shop" that was performed in a non-objective manner by the former employee of Third-Party Defendant Kaplan, identified overcharges in the exact same nine (9) Hagan stores and found no violations in the exact same two (2) store centers omitted from the December 2012 Default Notice - Store Centers 5613 and 6283. **See Exhibit "K".**

587.    On December 20, 2013, counsel for the Hagans sent a formal written response to the Counterclaim-Defendants' Notice of Default, dated December 12, 2013.   In this response, the Hagans specifically denied that there was a valid and factual basis to hold them in material default of the Franchise Agreements or the Carrier Agreements. **Annexed herewith as EXHIBIT "T" is a true copy of the letter from M. McKew, Esq. to L. Hudson, Esq., dated December 20, 2013.**

588.    Although the McKew letter was intended to put TUPSS on formal written notice of how they violated their own Franchise Agreements and demanded that TUPSS preserve all documents, tangible things and electronically stored information relevant to claims and defenses

arising from the dispute. The Hagans nevertheless still offered an olive branch and requested a conference call with all parties to take place on or before December 23, 2013. **See Id.**

589. The Counterclaim-Defendants refused to schedule a conference call or meeting with any executives from TUPSS as requested by the Hagans in the December 20, 2013 letter.

590. On January 3, 2014, the Counterclaim-Plaintiffs filed a Summons and Verified Complaint in Supreme Court, New York County against Tripp Singer, Atlantic Mailboxes, Inc. and Bradley Kaplan. **Annexed herewith as EXHIBIT "U" is a true copy of the Summons & Verified Complaint in the Action entitled <u>3A, Inc., et al. v. Tripp Singer, et al.</u> (NY. Sup.Ct., NY.Co. Index No. 650013/2014).**

591. On January 28, 2014, the Counterclaim-Defendants sent a letter entitled "Request to Correct the Record." This letter attempted to exculpate Singer and Kaplan in the New York State Court action by "assuring" the Hagans that the adverse action taken by them had nothing to do with the "mystery shops" performed at the request of Singer, but instead were based upon other sources which they were unwilling to identify. **Annexed herewith as EXHIBIT "V" is a true copy of the letter from P. Ellis, Esq. to M. McKew, Esq., dated January 28, 2014.**

592. Ironically, despite the fact that the Hagans' subpoenaed this allegedly exculpatory information from TUPSS and UPS, counsel for Third-Party Defendant Kaplan in the New York State Court action objected to the production of responses to the Hagans. **Annexed herewith as EXHIBIT "W" is a true copy of the email from R. White, Esq. to M. McKew, Esq., dated April 1, 2014.**

593. On January 31, 2014, the Hagans responded to the Counterclaim-Defendants "Request to Correct the Record" by serving a "Notice of Material Default, Cease & Desist and Response to Letter," dated January 28, 2014. Amongst other things, the Hagans set the record

straight regarding the timeline of events and the good faith efforts undertaken to resolve all disputes between the parties. Moreover, the Hagans notified the TUPSS in writing of the specific business and trade practices that were observed in the Manhattan Area that were making it impossible for them to effectively run their business. Amongst other things, the Hagans' letter alleged that they were selectively targeted, they were repeatedly deceived, they were asked to operate as an MCO with commercially unreasonable processes and systems and they had unreasonable restrictions imposed upon them. Additionally, the letter advised that TUPSS's conscious disregard for compliance in the Manhattan Area had so badly damaged the brand and decimated customer loyalty, that the Hagans efforts to enforce strict compliance alone could never fully correct the widespread problems in the network. **Annexed herewith as EXHIBIT "X" is a true copy of the letter from M. McKew, Esq. to P. Ellis, Esq., dated January 31, 2014.**

594.    On January 31, 2014, the Counterclaim-Defendants served a Demand for Payment, identifying monies claimed to be owed by the Counterclaim-Plaintiffs for past due royalties and shipping fees. However, at no time did the Counterclaim-Defendants serve a formal request to meet or confer with the Hagans for the purposes of mediating any disputes between the parties. The only such meeting to have occurred was the one requested by the Hagans that took place at TUPSS corporate headquarters in San Diego, California on November 12, 2013.

595.    On February 5, 2014, the Counterclaim-Defendants unilaterally terminated all eleven (11) store centers without notice or an opportunity to cure. The Hagans were instructed to cease operations at all former store centers and begin the de-identification process.

## PROOF OF UNETHICAL TRADE PRACTICES IN THE MANHATTAN AREA

596.    At all relevant times, all TUPSS franchisees were encouraged to aggressively sell UPS Air products to customers. The methods and systems by which this was to be done are established in the sales materials created by TUPSS as supplemented by Certified Operator Trainers ("COT") who are authorized to provide in-store training to employees in exchange for a fee.

597.    At all relevant times, the Certified Operator Trainer in the Manhattan Area utilized by franchisees other than the Hagans was Bradley Kaplan.

598.    At all relevant times, the Hagans did not send their employees for COT training, because they had their own certified trainers.

599.    After the Hagans were told by TUPSS corporate executives that they had zero tolerance for conduct which lacks integrity and can harm the brand, they began questioning and verifying whether in fact this was true.

600.    On or about November 8, 2013, all Manhattan Area TUPSS franchisees were advised in a written Area Update that UPS Ground is a guaranteed service.

601.    The Hagans took the November 8, 2013 Area Update seriously and advised all of their sales associates to tell customers that Ground is a guaranteed delivery service and that if UPS fails to complete delivery or attempt delivery by the end of the day on the delivery date promised, the customer can request a refund of their shipping charges,

602.    The response from some customers after disclosing the true nature and existence of the Ground guarantee was not all positive.  More specifically, on more than one occasion Plaintiff Robert Hagan was told by customers that they will never return to a UPS Store again because they had previously shipped a package at another store center and were told that Ground

was not a guaranteed service. Hagan was also told by customers that they were not receiving the same pricing across different stores and that they felt cheated. This caused the Hagans to continue investigating what was occurring at other store centers in the Manhattan Area.

603. On November 20, 2013, Store Center 5958 located at 105 East 34th Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5958").

604. Upon information and belief, on November 20, 2013, a transaction occurred at Panchmia Center 5958 in which a customer was overcharged 64% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013. Moreover, the following was observed: (a) the employee physically measured the box, confirmed the actual dimensions of 12x6x6 and entered them into the iShip CMS system; (b) the employee weighed the box, confirmed the weight of 1.35 lbs. and entered it into the iShip CMS system; (c) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (d) the customer was provided with a POS receipt for 2nd Day Air residential delivery and was only provided with a TUPSS Reference Number (MM7UDZM9WRZ5H); (e) after the customer left the store, the employee apparently shipped the package with a UPS Ground Label and manipulated the address so it would be billed as a less expensive commercial delivery address; and (f) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual

costs for the service requested. The tracking number for this transaction is: 1Z595A730352752510.

605. Upon information and belief, the employee at the Panchmia Center 5958 also made the following false and misleading statements: In response to the customer's request for the cheapest way to get the package there by Friday, November 22, 2013, the employee replies 'the cheapest option for Friday, would get it there throughout the day, is $22.69". When customer asks if that is the cheapest way that employee replies "yes sir". Customer replies "is that Ground". The employee says, "No, 2nd Day Air". When the customer asks how much is Ground service, the employee replies, "Ground will get it there for $13.78". The employee further states "Ground will get it there within a week, it is not guaranteed for any day". The customer asks again what the cheapest way to guarantee for Friday and the employee closes the sale by stating "that would be 2nd Day Air for $22.79." The tracking number for this transaction is: 1Z595A730352752510.

606. On November 20, 2013, Counterclaim-Defendants UPS HUB Customer Service Center located at 601 West 43rd Street, in the City, County and State of New York was owned and operated by Counterclaim-Defendants, UPS and or UPSA ("The UPS Hub").

607. Upon information and belief, on November 20, 2013, a transaction occurred at The UPS Hub in which a customer inquired about the proper retail rate for services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of

the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  The employee initially told the customer to use the self-service kiosk, but when the customer requested assistance, a uniformed UPS employee walked over to assist and made multiple the false and misleading statements to the customer during the 7 minute transaction: the employee begins by saying, "if you send it by Ground it will get there by Friday." The customer asks if that service is guaranteed and the employee replies "well guaranteed would be 2nd Day Air." The customer then says, "I can't guarantee it for Friday?" and the employee replies "by Air."  The employee provides both Ground and 2nd Day Air prices and then proceeds to tell the customer on three separate occasions that 2nd Day Air is the guaranteed service option and offers the confusing and misleading statement that "Air is even more guaranteed."  After being repeatedly pressed by the customer on whether UPS Ground is in fact a guaranteed service for Friday delivery, the UPS employee reluctantly turns his computer screen towards the customer and admits, "according to the company, yes, it says Friday…that is what it says on the [computer] screen." When the uniformed UPS employee is asked why The UPS Store locations do not tell customers that Ground is guaranteed, the UPS employee states: "it's private [franchise] so they will push guaranteed on you."    The tracking number for this transaction is: 1Z149X010318904773.

608.    Upon information and belief, on November 20, 2013, Store Center 4419 located at 130 Seventh Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4419").

609.    Upon information and belief, on November 20, 2013, a transaction occurred at Kaplan Center 4419 in which a customer was overcharged 89% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with

dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee was not wearing a uniform or a name tag; (b) the employee physically measured the box, but entered 12x8x8 as the actual dimensions into the iShip CMS system; (c) the employee weighed the box, but entered 2 lbs. as the actual weight of the box into the iShip CMS system; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: When asked by the customer "what is the cheapest way to get it there by Friday" the employee replies "Guaranteed for Friday is 2nd Day Air, $26.06."  When asked by the customer about Ground service, the employee replies "Ground is not guaranteed for Friday, it is estimated for Monday actually."  The customer asks again if 2nd Day Air is the cheapest option and the employee replies, "to guarantee for Friday, yea [yes] you have to do 2nd Day."   The tracking number for this transaction is: 1ZW4A9330217786841.

610.    Upon information and belief, on November 20, 2013, Store Center 4754 located at 243 5th Avenue, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 4754").

611.    Upon information and belief, on November 20, 2013, a transaction occurred at Seth Center 4754 in which a customer was overcharged 76% above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with

dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013. Moreover, the following was observed: (a) the employee was not wearing uniform or a name tag; (b) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically the employee also made the following false and misleading statements to the customer: "Ground shipping should get it there by Friday, that's $13.78. For the guaranteed product delivery, it is like $10 more"; "Ground shipping is not guaranteed…85-90% certainty it will get there with Ground"; "I can't use the `G word' [about ground service];" and "its $13.78 [for ground] verses $24.23 [for 2nd Day Air] for the guarantee." The tracking number for this transaction is: 1Z06R80V0250305519.

612. On November 20, 2013, Store Center 6387 located at 34 Third Avenue, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 6387").

613. Upon information and belief, on November 20, 2013, a transaction occurred at Panchmia Center 6387 in which a customer was overcharged 89% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the

end of the day on November 22, 2013. Moreover, the following was observed: (a) the employee was not wearing a uniform or name tag (instead had a wool cap and a jean jacket with what appeared to be motorcycle patches); (b) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system; (c) the employee weighed the box, but entered  1 lbs. 5.3 ozas the actual weight of the box; (d) no tracking number was provided to the customer; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the services requested.  More specifically, the employee also made the following false and misleading statements to the customer: When asked by the customer for the cheapest option for Friday the employee replies "the slowest and least expensive option is Ground, gets there within a week;" "it's Ground, the slowest and cheapest option, it gets there anywhere within a week for $14.31." When the customer asks if he can guarantee Ground the employee replies "No, anywhere within a week;" "there is no guarantee on Ground"; and "I have 2 Day Air for $26.06, guaranteed for 2 days". The customer asks again "you definitely can't guarantee Ground?" and the employee replies "No. anywhere within a week." In the background another employee can be heard telling another customer who is asking questions that Ground can take "anywhere up to a week."   The tracking number for this transaction is:  1ZA429320236197295.

614.    On November 20, 2013, Store Center 4766 located at 82 Nassau Street, in the City, County and State of New York was owned by Tani Sussman ("Sussman Center 4766").

615.    Upon information and belief, on November 20, 2013, a transaction occurred at Sussman Center 4766 in which a customer was overcharged 118% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address

using the cheapest method for delivery by the end of the day on Friday, November 22, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 14x12x6 as the actual dimensions into the iShip CMS system; (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the services requested. More specifically, the employee also made the following false and misleading statements to the customer: "the cheapest way for Friday will be is 2nd Day, this day [today] is Wednesday. [It] will be $30.09;" and when the customer asks if there is anything cheaper the employee replies, "you can do UPS Ground, it's not for Friday, that will be Monday. Its $13.78." The tracking number for this transaction is: 1ZRF85310297890574.

616. On November 20, 2013, Store Center 1492 located at 244 Madison Avenue, in the City, County and State of New York was owned by Shyam Buxani/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani Center 1492").

617. Upon information and belief, on November 20, 2013, a transaction occurred at Buxani/Dansignani Center 1492 in which a customer was overcharged 76% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013. Moreover, the following was observed:

(a) the employee physically measured the box, but entered 13x7x7 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: In response to the customer asking if there was anything cheaper than the 2nd Day Air price quote of $24.23, the employee says "Anything cheaper will not be guaranteed"; and "You can send it Ground but is not guaranteed that it will get there by Friday."  The employee further says that Ground is "expected for Friday, but not guaranteed." In response to the customer asking once again if Ground is guaranteed, the employee affirmatively lies and states "not at all."  The tracking number for this transaction is:  1Z1XY6210253052046.

618.    On November 20, 2013, Store Center 5388 located at 319 Lafayette Street, in the City, County and State of New York was owned by John Wong ("Wong Center 5388").

619.    Upon information and belief, on November 20, 2013, a transaction occurred at Wong Center 5388 in which a customer was overcharged 89% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x7x8 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box in the iShip CMS system; (c) the employee falsely entered the provided residential address as a

commercial address in iShip thereby lowering UPS shipping costs to The UPS Store 5388; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: "Ground is $13.78, it is not guaranteed, but it says it is expected Friday at end of day." In response to the customer confirming that Ground is the cheapest, but _not_ guaranteed, the employee stated "it is not guaranteed." The customer asked one final time if the employee was sure and the employee replied, "I am sure."  The tracking number for this transaction is: 1Z3E876Y0271949079.

620.    On November 20, 2013, Store Center 4619 located at 132 east 43rd Street, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 4619").

621.    Upon information and belief, on November 20, 2013, a transaction occurred at Seth Center 4619 in which a customer was overcharged 443% above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x7x8 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 1.3lbs as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More

specifically the employee also made the following false and misleading statements to the customer: "If you want it guaranteed for Friday, there is a Thursday option – it [the price] jumps a bunch its $74.95." He further states "if you just want to hope it gets there on Friday there it's the ground option - its $13." After the customer says again he needs it delivered by Friday the employee states, "I would do the $74, I would have to bite the bullet" and closes the sale for Next Day air 10:30 am delivery." Before the customer leaves, he again asks the employee whether he was provided with the cheapest cost service for guaranteed delivery by Friday and the employee says, "Right, that's why it costs so much." The tracking number for this transaction is: 1ZA6161A0195932162.

622. On November 20, 2013, Store Center 5691 located at One Penn Plaza , in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5691").

623. Upon information and belief, on November 20, 2013, a transaction occurred at Panchmia Center 5691 in which a customer was overcharged 118% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 2lbs as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More

specifically the employee also made the following false and misleading statements to the customer: "Ground is $14.87, which would take about 3-5 days. Could be there sooner, could be there later." When the customer asks a second time what the cheapest way to guarantee delivery is for Friday, the employee responds, "2nd Day Air, $30.09." The tracking number for this transaction is: 1Z1R04840282775354.

624.    On or about November 22, 2013, all Manhattan Area Franchisees were again reminded in writing that "UPS Ground is a guaranteed service." Franchisees were also advised that "upselling" to an Air Service is only appropriate "when it adds value". However, if shipping to a location where both Ground and Air have the exact same guaranteed delivery date and time (i.e. end of day), "it would not be appropriate or ethical to tell the customer that Ground is not guaranteed to arrive on the same date."

625.    On November 25, 2013, Store Center 6341 located at 480 6th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 6341").

626.    Upon information and belief, on November 25, 2013, a transaction occurred at Kaplan Center 6341 in which a customer was overcharged 253% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x14x12 as the actual dimensions

into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; (c) the employee charged the customer for $500 of enhanced declared value insurance for $8.00 that was not requested (and it does not appear on the POS receipt); and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements and omissions: The Employee intentionally withheld the actual shipping options and guarantees from the customer other than 2nd Day Air and stated that "regular Ground is 4 to 7 business days." The tracking number for this transaction is: 1Z19696A0290782303.

627.    On November 25, 2013, Store Center 6415 located at 217 Centre Street, in the City, County and State of New York was owned by John Wong ("Wong Center 6415").

628.    Upon information and belief, on November 25, 2013, a transaction occurred at Wong Center 6415 in which a customer was overcharged 218% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013. Moreover, the following was observed: (a) the employee appeared unintelligible due to a language barrier; (b) the Owner, John Wong was personally present during the transaction and standing behind the employee; (c) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (d) the employee weighed the box, but entered 7 lbs. as the actual weight of

the box; (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the services requested. More specifically, the employee also made the following false and misleading statements and/or omissions to the customer: The customer was offered 2nd Day Air as the only service option; and told, "Ground is not a guaranteed"; "I can't guarantee anything"; and Owner John Wong, added "the cheapest way to guarantee, by when, Wednesday, is 2nd Day Air." When the customer asks why he cannot guarantee Ground, Wong says, "Ground is only 4 to 7 business days." The tracking number for this transaction is: 1ZR09Y670203183055.

629. On November 25, 2013, Store Center 5865 located at 353 Third Avenue, in the City, County and State of New York was owned by Shueb Chowdhury ("Chowdhury Center 5685").

630. Upon information and belief, on November 25, 2013, a transaction occurred at Chowdhury Center 5865 in which a customer was overcharged 249% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x12 as the actual dimensions into the iShip CMS system; (b) the employee offered 2nd Day Air as the only service option; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee

also made the following false and misleading statements to the customer: "You're telling me guarantee, when I hear the word `guarantee,' I am not going to guarantee Ground. Because Ground it could go to the HUB and get lost or ship somewhere else and come right back. That could be a week." The employee then tells the customer that the cost for 2nd Day Air shipping is $55. When the customer sees a charge of $59 and questions it, the employee says "Yeah, with tax, it's $59." (sales tax is not legally collected on such a transaction). The tracking number for this transaction is: 1Z3X2F960212858470.

631. On November 25, 2013, Store Center 4768 located at 4768 Broadway, in the City, County and State of New York was owned by Marcos A. Lopez ("Lopez Center 4768").

632. Upon information and belief, on November 25, 2013, a transaction occurred at Lopez Center 4768 in which a customer was overcharged 248% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x14x14 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 6.39 lbs. as the actual weight of the box; (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "Ground

is not a guaranteed service," adding that "2nd Day [Air] is guaranteed for Wednesday." The tracking number for this transaction is: 1Z06R82V0299831812.

633. On November 25, 2013, Store Center 6166, located at 30 East 125th Street, in the City, County and State of New York was owned by Charmaine Raphael ("Raphael Center 6166").

634. Upon information and belief, on November 25, 2013, a transaction occurred at Raphael Center 6166 in which a customer was overcharged 207% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "you have $26.64 [Ground] but that is not really guaranteed to get there for Wednesday, it's Ground." "The only [guaranteed] one is that…$52.41 [2nd Day Air]." The employee further states "it says it will get there Wednesday [for Ground], but it might not. That is the chance you will have to take." On no less than three (3) separate instances, the employee intentionally misrepresents to the customer that "Ground is not guaranteed for

Wednesday" for the sole purpose of inducing the sale of a higher cost and unnecessary 2nd Day Air product.  The tracking number for this transaction is: 1ZA0E2480254045375.

635.    On November 25, 2013, Store Center 0526, located at 111 East 14th Street, in the City, County and State of New York was owned by Jerome Taylor ("J. Taylor Center 0526").

636.    Upon information and belief, on November 25, 2013, a transaction occurred at J. Taylor Center 0526 in which a customer was overcharged 189% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x12 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "We have second day for Wednesday it $49.32." When affirmatively asked by customer if that is the cheapest delivery option, the employee replies "the cheapest is Ground, $16.54 and it will get there Wednesday, but it is not for sure. It's not 100%, it will get there Wednesday or Thursday"; "The one we have for Wednesday is $49.32."  The tracking number for this transaction is: 1ZR228V20211165285.

637.     On November 25, 2013, Store Center 5472 located at 388 2nd Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5472").

638.     Upon information and belief, on November 25, 2013, a transaction occurred at Kaplan Center 5472 in which a customer was overcharged 217% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x14x12 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on the scale, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "To guarantee it for Wednesday is $54.29" and "Ground is expected for Monday".  The tracking number for this transaction is: 1ZW63F370267269665.

639.     On November 25, 2013, Store Center 0745 located at 208 East 51st Street, in the City, County and State of New York was owned by Mark Taylor ("M. Taylor Center 0745").

640.     Upon information and belief, on November 25, 2013, a transaction occurred at M. Taylor Center 0745 in which a customer was overcharged 217% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural)

address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on scale and entered 7 lbs. as the actual weight into the iShip CMS system; (c) the employee offers the customer 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: "Guaranteed for Wednesday is $54.29".   When the customer asks about ground services the employee states "Ground is not a guaranteed service."  The tracking number for this transaction is: 1Z4R12V71345253591.

641.    On November 25, 2013, Store Center 4163 located at 55 West 116th Street, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 4163").

642.    Upon information and belief, on November 25, 2013, a transaction occurred at Rahman Center 4163 in which a customer was overcharged 232% above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed:

(a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on scale and entered 7 lbs. as the actual weight into the iShip CMS system; (c) the employee offers 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When the customer asks for the cheapest service for Wednesday the employee states, "That will be $56.71 [2nd Day Air]". The customer asks again if there is any cheaper option and the employee says "No." The tracking number for this transaction is: 1Z67WE283507481900.

643.    On or about November 8, 2013, it was made clear in writing to all Manhattan Area franchisees in an Area Update that where a customer requests a package to be delivered to a one-day Ground delivery zone (i.e. NJ from NY) by the end of the day, Air services should not be sold.

644.    On December 2, 2013, Store Center 5296 located at 64 Beaver Street, in the City, County and State of New York was owned by Ed Xu ("Xu Center 5296").

645.    Upon information and belief, on December 2, 2013, a transaction occurred at Xu Center 5296 in which a customer was overcharged 206% above the proper retail rate for the services requested.    More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee

physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: the employee offered Next Day Air AM delivery as the only service option available; when asked if Next Day Air was the cheapest method, the employee said, "You said you want tomorrow, yes, $36.06". When the customer asks again, "Is that the cheapest?" the employee points at the door and says, "the cheapest is at the Post Office." The tracking number for this transaction is: 1ZR170610124860253.

646. On December 2, 2013, Store Center 2992 located at 2576 Broadway, in the City, County and State of New York was owned by Jerome Taylor ("J. Taylor Center 2992").

647. Upon information and belief, on December 2, 2013, a transaction occurred at J. Taylor Center 2992 in which a customer was overcharged 164% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee/owner physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; (b) the employee/owner weighed the box, but entered 1 lbs. as the actual weight of the box; and (c) the owner affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically,

the owner also made the following false and misleading statements to the customer: "There is no cheap guarantee for tomorrow, there is either a guarantee for afternoon and the morning;" "The cheapest guarantee is $31.03"; "Ground is not guaranteed;" and "Ground is not guaranteed anywhere." The tracking number for this transaction: 1Z1V9E321384149522.

648.    On December 2, 2013, Store Center 1083 located at 326 East 65th Street, County and State of New York was owned by Mark Taylor ("M. Taylor Center 1083").

649.    Upon information and belief, on December 2, 2013, a transaction occurred at Taylor Center 1083 in which a customer was overcharged 163% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee was wearing headphones and offered only Next Day Air service; (b) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: The employee quotes "$31.03" as the price for delivery any time next day. When asked if there is anything cheaper, the employee replies "not for tomorrow, Wednesday is $20.59 and Thursday is $15.67." The employee clarifies, "3-5 business days" in reference to the $15.67 UPS Ground Rate. The tracking number for this transaction is: 1Z4R12V71345253591.

650.    On December 2, 2013, Store Center 5777 located at 1838 2nd Avenue, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 5777").

651.    Upon information and belief, on December 2, 2013, a transaction occurred at Rahman Center 5777 in which a customer was overcharged 164% above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box and entered 1 lbs. as the actual weight into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "Ground is not guaranteed. 5-7 days is Ground."   The tracking number for this transaction is: 1ZX30W771376334690.

652.    On December 2, 2013, Store Center 0444 located at 244 Madison Avenue, in the City, County and State of New York was owned by Shyam/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani Center 0444").

653.    Upon information and belief, on December 2, 2013, a transaction occurred at Buxani/Dansignani Center 0444 in which a customer was overcharged 164% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed

box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x6x8 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements: In response to the customer asking the cheapest way to deliver the package by the end of day on Wednesday, the employee states, "$31.03." The customer again asks is that the cheapest way and the employee responds, "Yes, otherwise tomorrow earlier will be $36." The tracking number for this transaction is: 1Z5FX9161300394209.

654. On December 2, 2013, Store Center 5188 located at Toys R Us, 1514 Broadway, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5188").

655. Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 5188 in which a customer was overcharged 148% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the

end of the day on December 3, 2013.  Moreover, the following was observed: (a) The employee weighed the box and entered 1 lbs. into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When asked if the quoted price of $29.15 is definitely the cheapest way for tomorrow any time of day the employee responded "definitely."  The tracking number for this transaction is: 1ZE057A71339844252.

656.    On December 2, 2013, Store Center 4472 located at 809 West 181st Street, in the City, County and State of New York was owned by Danny Spies ("Spies Center 4472").

657.    Upon information and belief, on December 2, 2013, a transaction occurred at Spies Center 4472 in which a customer was overcharged 148% above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "Ground is not guaranteed" and "the cheapest one is $29.15 [Next Day Air Saver]."   The tracking number for this transaction is: 1ZX612371309773995.

658.    On December 2, 2013, Store Center 5565 located at 1324 Lexington Avenue, in the City, County and State of New York was owned by Sandra Machado ("Machado Center 5565").

659.    Upon information and belief, on December 2, 2013, a transaction occurred at Machado Center 5565 in which a customer was overcharged 257% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) The employee was not wearing a uniform or a name tag; (b) the employee physically measured the box, but entered 10x8x5 as the actual dimensions into the iShip CMS system (c) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (d) the employee failed to provide a CMS Shipment receipt to facilitate an overcharge; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "For tomorrow there are only two options Early Am which is 10:30am or End of Day" and "Ground won't guarantee it for tomorrow."  The tracking number for this transaction is:  1Z003W231360995266.

660.    On December 2, 2013, Store Center 0647 located at 1173A Second Avenue, in the City, County and State of New York was owned by Mark Taylor ("M. Taylor Center 0647").

661.    Upon information and belief, on December 2, 2013, a transaction occurred at M. Taylor Center 0647 in which a customer was overcharged 257% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee/owner physically measured the box, but entered 11x9x7 as the actual dimensions into the iShip CMS system; (b) the employee/owner weighed the box and entered 1 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "8:00am is $72.00, 10:30am for $39.00 and End of Day for $33.00." In response to the customer requesting the cheapest delivery rates for tomorrow (Tuesday), the employee stated, "that's $33.00."  The tracking number for this transaction is: 1Z87X7641383252537.

662.    On December 2, 2013, Store Center 4769 located at 888-C 8th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4769").

663.    Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 4769 in which a customer was overcharged 163% above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No

additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered the weight of the box as 2 lbs.; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "The cheapest I can guarantee is $31.03". When customer asks if there is anything cheaper, the employee replied "No." The tracking number for this transaction is: 1Z06R89V1337011467.

664. On December 2, 2013, Store Center 5979 located at 105 West 86th Street, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5979").

665. Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 5979 in which a customer was overcharged 163% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered the weight of the box as 1 lbs.; and (c) the employee affirmatively misrepresented the available shipping options, the

guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "Ground usually gets it there within a day, but there is no guarantee"; and "No, there are no guarantees." The tracking number for this transaction is: 1Z003W231360995266.

666. On December 2, 2013, Store Center 1786 located at 603 West 115th Street, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 1786").

667. Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 1786 in which a customer was overcharged 175% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When asked by customer what is the cheapest way by tomorrow, the employee replied, "That would be Ground, but it is just not guaranteed for tomorrow"; "it [Ground] is estimated for tomorrow or Wednesday, it is not guaranteed"; and "Let's say they encounter anything inconvenient, an accident, it's a truck going there." The tracking number for this transaction is: 1Z5X16W00134548219.

668.     On December 2, 2013, Store Center 4386 located at 2753 Broadway, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4386").

669.     Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 4386 in which a customer was overcharged 147% above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.   Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "We have Ground, it is estimated to get there tomorrow, but it is not guaranteed."   The tracking number for this transaction is: 1Z204F131331695860.

670.     On December 2, 2013, Store Center 4831 located at 366 Amsterdam Avenue, in the City, County and State of New York was owned by Jerome Taylor ("J. Taylor Center 4831").

671.     Upon information and belief, on December 2, 2013, a transaction occurred at J. Taylor Center 4831 in which a customer was overcharged 147% above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.   No

additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "Cheapest way and tomorrow ain't the same thing." When the customer asks if Ground is guaranteed for the following day, the employee states, "Nope." The tracking number for this transaction is: 1ZRF85221389721259.

672.     On December 2, 2013, Store Center 1052 located at 111 East 14th Street, in the City, County and State of New York was owned by Jerome Taylor ("J. Taylor Center 1052").

673.     Upon information and belief, on December 2, 2013, a transaction occurred at Taylor Center 1052 in which a customer was overcharged 206% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered the weight of the box as 1 lbs.; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "Guaranteed for

tomorrow is $36.06" and "Ground is never guaranteed." When the customer asks what day would Ground be guaranteed for the employee says, "it's never really guaranteed." The tracking number for this transaction is: 1Z124E850130728481.

674. On December 2, 2013, Store Center 6404 located at 71 Broadway, in the City, County and State of New York was owned by John Wong ("Wong Center 6404").

675. Upon information and belief, on December 2, 2013, a transaction occurred at Wong Center 6404 in which a customer was overcharged 163% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered 1 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "The cheapest you're looking at for the end of the day, since it is a residence, it could go to 8:00pm, it could be earlier, you're looking at $31.03." When customer asks if that is the cheapest, the employee responds, "that is the cheapest for tomorrow." The tracing number for this transaction is: 1ZR09Y141303005076.

676.     On December 2, 2013, Store Center 5138 located at 1357 Broadway, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 5138").

677.     Upon information and belief, on December 2, 2013, a transaction occurred at Seth Center 5138 in which a customer was overcharged 181% above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x7 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "For tomorrow between the hours of 12:00pm and 6:00pm, which is the latest, will be $33.13." When the customer asks again if that is the cheapest rate, the employee replies, "um hum [yes], if you do Ground it is estimated, but not guaranteed, it will probably get there 4 days later". The tracking number for this transaction is: 1ZE093R6NW37275392.

678.     On or about December 6, 2013, all Manhattan Area Franchisees were again advised in writing of the importance of "shipping with integrity." More specifically, all franchisees were advised that "shipping with integrity" includes "not exceeding the UPS Retail Rate" which "could be caused by improperly adding to the actual weight or dimensions of packages" or "entering a higher shipping price directly into the POS rather than being transferred

directly from the iShip CMS." Franchisees were also specifically reminded that exceeding the retail rates via the above methods "would be a material violation of the Franchise Agreement." It was also made clear that misrepresenting the UPS Ground Guarantee by stating that it does not exist or stating there is no guarantee less expensive than Air would be dishonest.

679.    On January 27, 2014, Store Center 4190 located at 9 East 8th Street, in the City, County and State of New York was owned by John Wong ("Wong Center 4190").

680.    Upon information and belief, on January 27, 2014, a transaction occurred at Wong Center 4190 in which a customer was overcharged 77% above the proper retail rate for the services requested.    More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.    The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.    No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.    Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "Sml Security Box" with actual dimensions of 9x7x3; (b) the employee entered 10x7x4 as the actual dimensions into the iShip CMS system (c); (d) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.    More specifically, the employee also made the following false and misleading statements to the customer: "by Wednesday, guaranteed, by end of day is going to cost you $20.99 [2nd Day Air]."    When the customer inquired about Ground

service, the employee said, "2nd Day Air, it's the one that is guaranteed." The tracking number for this transaction is: 1Z6F87830211083642.

681.     On January 27, 2014, Store Center 5899 located at 1397 2nd Avenue, in the City, County and State of New York was owned by Mohammed Riaz ("Riaz Center 5899").

682.     Upon information and belief, on January 27, 2014, a transaction occurred at Riaz Center 5899 in which a customer was overcharged 78% above the proper retail rate for the services requested.   More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs that should have been properly packaged in a 6x6x6 box. The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.   Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "#21" with actual dimensions of 9x7x5; (b) the employee entered 10x8x6 as the actual dimensions into the iShip CMS system (c) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (d) the employee failed to provide a CMS shipment receipt; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: "If you want guaranteed delivery for Wednesday that will be about $28 [2nd Day Air]" and "Ground is not guaranteed, with 2nd Day if it does not make it you get your money back."   The tracking number for this transaction is: 1Z4F49E20252687839.

683.     On January 27, 2014, Store Center 6374 located at 14 Murray Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5899").

684.     Upon information and belief, on January 27, 2014, a transaction occurred at Panchmia Center 6374 in which a customer was overcharged 93% above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "SB-9 STD" with actual dimensions of 9x7x3; (b) the employee weighed the box, but entered .47 lbs. as the actual weight of the box; (c) the employee failed to provide a CMS shipment receipt; (d) the employee did not migrate transaction from CMS and charged customer above retail rate by entering higher price into POS (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "it [Ground service] could take up to a week [for delivery]" and "the guaranteed Wednesday is $22.92 [2nd Day Air]."  The tracking number for this transaction is: 1Z8820630225034800.

685.     On January 27, 2014, Store Center 5017 located at 2216 Frederick Douglas Blvd, in the City, County and State of New York was owned by Sylvester Onuorah ("Onuorah Center 5017").

686.     Upon information and belief, on January 27, 2014, a transaction occurred at Onuorah Center 5017 in which a customer was overcharged 78% above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "10x10x5" with actual dimensions of 10x10x5; (b) the employee entered 11x8x5 as the actual dimensions into the iShip CMS system and affirmatively misrepresented the dimensions of the box to the customer; (c) the employee weighed the box, but entered .25 lbs. as the actual weight of the box; (d) the employee tries to induce customer into Next Day Air through the omission of other available services; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimensions,  and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: In response to the customer asking for all options to get package delivered by Wednesday the employee said, "I have tomorrow for $37.05 [Next Day Air] and Wednesday for $21.10 [2nd Day Air]". When

685.     On January 27, 2014, Store Center 5017 located at 2216 Frederick Douglas Blvd, in the City, County and State of New York was owned by Sylvester Onuorah ("Onuorah Center 5017").

686.     Upon information and belief, on January 27, 2014, a transaction occurred at Onuorah Center 5017 in which a customer was overcharged 78% above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "10x10x5" with actual dimensions of 10x10x5; (b) the employee entered 11x8x5 as the actual dimensions into the iShip CMS system and affirmatively misrepresented the dimensions of the box to the customer; (c) the employee weighed the box, but entered .25 lbs. as the actual weight of the box; (d) the employee tries to induce customer into Next Day Air through the omission of other available services; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimensions,  and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: In response to the customer asking for all options to get package delivered by Wednesday the employee said, "I have tomorrow for $37.05 [Next Day Air] and Wednesday for $21.10 [2nd Day Air]". When

customer questions the employee about the dimensions of the box he just purchased for the shipment, the employee states "this box is 9x7x3," yet the employee entered 11x8x5 into the iShip CMS system to calculate the billable weight. The tracking number for this transaction is: 1ZR1705Y0232487918.

687.    On January 27, 2014, Store Center 6367 located at 1732 1st Avenue, in the City, County and State of New York was owned by Otis Davis ("Davis Center 6367").

688.    Upon information and belief, on January 27, 2014, a transaction occurred at Davis Center 6367 in which a customer was overcharged 86% above the proper retail rate for the services requested. More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box. The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on January 28, 2014. Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "(#21F) 9x7x5" with actual dimensions of 9x7x5; (b) the employee entered 10x8x6 as the actual dimensions into the iShip CMS system (c) the employee weighed the box, but entered .35 lbs. as the actual weight of the box; (d) the employee failed to provide a CMS shipment receipt; (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "so you

want Wednesday [it to arrive by Wednesday] it's $21.10 [2nd Day Air rate]." The tracking number for this transaction is: 1Z8772XW0204733533.

689.     On January 27, 2014, Store Center 4248 located at 305 West Broadway, in the City, County and State of New York was owned by John Wong ("Wong Center 4248").

690.     Upon information and belief, on January 27, 2014, a transaction occurred at Wong Center 4248 in which a customer was overcharged 76% above the proper retail rate for the services requested.   More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on January 28, 2014. Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "9x7x3" with actual dimensions of 9x7x3; (b) the employee entered 10x7x4 as the actual dimensions into the iShip CMS system; (c) the employee weighed the box, but entered 1 lbs. as the actual weight of the box into the iShip CMS system; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimensions, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "$20.99 [2nd Day Air] to guarantee it Wednesday or earlier." The customer asked if there is a cheaper way to get it there and the employee said, "No, Ground takes 4-7 business days." When the customer asks the

employee to confirm the exact measurements of the box used for the shipment, the employee states: "10x7x4." The tracking number for this transaction is: 1Z3E877R0283055210.

691.    On January 27, 2014, Store Center 0304 located at 101 West 23rd Street, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 0304").

692.    Upon information and belief, on January 27, 2014, a transaction occurred at Seth Center 0304 in which a customer was overcharged 85% above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box. The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014. Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "#21 STD" with actual dimensions of 9x7x5; (b) the employee entered 10x8x7 as the actual dimensions into the iShip CMS system (c) the employee weighed the box, but entered 3 lbs. as the actual weight of the box;; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimension, and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "You said by Wednesday, $21.65 [2nd Day Air rate]." In response to the customer's inquiry about how the package is being shipped, the employee states, "It's going by surface, because it is going to NJ, Ground." The employee also confirms the actual dimensions of the box for the customer as

"9x7x3" although he entered 10x8x7 into iShip for the purpose of calculating the billable weight. The tracking number for this transaction is: 1Z1F487R0271953596.

693.     On January 27, 2014, Store Center 5953 located at 551 West 181st Street, in the City, County and State of New York was owned by Chad Jaafar ("Jaafar Center 0304").

694.     Upon information and belief, on January 27, 2014, a transaction occurred at Jafar Center 0304 in which a customer was charged the retail rate for services requested, but the box provided was intentionally over-dimensioned.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on January 28, 2014.  Moreover, the following was observed: (a) the employee provided the customer a UPS security box with actual dimensions of 9x7x5; (b) the employee entered 10x7x5 as the actual dimensions into the iShip CMS system; and (c) the employee attempted to misrepresent the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer in response to an inquiry about whether UPS Ground is a guaranteed service:  "Usually."  The tracking number for this transaction is: 1Z58E9000308190326.

## FIRST CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
### *(Declaratory Judgment)*

695.     That the Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

696.     Contrary to the Counterclaim-Defendants' allegations, the Counterclaim-Plaintiffs are not infringing, and have not infringed, directly, by inducement, contributorily, or in any way, any valid and asserted claim of any of the Counterclaim-Defendants' asserted trademarks.

697.     Also contrary to the Counterclaim-Defendants' allegation, the Counterclaim-Plaintiffs are not unfairly diluting and "tarnishing" the Counterclaim-Defendants business.

698.     To resolve the legal and factual questions raised by Counterclaim-Defendants, and to afford relief from the uncertainty and controversy that the Counterclaim-Defendants' accusations have precipitated, the Counterclaim-Plaintiffs are entitled to a declaratory judgment that: they do not infringe any valid and asserted claim of any of the Counterclaim-Defendants' asserted trademarks and that they do not unfairly dilute or tarnish the Counterclaim-Defendants' business.

## SECOND CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
### *(Breach of Contract)*

699.     The Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs, inclusive, as if realleged in full herein.

700.     The Counterclaim-Plaintiffs have written contracts with Counterclaim-Defendants known as the Franchise Agreements and the Contract Carrier Agreements.

701.     The Counterclaim-Plaintiffs, each of them, fully performed or were excused from performing, all conditions, covenants, and promises required on their parts, respectively in

accordance with the terms and conditions of all applicable Franchise Agreement and the Contract Carrier Agreement.

702.    The Counterclaim-Defendants' have materially breached both the Franchise Agreements and Contract Carrier Agreements by the conduct alleged herein.

703.    That between January 1, 2013 and the present, the Counterclaim-Defendants breached the Franchise Agreements, the Contract Carrier Agreements and the covenant of good faith and fair dealing therein, with the Counterclaim-Plaintiffs, including but not limited to the following:

a.  transferring, or purporting to transfer, the Counterclaim-Plaintiffs' business, customer lists, goodwill and other valuable assets to Third-Party Defendants without any consideration;

b.  unilaterally declaring the that Counterclaim-Plaintiffs were in material breach of the Franchise Agreements based upon incomplete, inaccurate and flawed information;

c.  intentionally serving "cease and desist" and "default" notice letters, even though the Counterclaim-Defendants knew that at the time such documents were issued, the Counterclaim-Plaintiffs were not engaged in any wrongful conduct and there was nothing for the Counterclaim-Plaintiffs to cure;

d.  failing to have a legitimate and fair compliance audit process in existence so that if compliance issues are raised, franchisees are provided with all relevant information to verify the accuracy and integrity of the audit process (i.e. Contemporaneously providing the franchisee with a report detailing the transaction, the POS receipt, the UPS tracking number, the actual weight and

dimensions of the box shipped and audio/video of the transaction to confirm what the customer and auditor said during the transaction);

e.  imposing upon the Counterclaim-Plaintiffs a "zero tolerance" retail rate compliance policy, while at the same time permitting virtually every other Manhattan Area Franchisee to openly engage in fraudulent and deceptive trade practices;

f.  failing and/or refusing to provide Counterclaim-Plaintiffs with specific information relating to the origin of and evidence to support that Counterclaim-Plaintiffs had in fact materially breached any agreement between the parties;

g.  causing Counterclaim-Plaintiffs' business and personal mail to be intercepted by a Third-Party Defendant franchisee, despite Counterclaim-Plaintiffs specifically instructing all mail to be immediately forwarded to Counterclaim-Plaintiffs' counsel;

h.  creating an "in terrorem" environment for the Counterclaim-Plaintiffs and using threats, intimidation and other misconduct to force the Counterclaim-Plaintiffs to accede to their demands;

i.  demanding royalties, advertising and media payments from Counterclaim-Plaintiffs while plotting to destroy them and improperly using those funds and delivering no services;

j.  unlawfully retaliating against the Counterclaim-Plaintiffs for whistleblowing on fraudulent and deceptive trade practices occurring in the Manhattan Area and elsewhere across the United States;

k.  unlawfully terminating the Counterclaim-Plaintiffs' eleven (11) Franchise Agreements and Carrier Contract Agreements, preventing the sale of the former store centers for value to third-parties and preventing the Hagans from earning a living in the pack and ship industry;

l.  attempting to and/or causing the forfeiture of Counterclaim-Plaintiffs "goodwill" or the "capital asset value" in each of the eleven (11) Former Store Centers owned by the Hagans;

m.  falsely claiming that certain royalties, advertising and media fees to which Counterclaim-Defendants are not legally entitled to, remain due and owing;

n.  misusing audit and other contract provisions to usurp the Counterclaim-Plaintiffs' confidential vendor and customer lists;

o.  remotely accessing Counterclaim-Plaintiffs' computers and POS systems without their knowledge and locking Counterclaim-Plaintiffs out of those systems, when access to those systems was necessary to prepare royalty reports and tax filings;

p.  misusing termination threats and other misconduct to coerce the Counterclaim-Plaintiffs to force them to stop investigating the true nature of the fraudulent and deceptive sales practices occurring within TUPSS network with the approval of the Counterclaim-Defendants;

q.  disparaging the Counterclaim-Plaintiffs to third-parties, including the Third-Party Defendants, former employees of the Hagans and customers who frequented the Hagan store centers;

r.  failing to comply with the mediation/arbitration provision set forth in the Franchise Agreements and instead filing a lawsuit against the Counterclaim-Plaintiffs;

s.  failing to participate in good faith mediation and/or arbitration at the request of the Counterclaim-Plaintiffs to address the issues and concerns, including, but not limited to the material breaches of the agreements between the parties; and

t.  rendering it impossible or impractical the ability for the Hagans to mitigate their damages by selling or transferring one or more Former Store Centers.

704.    As a direct result of the above breaches of contract and covenant of good faith and fair dealing by plaintiffs, defendants seek judgment and are entitled to damages in an amount to be established at trial, attorneys' fees, costs and expenses as the prevailing party, as well as the injunctive relief requested below.

## THIRD CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
*(Fraud)*

705.    Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs, inclusive, as if realleged in full herein.

706.    By submitting false, incomplete and unreliable information to Counterclaim-Plaintiffs about the status of compliance in the Manhattan Area and the alleged intentional conduct occurring at nine out of the eleven Hagan Store Centers, the future plans of TUPSS to expand with the Hagans and the fact that "common ground" was reached following the San Diego Meeting, the Counterclaim-Defendants misrepresented facts to Counterclaim-Plaintiffs.

707.     That the Counterclaim-Plaintiffs, were ignorant of the falsity of Counterclaim-Defendants' representations and had no choice but to assume them to be true, regardless of whether they were independently verified at the time they were made.

708.     That the Counterclaim-Defendants made these misrepresentations with the intention of deceiving and defrauding Counterclaim-Plaintiffs.   In particular, Counterclaim-Defendants made these misrepresentations: (a) to induce the Counterclaim-Plaintiffs to not report the information they uncovered to third-parties, including, but not limited to Bancorp, the New York State Attorney General and others who might conduct their own investigations; (b) to provide the Counterclaim-Plaintiffs with a false sense of security, that their concerns were being addressed; and (c) to cause the Counterclaim-Plaintiffs revenues to sharply decrease to create a pretext for terminating them in the future based upon their failure to meet the financial obligations imposed by the Counterclaim-Defendants.

709.     That in reasonable reliance on the Counterclaim-Defendants' misrepresentations, Counterclaim-Plaintiffs were induced to and did in fact implement a Transparency Sales Model in an attempt to operate their eleven stores with zero retail rate overcharges, regardless of intent, mistake or otherwise.

710.     That upon Counterclaim-Plaintiffs seeking to engage in further dialogue with Counterclaim-Defendants for the purposes of restoring the confidence of their private equity lender Penrose, the Counterclaim-Defendants refused to participate and instead took affirmative actions to alienate Penrose so that he would stop extending credit to the Hagans and eventually become adverse to them, along with their other creditors.

711.     As a proximate result of the fraudulent conduct of the Counterclaim-Defendants as alleged herein, the Counterclaim-Plaintiffs' business was destroyed and the Counterclaim-Defendants forced the closure of all eleven of the Hagan Store Centers.

712.     As a result of the Counterclaim-Defendants' fraud, the Counterclaim-Plaintiffs have suffered and continue to suffer harm to an extent still being ascertained.

## FOURTH CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
### *(Breach of the Duty of Good Faith and Fair Dealing)*

713.     Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs, inclusive, as if realleged in full herein.

714.     Under the Franchise Agreement, the Counterclaim-Defendants have an implied duty of good faith and fair dealing.

715.     Under the Carrier Agreements, the Counterclaim-Defendants have an implied duty of good faith and fair dealing.

716.     Under UPS' Code of Conduct, the Counterclaim-Defendants, have imposed upon themselves a duty of good faith and fair dealing when dealing with people they do business with, including franchisees and account holders.

717.     In addition to the express obligations of the Franchise Agreements and Carrier Contract Agreements, Counterclaim-Defendants owed Counterclaim-Plaintiffs a duty to perform their obligations and act pursuant to the covenant of good faith and fair dealing inherent within the franchise agreements and to take reasonable steps to enable Counterclaim-Plaintiffs to obtain the benefits of their contracts and their reasonable expectations.  In particular, Counterclaim-Defendants owed defendants a duty to not act to deprive Counterclaim-Plaintiffs of the fruits and benefits under the Franchise Agreements and the Carrier Contract Agreements.  In addition,

Counterclaim-Defendants owed Counterclaim-Plaintiffs a duty to not interfere with their reasonable expectations under the Franchise agreements. Those reasonable expectations, included but were not limited to, operating as franchisees for the average eight (8) years remaining on the eleven (11) Franchise Agreements, renewing those franchises for successive ten -year terms, operating peacefully and independently and being able to sell one or more of their franchise locations for value.

718. Pursuant to the Franchise Agreements and Contract Carrier Agreements with the Counterclaim-Plaintiffs, TUPSS, UPS and UPSA had a contractual obligation to provide the Counterclaim-Plaintiffs with a franchise model that was commercially reasonable, functional, free of fraud, and devoid of unethical business practices. TUPSS, UPS and UPS failed to honor this obligation and instead unjustly targeted the Counterclaim-Plaintiffs and de-franchised them instead of working with them to fix the massive problems they had uncovered.

719. Moreover, TUPSS, UPS and UPSA had an obligation to deal fairly and in good faith with the Counterclaim-Plaintiffs as franchisees and account holders. This obligation includes, at a minimum: (1) ensuring that the franchise model imposed upon with the Counterclaim-Plaintiffs was commercially reasonable; (2) ensuring with the Counterclaim-Plaintiffs' rights were considered and protected; (3) protecting the Counterclaim-Plaintiffs from becoming the targets of retaliation; (4) protecting the Counterclaim-Plaintiffs from having unfair conditions imposed upon them and having the franchise agreement selectively enforced against them; (5) promptly taking action to carefully investigate potential compliance issues that arise and providing proper notice to Counterclaim-Plaintiffs as to the results of said investigation, so that any issues discovered can be properly remediated; (6) providing multiple center owner (MCO) franchisees, such as the Counterclaim-Plaintiffs with access to commercially reasonable

systems; (7) providing the necessary systems and software to permit MCOs to develop new revenue streams, such as project-pricing for pack-and-ship residential moving jobs and value-added services; and (8) protecting Counterclaim-Plaintiffs holders from having to be subjected to fraudulent and deceptive business practices.

720.    TUPSS, UPS and UPSA breached their obligation to the Counterclaim-Plaintiffs.

721.    By and through the Counterclaim-Defendants' conduct alleged herein, Defendants' breached their duty of good faith and fair dealing in that they unfairly interfered with the Counterclaim-Plaintiffs' right to receive benefits under the Franchise Agreements.

722.    As a result of Counterclaim-Defendants' breach, the Counterclaim-Plaintiffs were harmed by the Counterclaim-Defendants' conduct and deprived of benefits to which the Counterclaim-Plaintiffs were entitled under the Franchise Agreements.

## FIFTH CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
### *(First Amendment)*

723.    The Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

724.    That the Counterclaim-Defendants are engaged in the shipping and mail industry, which is regulated by the Federal Government, thus making them actors under color of law.

725.    That the Counterclaim-Defendants are regulated by the Federal Trade Commission and other governmental bodies that oversee the postal, shipping and transportation industries.

726.    That the Counterclaim-Defendants participate in Federal Government programs and receive special benefits from the United States Government.

727.     That the Counterclaim-Defendants are contractors with the United States Government and as such, information relating to pricing compliance, sales practices and services offered is a matter of public concern.

728.     The Counterclaim-Plaintiffs violated 42 USC § 1983 and the Counterclaim-Plaintiffs' First Amendment rights by denying them the ability to ask questions and obtain truthful answers about certain practices occurring at TUPSS.

729.     More specifically, as set forth in more detail above, as Plaintiffs began implementing their Transparency Sales Model and investigating how other Manhattan Area Franchisees were dealing with retail rate compliance issues, the Counterclaim-Defendants uncovered what appeared to be a massive pattern of fraudulent and deceptive trade practices occurring in the Manhattan Area and elsewhere with the tacit approval of the Counterclaim-Defendants.

730.     However, when the Counterclaim-Plaintiffs began asking questions about these practices and requested clarification as to the proper and compliant way to sell UPS Air and UPS Ground products, they were threatened and then subjected to escalating adverse action.

731.     Upon information and belief, the adverse action imposed upon the Counterclaim-Plaintiffs by the Counterclaim-Defendants was in retaliation for destroying their ability to maintain a position of plausible deniability with respect to systematic fraudulent and deceptive trade practices being employed by various franchisees in the Manhattan Area, California and elsewhere across the United States.

732.     That at all times alleged herein, the Counterclaim-Defendants had extensive knowledge of the speech and activities Counterclaim-Plaintiffs were engaged in with respect to their efforts to implement a compliant sales model at their store centers.

733. That despite the good faith efforts undertaken by the Counterclaim-Plaintiffs to be and remain compliant, well before even a written warning was served, the Counterclaim-Defendants intended to disrupt and did in fact disrupt Counterclaim-Plaintiffs business in order to quash their speech and prevent them from discovering additional facts related to the practices occurring in the Manhattan Area and elsewhere.

734. That almost immediately after the Counterclaim-Defendants notified TUPSS in writing of certain unlawful business practices occurring in the Manhattan Area and elsewhere, they were retaliated against and subjected to adverse action, including the termination of their franchise agreements.

735. As a result of Counterclaim-Defendant's conduct alleged herein, the Counterclaim-Defendants wrongfully interfered with the Counterclaim-Plaintiffs constitutional rights.

736. That the speech and activities by the Counterclaim-Plaintiffs constituted protected activity.

737. That the speech and activities by the Counterclaim-Plaintiffs concerned a matter of public concern.

738. Specific examples of the protected speech alleged, can be found in the multiple emails, letters sent to the Counterclaim-Defendants and acknowledged to have been received by them.

739. That the speech and activities by the Counterclaim-Plaintiffs was a motivating factor for the retaliation.

740. That the Counterclaim-Plaintiffs have suffered and continue to suffer harm to an extent still being ascertained.

## SIXTH CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
### *(Breach of the N.Y. Franchise Sales Act – N.Y. Gen. Bus. Law § 687)*

741. The Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

742. TUPSS has held itself out as the franchisor. It is the "alter ego" of Counterclaim-Defendants United Parcel Service of America, Inc. and the other United Parcel Service, Inc. entities. All three Counterclaim-Defendants are subject to the provisions of the New York Franchise Sales Act.

743. That as a franchisor, TUPSS may have been required to register with the New York State Attorney General before selling or offering to sell a franchise within the State of New York.

744. That upon information and belief, TUPSS has not registered with the New York State Attorney General before selling or offering to sell a franchise within the State of New York.

745. That the New York Franchise Sales Act prohibits franchisors from requiring releases by franchisees that relieve the franchisor from liability under the act. More specifically, the Act provides that "[i]t is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article."

746. That at the time an individual executes a TUPSS franchise agreement, the Counterclaim-Defendants require them to execute releases in violation of the New York Franchise Sales Act.

747.     That at the time an individual executes a TUPSS franchise agreement, the Counterclaim-Defendants require them to execute releases in violation of the New York Franchise Sales Act.

748.     That upon the Counterclaim-Plaintiffs informing the Counterclaim-Defendants of their intent to sell or transfer one or more franchise locations in order to mitigate damages, the Counterclaim-Defendants stated that they would not approve any such sale or transfer absent the Counterclaim-Plaintiffs executing a general release in favor of the Counterclaim-Defendants in violation of the New York Franchise Sales Act.

749.     At all relevant times, it was a violation of the New York Franchise Sales Act for a franchisor to offer or sell any franchise to "directly or indirectly…employ any device, scheme or artifice to defraud" or "[e]ngage in any act, practice, or course of business which operates or would operate a fraud or default upon any person."

750.     As a result of the violations of the New York Franchise Sales Act, the Counterclaim-Defendants suffered substantial damages, including lost profits, damages to the good will, profitability and value of their franchise business, and lost business reputation, as well as other direct, indirect and consequential damages and were forced to expend time and money, including the payment of court costs and attorneys' fees.

## SEVENTH CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
### *(Violation of the California Franchise Relations Act – Cal. Bus. & Prof. Code § 20020)*

751.     The Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

752.     The Counterclaim-Defendant TUPSS has held itself out as the franchisor. It is the "alter ego" of plaintiff United Parcel Service of America, Inc. and the other United Parcel

Service, Inc. entities. Pursuant to the choice of law expressly stated in the Franchise Agreements, the all of the Counterclaim-Defendants are subject to the provisions of the California Franchise Relations Act.

753.    On or about February 5, 2014, the Counterclaim-Defendants sent Counterclaim-Plaintiffs a letter purporting to notify them of alleged defaults and to terminate their franchise agreements for alleged failure to pay permit an audit inspection.

754.    At all relevant times, it was a violation of the California Franchise Relations Act for a franchisor to "terminate a franchise prior to the expiration of its term, except for good cause." "Good cause" includes the franchisee being given notice of the failure of the franchisee to comply with any lawful requirement of the franchise agreement with a reasonable opportunity to cure.

755.    That prior to February 5, 2014, the Counterclaim-Defendants put in motion a plan to destabilize the Counterclaim-Plaintiffs' business and finances, which included cutting off the Counterclaim-Plaintiffs access to credit, selectively enforcing the Franchise Agreement against them, artificially escalating customer concerns and claims, imposing requirements on the Counterclaim-Plaintiffs that were more restrictive than required, causing the Counterclaim-Plaintiffs to abandon revenue streams that were incompatible with the franchisor's commercially unreasonable systems and software, such as bundled services for value-added transactions and project-based pricing for residential customers in the process of moving in and out of apartments in New York City.

756.    That based upon the facts herein, the Counterclaim-Defendants terminated the Counterclaim-Plaintiffs' franchise agreements for each of their eleven (11) store centers without "good cause" in violation of the California Franchise Relations Act.

757.	As a result of the violations of the California Franchise Relations Act, the Counterclaim-Plaintiffs suffered substantial damages, including lost profits, damages to the good will, profitability and value of their franchise business, and lost business reputation, as well as other direct, indirect and consequential damages and were forced to expend time and money, including the payment of court costs and attorneys' fees.

### EIGHTH CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
*(Violation of the California Franchise Relations Act – Cal. Bus. & Prof. Code § 17200)*

758.	Counterclaim-Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

759.	The Counterclaim-Plaintiffs and Counterclaim-Defendants are "persons" as defined under Calif. Bus. & Prof. Code § 17201. The Counterclaim-Defendants committed unlawful unfair or fraudulent business acts or practices as defined under Calif. Bus. & Prof. Code §§ 17200, 17203 and other applicable statutory provisions of the Calif. Bus. & Prof. Code.

760.	The unlawful, unfair and/or deceptive and fraudulent acts or practices committed by Counterclaim-Defendants jointly and severally were a series of acts and violations that in addition to being separately actionable are part of an actionable pattern of violations and misconduct that include, but are not limited to:

a.	Failing to disclose at the time that the Counterclaim-Plaintiffs initially purchased and/or renewed their franchises, that the business model upon which they based their decision to buy or continue to reinvest would be dramatically altered all in violation of the Federal Trade Commission's so-called Franchise Pre-Sale Disclosure Rule, 16 C.F.R Part 436. and Calif. Corp. Code §§ 31000 et seq.;

b.  Unlawfully and unfairly usurping the Counterclaim-Plaintiffs customer lists by the use of iShip, "Mailbox Manager" and other computer software programs remotely controlled by the Counterclaim-Defendants;

c.  Using fraud, deceit, penalties, threats of termination, and coercion to punish franchisees that speak out about unethical business practices within TUPSS franchise network;

d.  Selectively enforcing the franchise agreement against the Counterclaim-Plaintiffs in a long term scheme, conspiracy, plan and/or pattern of misconduct to cause a forfeiture and/or drive down the value of the Counterclaim-Plaintiffs' "goodwill" and "going concern" or "capital asset" value of their businesses;

e.  Conjuring up bogus claims against the Counterclaim-Plaintiffs in a long term scheme, conspiracy, plan and/or pattern of misconduct to acquire for the Counterclaim-Defendants, domination and control over the pack and ship market and to dramatically expand their drop off and shipment network at the expense of the Counterclaim-Plaintiffs who invested more than $3.5 Million in in their eleven (11) independently owned and operated businesses;

f.  Destroying the consent and mutuality required for the existence of a valid franchise contract under Calif. Civ. Code §§ 1550, 1565-1576, by attempting to transfer the franchise agreements to the Third-Party Defendants without proper notice to or the consent of the Counterclaim-Plaintiffs and in violation of the express terms of the franchise agreements;

g. Utilizing artful drafting of franchise contracts of adhesion to carry out and/or facilitate the long term scheme, conspiracy and pattern of activity or misconduct described herein;

h. Unfairly attempting to invoke New York law to enforce the post-term non-competition covenants, which are unenforceable under Calif. Bus. & Prof. Code § 16600, while mandating that California law apply to the balance of the franchise relationship;

i. Abusing the post-termination procedures contained in the franchise agreements to secure information about the franchisees' business operations to which Counterclaim-Defendants were not lawfully entitled under the franchise contracts of adhesion; and

j. By otherwise participating in the wrongful conduct described herein.

761. As a result of the above referenced misconduct, Counterclaim-Defendants were unjustly enriched not just by the unfair collection of royalties, advertising and national media fees from Counterclaim-Plaintiffs and other franchisees during the duration and pendency of the scheme, conspiracy and pattern of misconduct, but by the increase in their own revenues in an amount of up to and possibly exceeding $150 Million for calendar year 2013 and first quarter of 2014 alone, all of which plaintiffs should be ordered to disgorge.

762. In addition, penalties should be assessed against the Counterclaim-Defendants for each violation as committed multiple times under Calif. Bus. & Prof. Code § 17206.

763. Counterclaim-Plaintiffs are entitled to declaratory and injunctive relief declaring the franchise agreements with the Counterclaim-Defendants to be null and void as a result of the alleged misconduct of the Counterclaim-Defendants and ordering that Counterclaim-Plaintiffs be

entitled to continue to use the The UPS Store, Inc. tradename and trademarks without any further payments of royalties, advertising or media fees to Counterclaim-Defendants or interference with their business operations by the Counterclaim-Defendants and those working in concert with them.

764.    Counterclaim-Plaintiffs seek declaratory and injunctive relief declaring that the Franchise Agreements and Contract Carrier Agreements executed by TUPSS franchisees are null and void under California law including but not limited to Calif. Bus. & Prof. Code §§ 17051 and 17046-17048 and as unconscionable contracts of adhesion and preliminarily and permanently enjoining defendants from enforcing those unlawful agreements.

765.    Counterclaim-Plaintiffs are entitled to an award of attorneys' fees under the common fund doctrine and/or the private attorney general doctrine as enunciated by California law including but not limited to Calif. Code Civ. Pr. § 101.5.

### NINTH CLAIM FOR RELIEF AGAINST ALL PARTIES
*(Unfair Trade Practices Under California Law)*

766.    Counterclaim-Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

767.    Counterclaim-Defendants and the Third-Party Defendant Manhattan Area Franchisees were engaged in the sale of articles or products including services as defined under Calif. Bus. & Prof. Code §§ 17023 and 17024.

768.    That the Counterclaim-Defendants falsely advertised and represented misleading information to the Counterclaim-Plaintiffs and the public regarding the sale of shipping products including UPS Ground and UPS Air services.

769.     The Counterclaim-Defendants committed unfair and/or deceptive acts or practices as defined under Calif. Bus. & Prof. Code §§ 17000 et seq. and which are actionable under Calif. Bus. & Prof. Code § 17070.

770.     That on or about February 6, 2014, Counterclaim-Plaintiff Thomas Hagan, was the victim of these practices on at least one occasion in the State of California, in connection with shipping transactions.

771.     More specifically, on February 6, 2014, Hagan purchased two (2) boxes with dimensions of 8x8x8 at Store Center 1076, located at 826 Orange Ave, Coronado, California 92118 to ship items to Los Angeles, California.  Hagan packed the boxes and then took them to Store Center 6100, located at One Park Boulevard, San Diego, California.  He requested rate quotes for the package was advised that the package could be guaranteed via 2nd Day Air for next day delivery by the end of the day.  Hagan requested that one box be shipped via the recommended UPS 2nd Day Air and that the other be shipped via UPS Ground.  However, in fact, both services offered the exact same delivery guarantee, one day transit, with guaranteed end of day delivery. The sales associate processed both packages, purported to measure and weigh them and entered the dimensions of both boxes into the iShip CMS System as 9x9x9 with an actual weight of 1.2 lbs.  Although the actual weight of the parcels were 1.2 lbs., the dimensional over-measurements calculated a billable weight of 5 lbs. for the UPS 2nd Day Air delivery and 2 lbs for the UPS Ground delivery. However, upon verifying the rate at www.UPS.com, it was determined that 2nd Day Air was not even a valid shipping product offered by UPS for such a transaction.  Counterclaim Plaintiff Thomas Hagan had been sold a higher-priced shipping product that was not even available that offered him no additional benefit, a practice that virtually mirrors that which was discovered with the Third-Party Defendant Manhattan Area

Franchisees. (See POS Receipt ID#s 83384108949885888879 from Store Center #1076 and 83138808946093888047 from Store Center #6100; Tracking Numbers 1ZV285V90215327210 for the 2nd Day Air parcel and 1ZV285V90315326862 for the UPS Ground parcel).

772.    Upon information and belief, both packages shipped by Counterclaim-Plaintiff Thomas Hagan traveled the exact same route by UPS Ground, although Hagan was charged a higher shipping fee and fuel surcharge for the parcel shipped via UPS 2nd Day Air (Tracking Number 1ZV285V90215327210).

773.    The unfair and/or deceptive acts or practices committed by the Counterclaim-Defendants jointly and severally were a series of acts and violations that in addition to being separately actionable are part of an actionable pattern of violations and misconduct.

774.    The unfair and/or deceptive acts or practices committed by the Counterclaim-Defendants jointly and severally included, but were not limited to:

    a.  upon information and belief, requiring the TUPSS franchisees to sell articles and products and/or their services to customers in a fraudulent and deceptive manner;

    b.  Upon information and belief, forcing franchisees to sell or use UPS deferred Air shipping products to the public that either do not exist or should not have be offered because they provide inferior delivery guarantees as compared with UPS Ground;

    c.  Engaging in the secret payment or allowance of overcharges, the payment of additional incentives, benefits or unearned discounts, or secretly extending to certain franchisees, special services or privileges not extended to all franchisees and the Counterclaim-Plaintiffs;

d. Using threats, intimidation and the imposition of unreasonable operational conditions to turn franchisees against the Counterclaim-Plaintiffs and to induce them to participate in all of the aforementioned unfair and/or deceptive trade practices; and

e. Soliciting the violations and unfair and/or deceptive trade practices and jointly participating in the violations and unfair and/or deceptive trade practices outlined above.

775. As a result of the above referenced misconduct, the Counterclaim-Plaintiffs suffered the following direct, indirect and consequential damages:

f. Lost out-of-pocket expenses;

g. Lost business opportunities

h. Lost profits;

i. Lost value of their "goodwill" and the "going concern" or "capital asset" value of their businesses;

j. Lost business reputation; and

k. Loss of time and money, including the payment of court costs and attorneys' fees.

776. That the misconduct of the Counterclaim-Defendants should be preliminarily and permanently enjoined and the executed copies of the Franchise Agreements and the Contract Carrier Agreements should be declared null and void pursuant to Calif. Bus. & Prof. Code § 17051.

<u>**TENTH CLAIM FOR RELIEF AGAINST ALL PARTIES**</u>
*<u>(Fraudulent & Deceptive Trade Practices Under New York Law)</u>*

777.    Counterclaim-Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

778.    That the Counterclaim-Defendants and the Third-Party Defendant Manhattan Area Franchisees conduct business, trade or commerce in the furnishing of services in the State of New York under N.Y. Gen. Bus. Law §§ 349 and 350.

779.    The Counterclaim-Defendants committed fraudulent, unfair and/or deceptive acts or practices which are actionable under N.Y. Gen. Bus. Law §§ 349 and 350.

780.    That the Counterclaim-Defendants and the Third-Party Defendant Manhattan Area Franchisees conduct business, trade or commerce in the furnishing of services in the State of New York under N.Y. Gen. Bus. Law §§ 349 and 350.

781.    The above-described conduct of the Counterclaim-Defendants is without legal justification and constitutes a knowing and willful violation of applicable New York statutory law, including New York General Business Law §§ 349 and 350.

782.    The said conduct of the Counterclaim-Defendants has caused the Counterclaim-Plaintiffs undue damage and expense, including attorneys' fees and has had the effect of damaging Counterclaim-Plaintiffs viability as a business enterprise.

783.    As a result of the above referenced misconduct, the Counterclaim-Plaintiffs suffered the following direct, indirect and consequential damages:

l.   Lost out-of-pocket expenses;

m.   Lost business opportunities

n.   Lost profits;

o. Lost value of their "goodwill" and the "going concern" or "capital asset" value of their businesses;

p. Lost business reputation; and

q. Loss of time and money, including the payment of court costs and attorneys' fees.

784. That the misconduct of the Counterclaim-Defendants should be preliminarily and permanently enjoined, Counterclaim-Plaintiff should be awarded the maximum statutory award, treble damages and reasonable attorneys' fees pursuant to N.Y. Gen. Bus. Law § 349(h).

## ELEVENTH CLAIM FOR RELIEF AGAINST ALL PARTIES
### *(Unjust Enrichment)*

785. The Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

786. That as a result of their conduct, the Counterclaim-Defendants and the Third-Party Defendants have been unjustly enriched.

787. More specifically, the Counterclaim-Defendants and the Third-Party Defendants have been enriched in the form of systematic overcharges collected from the public in the Manhattan Area and elsewhere.

788. That the Counterclaim-Defendants aided and abetted the Third-Party Defendants in collecting these overcharges and upon the Counterclaim-Plaintiffs attempting to stop these unlawful practices, they were subjected to escalating adverse action, including the termination of all eleven (11) of their franchise locations.

789. That the Third-Party Defendants were rewarded and further enriched after the Counterclaim-Plaintiffs' locations were closed, because twenty percent (20%) of their

competition in the Manhattan Area had disappeared and the Counterclaim-Defendants began distributing customer lists and mailbox customers previously belonging to the Counterclaim-Plaintiffs to the Third-Party Defendants without the payment of any consideration to the Counterclaim-Plaintiff.

790.     That the Counterclaim-Defendants and Third-Party Defendant voluntarily accepted and retained these payments in the form of additional shipping revenues and royalty fees with full knowledge that as a result of their wrongdoing and that by continuing these practices, the Counterclaim-Plaintiffs would have to be de-franchised and deprived the ability to operate their eleven Store Centers to keep said practices secret.

791.     As a result of their conduct, the Third-Party Defendants have further been unjustly through increased gross sales they received as a result of the closure of the eleven (11) Manhattan Area stores owned by the Counterclaim-Plaintiffs.  The Third-Party Defendants have also been enriched in the form of converting Counterclaim-Plaintiffs' mailbox customers and other goodwill without paying value for it, by virtue of their aiding and abetting the Counterclaim-Defendants.

792.     The Third-Party Defendants voluntarily accepted and retained this additional business revenue and upon information and belief have induced Counterclaim-Plaintiffs former mailbox customers to sign new agreements at their store centers, with full knowledge that as a result of their wrongdoing, the Counterclaim-Plaintiffs were being permanently deprived of money.

## TWELFTH CLAIM FOR RELIEF AGAINST ALL PARTIES
### *(Tortious Interference)*

793.    That the Counterclaim-Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

794.    The Counterclaim-Plaintiffs had valid contracts with various third-parties, including, Bancorp/SBA, John Penrose, eleven owners/landlords for the commercial space where each of the former Hagan Store Centers are located, and various TUPSS-approved vendors that provided credit, goods or services to the Counterclaim-Plaintiffs.

795.    At all times alleged herein, the Counterclaim-Defendants and the Third-Party Defendants had knowledge of the aforementioned contracts between the Counterclaim-Plaintiffs and the aforementioned third-parties.

796.    That the Counterclaim-Defendants and the Third-Party Defendants intended to disrupt and did in fact disrupt Counterclaim-Plaintiffs contractual relationships with the aforementioned third-parties through their wrongful conduct and misrepresentations.

797.    That the Third-Party Defendants were rewarded for their loyalty in rallying against the Counterclaim-Plaintiffs and continuing to promote fraudulent and deceptive sales practices in the Manhattan Area.  More specifically, the Counterclaim-Defendants provided them with customer information, mailbox lists and caused mail to be diverted away from the former Hagan store centers to locations owned by Third-Party Defendant Manhattan Area Franchisees.

798.    In or around February 2014, TUPSS and UPS designated Store Center #4769, owned by Brad Kaplan, located at 888-C 8th Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #6283, located at 694 10th

Avenue, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

799. In or around February 2014, TUPSS and UPS designated Store Center #0304, owned by Ketan Seth, located at 101 West 23rd Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #6281, located at 222 8th Avenue, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

800. In or around February 2014, TUPSS and UPS designated Store Center #6374, owned by Kevin Panchmia, located at 14 Murray Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #5308, located at 342 Broadway, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

801. In or around February 2014, TUPSS and UPS designated Store Center #4754, owned by Ketan Seth, located at 243 5th Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #4311, located at 303 Park Avenue South, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

802. In or around February 2014, TUPSS and UPS designated Store Center #4619, owned by Ketan Seth, located at 132 East 43rd Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #1227, located at 527 Third Avenue, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

803.    In or around February 2014, TUPSS and UPS designated Store Center #6374, owned by Kevin Panchmia, located at 14 Murray Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #5308, located at 342 Broadway, in the City of New York, NY.   No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

804.    In or around February 2014, TUPSS and UPS designated Store Center #4754, owned by Ketan Seth, located at 243 5th Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #4311, located at 303 Park Avenue South, in the City of New York, NY.   No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

805.    In or around February 2014, TUPSS and UPS designated Store Center #4619, owned by Ketan Seth, located at 132 East 43rd Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #1227, located at 527 Third Avenue, in the City of New York, NY.   No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

806.    In or around February 2014, TUPSS and UPS designated Store Center #5565, owned by Sandra Machado, located at 1324 Lexington Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #0523, located at 1202 Lexington Avenue, in the City of New York, NY.   No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

807.    In or around February 2014, TUPSS and UPS designated Store Center #5777, owned by Abu Rahman, located at 1838 2nd Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #6280, located at 1474 Third

Avenue, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

808. In or around February 2014, TUPSS and UPS designated Store Center #5777, owned by Abu Rahman, located at 1838 2nd Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #0561, located at 1636 Third Avenue, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

809. In or around February 2014, TUPSS and UPS designated Store Center #6367, owned by Otis Davis, located at 1732 1st Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #1382, located at 1562 1st Avenue, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

810. In or around March 2014, TUPSS and UPS designated Store Center #4769, owned by Brad Kaplan, located at 888-C 8th Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #1141, located at 331 West 57th Street, in the City of New York, NY. No consideration was paid to the Counterclaim-Plaintiffs for this transfer of business.

811. At or around the same time the aforementioned customer transfers were occurring, the Counterclaim-Defendants and Third-Party Defendants began contacting Counterclaim-Plaintiffs' landlords to induce them to evict the Hagans and instead put in one of the Third-Party Defendants as a substitute tenant – all done without the consent or approval of the Counterclaim-Plaintiffs and without offering any consideration in connection with the proposed transactions.

812.     As a result of the conduct alleged herein, the Counterclaim-Defendants interfered with the Counterclaim-Plaintiffs contractual relationships with third-parties, causing irreparable harm.

813.     That the Counterclaim-Plaintiffs have suffered and continue to suffer harm to an extent still being ascertained.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Defendants/Counterclaim-Plaintiffs/Third Party Plaintiffs pray as follows:

A.  That the Court enter judgment dismissing Plaintiffs' claims against Defendants in the main action; deny Plaintiffs' request for damages, injunctive relief and attorney's fees and sustain Defendants affirmative defenses in the main action;

B.  That the Court grant Counterclaim-Plaintiffs/Third Party Plaintiffs judgment on each and every count of their claims against the Counterclaim-Defendants and Third Party Defendants, together with an award of all damages available under such laws in the minimum amount of FIFTY MILLION DOLLARS ($50,000,000), together with the maximum statutory damages available, and treble damages, where applicable;

C.  That the Court grant the injunctive and declaratory relief requested herein;

D.  For judgment against the Counterclaim-Defendants and Third-Party Defendants on the Counterclaim-Plaintiffs/Third-Party Plaintiffs' claims of unjust enrichment, including restitution of the wrongful profits, revenues and benefits received, in an amount deemed appropriate by the Court;

E.  For punitive damages, attorney's fees and costs of suit including post judgment interest on the entire judgment until paid in full; and

F.   For any other and further relief as the Court finds just and proper.

### DEMAND FOR JURY TRIAL

The Counterclaim-Defendants assert their rights under the Seventh Amendment to the

U.S. Constitution and demands, in accordance with the Federal Rules of Civil Procedure 38, a

trial by jury on all issues.

Dated: New York, New York
        April 16, 2014

**STEPHEN J. SAVVA, P.C.**

**By:**_____
        Stephen J. Savva, Esq. (SS-2237)

        Attorneys for the Defendants/
        Counterclaim-Plaintiffs & Third Party-Plaintiffs
        ROBERT HAGAN, et al.
        546 Fifth Avenue, 6th Floor
        New York, NY 10036
        (212) 245-5820 – Office
        (646) 514-3543 – Facsimile
        SJSavvaPC@aol.com – Email

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Answer, Counterclaims and Third-Party Complaint has been served upon the attorneys for the Plaintiffs electronically via the Courts' ECF notification system and by deposit in the United States Mail in New York, NY, in a sealed envelope with first class postage thereon fully prepaid, this 16th day of April 2014:

David A. Kochman, Esq.
Peter C. Gourdine, Esq.
REED SMITH, LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 521-5400
Fax: (212) 521-5450

**By:**_____
Stephen J. Savva, Esq. (SS-2237)
STEPHEN J. SAVVA, P.C.
Attorneys for the Defendants,
Counterclaim-Plaintiffs & Third Party-Plaintiffs
ROBERT HAGAN, et al.
546 Fifth Avenue, 6th Floor
New York, NY 10036
(212) 245-5820 – Office
(646) 514-3543 – Facsimile
SJSavvaPC@aol.com – Email