```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE UPS STORE, INC,

                Plaintiff,              New York, N.Y.

           v.                           14 Civ. 1210(WHP)

ROBERT HAGAN,

                Defendant.

------------------------------x
                                        July 18, 2014
                                        11:35 a.m.
Before:

               HON. WILLIAM H. PAULEY III,

                                        District Judge


                         APPEARANCES


MORRISON & FOERSTER, LLP
     Attorneys for Plaintiff
BY:  MARK R. McDONALD


STEPHEN J. SAVVA
     Attorney for Defendant


TRACHTENBERG, RODES & FRIEDBERG, LLP
     Attorneys for Third-Party Defendants
BY:  LEONARD A. RODES
```

1              (In the robing room)
2              THE COURT:  I'm Judge Pauley.  You are?
3              MR. McDONALD:  Mark McDonald.
4              THE COURT:  Okay, Mr. McDonald.  Welcome.
5              MR. SAVVA:  Mr. Savva.
6              THE COURT:  Okay, mr. Savva.
7              MR. RODES:  My name is Leonard Rodes, and I am
8    appearing here for the first time on behalf of most of the
9    third-party defendants.
10             THE COURT:  Are you going to interpose a notice of
11   appearance?
12             MR. RODES:  Yes.
13             THE COURT:  Very well.
14             Mr. McDonald, I got this long narrative complaint that
15   was filed by your predecessor law firm in this case, which also
16   thinks whenever it is filing a complaint that it is sort of
17   like a motion for summary judgment.
18             Why don't you give me the *Reader's Digest* version of
19   this case which, if I look at your *ad damnum* clause, is about
20   200-and-some-odd thousand dollars, right?
21             MR. McDONALD:  I added it up and it's about 500,000.
22   That is the amount of money at stake.
23             The *Reader's Digest* version can be pretty short, and I
24   am glad you pointed out it was prior counsel.  We didn't file
25   those.  We wouldn't have done it verified with all the

1     exhibits.

2              THE COURT:  It's too bad predecessor counsel aren't
3     here, because I would give them a piece of my mind and I invite
4     them to reread the rules about a plain and concise statement of
5     the claim.  I make this observation only because I was sitting
6     in Part I of this court at around the same time when the same
7     law firm, Reed Smith, filed a lawsuit on behalf of Alexander
8     Rodriguez, otherwise known as A Rod, in which they did exactly
9     the same thing, except they had a 100-page complaint with
10    exhibits.

11             MR. McDONALD:  Well, I think their complaint in this
12    case was 33 pages, so it was --

13             THE COURT:  It is 178 paragraphs.

14             MR. McDONALD:  And there are a lot of exhibits.

15             The *Reader's Digest* version of the case is this:

16             Our client are UPS and UPS Store, which is a
17    franchisor.  The defendants in the case were a number, about
18    11, of UPS Store franchisees here in Manhattan.  Our client
19    came to the conclusion that those defendants had violated their
20    franchise agreements.  They terminate those franchise
21    agreements.

22             To some extent our case is a collection case.  At the
23    time they terminate those franchise agreements, they were owed
24    about half a million dollars.  In addition, at the time that
25    the complaint was filed, those stores were still holding

1   themselves out in using the UPS marks, which is an issue that
2   the company does take seriously, so they asserted Lanham Act
3   claims to get those stores to take the marks down and
4   deidentify.  At this point I'm not sure.  Counsel has told me
5   that they have now since deidentified those stores.  I don't
6   know the answer to that.
7         But, frankly, that is the *Reader's Digest* version of
8   our case.
9         THE COURT:  What discovery do you anticipate taking?
10        MR. McDONALD:  Your Honor, I think our discovery on
11  our side is going to be very limited.  We will take the
12  depositions of the defendants; but, other than that, I think
13  most of the materials we have in our possession.  For example,
14  the evidence that they owed us money, that's not something
15  that's going to take a lot of discovery.  We don't see any need
16  from our side for any depositions of anybody other than the
17  defendants in the case.
18        THE COURT:  Mr. Savva, what do you have to say,
19  because you are guilty of the same matter that I faulted Reed
20  Smith for.
21        MR. SAVVA:  I will take somewhat of a *mea culpa*.
22        THE COURT:  You should.  Okay?  This is a ridiculous
23  answer and counterclaim, 811 paragraphs.
24        MR. SAVVA:  Your Honor, representing 11 --
25        THE COURT:  I don't use "ridiculous" often, especially

1    on the record, but it is ridiculous.

2            MR. SAVVA:  I understand, your Honor.  Representing 11
3    separate entities, the counterclaims are almost akin to writing
4    up a class action, but they are all similarly owned by two
5    brothers.  So the claims that were brought, it is almost the
6    allegations are almost brought as if it was a class action with
7    11 separate stores that were put into this case.

8            The claims that have been brought by UPS, while they
9    couch this as a collection action, in reality, prior to any
10   defaults occurring, back in October of 2012, there were no
11   defaults, there were no issues.  The Hagans were touted as the
12   preeminent franchisees in the United States.  They owed no
13   creditors.  They owed nothing to the UPS Store.  They
14   identified concerns and issues occurring in the franchise
15   network, reached out to leadership at UPS, went out to San
16   Diego, raised these issues in a good-faith effort to address
17   them, because they believed that it was impossible to continue
18   operating a franchise with fraudulent conduct occurring in the
19   franchise in Manhattan, and as a result, they were retaliated
20   against and caused to implement commercially unreasonable
21   standards that caused their business to fail.  As a result,
22   they were subject to standards that made it impossible for them
23   to run their business.  They were subject to disparate
24   treatment.  They were caused to have complaints escalated to
25   their stores.  As a result, relationships that they had with

1   private equity investors were damaged.  The private equity
2   investor that they had that was lending them money, that lent
3   them an additional $450,000 as of October, had requested a
4   simple phone call with UPS, as we allege in the complaint, to
5   confirm, as UPS had told the Hagans, that everything was okay.
6   UPS ignored that request and, as a result, the lender backed
7   out because he saw that UPS was failing to address the
8   compliance issues that existed at the other stores.  When an
9   investigation was conducted to --
10              THE COURT:  Are these stores still in business?
11              MR. SAVVA:  All 11 of the UPS Stores, UPS terminated
12  the franchise agreement.  The Hagans closed.  Prior to the
13  commencement of the complaint, 10 of the 11 were closed.  One
14  of the stores remained open, the store on 57th Street.  The UPS
15  sign was taped over, it was kept open to service mailbox
16  customers.  Upon prior predecessor counsel contacting us to say
17  they needed the store closed, we immediately closed it and UPS
18  then had all of the mailbox customers and mail from all 11
19  stores transferred to existing franchisees, without paying any
20  compensation to the Hagans, and those assets were permanently
21  lost.  That's where the third-party claims come in for unjust
22  enrichment and other associated claims.
23              We attempted to resolve this through mediation.  We
24  exhausted that multiple times.  We were hopeful that mediation
25  was going to be attempted at the early stages of this case.  It

1  didn't occur.  At the early stages we thought that we would
2  understand what the motion practice was going to be.  We were
3  never told, and it wasn't until two days ago that we received
4  the premotion letter, which I still have yet to respond to, but
5  I do intend to oppose.
6             We feel that discovery should proceed because our
7  defenses are relevant to the pretextual terminations.  The
8  issue of compliance is relevant to the defenses and also the
9  affirmative claims and we feel that there is a fraud upon the
10 public that UPS does not want disclosed and that is why they
11 want to stay discovery and they just want to delay this so that
12 hopefully the Hagans will file bankruptcy and their creditors
13 will overcome them.
14            THE COURT:  Why don't you tell me about your
15 opposition to the motion to dismiss some counterclaims.  I
16 recognize that plaintiffs' counsel sends a letter two days
17 before a conference, that doesn't give you sufficient time, but
18 how can you make a First Amendment claim?
19            MR. SAVVA:  The First Amendment claim is based upon
20 the retaliatory conduct.  So the Hagans were public with
21 respect to their outspoken refusal to comply with UPS Stores'
22 policies and procedures concerning the methods that UPS wanted
23 the franchisees to comply with.
24            For example, in the complaint, it is alleged that
25 there was a meeting that occurred with the franchisees where

1   Robert Hagen asked questions regarding the UPS ground guarantee
2   and whether ground is a guaranteed service.
3           Subsequent to that there was a phone call where one of
4   the UPS area franchisees told Thomas Hagan, You should tell
5   Robert to stop speaking up about the ground guarantee.  It is
6   going to kill your business if he does.
7           These are all things that occurred prior to the
8   adverse action that existed with their franchise being
9   terminated and with UPS clamping down on them with complaints
10  and with the requirement that they be 100 percent compliant
11  while, at the same time, other franchisees were openly
12  overcharging customers.
13          That's an example of where the First Amendment claim
14  has been sufficiently pled in the complaint and is ignored by
15  the plaintiffs in their letter.
16          Another example is we make a claim -- they claim that
17  there is no basis for claims under California law.  They say
18  you can't make claims under the unfair trade practices under
19  California law.  However, I think it is in paragraph 770 of our
20  counterclaims, there is an allegation where Thomas Hagen was in
21  California, he was overcharged in California on a transaction,
22  he makes that allegation, he identifies the receipt number
23  where he was personally overcharged on a transaction in
24  California, completely ignored by the defendants yet that's the
25  basis for which they claimed that a motion to dismiss should be

1   made.

2            There are other issues that I have to go through the

3   pleadings in more detail in order to give you those kinds of

4   specific responses as to the areas where they just overlooked

5   factual pleadings.

6            MR. McDONALD:  I have no doubt we have a very viable

7   motion to dismiss.  We have summarized the grounds in a

8   three-page letter, but we have a viable motion to dismiss a lot

9   of that counterclaim.

10           I wasn't trying to avoid or prevent counsel from

11   having the opportunity to submit the letter.  My understanding

12   is that we would submit our letter, they would submit a letter,

13   and then at that point we would have a discussion, a

14   conference, about the filing of it and scheduling of it.

15           MR. SAVVA:  And my typical practice is I receive a

16   letter, I call my adversary, I see if it is possible for us to

17   work out certain issues and avoid motion practice so that I can

18   have that discussion with him like, Did you see the allegation

19   in paragraph 770?  Is that what you are referring to?  Then we

20   can have a discussion to see if that is the basis for which the

21   motion is being made, and then to the extent an amended

22   pleading can be filed or we will withdraw certain claims, but

23   we didn't have that opportunity.

24           THE COURT:  Let me hear from Mr. Rodes for a moment.

25           MR. RODES:  Thank you, your Honor.

1        My firm has just been retained by, again, most of the
2    third-party defendants.  I think it is 19 out of 21.  There are
3    individual names and then there are corporate third-party
4    defendants that are allegedly owned by the 21 individual names,
5    and I have been retained by 19 of the 21 individuals along with
6    their associated entities that run UPS Stores.
7        I just yesterday stipulated with Mr. Savva that I
8    would accept service for the clients that have retained me;
9    and, pursuant to that stipulation, we are waiving
10   service-related defenses and have agreed on a response date of
11   September 30, which is what they would receive had Mr. Savva
12   served the third-party complaint on them with a waiver of
13   service document.
14       That said, I already know, from having looked at the
15   third-party complaint, that we, too, are likely to want to move
16   to dismiss.  There are four counterclaims that are made against
17   UPS parties that are also pled as third-party claims against my
18   clients; and, as to those four, I suspect that there are
19   similar and perhaps additional bases upon which my clients
20   would want to move to dismiss those third-party claims.
21       Your Honor, if I may, on the California law point, I
22   have looked at that, and it is not a question of failure to
23   plead a fact that they had some individual isolated transaction
24   that could have occurred in California.  The cases that I think
25   Mr. McDonald cited, if they are the same cases that I found

E7i2upsc

1   with pretty quick research, have to do with due process and
2   fairness, having a California statute be the basis of a claim
3   between parties that are wholly outside of California, and I
4   don't think the fact that one or two transactions may have
5   taken place in California would undercut the force of those
6   cases.
7            MR. SAVVA:  But UPS is --
8            THE COURT:  I am not inviting responses.  You address
9   yourself to the court.
10           I think that all of you had better understand that my
11  philosophy as a judge is to try to ensure that litigation moves
12  in the most cost effective and efficient way through the
13  courts.  Certainly based upon the parties' pleadings in this
14  case, you are going to be at fundamental loggerheads with the
15  court.  That is why, knowing we were having this conference, I
16  think it would have been helpful to everybody if there were
17  motions that people were anticipating making, sending letters
18  so that we could do it all at once.  Ultimately, the game is
19  not going to be worth the candle here.
20           I am going to permit a motion to be filed because I am
21  not going to sit and fan through -- by the way, I can't tell
22  how many pages your answer with counterclaims is because you
23  didn't number them.
24           MR. SAVVA:  Is it --
25           THE COURT:  No.  You didn't number them.  But with

1    their exhibits, it is just about equal to the plaintiffs'
2    monstrosity, okay?  So start reading the federal rules.  I am
3    going to wait for full-blown letters, notwithstanding my desire
4    for efficiency, because maybe it will cause you all to rethink
5    what you are doing here, and we will have a conference to
6    discuss the motions.
7            I think it is pointless to travel from Los Angeles for
8    another conference, unless you are planning to be here in New
9    York.  I will fix a date right now and counsel will all get
10   their letters in in ample time.  I will fix a date, so that I
11   can review them thoroughly and we can have a meaningful
12   discussion about it.  I really don't see any First Amendment
13   claim here, but maybe you will be able to persuade me.
14           MR. McDONALD:  I do happen to be coming back.
15           THE COURT:  When?
16           MR. McDONALD:  I will be in New York on the 29th and
17   30th and 31st.  I can extend the trip days around there to the
18   court's convenience.
19           THE COURT:  How about a conference on the 30th in the
20   afternoon?
21           MR. SAVVA:  That would be fine, your Honor.
22           THE COURT:  Let's say 4:30, all right?  4:30 on July
23   30 for a premotion conference.  Submit your letter in
24   opposition, Mr. Savva, to Mr. McDonald's letter by next
25   Wednesday.

1           Can you get a letter in?
2           MR. RODES:  I can try, your Honor.  I have got a lot
3  of different clients, and that's one of the reasons why I am
4  agreeing to accept service.  I asked for the full 60 days or
5  so.  On this issue, I would like to suggest to the court that I
6  suspect the arguments that UPS Stores makes with respect to the
7  four claims that are asserted also as third-party claims are
8  likely to constitute all or most of the arguments I would make;
9  and if there are others, I might be able to thereafter advise
10 the court.  And since I am in New York, I am not in L.A., if
11 the court found it necessary to have another conference, we
12 could do that.
13          THE COURT:  I am not doing this on the installment
14 method.  So if the long answer is that July 30 isn't working,
15 then we will pick another date.
16          I have got an oral argument that I have got to attend
17 to momentarily with serious lawyers who aren't besieging the
18 courts with this kind of junk.
19          MR. RODES:  Your Honor, I have just appeared.
20          THE COURT:  It is junk.
21          MR. RODES:  Your Honor, I have just appeared and I am
22 sorry --
23          THE COURT:  Please, enough.
24          We will deal with your motion and any motion from the
25 third-party defendants.  I will put this down for a conference.

E7i2upsc

1  You will come see me on September 5.  That's it.  11:00.  Get
2  your letters in to me by August 29.
3           MR. SAVVA:  Your Honor, I had a housekeeping matter.
4           THE COURT:  What?
5           MR. SAVVA:  With respect to the third-party defendants
6  that were named as ABCs, I have identified the corporate
7  defendants, so I would like to amend the pleadings.
8           THE COURT:  Amend it, amend it.  It is as of right.
9  While you are amending maybe you want to prune it, maybe you
10 want to put some page numbers and do some other things.  But
11 that's up to you.
12          MR. RODES:  I will confer with counsel.
13          THE COURT:  Great.  Have a good afternoon.
14          MR. SAVVA:  Is discovery stayed?
15          THE COURT:  Discovery is stayed until September 5,
16 yes.
17                              - - -
18
19
20
21
22
23
24
25