UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE UPS STORE, INC.; UNITED PARCEL SERVICE, INC.; and
UNITED PARCEL SERVICE OF AMERICA, INC.,

                                       Plaintiffs and Counterclaim Defendants,

                        -v-

ROBERT HAGAN; THOMAS HAGAN; RIDGE ASSETS, INC.;
3A, INC.; TANMOR, INC.; RIDGE LOGISTICS, LLC;
RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC;
RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC;
TOMPACK, LLC; BIGPACK, LLC; and NYPS, LLC,

                         Defendants and Counterclaimants.

--------------------------------------------------------------------------------x

ROBERT HAGAN; THOMAS HAGAN; RIDGE ASSETS, INC.;
3A, INC.; TANMOR, INC.; RIDGE LOGISTICS, LLC;
RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC;
RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC;
TOMPACK, LLC; BIGPACK, LLC; and NYPS, LLC,

                             Third-Party Plaintiffs,

                        -v-

BRADLEY KAPLAN; 43RD STREET BUSINESS SERVICES,
INC. d/b/a "The UPS Store Center 5188" and "The UPS Store
Center 1786"; 9TH AVENUE BUSINESS SERVICES, INC. d/b/a
"The UPS Store Center 4386" and "The UPS Store Center 5472";
B.E.K. VENTURES, INC. d/b/a "The UPS Store Center 4419"; 8TH
AVENUE BUSINESS SERVICES, INC. d/b/a "The UPS Store
Center 4769" and "The UPS Store Center 5979"; 12TH AVENUE
BUSINESS SERVICES, INC. d/b/a "The UPS Store Center 6341";
JOHN WONG; SERVICE PARCEL UNLIMITED, INC. d/b/a
"The UPS Store Center 4190", "The UPS Store Center 4248", "The
UPS Store Center 5388", "The UPS Store Center 6404" and "The
UPS Store Center 6415"; KEVIN PANCHMIA; ROMAN P.
ENTERPRISES, INC. d/b/a "The UPS Store Center 5958"; KP
ENTERPRISES, INC. d/b/a "The UPS Store Center 5691";
LEANNA ENTERPRISES, INC. d/b/a "The UPS Store Center
6374"; GOLY SHIPPING, INC. d/b/a "The UPS Store Center
6387"; KETAN SETH; 23RD STREET SHIPPING, INC. d/b/a The
UPS Store Center 0304"; 43RD STREET SHIPPING SERVICES,

14-CV-1210 (WHP)

*ECF CASE*

**FIRST AMENDED
ANSWER, COUNTERCLAIMS
AND THIRD-PARTY COMPLAINT
ON BEHALF OF ALL DEFENDANTS**

INC. d/b/a "The UPS Store Center  4619"; INNOVATED
LOGISTICS SOLUTIONS, INC. d/b/a "The UPS Store Center
4754"; BROADWAY SHIPPING SERVICES, INC. d/b/a "The
UPS Store Center 5138"; JEROME TAYLOR; LEKYLE, INC.
d/b/a "The UPS Store Center 0526" and "The UPS Store Center
4831"; SIX & MORE INC. d/b/a "The UPS Store Center 2992";
JERVAL, INC. d/b/a "The UPS Store Center 1052"; MARK
TAYLOR; ZOEFIFTYONE CORP. d/b/a "The UPS Store Center
0745"; 1275 FIRST AVENUE CORP. d/b/a "The UPS Store Center
1083"; 1173-A SECOND AVE CORP. d/b/a "The UPS Store
Center 0647"; SHYAM BUXANI; MOHAN BUXANI; DANNY
DANSIGNANI; SIGLO2 21 LTD. d/b/a "The UPS Store Center
0444"; SIGLO-21, INC. d/b/a "The UPS Store Center 1492"; ABU
RAHMAN; AR116 INC. d/b/a "The UPS Store Center 4163"; AR
95 INC. d/b/a "The UPS Store Center 5777"; SHUEB
CHOUDHURY; WORLDWIDE SHIPPING, INC. d/b/a "The UPS
Store Center 5865"; TANI SUSSMAN; GOTHAM SENDING
SERVICES INC. d/b/a "The UPS Store Center 4766";
SYLVESTER ONOURAH; SMA ENTERPRISES INC. d/b/a "The
UPS Store Center 5017"; OTIS DAVIS; STARSHIP SHIPPING
INC. d/b/a "The UPS Store Center 6367"; MARCOS A. LOPEZ;
MAL BUSINESS SOLUTIONS INC. d/b/a "The UPS Store Center
4768"; CHARMAINE RAPHAEL; FIVE CEES ASSET GROUP
INC. d/b/a "The UPS Store Center 6166"; MOHAMMED RIAZ;
SUBHAN ENTERPRISES INC. d/b/a "The UPS Store Center
5899"; CHAD JAAFAR; FAIRVIEW INC. d/b/a "The UPS Store
Center 5953"; DANNY SPIES; SPIES ENTERPRISES INC. d/b/a
"The UPS Store Center 4472"; ED XU; EDWARD J C
CORPORATION d/b/a "The UPS Store Center 5296"; SANDRA
MACHADO; JOAO MACHADO; and J&S QUEST SERVICES,
LLC d/b/a "The UPS Store Center 5565,

                                    Third-Party Defendants.

-------------------------------------------------------------------------------x


      Defendants/Counterclaimants  ROBERT  HAGAN  ("Rob"  or  "Robert");  THOMAS

HAGAN ("Tom" or "Thomas"); RIDGE ASSETS, INC.; 3A, INC.; TANMOR, INC.; RIDGE

LOGISTICS, LLC; RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC; RIDGEDOWN, INC.;

ROBPACK, LLC; RIDGE PEN, LLC; TOMPACK, LLC; BIGPACK, LLC; and NYPS, LLC

(collectively, the "NYPS Stores") by and through their attorneys, STEPHEN J. SAVVA, P.C., as

and for their First Amended Answer, Counterclaims and Third Party Complaint, submit the following in response to the Verified Complaint of the Plaintiffs/Counterclaim-Defendants THE UPS STORE, INC. ("TUPSS"); UNITED PARCEL SERVICE, INC. ("UPS"); and UNITED PARCEL SERVICE OF AMERICA, INC. ("UPSA") (collectively "UPS/TUPSS") filed February 25, 2014, allege as follows:

## ANSWER TO VERIFIED COMPLAINT

### INTRODUCTION

1.      The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 1 and therefore deny them.

2.      The Defendants/Counterclaimants admit that they owned and operated eleven (11) The UPS Store franchise locations in New York County, New York, representing approximately 1/5 of all such locations in New York County as of January 1, 2014. The Defendants/Counterclaimants admit that they were a party to certain Franchise Agreements and Carrier Contract Carrier Agreements, but deny the remaining allegations in this paragraph and leave Plaintiffs/Counterclaim-Defendants to their proof regarding same.

3.      The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3 and therefore deny them. Moreover, although Defendants/Counterclaimants have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14), neither the individual referenced in this paragraph or any documents relating to this allegation have been disclosed. The Defendants/Counterclaimants

further deny that the Plaintiffs/Counterclaim-Defendants had "every right" to terminate the Franchise Agreements and Carrier Contract Agreements and that the Hagans were treated appropriately and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

4.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 4 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

5.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 5 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

6.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 6 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

7.      The Defendants/Counterclaimants deny the allegations set forth in Paragraph 7 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

8.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 8 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

9.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 9 and therefore deny them.

10.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 10.  However, Defendants/Counterclaimants admit that TUPSS is a Delaware Corporation with a principal place of business at 6060 Cornerstone West, San Diego, California 92121; that it is a wholly owned subsidiary of UPS; that UPS is a Delaware Corporation; and that TUPSS provides a wide range of products and services and have a physical presence in this District. The

Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of the allegations set forth herein.

11.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 11.   However, Defendants/Counterclaimants admit that UPS is an Ohio Corporation with a principal place of business at 55 Glenlake Pkwy NE, Atlanta, GA 30328; that it is a wholly owned subsidiary of UPS; that UPS is a Delaware Corporation; and that UPS provides a wide range of products and services and have a physical presence in this District. The Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of the allegations set forth herein.

12.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 12 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of the allegations set forth herein.

13.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 13.

14.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 14.

15.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 15.

16.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 16.

17.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 17.

18.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 18.

19.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 19.

20.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 20.

21.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 21.

22.    The Defendants/Counterclaimants admit the allegations set forth in Paragraph 22.

23.    The Defendants/Counterclaimants admit the allegations set forth in Paragraph 23.

24.    The Defendants/Counterclaimants admit the allegations set forth in Paragraph 24.

25.    The Defendants/Counterclaimants admit the allegations set forth in Paragraph 25.

26.    The Defendants/Counterclaimants admit the allegations set forth in Paragraph 26.

## JURISDICTION & VENUE

27.    Paragraph 27 contains a statement of jurisdiction to which no answer is required. To the extent an answer is required, the Defendants/Counterclaimants deny the allegations set forth in Paragraph 27 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

28.    Paragraph 28 contains a statement of jurisdiction to which no answer is required. To the extent an answer is required, the Defendants/Counterclaimants deny the allegations set forth in Paragraph 28 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

29.    Paragraph 29 contains a statement of venue to which no answer is required.  To the extent an answer is required, the Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

## TUPSS' FRANCHISE BUSINESS

30.    The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 30 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

31.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 31 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

32.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 32 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

33.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 33 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

34.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 34 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

35.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 35 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

36.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 36 and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the allegations set forth herein.

37.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 37, except the Defendants/Counterclaimants admit that TUPSS grants franchises to persons to own and operate franchise centers at specific locations and licenses and authorizes the use of certain marks and materials within a territory designated in the franchise agreement and leave the

Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of allegations set forth herein.

38.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 38, except the Defendants/Counterclaimants admit that TUPSS has certain materials and manuals available and requires franchises to purchase certain property, equipment and software, to own and operate franchise centers and leave the Plaintiffs/Counterclaim-Defendants to their proof regarding the remainder of allegations set forth herein.

39.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 39, and therefore deny them.

40.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 40, and therefore deny them.

## THE PARTIES' FRANCHISE RELATIONSHIP

41.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 41 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.

42.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 42 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.

43.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 43 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.

44.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 44 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

45.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 45 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

46.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 46 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of

documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

47.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 47 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

48.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 48 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

49.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 49 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

50.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 50 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

51.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 51 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

52.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 52 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

53.     The   Defendants/Counterclaimants   are   without   sufficient   knowledge   or information to form a belief as to the truth of the allegations in Paragraph 53 - insofar as no

Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

54. The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 54 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

55. The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 55 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

56. The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 56 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that agreements exist between the

parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

57.   The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 57 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

58.   The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 58 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

59.   The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 59 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of

documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

60.    The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 60 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

61.    The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 61 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

62.    The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 62 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. The Defendants/Counterclaimants do admit that they received an MBE loan in or around September

2012 in the amount of approximately $150,000.  As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

63.     The  Defendants/Counterclaimants  are  without  sufficient  knowledge  or information to form a belief as to the truth of the allegations in Paragraph 63 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

64.     The  Defendants/Counterclaimants  are  without  sufficient  knowledge  or information to form a belief as to the truth of the allegations in Paragraph 64 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

65.     The  Defendants/Counterclaimants  are  without  sufficient  knowledge  or information to form a belief as to the truth of the allegations in Paragraph 65 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that agreements exist between the parties, Defendants/Counterclaimants refer the Court to the actual documents and/or sections of documents cited to determine whether or not they are valid and enforceable. As such, Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof.

## THE BREACH AND TERMINATION OF THE FRANCHISE AGREEMENTS

66.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 66 and therefore deny them. Moreover, although Defendants/Counterclaimants have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14), neither the individual referenced in this paragraph or any documents relating to this allegation have been disclosed.  The Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.

67.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 67 and therefore deny them.  There is no "normal practice" identified in any TUPSS materials or manuals regarding obtaining a shipping price and entering it into the point-of-sale system.  The Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof regarding these allegations.

68.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 68 and therefore deny them. Moreover, although Defendants/Counterclaimants have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14), neither the individual referenced in this paragraph or any documents relating to these allegations have been disclosed.  The Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof

regarding same.   It should be noted, that while the Plaintiffs/Counterclaim-Defendants allege to have contemporaneously possessed this information, they intentionally withheld it and continue to withhold it from the Defendants/Counterclaimants even after the termination of their franchise agreements.

69.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 69 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

70.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 70 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

71.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 71 and therefore deny them. Moreover, although Defendants/Counterclaimants have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14) and no information or documents relating to these allegations have been disclosed.   The Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same.  It should be noted, that while the Plaintiffs/Counterclaim-Defendants allege to have contemporaneously possessed this information, they intentionally withheld it and continue to withhold it from the Defendants/Counterclaimants even after they have been de-franchised.

72.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 72 and therefore deny them. Moreover, although Defendants/Counterclaimants have subpoenaed this information from Plaintiffs/Counterclaim-Defendants in connection with a related action pending in New York

State Supreme Court entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County Index No. 650013/14) and no information or documents relating to these allegations have been disclosed. The Defendants/Counterclaimants leave the Plaintiffs/Counterclaim-Defendants to their proof regarding same. It should be noted, that while the Plaintiffs/Counterclaim-Defendants allege to have contemporaneously possessed this information, they intentionally withheld it and continue to withhold it from the Defendants/Counterclaimants even after they have been de-franchised.

73. The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 73 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that such a document does exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 73. On November 6, 2013, TUPSS's Senior Vice President and Chief Operating Officer C. James Hillquist called Thomas Hagan and told him he was emailing him a draft of a document that would be potentially mailed at a later date. Said document was only sent *after* the Defendants/Counterclaimants travelled to TUPSS Headquarters on November 12, 2013 to mediate their disputes with TUPSS corporate executives and counsel.

74. The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 74 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that such a document does exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 74 insofar as they tend to characterize a document that may or may not speak for itself.

75.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 75 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.  To the extent that such a document does exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 75 insofar as they tend to characterize a document that may or may not speak for itself.

76.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 76 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaimants were driven out of business by the Plaintiffs/Counterclaim-Defendants and by virtue of the restrictions imposed upon them and the tortious manner in which Plaintiffs/Counterclaim-Defendants' interfered with the Hagan's private equity investor, insufficient funds were available to cover all financial obligations of the Hagan's business.

77.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 77 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaimants were driven out of business by the Plaintiffs/Counterclaim-Defendants and by virtue of the restrictions imposed upon them and the tortious manner in which Plaintiffs/Counterclaim-Defendants' interfered with the Hagan's private equity investor, insufficient funds were available to cover all financial obligations of the Hagan's business.

78.     The Defendants/Counterclaimants admit the allegations set forth in Paragraph 78 and respectfully refer the Court to the Summons and Verified Complaint in the action entitled *3A, Inc., et al. v. Atlantic Mailboxes, Inc., et al.* (Supreme Court, New York County, Index No. 650013/14).

79.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 79 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaimants were fully within their rights under the Franchise Agreements to close their stores for one business day to conduct an organizational meeting. All stores were open for business the next day.

80.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 80 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that such a document does exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 80 insofar as they tend to characterize a document that may or may not speak for itself.

81.      The Defendants/Counterclaimants deny the allegations set forth in Paragraph 81 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaimants have not received any invoices or other details regarding any amounts claimed to be owed and whether such amounts are actual or estimated.

82.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 82 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them. To the extent that such a document does exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 82 insofar as they tend to characterize a document that may or may not speak for itself.

83.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 83 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

84.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 84 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaimants have not received any invoices or other details regarding any amounts claimed to be owed and whether such amounts are actual or estimated.

85.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 85 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 85 insofar as they tend to characterize documents that may or may not speak for themselves.

86.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 86 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 86 insofar as they tend to characterize documents that may or may not speak for themselves.

87.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 87 and leave the Plaintiffs/Counterclaim-Defendants to their proof.   Moreover, the Plaintiffs/Counterclaim-Defendants suspended the Hagans' access to the computer software and hardware systems at the former store centers making it difficult for them to complete and submit royalty reports.   However, at all relevant times, the Plaintiffs/Counterclaim-Defendants had remote access to the Hagan's POS systems and could identify their exact sales.

88.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 88 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaimants have not received any invoices or other details regarding any amounts claimed to be owed and whether such amounts are actual or estimated.

89.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 89 and leave the Plaintiffs/Counterclaim-Defendants to their proof. The Defendants/Counterclaimants have not received any invoices or other details regarding any amounts claimed to be owed and whether such amounts are actual or estimated.

## DEFENDANTS VIOLATE THEIR POST-TERMINATION OBLIGATIONS

90.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 90 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

91.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 91 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

92.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 92 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 92 insofar as they tend to characterize documents that may or may not speak for themselves.

93.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 93 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist,

Defendants/Counterclaimants deny the allegations set forth in Paragraph 93 insofar as they tend to characterize documents that may or may not speak for themselves.

94.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 94 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

95.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 95 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

96.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 96 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

97.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 97 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 97 insofar as they tend to characterize documents that may or may not speak for themselves.  Moreover, such alleged "Lease Addendum" documents were never executed by the owners/landlords of the premises leased by the Defendants/Counterclaimants and thus were not incorporated by reference or otherwise made a part of any of the lease agreements relating to the Former Centers.

98.     The Defendants/Counterclaimants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 98 - insofar as no Exhibits are part of the official Complaint filed with the United States District Court ECF File for this Action - and therefore deny them.   To the extent that such documents exist, Defendants/Counterclaimants deny the allegations set forth in Paragraph 98 insofar as they tend to characterize documents that may or may not speak for themselves.  Moreover, such alleged

23

"Lease Addendum" documents were never executed by the owners/landlords of the premises leased by the Defendants/Counterclaimants and thus were not incorporated by reference or otherwise made a part of any of the lease agreements relating to the Former Centers.

### FIRST CLAIM FOR RELIEF
### Lanham Act – Trademark Infringement

99.     In response to Paragraph 99, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

100.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 100 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

101.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 101 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

102.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 102 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

103.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 103 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### SECOND CLAIM FOR RELIEF
### Lanham Act – Unfair Competition

104.     In response to Paragraph 104, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

105.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 105 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

106.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 106 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

107.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 107 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

108.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 108 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### THIRD CLAIM FOR RELIEF
### Lanham Act – Unfair Dilution & Tarnishment

109.    In response to Paragraph 109, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

110.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 110 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

111.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 111 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

112.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 112 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

113.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 113 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### FOURTH CLAIM FOR RELIEF
### Common Law Trademark Infringement

114.    In response to Paragraph 114, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

115.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 115 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

116.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 116 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

117.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 117 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

118.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 118 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

119.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 119 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### FIFITH CLAIM FOR RELIEF
### Breach of Contract – Franchise Agreements & NCNSA

120.     In response to Paragraph 120, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

121.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 121 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

122.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 122 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

123.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 123 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

124.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 124 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

125.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 125 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

126.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 126 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

127.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 127 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

128.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 128 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

129.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 129 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### SIXTH CLAIM FOR RELIEF
### Common Law Unfair Competition

130.    In response to Paragraph 130, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

131.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 131 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

132.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 132 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

133.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 133 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

134.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 134 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

135.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 135 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

136.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 136 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

137.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 137 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

138.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 138 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### SEVENTH CLAIM FOR RELIEF
#### Common Law Misappropriation – Trade Secrets

139.    In response to Paragraph 139, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

140.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 140 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

141.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 141 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

142.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 142 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

143.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 143 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

144.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 144 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

145.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 145 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

146.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 146 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

147.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 147 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### EIGHTH CLAIM FOR RELIEF
#### Conversion

148.     In response to Paragraph 148, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

149.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 149 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

150.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 150 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

151.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 151 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

152.     The Defendants/Counterclaimants deny the allegations set forth in Paragraph 152 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### NINTH CLAIM FOR RELIEF
### *Breach of Contract – Franchise Agreements*
### *(Royalties & Fees)*

153.    In response to Paragraph 153, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

154.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 154 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

155.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 155 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

156.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 156 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

157.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 157 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

158.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 158 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

159.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 159 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

160.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 160 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

161.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 161 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

162.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 162 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### TENTH CLAIM FOR RELIEF
### *Breach of Contract – Promissory Note*

163.    In  response  to  Paragraph  163,  Defendants/Counterclaimants  incorporate  their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

164.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 164 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

165.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 165 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

166.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 166 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

167.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 167 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

168.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 168 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

169.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 169 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

170.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 170 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

171.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 171 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

172.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 172 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

### *ELEVENTH CLAIM FOR RELIEF*
### *Breach of Contract – Contract Carrier Agreements*
### *(Shipping Charges)*

173.    In response to Paragraph 173, Defendants/Counterclaimants incorporate their responses to each and every allegation contained above with the same force and effect as if fully set forth herein.

174.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 174 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

175.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 175 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

176.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 176 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

177.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 177 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

178.    The Defendants/Counterclaimants deny the allegations set forth in Paragraph 178 and leave the Plaintiffs/Counterclaim-Defendants to their proof.

## FURTHER ANSWER AND AFFIRMATIVE DEFENSES

By way of a further Answer and as affirmative defenses, Defendants/Counterclaimants deny that they are liable to the Plaintiffs/Counterclaim-Defendants on any of the claims alleged and deny that Plaintiffs/Counterclaim-Defendants are entitled to damages, equitable relief, attorneys' fees, costs, pre-judgment interest or to any relief whatsoever, and state as follows:

## FIRST AFFIRMATIVE DEFENSE
### *(Failure to State a Claim)*

179.    The Complaint, on one or more counts therein, fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE
### *(Fair Use)*

180.    The claims made in the Complaint are barred, in whole or in part, by the doctrines of fair use, nominative fair use and/or descriptive fair use.

## THIRD AFFIRMATIVE DEFENSE
### *(Innocent Infringement)*

181.    The claims made in the Complaint are barred, in whole or in part, because any potential infringement, was innocent, limited in duration and intended to prevent inconvenience to customers.

## FOURTH AFFIRMATIVE DEFENSE
### *(Statute of Limitations)*

182.    The claims made in the Complaint are barred, in whole or in part, by applicable statute of limitations.

## FIFTH AFFIRMATIVE DEFENSE
### *(Laches)*

183.    The claims made in the Complaint are barred, in whole or in part, by doctrine of Laches, in that Plaintiffs/Counterclaim-Defendants unreasonably delayed efforts to enforce their rights, if any, despite full knowledge of the alleged actions of the Defendants/Counterclaimants.

## SIXTH AFFIRMATIVE DEFENSE
### *(Waiver, Acquiescence & Estoppel)*

184.    Each of the purported claims set forth in the Complaint are barred by the doctrines of waiver, acquiescence and estoppel.

## SEVENTH AFFIRMATIVE DEFENSE
### *(Non-Infringement)*

185.    The Defendants/Counterclaimants have not infringed any applicable trademarks under federal or state law.

## EIGHTH AFFIRMATIVE DEFENSE
### *(No Causation)*

186.    The Plaintiffs/Counterclaim-Defendants' claims against the Defendants/Counterclaimants are barred because the Plaintiffs/Counterclaim-Defendants' damages, if any, including, but not limited to "damage to the brand," "dilution," "tarnishment," "injury to goodwill," and/or "reputational harm" were not caused by Defendants/Counterclaimants.

## NINTH AFFIRMATIVE DEFENSE
### *(No Damage)*

187.    Without admitting that the Complaint states a claim, there has been no damage to the Plaintiffs/Counterclaim-Defendants brand or business that can be directly attributable to any act or acts alleged against the Defendants/Counterclaimants in this action.  In October 2013,

Defendants/Counterclaimants raised concerns regarding the ethics of business practices to a TUPSS Regional Vice President, the UPSS Area Franchisee for Manhattan and other Manhattan Franchisees at an Area Meeting taking place at a UPS Hub located in New York County, New York.   Thereafter, in November 2013, the Defendants/Counterclaimants personally notified Plaintiff TUPSS and its' corporate counsel at TUPSS corporate headquarters in San Diego, California of serious risks to the brand, consumers and the business that required the immediate attention of the Plaintiffs/Counterclaim-Defendants to remedy. At that time, the Defendants/Counterclaimants were current on all financial obligations to their primary creditors, including the payment of royalties to TUPSS and shipping fees to UPS.  Instead of fixing the problems and acting in good faith, the Plaintiffs/Counterclaim-Defendants engaged in a campaign to destroy the Defendants/Counterclaimants and put them out of business in order to permanently conceal their wrongful conduct so that they could continue reaping the benefits attributable to questionable and unethical business practices.

## TENTH AFFIRMATIVE DEFENSE
### *(Unclean Hands)*

188.    The Plaintiffs/Counterclaim-Defendants' claims are barred by the doctrine of unclean hands and inequitable conduct.

## ELEVENTH AFFIRMATIVE DEFENSE
### *(Lack of Irreparable Harm)*

189.    The Plaintiffs/Counterclaim-Defendants' claims for injunctive relief are barred because Plaintiffs/Counterclaim-Defendants cannot show that they are currently suffering or will suffer any future irreparable harm from Defendants/Counterclaimants' actions.

## TWELFTH  AFFIRMATIVE DEFENSE
### *(Adequacy of Remedy at Law)*

190.    The alleged injury or damage suffered by Plaintiffs/Counterclaim-Defendants, if any, would be adequately compensated by money damages.    Accordingly, Plaintiffs/Counterclaim-Defendants have an adequate remedy at law and are not entitled to seek injunctive relief.

## THIRTEENTH  AFFIRMATIVE DEFENSE
### *(Failure to Mitigate)*

191.    The claims made in the Complaint are barred, in whole or in part, because of the Plaintiffs/Counterclaim-Defendants failure to mitigate damages, if such damages exist.

## FOURTEENTH  AFFIRMATIVE DEFENSE
### *(First Amendment)*

192.    The claims made in the Complaint are barred, in whole or in part, by the First Amendment to the Constitution of the United States of America.

## FIFTEENTH  AFFIRMATIVE DEFENSE
### *(Duplicative Claims)*

193.     Without admitting that the Complaint states a claim, any remedies are limited to the extent that there is sought an overlapping or duplicative recovery pursuant to the various claims against the Defendants/Counterclaimants for any alleged single wrong.

## SIXTEENTH AFFIRMATIVE DEFENSE
### *(Actions of Others)*

194.    The claims made in the Complaint are barred, in whole or in part, because Defendants/Counterclaimants are not liable for the acts of others over whom they have no control.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### *(Breach of the Covenant of Good Faith & Fair Dealing)*

195.    The Plaintiffs/Counterclaim-Defendants are estopped from recovery against the Defendants/Counterclaimants due to their own conduct and actions, including, but not limited to, conduct in violation of the covenant of good faith and fair dealing.    Moreover, the Plaintiffs/Counterclaim-Defendants' conduct was retaliatory, unfair and deceptive.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### *(Fraud)*

196.    The claims made in the Complaint are barred, in whole or in part, because of the Plaintiffs/Counterclaim-Defendants fraudulent conduct against Defendants/Counterclaimants and the public at large.

## NINETEENTH AFFIRMATIVE DEFENSE
### *(Recoupment/Setoff)*

197.    That the Plaintiffs/Counterclaim-Defendants are in breach of various agreements, including, but not limited to the Franchise Agreements and the Contract Carrier Agreements and have committed other tortious acts against the Defendants/Counterclaimants as more particularly stated in the Counterclaims below.    Accordingly, Defendants/Counterclaimants are entitled to a setoff from any monies to which the Plaintiffs/Counterclaim-Defendants may be entitled recover.

## TWENTIETH AFFIRMATIVE DEFENSE
### *(Prevention of Performance)*

198.    That the Plaintiffs/Counterclaim-Defendants claims are barred, in whole or in part, because Defendants/Counterclaimants' full performance under any existing agreements between the parties was prevented by the Plaintiffs/Counterclaim-Defendants' conduct and the Plaintiffs/Counterclaim-Defendants' imposition of commercially unreasonable systems,

hardware, software, training modules, and other sales methods upon TUPSS multiple center owner (MCO) franchisees, such as the Defendants/Counterclaimants.

## TWENTY-FIRST AFFIRMATIVE DEFENSE
### *(Unjust Enrichment)*

199.    That Plaintiffs/Counterclaim-Defendants would be unjustly enriched if they were awarded the relief requested in the Complaint.

## TWENTY-SECOND AFFIRMATIVE DEFENSE
### *(Failure to Pursue Alternative Dispute Resolution)*

200.    That the Plaintiffs/Counterclaim-Defendants claims are barred and they lack standing to bring claims against the Defendants/Counterclaimants because they failed to pursue mediation and/or alternative dispute resolution as proscribed in the Franchise Agreements.  In contrast, it should be noted that Defendants/Counterclaimants' identified a dispute, raised that dispute to the Plaintiffs/Counterclaim-Defendants in writing and on November 12, 2012, Defendants/Counterclaimants travelled to TUPSS Headquarters at their own cost in an attempt to fully resolve same. Following that meeting, Defendants/Counterclaimants' made multiple written requests to participate in additional meetings with corporate executives from TUPSS, however each such request was either ignored or denied by the Defendants and their counsel.

## TWENTY-THIRD AFFIRMATIVE DEFENSE
### *(Failure of Conditions Precedent)*

201.    The Defendants/Counterclaimants have not performed all conditions, covenants and promises required to be performed under the Franchise Agreements, the Contract Carrier Agreements and other applicable statutes, rules and ordinances they are required to follow, and as such they cannot seek to enforce the agreements they themselves failed to abide by. Moreover, Plaintiffs/Counterclaim-Defendants were obligated to offer a proprietary system of

business, know-how and product offerings that were commercially reasonable, fully functional, ethical, transparent and that do not cause violations of any consumer protection laws by multiple center owner franchisees such as the Defendants/Counterclaimants.  That at the time of each and every claim in the Complaint allegedly arose, the Plaintiffs/Counterclaim-Defendants failed to perform in this regard.   More specifically, Plaintiffs/Counterclaim-Defendants provided franchisees with a sales system that caused widespread fraudulent and deceptive trade practices in the TUPSS Manhattan Area Network and upon information and belief, elsewhere.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**
***(Breaches by Plaintiffs/Counterclaim-Defendants TUPSS and UPS)***

202.    If Defendants/Counterclaimants allegedly breached any agreements with the Defendants, such breaches are excused because the Plaintiffs'/Counterclaim-Defendants TUPSS and UPS breached such agreements first.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**
***(Improper Notice)***

203.    The Plaintiffs/Counterclaim-Defendants claims are barred, in whole or in part, because they failed to properly serve the Defendants-Counterclaimants with the necessary written notices setting forth the full nature of the alleged breaches and/or annexing invoices to support claims for any amounts past due, thus depriving the Defendants-Counterclaimants of the opportunity to investigate and cure such breaches.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**
***(Contract Void as Against Public Policy)***

204.    The Plaintiffs/Counterclaim-Defendants claims under the Franchise Agreements and the Contract Carrier Agreements are barred because said agreements are void as against public policy.  More specifically, after Defendants/Counterclaimants uncovered that it was a

nationwide practice at TUPSS for franchisees to add inches to the sides of measured boxes before entering dimensions into the iShip CMS system, to upsell customers by not disclosing UPS Ground as guaranteed service and by otherwise deceiving customers into purchasing higher-cost shipping products that offer little or no benefit to customers.  With respect to the Contract Carrier Agreements, upon information and belief, until and unless a franchisee or customer affirmatively requests a re-rate, even if mis-measured package is identified by the UPS multidimensional laser scanners and found to cost less than what the customer actually paid, UPS either retains the overcharge, or in some cases credits it back to the franchisee without further notice.  Conversely, if a mis-measured package is identified by the UPS multidimensional laser scanners and found to cost more than what the customer actually paid, Defendant UPS automatically re-rates the transaction and bills the franchisee's UPS account for any additional shipping fees that should have been collected from the consumer at the point of sale. Accordingly, the customer always loses, Defendant UPS always wins and the franchisee always seems to be left somewhere in the middle.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**
*(Ratification)*

205.    The Complaint is barred in whole or in part by the doctrine of ratification.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**
*(Violation of New York Franchise Act)*

206.    That the Plaintiffs/Counterclaim-Defendants' violations of the New York Practices Act preclude and otherwise bar their claims for relief.

## ADDITIONAL AFFIRMATIVE DEFENSE
### *(Reservation of Rights)*

207.    Defendants/Counterclaimants hereby reserve their rights to amend or assert additional affirmative defenses based upon information learned or obtained during discovery.

**WHEREFORE,** Defendants/Counterclaimants' pray for judgment as follows:

1.    That the Plaintiffs/Counterclaim-Defendants take nothing by way of their Complaint;

2.  That the Complaint, and each and every claim for relief therein, be dismissed with prejudice;

3.  That the Plaintiffs/Counterclaim-Defendants' requests for preliminary and permanent injunction be denied;

4.  Enter a judgment that the Defendants/Counterclaimants have not infringed the Plaintiffs/Counterclaim-Defendants' trademarks;

5.  Enter a judgment that the Defendants/Counterclaimants have not diluted the Plaintiffs/Counterclaim-Defendants' trademarks;

6.  Enter a judgment that the Defendants/Counterclaimants have not caused and/or are not likely to cause consumer confusion;

7.    That Defendants/Counterclaimants be awarded their costs of suit incurred herein, including attorneys' fees and expenses; and

8.  For such other and further relief the Court deems just and proper.

## FACTS APPLICABLE TO COUNTERCLAIMS & THIRD-PARTY COMPLAINT

Counterclaimants/Third-Party Plaintiffs ROBERT HAGAN ("Rob" or "Robert"); THOMAS HAGAN ("Tom" or "Thomas"); RIDGE ASSETS, INC.; 3A, INC.; TANMOR, INC.; RIDGE LOGISTICS, LLC; RIDGEPAC, INC.; TOMMYS DOC SQUAD, LLC; RIDGEDOWN, INC.; ROBPACK, LLC; RIDGE PEN, LLC; TOMPACK, LLC; BIGPACK, LLC;; and NYPS, LLC (the "NYPS Stores"), (collectively "Counterclaimants" or "the Hagans"), by and through their attorneys, STEPHEN J. SAVVA, P.C., as and for their First Amended Counterclaims against THE UPS STORE, INC. ("TUPSS"); UNITED PARCEL SERVICE, INC. ("UPS"); and UNITED PARCEL SERVICE OF AMERICA, INC. ("UPSA") (the "Counterclaim-Defendants") and for their First Amended Third-Party Complaint against BRADLEY KAPLAN; 43RD STREET BUSINESS SERVICES, INC. d/b/a "The UPS Store Center 5188" and "The UPS Store Center 1786"; 9TH AVENUE BUSINESS SERVICES, INC. d/b/a "The UPS Store Center 4386" and "The UPS Store Center 5472"; B.E.K. VENTURES, INC. d/b/a "The UPS Store Center 4419"; 8TH AVENUE BUSINESS SERVICES, INC. d/b/a "The UPS Store Center 4769" and "The UPS Store Center 5979"; 12TH AVENUE BUSINESS SERVICES, INC. d/b/a "The UPS Store Center 6341"; JOHN WONG; SERVICE PARCEL UNLIMITED, INC. d/b/a "The UPS Store Center 4190", "The UPS Store Center 4248", "The UPS Store Center 5388", "The UPS Store Center 6404" and "The UPS Store Center 6415"; KEVIN PANCHMIA; ROMAN P. ENTERPRISES, INC. d/b/a "The UPS Store Center 5958"; KP ENTERPRISES, INC. d/b/a "The UPS Store Center 5691"; LEANNA ENTERPRISES, INC. d/b/a "The UPS Store Center 6374"; GOLY SHIPPING, INC. d/b/a "The UPS Store Center 6387"; KETAN SETH; 23RD STREET SHIPPING, INC. d/b/a The UPS Store Center 0304"; 43RD STREET SHIPPING SERVICES, INC. d/b/a "The UPS Store Center 4619"; INNOVATED LOGISTICS

SOLUTIONS, INC. d/b/a "The UPS Store Center 4754"; BROADWAY SHIPPING SERVICES, INC. d/b/a "The UPS Store Center 5138"; JEROME TAYLOR; LEKYLE, INC. d/b/a "The UPS Store Center 0526" and "The UPS Store Center 4831"; SIX & MORE INC. d/b/a "The UPS Store Center 2992"; JERVAL, INC. d/b/a "The UPS Store Center 1052"; MARK TAYLOR; ZOEFIFTYONE CORP. d/b/a "The UPS Store Center 0745"; 1275 FIRST AVENUE CORP. d/b/a "The UPS Store Center 1083"; 1173-A SECOND AVE CORP. d/b/a "The UPS Store Center 0647"; SHYAM BUXANI; MOHAN BUXANI; DANNY DANSIGNANI; SIGLO2 21 LTD. d/b/a "The UPS Store Center 0444"; SIGLO-21, INC. d/b/a "The UPS Store Center 1492"; ABU RAHMAN; AR116 INC. d/b/a "The UPS Store Center 4163"; AR 95 INC. d/b/a "The UPS Store Center 5777"; SHUEB CHOUDHURY; WORLDWIDE SHIPPING, INC. d/b/a "The UPS Store Center 5865"; TANI SUSSMAN; GOTHAM SENDING SERVICES INC. d/b/a "The UPS Store Center 4766"; SYLVESTER ONOURAH; SMA ENTERPRISES INC. d/b/a "The UPS Store Center 5017"; OTIS DAVIS; STARSHIP SHIPPING INC. d/b/a "The UPS Store Center 6367"; MARCOS A. LOPEZ; MAL BUSINESS SOLUTIONS INC. d/b/a "The UPS Store Center 4768"; CHARMAINE RAPHAEL; FIVE CEES ASSET GROUP INC. d/b/a "The UPS Store Center 6166"; MOHAMMED RIAZ; SUBHAN ENTERPRISES INC. d/b/a "The UPS Store Center 5899"; CHAD JAAFAR; FAIRVIEW INC. d/b/a "The UPS Store Center 5953"; DANNY SPIES; SPIES ENTERPRISES INC. d/b/a "The UPS Store Center 4472"; ED XU; EDWARD J C CORPORATION d/b/a "The UPS Store Center 5296"; SANDRA MACHADO; JOAO MACHADO; and J&S QUEST SERVICES, LLC d/b/a "The UPS Store Center 5565 (collectively "Third-Party Defendants" or the "Manhattan Area TUPSS Franchisees"), allege as follows:

## NATURE OF ACTION

1.      The Hagans' adopt all of the statements contained in the Answer and Affirmative Defenses as if fully written herein at length.

2.      This case and the claims set forth herein involve a novel pattern of fraud and deceit at the hands of The UPS Store, Inc., UPS, Inc., and UPSA, Inc. (collectively "TUPSS/UPS") in conspiracy with the Third-Party Defendant Manhattan Area TUPSS Franchisees and others who sought to and did deceive the Hagans and the public by engaging in unethical business practices resulting in customer overcharges in the State of New York and elsewhere across the United States.   To wit, amongst other things, TUPSS/UPS actively encouraged franchisees to systematically over-measure shipping packages and mislead consumers into purchasing unnecessary and more costly shipping products (Air versus Ground) by falsely representing and concealing delivery date guarantees and shipping services.   The existence of this scheme negatively impacted the Hagans because, amongst other things, it put their business at significant risk and it caused their private equity lender to cease lending additional operating funds until and unless TUPSS explained its actions.   More specifically, the Hagans' discovery and reporting of an undeniable pattern of unethical sales practices put into motion a series of adverse actions at the hands of TUPSS/UPS and those working in concert with them that led to the swift destruction of the Hagans' eleven The UPS Store franchise locations in Manhattan.   The Hagans' bring the instant counterclaims and Third Party action to recover the losses they sustained as a result of the forced closure of all eleven of their franchise locations, which had on average, approximately eight years remaining on each franchise agreement and retail store lease.

3.     The scheme uncovered and reported by the Hagans involves practices that were virtually undetected by consumers and shareholders at UPS until the Hagans filed a lawsuit.  At all relevant times, the Hagans were committed to improving business operations and requested support from TUPSS senior leadership.  More specifically, the Hagans discovered and reported that (a) UPS Store franchisees were actively encouraged to conceal cheaper shipping options from the public such as UPS Ground Services, in favor of selling more expensive UPS Air Services; and (b) once UPS Air Services were selected, UPS Store franchisees were encouraged to over-dimension packages to trigger higher dimensional weight billing.

4.     Instead of acting on the Hagans' discovery and reporting of this fraudulent scheme, TUPSS/UPS sought to immediately retaliate against the Hagans with the help of the TUPSS Area Franchisee and other Manhattan Area TUPSS Franchisees who all worked in concert to hasten the Hagans' demise and then reap the benefits by converting the valuable assets, goodwill and customers from their eleven franchise locations without paying for them.  It was not until after the Hagans' began speaking about the existence of these fraudulent and deceptive sales practices, that TUPSS and UPS took formal adverse actions against them.

5.     After rapidly growing from just one store in 2008, to eleven of the top grossing stores in the region and twenty percent of the Manhattan Area by 2012, the Hagans were led to believe they had the full support of TUPSS/UPS.  However, at the same time they were being encouraged to continue expanding and take on more debt, it appears that TUPSS/UPS was allegedly conducting some form of secret investigation aimed to de-stabilize their operations and punish them for refusing to acquiesce with questionable and unethical sales practices imposed by UPS/TUPSS and adopted at virtually all The UPS Store franchise locations in Manhattan and elsewhere across the country.

6.     As the Hagans evaluated the situation, it became apparent that they had drawn attention to themselves because they were unwilling to emulate the sales practices of their Manhattan Area Franchisee counterparts.  More specifically, the Hagans uncovered clear and undeniable patterns of fraudulent and deceptive practices at TUPSS retail stores that were aimed at increasing revenues by deceiving customers into paying more than necessary for shipping services.  These practices include, but are not limited to: (a) intentionally misrepresenting the UPS Ground delivery guarantee; (b) misleading customers about expected delivery dates and times; (c) improperly upselling higher-price shipping options that offer no additional benefits to customers (such as 2nd Day Air when UPS Ground delivers in one day); (d) improperly concealing the existence of cheaper cost shipping services when requested by customers; (e) adding inches to the dimensions of boxes when entering them into the iShip CMS system; and (f) adding weight to boxes when entering them in the iShip CMS system.  The Hagans also learned from inside sources that the above practices had become necessary throughout the TUPSS network because without them, many franchisees would be forced out of business.  Although reporting these unethical practices to The UPS Store, Inc. corporate executives and counsel was the right thing to do, because these unethical practices were apparently sanctioned by TUPSS/UPS, it ended up costing the Hagans and their families the financial security their business venture was intended to provide them with.

7.     Perhaps the most shocking discovery made by the Hagans was that even after they reported these practices to senior leadership at TUPSS, the fraudulent, deceptive and unethical practices continues openly and notoriously and were easily documented by walking into any TUPSS location in Manhattan and shipping a box.  Employees in virtually every Manhattan Area TUPSS location had become so accustomed to the practice of misrepresenting the existence of

the UPS Ground guarantee, lying about expected delivery dates, withholding accurate price quotes and over-dimensioning boxes to trigger higher retail billable rates, that even after they were warned in writing to avoid these practices, they openly engaged in conversations on the topic and even feigned measuring boxes in front of customers, while at the same time adding inches to them in UPS's iShip CMS System without the customers' knowledge or consent.

8.     The existence of these unethical practices is also easily corroborated within the internal records of The UPS Store, Inc., UPS, Inc. and the Manhattan Area Franchisees who received monthly billing invoices with detailed statements of all shipping activity in a prior month.  These searchable records detail each and every shipping transaction that originates from a TUPSS retail location and permits a review of all relevant aspects of a shipping transaction, such as the tracking number, the shipping address, the amount charged to the customer, the weight and dimension of each box entered by the franchisee into the computer, the incentives paid and any discrepancies found to exist in the actual dimensions and/or actual weights of boxes when they are finally processed by UPS and verified with their multi-dimensional laser device measurement systems.  Indeed, if TUPSS/UPS so chooses, they can calculate exactly how much a TUPSS franchise location has overcharged customers in any given month.  This is not a speculative allegation, it is a verified fact admitted by the TUPSS/UPS in their own Verified Complaint.  However, while TUPSS/UPS clearly has this capability, at no time to this date has TUPSS/UPS ever produced any specific evidence demonstrating that the Hagans ever intentionally overcharged customers or failed to exercise reasonable steps to discipline or terminate employees who were failing to comply with proper sales practices and procedures. While TUPSS/UPS may seek to demonize the Hagans as the "bad guys," the fact remains that the Hagans appear to be the only ones at TUPSS/UPS who were actually: (a) willing to go on the

record to report the existence of massive retail rate compliance issues; (b) complain of selective enforcement; and (c) request help to fix the problems that were preventing them from operating their business successfully.

9.      Almost immediately after the Hagans notified TUPSS corporate executives and counsel of compliance barriers, they were issued a notice of default and told to mind their own business.   Indeed, within five short months after raising these issues, the Hagans' $6 Million annual grossing business was gone and all that remained was a lawsuit against them in Federal Court.  Because the former Hagan Store Centers will never be re-opened by the Hagans, money damages are the only remedy available to them to address the immeasurable harm caused by TUPSS/UPS and the Third Party.

## FACTUAL BACKGROUND

10.      Between 2008 and 2012, with the financial support and encouragement of TUPSS/UPS, Plaintiffs ROBERT HAGAN ("Robert") and THOMAS HAGAN ("Thomas"), rapidly became one of the largest multiple center owners ("MCOs") of The UPS Store, Inc. storefront retail locations in the United States ("store centers").  More specifically, within that same period the Hagans' acquired approximately twenty percent (20%) of all store centers in New York County, New York (the "Manhattan Area").

11.      At all relevant times, the TUPSS/UPS knew that the Hagans' store centers were not physically operated by them and that as large MCOs, they would be required to develop a customized management model requiring an operations manager, store managers (overseeing multiple store centers) and sales associates working inside their store centers.  The Hagans used the existing franchise model, systems, materials and resources to train their employees and build their new store centers.  The Hagans also obtained certification to train employees so that they

did not need to pay other certified trainer/owners in Manhattan, such as Third-Party Defendant Bradley Kaplan to train their employees.

12.     By all accounts, TUPSS/UPS led the Hagans to believe that they were wildly successful in the implementation of their management model.  They received verbal and written accolades from Tim Davis, the President of TUPSS, as well as encouragement to aggressively continue developing their MCO in the form of pre-approvals to open future store centers, sales awards, special recognition at TUPSS Conventions and close to $1 Million in financing from TUPSS in the form of MBE loans.

13.     As the Hagans' footprint grew, the TUPSS Manhattan Area Franchisee Representative, Atlantic Mailboxes, Inc. ("Atlantic") and its president, Tripp Singer (collectively "Singer") also benefited.  As the Area Franchisee, Singer provided the Hagans' employees with additional training support and compliance assistance.   However, soon after the Hagans purchased their tenth location and refinanced their TUPSS debt with an SBA loan underwritten by The Bancorp, individuals and affiliated with TUPSS/UPS appear to have begun secretly working to destabilize the Hagans' business with the intent of taking it away from them in order to turn it over to other Manhattan Area franchisees they were conspiring with.

14.     The Hagans seek to recover damages resulting from the TUPSS/UPS's wrongful acts intended to, *inter alia*, avoid their contractual obligations, tortuously interfere with the Hagans' business relationships, irreparably damage their reputations and ultimately cut them out of the shipping business without just compensation.  In less than five months, the Counterclaim-Defendants destroyed the Hagans' thriving business, thus depriving them of the financial benefits they deserved from the years of sweat equity and millions of dollars they personally invested and guaranteed to rehabilitate underperforming store centers and build new ones.

However, throughout this entire process, the TUPSS/UPS were wildly enriched as the Hagans: (a) expanded into new territories in Manhattan; (b) paid franchisee fees and additional gross royalties; (c) shipped tens of thousands of packages; (d) introduced new revenue streams to TUPSS/UPS; and (e) exerted pressure on market competitors in the Manhattan Area such as Fedex/Kinkos, Staples and former TUPSS/Mailbox Etc. franchisees against whom the TUPSS/UPS routinely elected not to enforce written non-compete and non-solicitation agreements.  As set forth in more detail below, the Hagans' dream of expanding their business quickly turned into a nightmare as they refused to acquiesce to the questionable business practices encouraged at TUPSS/UPS.

15.    The Hagans also seek to recover damages resulting from the Counterclaim-Defendants purposeful violation of their First Amendment rights.  More specifically, almost immediately after the Hagans publically voiced their concerns at a UPS Hub in Manhattan and began identifying and attempting to fix compliance barriers relating to sales practices in the Manhattan Area Network and elsewhere, TUPSS/UPS and those working in concert with them swiftly instituted escalating adverse and retaliatory action against them.  These actions include, but are not limited to: (a) falsely labeling the Hagans as fraudsters; (b) attempting to set them up through bogus "mystery shop" events; (c) seeking to have them admit to unspecified non-recourse terminable offenses under the Franchise Agreement; (d) purposefully interfering and destroying their ability to receive credit from their private equity lender; and (e) selectively, intentionally and arbitrarily imposing upon them impossible compliance standards so that they would fall terminally behind on their financial obligations, thus creating a pretext for terminating their franchise agreements.  It is believed that TUPSS/UPS took such extreme actions in order to permanently curtail the Hagans' speech so they could continue to engage in and conceal

wrongful business practices within the Manhattan Area Network and elsewhere across TUPSS network.  To this date, TUPSS/UPS and the Third-Party Defendants believe that these matters should never be spoken of again because the only ones with standing to bring such complaints are the customers who have no idea they were defrauded.  In many ways, the counterclaims in this action represent the only vehicle by which TUPSS/UPS will have to answer for the monies it collected and intends to retain from customers as a result of the same fraudulent and deceptive trade practices the Hagans reported and attempted to stop.

16.     After terminating the Hagans' franchise agreements and depriving them of the ability to earn a living, TUPSS/UPS took a page out of their playbook and sued them in Federal Court for trademark violations, unpaid royalties and shipping fees – an apparent common occurrence when looking to exert pressure and silence former franchisees who dare to raise a grievance with TUPSS/ UPS.  However, the one difference in this case is that the Hagans decided to fight back and they did so having documented their case extremely well.  The Hagans believe that the bad intent of TUPSS/UPS is evidenced by their refusal to work collaboratively with them.  TUPSS/UPS illogically chose to de-franchise the Hagans instead of working collaboratively with them to fix commercially unreasonable systems and eradicate fraudulent and unethical sales practices occurring at TUPSS franchise locations in the Manhattan Area and elsewhere across the United States.

17.     The Hagans further seek damages relating to TUPSS/UPS's improper and purposeful refusal to investigate and promptly correct undeniable patterns of fraudulent and deceptive trade practices at multiple TUPSS franchise locations in Manhattan, including those run by Third-Party Defendant Bradley Kaplan -- the same individual certified by TUPSS to train new employees.  This inaction irreparably tainted and devalued all TUPSS franchise locations in

the Manhattan Area, making it impossible for the Hagans to sell the assets of their business for value due to the impossible disclosures that they would have to make in order to solicit their business to a purchaser.   Moreover, because evidence existed that the same Third-Party Defendant Manhattan Area Franchisees who expressed an interest in purchasing some of the Hagan's locations at a significantly reduced price were complicit in the fraudulent and unethical business practices in the Area and TUPSS/UPS knew that the Hagans would lose everything if they continued exerting pressure on them.   As a further incentive to silence the Hagans, counsel for TUPSS/UPS made it clear that if the Hagans did attempt to sell or transfer a store center, they would be required to execute a general release in favor of TUPSS/UPS, thus waiving all claims against them.

18.     It is undisputed that almost immediately after the Hagans put TUPSS executives on actual notice of specific compliance barriers inherent within the franchise model, the Hagans were threatened, told to mind their own business and directed to implement a completely unattainable "zero tolerance" compliance standard if they wished to remain within TUPSS franchise network. At the same time, Customer Service representatives at TUPSS Headquarters began intentionally escalating claims and customer concerns against them to give the appearance that the Hagans were not operating their business properly. Given that the Hagans took the initiative to contact TUPSS executives, the increasingly aggressive position from TUPSS/UPS came as somewhat of a shock to the Hagans.   Prior to the emergence of these issues, the Hagans were advised that they were one of the only franchisees in entire network to adopt and implement formal written compliance policies signed by all employees concerning retail rate pricing.

19.     As the pressure began mounting against the Hagans, they had no choice but to continue investigating the franchise model to learn why they had been targeted.   A deeper look

into the software, hardware, training manuals and information provided by the Area Franchisee, showed that full compliance with respect to retail rate pricing was somewhat impossible, especially in stores where an owner could not be physically present.  More specifically, while upgrades to antiquated software, hardware, training modules and sales practices to avoid many types of retail rate overcharges and other fraudulent conduct were all feasible, for reasons still unknown, The UPS Store, Inc. and UPS refused to implement them or delayed rolling them out (i.e. new software, manager key or approval for non-iShip CMS migration, monthly reporting of improper dimensional overcharges, monthly reporting of improper weight overcharges, blocking the sale of higher-cost Air products where UPS Ground offers the exact same delivery date and time guarantee, properly informing customers at the point of sale, etc.).  The only reasonable conclusion the Hagans could reach to explain the Counterclaim-Defendants conscious conduct was that full compliance and transparency must lead to lower revenues.  This conclusion was proven to be true as the Hagans were forced to eliminate even non-intentional retail rate deviations.

20.    Because TUPSS/UPS refused to offer compliance assistance to the Hagans, they were left with very limited options.  They had employees sign policy documents, they upgraded security camera systems, they spot checked transactions and they repeatedly instructed all employees to provide customers with complete and accurate information regarding shipping transactions (the "Transparency Sales Model").  As the Hagans suspected, revenues sharply fell.  Moreover, as customers became aware of accurate delivery guarantees, shipping rates and the impact of package measurements and weights on billable rates, they began shipping more frequently via UPS Ground, because it is a cost-efficient, reliable, guaranteed service, that in

most cases, reaches locations as quickly or within one or two days of the significantly more expensive UPS Air products.

21.     Since the Hagans had always been responsive to prior requests to implement compliance protocols, it seemed strange that TUPSS/UPS purposefully withheld and failed to share timely information about alleged claims of non-compliance occurring at their Store Centers.  More specifically, during the exact same time period TUPSS/UPS claims to have been investigating the Hagans, the Hagans were told by the Area Franchisee Singer that no new retail rate complaints had been received by TUPSS.  Nevertheless, the Hagans still found themselves involved in some form of top-secret investigation launched by TUPSS corporate executives based upon what TUPSS/UPS alleges in its Complaint was a "tip" from a still-unidentified "former employee" of the Hagans.

22.     Without telling the Hagans anything about this "tip," offering them tangible examples of the non-compliant activities complained of, or providing even the most basic information needed to properly investigate or fix a problem of this nature, TUPSS/UPS inexplicably sat back and did nothing.  For obvious reasons, this was unacceptable to the Hagans, as it would be to any business owner trying to protect their business, customers and most important, creditors who entrusted them with millions of dollars.  Thus, by taking no action until the Hagans actually demanded a meeting at TUPSS headquarters, TUPSS' amplified the harm to the public, they destroyed the Hagans' relationship with third-party creditors and they made it next to impossible for to investigate and fix whatever TUPSS/UPS had allegedly uncovered.

23.     When it became apparent that TUPSS/UPS was taking no action to help the Hagans and address their legitimate concerns about compliance barriers and the non-functional TUPSS MCO model, they were left with no choice but to attempt to operate their eleven (11)

store centers under a "zero tolerance" retail rate compliance standard and to identify areas of risk inherent within the flawed TUPSS franchise sales model on their own.  As the Hagans clamped down on compliance, gross sales plummeted and intense pressure was exerted by TUPSS/UPS and those working in concert with them for the Hagans to immediately stop questioning things such as: (a) the impact of entering accurate dimensions and weight on shipping charges; (b) whether or not UPS Ground is a guaranteed service; (c) whether or not 2nd Day Air can be sold to a customer when it is being delivered to a zone where UPS Ground guarantees next day delivery at a lower cost; (d) why 2nd Day Air service is aggressively sold at TUPSS for one-day ground transit deliveries, when that service is not even available via UPS.com; (e) whether or not customers should be told about the UPS Ground guarantee; and (f) whether or not upselling requires disclosing the existence of all available service options and benefits.

24.     The efforts undertaken by the Hagans to meet the "zero tolerance" demands were necessary, but very costly.  The Hagans terminated employees, they upgraded in-store security cameras, they hired additional employees, they trained employees on thier "Transparency Sales Model" and they tried to do whatever they could to remain fully compliant.  Just as in the past, TUPSS/UPS sat back and offered the Hagans no support or suggestions on how to remain compliant and profitable within the existing TUPSS franchise model.  The sole recommendation provided TUPSS representatives was to keep "migrating all shipping transactions from the iShip CMS system to the POS register system" and look at how other franchisees and MCOs were operating.

25.     As the Hagans continued down the path of full compliance, they learned that they had been intentionally deceived by the TUPSS/UPS and that no formal policies, procedures, or sales models existed to protect them or the public from the numerous compliance barriers that

appear to be intentionally built into the TUPSS franchise system.  Indeed, because TUPSS/UPS retains exclusive control over things such as computer software, hardware systems, multiple dimension measurement devices, the "iShip" billing platform, advertising, shipping guarantees, insurance, fuel surcharges and the manner in which customer service representatives deal with complaints from the public, it became clear that it was virtually impossible for any TUPSS franchisee to completely avoid retail rate compliance issues.

26.     The Hagans discovered that in the Manhattan Area and perhaps elsewhere, non-compliance is trained, encouraged and according to TUPSS' Manhattan Area Franchise's operations manager Jose Contreras – a former Kaplan employee - it is sometimes necessary for a franchise owner to survive.  The Hagans ultimately learned that there was a preferred method to initiate overcharges at TUPSS and that the implementation of the Hagans' "Transparency Sales Model" created a massive problem, because it was in direct conflict with that preferred method.

27.     The Hagans believe that TUPSS/UPS failed to intervene in the unethical practices reported because it was not in their financial interests to do so.  The Hagans further believe that TUPSS/UPS was able to recruit the Third-Party Defendants because they were assured the protections of not being subjected to adverse actions by the Franchisor and they reaped significant financial benefits with the help of TUPSS/UPS.  Indeed, the fact that TUPSS/UPS twisted the Hagans' reporting of unethical and fraudulent sales practices into something negative was a clear indication to the Hagans' that TUPSS/UPS prioritized the collection of illicit revenues far above any potential damage to the "brand" or customer loyalty.  If the opposite was true, both TUPSS and UPS would have immediately investigated the Hagans claims, confirmed the truth of their allegations and taken swift steps to correct and prevent the pervasive pattern of unethical business practices documented in the Manhattan Area and elsewhere over the three

month period before the Hagans' franchise agreements were terminated.  The Hagans were punished because they refused to mind their business and fall in line with the preferred unethical methods of selling and shipping products.

28.     The significance of the migration process from iShip CMS to the POS system only became clear to the Hagans after they audited the sales practices in the area and spoke to individuals on the condition of anonymity.  When a franchisee properly migrates a transaction from the iShip CMS system to the POS system, a customer receipt is generated containing a valid tracking number and shipping rate which appears to be fully compliant.  However, in many cases such receipts were found to actually represent overcharges ranging from 50% to 400%. First, if a customer is lied to about: (a) the existence of a specific delivery service; (b) the delivery guarantee for that service; or (c) the customer is  fraudulently induced to purchase another, significantly more expensive product, the receipt they receive may on its face seem to be "compliant," but in fact, the customer could still be the victim of an overcharge.  Second, because the customer receipt from the POS system does not include the dimensions or weight of the package, overcharges are easily be hidden within the iShip software that calculates the billable rate based upon whatever information is entered into the computer at the point of sale. More specifically, all shipping quotes are calculated based upon the assumption that the accurate weight and dimensions of the package have been keyed into the iShip system.  If the weight and dimensions of a package are purposefully increased, the billable rate can be artificially manipulated upward.  The reason this was a preferred overcharge method is because it is generally only detected if the customer knows to challenge the calculation of the billable rate. This rarely occurs because customers generally do not participate in the measurement and weighing of packages and they do not see the dimensions and weights being keyed into the iShip

CMS system by the store employee.  Perhaps the most sophisticated aspect of this overcharge method is that the UPS multi-dimensional laser measurement system can and often does detect over-measurements or mis-weighing when the package is presented for processing.  At that time, UPS either re-rates the package and issues a credit to the franchisee's UPS shipping account or UPS simply keeps the additional revenue for themselves.  Either way, TUPSS still collects the royalties on the highest amount charged, the franchisee receives higher incentives and UPS is able to report higher gross sales through TUPSS.  Finally, in the extremely rare instance where a smart customer complains to TUPSS/UPS, the complaint is quickly diffused or passed off to the franchise owner who is then instructed to call the customer to apologize and offer a full or partial refund.  In most cases, the franchise owner doesn't even bother to investigate the claim.  In most cases, the overcharges are credibly blamed upon data entry errors or miscommunications regarding the service requested by the customer.  Because TUPSS/UPS now incorporates mandatory "Terms and Conditions" that require confidential arbitration of all customer claims with strict time limitations, TUPSS/UPS knows that their liability is limited so long as they can keep these deceptive practices a secret. *See* http://www.ups.com/media/en/claims_legal_actions.pdf.  Had the Hagans not taken the initiative to investigate and publically disclose the existence of this scheme, it would continue to occur unfettered.

29.     The only way such a complex scheme could have been discovered was through reviewing internal records, speaking with key TUPSS personnel and documenting hundreds of transactions at multiple franchise locations to identify clear patterns of how employees were trained to sell shipping products and process packages.  It is no coincidence that the Hagans' were singled out for failing to follow the TUPSS/UPS's preferred unethical practices or that the

Third-Party Defendants Manhattan Area Franchisees were waiting in the wings to take over the Hagans Store Centers and business as soon as termination notices were issued.

30.     With respect to the Third-Party Defendants, it should have come as no surprise to TUPSS/UPS that the Hagans were looking into the business practices of other Manhattan Area Franchisees. In fact, the Hagans specifically conveyed this information to TUPSS corporate executives and counsel in San Diego, regional vice presidents, operations managers and consultants at a UPS facility in New Jersey and the Area Franchisee in New York. The Hagans even sent an email to specifically invite TUPSS to begin auditing the Hagans' eleven store centers to determine whether or not the implementation of the Transparency Sales Model had been effective.   Upon information and belief, between November 2013 and the date the Hagan's franchise agreements were unilaterally terminated, no action was taken on the part of TUPSS/ UPS to investigate and address the Hagans' concerns.

31.     Upon information and belief, a key component within the TUPSS corporate franchise model is to maintain plausible deniability with respect to all retail rate overcharges. By doing this, TUPSS/UPS retains the ultimate power to terminate franchisees at will.   More specifically, citing non-compliance with TUPSS Franchise Agreement and the UPS Contract Carrier Agreement, TUPSS/UPS has figured out a way to impose whatever unreasonable conditions they seek upon unsuspecting franchisees that become too successful or who refuse to do as they are told.   Such conclusion was only be reached after the Hagans reviewed clear and convincing evidence of the Third-Party Defendants Manhattan Area TUPSS Franchisees participating in what can only be described as systematic dishonest, unethical, fraudulent and deceptive consumer business practices.

32.    Upon information and belief, TUPSS/UPS has been aware of retail rate compliance issues in the TUPSS franchise network for some time and these issues are not limited to transactions occurring in the Manhattan Area.  TUPSS/UPS have also been repeatedly named in multiple State and Federal lawsuits involving questionable business practices concerning dimensional weight overcharges, selling higher priced "UPS Air" products and then shipping them by Ground (UPS "Air-In-Ground" program) and improperly administering insurance charges to the exclusive detriment of their customers.  In many cases, such as the one dealing with the dimensional weight overcharges, although Defendant UPS denied liability, millions of dollars has been paid to settle claims.

33.    TUPSS has also been the target of multiple consumer fraud watch-groups and websites that post grievances by customers.  One such grievance posted on a site called "www.RipoffReport.com" caught the Hagans' attention because it included certain facts that were reminiscent of the policies uncovered in the Manhattan Area.  On October 23, 2013, a post entitled, "UPS store Deceit Overcharged Intentionally Openly Admitted it was the Owners Policy San Jose California" states:

> I ship a lot of items as an Ebay power seller.  I had a customer ask for a UPS estimate on a large item.  I had my tape measure in my hand and the box measured 42.5" by 14.5" by 14 7/8"  They rounded the 42 to 43 which is understandable. But they estimated the box at 16" by 16" on each side when shown both sides were less than 15" the clerk told me that the owner insited they round then add an inch.  The estimate increased the dimensional weight be 4 inches and the cost be over $4.  The rip off was only 5% but the clerk said he was required to do this on every package that left the store.  I have shipped several other packages through this location and never checked the measurement with what was being charged.  This location is overcharging every customer on every package and openly admitted it.
>
> I called UPS and they said they have no power over the UPS stores.  I could not find the proper chanels to voice my disgust at this business and hope you will get a scale as I wonder now about the weight as well.  This is not a place I would do business with again.  The staff has always been

friendly and when I told the clerk he should not bill me for the larger
dimensions he admitted he fealt bad about doing it but was affraid of
losing his job and would not bill it for the actual size.
This is a dilema for the employee and this store should be sued I do not
knwo how to do that kind of stuff but at least I can warn others about this
place perhaps other UPS stores.

I walked out and did not ship with this place.

**Annexed herewith as EXHIBIT "A" is a true copy of the Ripoff Report posting from
October 23, 2013 found at [http://www.ripoffreport.com/r/UPS-store-/San-Jose-California-
95118/UPS-store-Deceit-Overcharged-Intentionally-Openly-Admitted-it-was-the-owners-
Policy-San-1094690](http://www.ripoffreport.com/r/UPS-store-/San-Jose-California-95118/UPS-store-Deceit-Overcharged-Intentionally-Openly-Admitted-it-was-the-owners-Policy-San-1094690).** The above website was a clear indication to the Hagans that the sales
practices observed within Manhattan had to have been learned through training and not
spontaneously conceived by individual franchisees. The Hagans' did not adopt these practices,
because they trained their own employees.

34.    The Hagans have no doubt that the Counterclaim-Defendants were also fully
aware of the widespread compliance barriers within the franchise network. Through the
Counterclaim-Defendants' tacit approval of unethical sales methods, they effectively presided
over a massive fraud perpetrated upon the public that generated millions of dollars in additional
revenues for UPS, royalties for TUPSS and incentives for the Third-Party Defendant Manhattan
Area Franchisees who willfully participated. Ironically, at the same time, citing the need to
protect the brand and bring integrity back to the franchise, the TUPSS attacked and de-franchised
the Hagans as they struggled to make ends meet by selling UPS products compliantly.

35.    The one key fact that distinguishes this case from all other disputes between
TUPSS/UPS and other litigants, is that none have ever travelled to the TUPSS corporate
headquarters, sat in their boardroom and begged top company executives and corporate counsel
to fix massive fraud problems in the network and implement proper safeguards to prevent retail

rate overcharges.   The Hagans felt obligated to bring this issue to the attention of TUPSS corporate executives privately.  Litigation was always a last resort.  The Hagans naively assumed that after investing millions of dollars in the franchise, both TUPSS and UPS would listen and want to see the Hagans' succeed, not fail.  However, almost immediately after *requesting* a first meeting, TUPSS accused the Hagans of being engaged in "a widespread pattern of improper and dishonest conduct" and reserved the right to terminate their franchise agreements at will if they did not remain 100% compliant.  It is undisputed that the Hagans contacted TUPSS corporate executives to request a meeting *before* any notices or adverse actions were ever taken against them.

36.   With the benefit of hindsight, the significance of the Hagans' meeting at TUPSS' corporate headquarters in San Diego, California cannot be overlooked.  On November 9, 2013, Robert Hagan, Thomas Hagan and their counsel flew to San Diego at their own cost for the sole purpose of resolving concerns that had arisen about TUPSS' commitment to work with them collaboratively.  On November 12, 2013, the Hagans met with C. James Hillquist – TUPSS Senior Vice President of Global Ops/Chief Operating Officer, Don Higginson – TUPPS Senior Vice President of Franchise Services and Channa Parker Barra - TUPSS Managing Attorney (the "San Diego Meeting").  During that meeting, the Hagans discussed: (a) their compliance efforts to date; (b) barriers to full compliance; (c) widespread compliance violations occurring within the franchise network; (d) potential solutions to all compliance issues; (e) major deficiencies with TUPSS' MCO program; (f) the need for the Hagans' private equity lender to continue assisting them; and (g) a reasonable action plan to move forward as partners.

37.   The TUPSS corporate executives listened to the Hagans' presentation, reviewed the documents the Hagans compiled for them and told them that they were impressed and

satisfied with the new compliance initiatives the Hagans had developed and begun implementing.  However, SVP Don Higginson chuckled and advised his colleagues that if the Hagans are required to follow a fully transparent sales model, in fairness to them, other franchisees would also have to be required to follow suit.  At the time, the Hagans did not quite understand the significance of that comment, however in retrospect, Higginson was likely alluding to the financial impact that implementing a transparent sales model would have across the entire franchise network.  Immediately upon returning from the San Diego Meeting, the Hagans requested a follow-up meeting with Eric Maida - TUPSS Northeast Regional Vice President ("Maida").

38.     On November 19, 2013, Plaintiff Robert Hagan and his counsel met with Maida, Jay Schlessenger – TUPSS Operations Manager for the Northeast Region ("Schlessenger") and Sean O'Neil – TUPSS Franchise Consultant ("O'Neil") at a UPS facility in Secaucus, NJ (the "Maida Meeting").  Robert told Maida about the San Diego Meeting and discussed some of his concerns regarding the lack of support for MCOs, his efforts to enforce compliance and the difficulty of implementing a transparent sales model in an area when other franchisees are being systematically trained and instructed to operate in a non-compliant manner.  Hagan told Maida that training seemed to be a major issue, because in the past, the Hagans had bad experiences with employees who had worked and been trained at other TUPSS franchise locations.  Maida stated that he had no information about non-compliance at any other store centers in Manhattan and requested that Robert show him tangible proof of non-compliance by another franchisee in the Manhattan Area.  In response, Hagan showed him a POS receipt and a video he personally took detailing a transaction he experienced just a few weeks earlier at a Store Center located on Lexington Avenue in the City, County and State of New York (the "Hagan Video").

39.     Robert explained to Maida that the original purpose behind recording the Hagan Video was to learn techniques from another compliant store to train employees.  Instead, the experience led Hagan to believe that retail rate compliance issues were actually more widespread than individuals at TUPSS had led him to believe.

40.     The Hagan Video showcased multiple examples of non-compliant activities, including repeated misrepresentations about the UPS Ground guarantee, improper upselling/cross-selling techniques, the sale of unnecessary shipping services, the failure to migrate a transaction from the iShip CMS system to the POS System and an improper fee-added overcharge to the maximum UPS retail shipping rate.

41.     Before leaving the UPS facility, Hagan advised and assured Maida that private investigators had begun surveying the Manhattan Area and the extent of the non-compliance was widespread and pervasive in each and every store center.  Just as Robert Hagan did with TUPSS corporate executives in San Diego, he urged Maida to conduct his own internal investigation if he had any doubt as to the veracity of the Hagan Video or any of the claims he made.

42.     Although prior to being shown the Hagan Video, Maida claimed that he took compliance issues very seriously and that he had an affirmative duty to investigate all claims of non-compliance and consumer fraud in the Northeast Region, in the weeks and months following his personal review of the Hagan Video, neither Maida, nor the Counterclaim-Defendants requested a copy of the video or conducted any follow-up investigation to curtail the sales practices witnessed and reported by Hagan.

43.     In the weeks and months that followed the Maida Meeting, while the Counterclaim-Defendants stood by idly, it is estimated that tens of thousands of TUPSS customers in Manhattan and many more elsewhere were subjected to unethical, dishonest and

fraudulent business practices at TUPSS retail locations.  More specifically, evidence compiled by a team of private investigators on multiple dates in the months **after** the San Diego Meeting ***and*** **after** the Maida Meeting documented every single Third-Party Defendant Manhattan Area Franchisee committing one or more of the following acts: (a) lying about the UPS Ground delivery guarantee; (b) misleading customers about guaranteed delivery dates; (c) improperly upselling higher-price shipping options that offer no additional benefits to customers; (d) improperly concealing the existence of cheaper cost shipping services when requested by customers; (e) adding inches to the dimensions of boxes when entering them into the iShip CMS system; (f) adding weight to boxes when entering them in the iShip CMS system; (g) overcharging customers more than the maximum allowable UPS retail rate; (h) charging customers for accessorial charges they did not request; and (i) otherwise engaging in conduct that appears to be in material breach of TUPPS Franchise Agreements and the UPS Carrier Agreements.

44.     It is also worth noting that following the Maida Meeting, TUPSS/UPS exponentially ramped up efforts to destabilize the Hagan's business and successfully caused their private equity lender, John Penrose ("Penrose"), to stop funding them.  TUPSS/UPS knew that Penrose would cut off funding to their eleven store centers if they were held to impossible and unattainable compliance standards.

45.     Despite dwindling cash reserves, the lack of support from TUPSS/UPS, steadily declining sales and the loss of their private equity lender, the Hagans continued to operate their store centers to the best of their ability.  When the Hagans attempted to implement a plan to sell a portion of their stores to consolidate operations, raise cash and partially mitigate damages, they were advised by counsel for TUPSS/UPS that any such sale(s) would require providing both

TUPSS and UPS with a general release of all claims.  As a result of the above, the Hagans fell behind on their UPS shipping bills, their rents and other financial obligations.

46.     On January 31, 2014, the Hagans served counsel for TUPSS/UPS with a Notice of Material Default and demanded that they immediately cease and desist from their wrongful conduct, specifically citing the fraudulent and deceptive trade practices occurring in the Manhattan Area and elsewhere within TUPSS network.   TUPSS/UPS ignored and failed to provide any denial or other response to this notice. **Annexed herewith as EXHIBIT "B" is the letter from M. McKew, Esq. to P. Ellis, Esq., dated January 31, 2014.**

47.     On February 5, 2014, counsel for TUPSS/UPS advised the Hagans that all eleven of their franchise agreements had been unilaterally terminated without notice or an opportunity to cure and that they were immediately obligated to comply with post termination obligations under the Franchise Agreements, which included shutting down all the stores and not engaging in any competitive business activities.   All eleven of the Hagans' former store centers are permanently closed and they are out of possession of the retail spaces.

48.     The Hagans now seek to recover money damages from TUPSS/UPS and the Third-Party Defendants working in concert with them for their joint efforts to systematically convert and transfer the Hagans' business assets without just compensation. Shortly after terminating the Hagans' franchise agreements, the TUPSS/UPS began distributing the Hagans' mailbox customers and business to the Third-Party Defendants upon terms that have never been disclosed to the Hagans.

49.     Moreover, upon information and belief, the Hagans discovered that TUPSS/UPS, Third-Party Defendants and those working in concert with them, began secretly inducing the Hagans' landlords to expedite the eviction process so that the former store centers, customer

lists, equipment, goodwill and business could all be quickly converted without compensating the Hagans.  Indeed, within days after TUPSS/UPS terminated the Hagans' franchise and contract carrier agreements, without the Hagan's knowledge, contacts were made to the Hagans' commercial landlords for the purpose of interfering with their business relationships and hand-picking substitute franchisees to take over each of the former Hagan locations, in some cases at reduced rents, in order to trigger "Good Guy" guarantee clauses which would require the Hagans to become personally liable for any shortfall in rent.  **Annexed herewith as Exhibit "C" is a true copy of an e-mail from T. Singer to D. Milin (the landlord for former Hagan Center #6283), copying E. Maida (TUPSS Northeast Regional VP), dated February 9, 2014.**

50.     While the Hagans may never fully know the true extent to which they were the victims of retaliation and selective enforcement prior to full discovery, what cannot be disputed is that they were retaliated against and that this matter was not properly handled.  It is highly irregular for a Vice President of Operations and Chief Operating Officer to travel across the country to perform a personal "mystery shop" at a The UPS Store location and then keep it secret.  TUPSS/UPS repeatedly claimed that they were not looking to de-franchise the Hagans, yet their actions all indicate otherwise.   Indeed, upon information and belief, it now appears that TUPSS/UPS also withheld information about their activities from Bancorp (the SBA lender), despite their affirmative obligation to immediately notify them in the event of a material change that could adversely impact the SBA loan.   Until and unless TUPSS/UPS and Third-Party Defendants are required to fully disclose their internal records and appear for depositions under oath, the true scope of the questionable practices uncovered by the Hagans will never fully be known.

## THE PARTIES

51.     3A, Inc. ("3A") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 1636 Third Avenue, New York, New York.

52.     Tanmor, Inc. ("Tanmor") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 527 Third Avenue, New York, New York.

53.     Ridgepac, Inc. ("Ridgepac") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 331 West 57th St., New York, New York.

54.     Ridge Assets, Inc. ("Ridge Assets") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 1202 Lexington Avenue, New York, New York.

55.     Ridgedown, Inc. ("Ridgedown") is, and at all relevant times was, a corporation organized under the laws of the State of New York with a principal place of business at 342 Broadway, New York, New York.

56.     Tommys Doc Squad, LLC ("Tommys") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 303 Park Avenue South, New York, New York.

57.     Ridge Logistics, LLC ("Ridge Logistics") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 1562 First Avenue, New York, New York.

58.     Ridge Pen, LLC ("Ridge Pen") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 1474 Third Avenue, New York, New York.

59.     Tompack, LLC ("Tompack") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 228 Eighth Avenue, New York, New York.

60.     Bigpack, LLC ("Bigpack") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 694 Tenth Avenue, New York, New York.

61.     Robpack, LLC ("Robpack") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 328 Eighth Avenue, New York, New York.

62.     NYPS, LLC ("NYPS") is, and at all relevant times was, a limited liability company organized under the laws of the State of New York with a principal place of business at 331 West 57th St., New York, New York.

63.     Thomas Hagan ("Tom") is, and at all relevant times was, a resident of the State of New Jersey.

64.     Robert Hagan ("Robert") is, and at all relevant times was, a resident of the State of New Jersey.

65.     Tom and Robert each own, and at all relevant times owned, one half of the shares of 3A, Tanmor, Ridgepac, Ridge Assets and Ridgedown.

66.     Robert is, and at all relevant times was, the Secretary and Vice President of 3A, Tanmor, Ridgepac, Ridge Assets and Ridgedown.

67.     Tom is, and at all relevant times was, the President and Treasurer of 3A, Tanmor, Ridgepac, Ridge Assets and Ridgedown.

68.     Tom and Robert each have, and at all relevant times had, a 50% membership interest in NYPS.

69.     Tom and Robert are, and at all relevant times were, the managing members of NYPS, LLC.

70.     NYPS has, and at all relevant times had, a 100% membership interest in Tommys, Ridge Logistics, Ridge Pen, Tompack, Bigpack and Robpack.

71.     NYPS is, and at all relevant times was, the managing member of Tommys, Ridge Logistics, Ridge Pen, Tompack, Bigpack and Robpack.

72.     Upon information and belief, TUPSS is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6060 Cornerstone Court West, San Diego, California 92121. TUPSS is a wholly owned subsidiary of United Parcel Service, Inc., a Delaware corporation. TUPSS is a franchisor of independently owned and operated postal, packaging, shipping, business, and communication retail service centers, under The UPS Store® mark, with hundreds of thousands of mailbox holders in the United States and thousands of locations offering mail and parcel receiving, packaging, and shipping services and providing small businesses with a wide range of products and services in this District, across the United States and Canada.

73.     Upon information and belief, UPS is a corporation organized and existing under the laws of the State of Ohio with its principal place of business at 55 Glenlake Pkwy NE, Atlanta, GA 30328 Georgia. UPS is a wholly owned subsidiary of United Parcel Service, Inc., a

Delaware corporation. In 2009, United Parcel Service, Inc., a New York Corporation, was merged into UPS.

74.     Upon information and belief, UPSA is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 55 Glenlake Parkway NE, Atlanta, Georgia 30328. UPSA is a wholly owned subsidiary of United Parcel Service, Inc., a Delaware corporation.

75.     BRADLEY KAPLAN ("Kaplan") is an individual who upon information and belief resides in the Town of New Canaan, County of Fairfield, State of Connecticut.

76.     That upon information and belief Kaplan is a The UPS Store multiple center owner in the Manhattan Area who owns eight (8) The UPS Store franchise locations.

77.     That Kaplan, through his corporate entity 43RD STREET BUSINESS SERVICES, INC., owns Store Center 1786 located at 603 West 115th Street, in the City, County and State of New York ("Kaplan Center 1786").

78.     That Kaplan, through his corporate entity, 43RD STREET BUSINESS SERVICES, INC., owns Store Center 5188 located at Toys R Us, 1514 Broadway, in the City, County and State of New York ("Kaplan Center 5188").

79.     That 43RD STREET BUSINESS SERVICES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

80.     That Kaplan, through his corporate entity 9TH AVENUE BUSINESS SERVICES, INC., owns Store Center 4386 located at 2753 Broadway, in the City, County and State of New York ("Kaplan Center 4386").

81.   That Kaplan, through his corporate entity, 9TH AVENUE BUSINESS SERVICES, INC., owns Store Center 5472 located at 388 2nd Avenue, in the City, County and State of New York ("Kaplan Center 5472").

82.   That 9TH AVENUE BUSINESS SERVICES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

83.   That Kaplan, through his corporate entity B.E.K. VENTURES, INC., owns Store Center 4419 located at 130 Seventh Avenue, in the City, County and State of New York ("Kaplan Center 4419").

84.   That B.E.K., INC. is a domestic business corporation duly organized and existing under the laws of the State of New York.

85.   That Kaplan, through his corporate entity, 8TH AVENUE BUSINESS SERVICES, INC., owns Store Center 4769 located at 888-C 8th Avenue, in the City, County and State of New York ("Kaplan Center 4769").

86.   That Kaplan, through his corporate entity, 8TH AVENUE BUSINESS SERVICES, INC., owns Store Center 5979 located at 105 West 86th Street, in the City, County and State of New York ("Kaplan Center 5979").

87.   That 8TH AVENUE BUSINESS SERVICES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

88.   That Kaplan, through his corporate entity, 12TH AVENUE BUSINESS SERVICES, INC., owns Store Center 6341 located at 480 6th Avenue, in the City, County and State of New York ("Kaplan Center 6341").

89.   That 12TH AVENUE BUSINESS SERVICES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

90.     JOHN WONG ("Wong") is an individual who upon information and belief resides in the City, County and State of New York.

91.     That upon information and belief Wong is a The UPS Store multiple center owner in the Manhattan Area who owns five (5) The UPS Store franchise locations.

92.     That Wong, through his corporate entity SERVICE PARCEL UNLIMITED, INC., owns Store Center 4190 located at 9 East 8th Street, in the City, County and State of New York ("Wong Center 4190").

93.     That Wong, through his corporate entity SERVICE PARCEL UNLIMITED, INC., owns Store Center 4248 located at 305 West Broadway, in the City, County and State of New York ("Wong Center 4248").

94.     That Wong, through his corporate entity SERVICE PARCEL UNLIMITED, INC., owns Store Center 5388 located at 319 Lafayette Street, in the City, County and State of New York ("Wong Center 5388").

95.     That Wong, through his corporate entity SERVICE PARCEL UNLIMITED, INC., owns Store Center 6404 located at 71 Broadway, in the City, County and State of New York ("Wong Center 6404").

96.     That Wong, through his corporate entity SERVICE PARCEL UNLIMITED, INC., owns Store Center 6415 located at 217 Centre Street, in the City, County and State of New York ("Wong Center 6415").

97.     That SERVICE PARCEL UNLIMITED, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

98.     KEVIN PANCHMIA ("Panchmia") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

99.     That upon information and belief Panchmia is a The UPS Store multiple center owner in the Manhattan Area who owns four (4) The UPS Store franchise locations.

100.    That Panchmia, through his corporate entity ROMAN P. ENTERPRISE, INC., owns Store Center 5958 located at 105 East 34th Street, in the City, County and State of New York ("Panchmia Center 5958").

101.    That ROMAN P. ENTERPRISE, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

102.    That Panchmia, through his corporate entity KP ENTERPRISES, INC, owns Store Center 5691 located at One Penn Plaza, in the City, County and State of New ("Panchmia Center 5691").

103.    That ABC KP ENTERPRISES, INC, is a domestic business corporation duly organized and existing under the laws of the State of New York.

104.    That KP ENTERPRISES, INC, is a foreign business corporation duly organized and existing under the laws of the State of New York.

105.    That Panchmia, through his corporate entity LEANNA ENTERPRISE, INC., owns Store Center 6374 located at 14 Murray Street, in the City, County and State of New ("Panchmia Center 6374").

106.    That LEANNA ENTERPRISE, INC, is a domestic business corporation duly organized and existing under the laws of the State of New York.

107.    That Panchmia, through his corporate entity GOLY SHIPPING, INC., owns Store Center 6387 located at 34 Third Avenue, in the City, County and State of New ("Panchmia Center 6387").

108.    That GOLY SHIPPING, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

109.    KETAN SETH ("Seth") is an individual who upon information and belief resides in the City, County and State of New York.

110.    That upon information and belief Seth is a The UPS Store multiple center owner in the Manhattan Area who owns four (4) The UPS Store franchise locations.

111.    That Seth, through his corporate entity 23RD STREET SHIPPING, INC., owns Store Center 0304 located at 101 West 23rd Street, in the City, County and State of New ("Seth Center 0304").

112.    That 23RD STREET SHIPPING, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

113.    That Seth, through his corporate entity 43RD STREET SHIPPING, INC., owns Store Center 4619 located at 132 East 43rd Street, in the City, County and State of New York ("Seth Center 4619").

114.    That 43RD STREET SHIPPING, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

115.    That Seth, through his corporate entity INNOVATED LOGISTICS SOLUTIONS INC., owns Store Center 4754 located at 243 5th Avenue, in the City, County and State of New York ("Seth Center 4754").

116.    That INNOVATED LOGISTICS SOLUTIONS INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

117.     That Seth, through his corporate entity BROADWAY SHIPPING SERVICES, INC., owns Store Center 5138 located at 1357 Broadway, in the City, County and State of New York ("Seth Center 5138").

118.     That BROADWAY SHIPPING SERVICES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

119.     JEROME TAYLOR ("J. Taylor") is an individual who upon information and belief resides in the City, County and State of New York.

120.     That upon information and belief J. Taylor is a The UPS Store multiple center owner in the Manhattan Area who owns four (4) The UPS Store franchise locations.

121.     That J. Taylor, through his corporate entity LEKYLE, INC., owns Store Center 0526, located at 119 West 72nd Street, in the City, County and State of New ("J. Taylor Center 0526").

122.     That J. Taylor, through his corporate entity LEKYLE, INC., owns Store Center 4831 located at 366 Amsterdam Avenue, in the City, County and State of New ("J. Taylor Center 4831").

123.     That LEKYLE, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

124.     That J. Taylor, through his corporate entity JERVAL, INC., owns Store Center 1052 located at 111 East 14th Street, in the City, County and State of New ("J. Taylor Center 1052").

125.     That JERVAL, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

126.    That J. Taylor, through his corporate entity SIX & MORE, INC., owns Store Center 2992 located at 2576 Broadway, in the City, County and State of New York ("J. Taylor Center 2992").

127.    That SIX & MORE, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

128.    MARK TAYLOR ("M. Taylor") is an individual who upon information and belief resides in the City, County and State of New York.

129.    That upon information and belief M. Taylor is a The UPS Store multiple center owner in the Manhattan Area who owns three (3) The UPS Store franchise locations.

130.    That M. Taylor, through his corporate entity ZOEFIFTYONE CORP., owns Store Center 0745 located at 208 East 51st Street, in the City, County and State of New York ("M. Taylor Center 0745").

131.    That ZOEFIFTYONE CORP, is a domestic business corporation duly organized and existing under the laws of the State of New York.

132.    That M. Taylor, through his corporate entity 1275 FIRST AVENUE CORP., owns Store Center 1083 located at 326 East 65th Street, County and State of New York ("M. Taylor Center 1083").

133.    That 1275 FIRST AVENUE CORP., is a domestic business corporation duly organized and existing under the laws of the State of New York.

134.    That M. Taylor, through his corporate entity 1173-A SECOND AVE. CORP., owns Store Center 0647 located at 1173A Second Avenue, in the City, County and State of New ("M. Taylor Center 0647").

135.   That 1173-A SECOND AVE. CORP, is a domestic business corporation duly organized and existing under the laws of the State of New York.

136.   SHYAM BUXANI is an individual, who upon information and belief, resides in the City, County and State of New York.

137.   MOHAN BUXANI is an individual, who upon information and belief, resides in the City, County and State of New York.

138.   DANNY DANSIGNANI is an individual, who upon information and belief, resides in the City, County and State of New York.

139.   That upon information and belief SHYAM BUXANI, MOHAN BUXANI and DANNY DANSIGNANI (collectively "Buxani/Dansignani") are The UPS Store multiple center owners in the Manhattan Area who jointly own two (2) The UPS Store franchise locations.

140.   That Buxani/Dansignani, through their corporate entity SIGLO2 21 LTD., own Store Center 0444 located at 244 Madison Avenue, in the City, County and State of New York ("Buxani/Dansignani Center 0444").

141.   That SIGLO2 21 LTD, is a domestic business corporation duly organized and existing under the laws of the State of New York.

142.   That SIGLO2 21 LTD, is a domestic partnership duly organized and existing under the laws of the State of New York.

143.   That SIGLO2 21 LTD, is a domestic limited liability company duly organized and existing under the laws of the State of New York.

144.   That Buxani/Dansignani, through their corporate entity SIGLO-21, INC., own Store Center 1492 located at 1040 First Avenue, in the City, County and State of New York ("Buxani/Dansignani Center 1492").

145.    That SIGLO-21, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

146.    ABU RAHMAN ("Rahman") is an individual who upon information and belief resides in the City of New York, County of Richmond and State of New York.

147.    That upon information and belief Rahman is a The UPS Store multiple center owner in the Manhattan Area who owns two (2) The UPS Store franchise locations.

148.    That Rahman, through his corporate entity AR116 INC., owns Store Center 4163 located at 55 West 116th Street, in the City, County and State of New ("Rahman Center 4163").

149.    That AR116 INC, is a domestic business corporation duly organized and existing under the laws of the State of New York.

150.    That Rahman, through his corporate entity AR 95, INC., owns Store Center 5777 located at 1838 2nd Avenue, in the City, County and State of New York ("Rahman Center 5777").

151.    That AR 95, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

152.    SHUEB CHOWDHURY ("Chowdhury") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

153.    That upon information and belief Chowdhury owns one (1) The UPS Store franchise location.

154.    That Chowdhury, through his corporate entity WORLDWIDE SHIPPING, INC., owns Store Center 5865 located at 353 Third Avenue, in the City, County and State of New ("Chowdhury Center 5685").

155.    That WORLDWIDE SHIPPING, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

156.    That upon information and belief, WORLDWIDE SHIPPING, INC. had its authority to do business annulled by the New York Secretary of State on or about September 24, 1997.

157.    TANI SUSSMAN ("Sussman") is an individual who upon information and belief resides in the Town of New Milford, County of Bergen, State of New Jersey.

158.    That upon information and belief Sussman owns one (1) The UPS Store franchise location.

159.    That Sussman, through his corporate entity GOTHAM SENDING SERVICES, INC., owns Store Center 4766 located at 82 Nassau Street, in the City, County and State of New York ("Sussman Center 4766").

160.    That GOTHAM SENDING SERVICES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

161.    SYLVESTER ONUORAH ("Onuorah") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

162.    That upon information and belief Onuorah owns one (1) The UPS Store franchise location.

163.    That Onourah, through his corporate entity SMA ENTERPRISES, INC., owns Store Center 5017 located at 2216 Frederick Douglas Blvd, in the City, County and State of New York  ("Onuorah Center 5017").

164.    That SMA ENTERPRISES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

165.    OTIS DAVIS ("Davis") is an individual who upon information and belief resides in the City, County and State of New York.

166.    That upon information and belief Davis owns one (1) The UPS Store franchise location.

167.    That Davis, through his corporate entity STARSHIP SHIPPING, INC., owns Store Center 6367 located at 1732 1st Avenue, in the City, County and State of New York ("Davis Center 6367").

168.    That STARSHIP SHIPPING, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

169.    MARCOS LOPEZ ("Lopez") is an individual who upon information and belief resides in the City, County and State of New York.

170.    That upon information and belief Lopez owns one (1) The UPS Store franchise location.

171.    That Lopez, through his corporate entity  MAL BUSINESS SOLUTIONS, INC., owns Store Center 4768 located at 4768 Broadway, in the City, County and State of New York ("Lopez Center 4768").

172.    That MAL BUSINESS SOLUTIONS, INC, is a domestic business corporation duly organized and existing under the laws of the State of New York.

173.    CHARMAINE RAPHAEL ("Raphael") is an individual who upon information and belief resides in the City, County and State of New York.

174.    That upon information and belief Lopez owns one (1) The UPS Store franchise location.

175.    That Raphael, through her corporate entity FIVES CEES ASSET GROUP, INC., owns Store Center 6166, located at 30 East 125th Street, in the City, County and State of New ("Raphael Center 6166").

176.    That FIVES CEES ASSET GROUP, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

177.    MOHAMMED RIAZ ("Riaz") is an individual who upon information and belief resides in the City, County and State of New York.

178.    That upon information and belief Riaz owns one (1) The UPS Store franchise location.

179.    That Riaz, through his corporate entity SUBBAN ENTERPRISES, INC., owns Store Center 5899 located at 1397 2nd Avenue, in the City, County and State of New York ("Riaz Center 5899").

180.    That SUBBAN ENTERPRISES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

181.    CHAD JAAFAR ("Jaafar") is an individual who upon information and belief resides in the Town of Ridgefield, County of Bergen and State of New Jersey.

182.    That upon information and belief Jaafar owns one (1) The UPS Store franchise location.

183.    That Jaafar, through his corporate entity FARVIEW, INC., owns Store Center 5953 located at 551 West 181st Street, in the City, County and State of New York ("Jaafar Center 0304").

184.    That FARVIEW INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

185.     DANNY SPIES ("Spies") is an individual who upon information and belief resides in the City of Yonkers, County of Westchester and State of New York.

186.     That upon information and belief Spies owns one (1) The UPS Store franchise location.

187.     That Spies, through his corporate entity SPIES ENTERPRISES, INC., owns Store Center 4472 located at 809 West 181st Street, in the City, County and State of New ("Spies Center 4472").

188.     That SPIES ENTERPRISES, INC., is a domestic business corporation duly organized and existing under the laws of the State of New York.

189.     ED XU ("Xu") is an individual who upon information and belief resides in the City of New York, County of Queens and State of New York.

190.     That upon information and belief Xu owns one (1) The UPS Store franchise location.

191.     That Xu, through his corporate entity  EDWARD J C CORPORATION, owns Store Center 5296 located at 64 Beaver Street, in the City, County and State of New York ("Xu Center 5296").

192.      That ABC EDWARD J C CORPORATION, is a domestic business corporation duly organized and existing under the laws of the State of New York.

193.     SANDRA MACHADO and JOAO MACHADO ("the Machados") are individuals who upon information and belief resides in the City of New York, County of Queens and State of New York.

194.     That upon information and belief the Machados own one (1) The UPS Store franchise location.

195.    That the Machados, through their corporate entity J & S QUEST SERVICES, LLC, owns Store Center 5565 located at 1324 Lexington Avenue, in the City, County and State of New York ("Machado Center 5565").

196.    That J & S QUEST SERVICES, LLC is a domestic limited liability company organized and existing under the laws of the State of New York.

## JURISDICTION

197.    The Court has original subject matter jurisdiction over this civil action pursuant to 28 USC §§ 1331, 1367 and 1983, in that this is a civil action involving claims arising under the laws of the United States.  This Court also has jurisdiction under 28 USC §§ 2201 and 2202. Moreover, this Court has supplemental jurisdiction over state law claims, pursuant to 28 U.S.C. § 1367(a).

## VENUE

198.    Venue is proper in this District (1) pursuant to 18 U.S.C. § 1965 (a) in that, upon information and belief, all Counterclaim-Defendants and Third-Party Defendants transact and have transacted their affairs in this District, (2) pursuant to 28 U.S.C. § 1391 (b) in that a substantial part of the events or omissions giving rise to the claims occurred in this District, and (3) pursuant to 28 U.S.C. § 1391(c) in that at least one Counterclaim-Defendant and Third-Party Defendant resides in this District (and venue is not available under 28 U.S.C. § 1391(a) because not all defendants reside in the same state).

## THE UPS STORE BUSINESS

199.    Upon information and belief, in or about 1980, Mail Boxes Etc., Inc. ("MBE") or its predecessor-in-interest began providing packaging, shipping and postal services to customers through a network of retail stores.

200.   Upon information and belief, in or about 2000, there were approximately 4,000 MBE locations worldwide.

201.   Upon information and belief, in or about 2001, United Parcel Service of America, Inc. acquired MBE.

202.   Upon information and belief, United Parcel Service of America, Inc. is a wholly-owned subsidiary of United Parcel Service, Inc. ("UPS").

203.   Upon information and belief, United Parcel Service, Inc. is one of the world's largest package delivery companies.

204.   Upon information and belief, after its acquisition, MBE was a wholly-owned subsidiary of United Parcel Service of America, Inc.

205.   Upon information and belief, in or about 2003, United Parcel Service of America, Inc. began the process of rebranding retail stores in the MBE franchise network as "The UPS Store."

206.   Upon information and belief, in or about 2012, the United Parcel Service of America, Inc. renamed its wholly-owned subsidiary MBE to TUPSS.

207.   Upon information and belief, TUPSS is a wholly-owned subsidiary of United Parcel Service of America, Inc.

208.   Upon information and belief, MBE is the predecessor-in-interest to TUPSS.

209.   Upon information and belief, TUPSS is presently one of the world's largest franchisor of retail shipping, postal, printing and business service centers.

210.   Upon information and belief, each TUPSS retail service center (a "Store Center") exists and operates pursuant to a standard franchise agreement with TUPSS for a ten (10) year term.

211.    Upon information and belief, each TUPSS Store Center offers to its customers, postal, packaging, business communication and other goods and services.

212.    Upon information and belief, as of April 2014, there are approximately 4,400 TUPSS franchisee locations in the U.S.

213.    Upon information and belief, as of February 4, 2014, there were approximately fifty-four (54) TUPSS retail locations in New York County.

214.    Upon information and belief, TUPSS actively markets the sale of its franchises, *inter alia*, through its website, www.theupsstore.com, and through its area franchisees.

215.    Upon information and belief, a TUPSS area franchisee or area franchise representative ("Area Franchisee") operates pursuant to an area franchisee agreement with TUPSS ("Area Franchisee Agreement").

216.    Upon information and belief, the Manhattan Area Franchise is Atlantic Mailboxes, Inc. ("Atlantic") and Atlantic's President is Tripp Singer ("Singer").

217.    Atlantic's Area Support Manager in Manhattan is Jose Contreras ("Contreras").

218.    Upon information and belief, the Manhattan Area Franchisee has a contractual responsibility to make sure that a certain number of new store centers open in the Manhattan Area each calendar year.

219.    Upon information and belief, the Manhattan Area Franchisee has a contractual responsibility to make sure that store centers do not close in the Manhattan Area each calendar year.

220.    Upon information and belief, the Manhattan Area Franchisee has a contractual responsibility, *inter alia*, to develop and supervise TUPSS franchisees within the Manhattan

Area and in return the Area Franchisee receives royalties on the gross sales and commissions of franchisees in its Area.

221.    Upon information and belief, in or around December 2002, Singer entered into his Area Franchise Agreement with the Counterclaim-Defendants or their predecessors.   As part of Singer's Area Franchise Agreement he was required to maintain the existing number of locations and add a certain number of new locations each year.

222.    Upon information and belief, in or around April 2003, there were approximately 43 TUPSS and/or Mailbox, Etc. locations in the Manhattan Area.

223.    Upon information and belief, in or around December 2011, Singer renewed his Area Franchise Agreement with the TUPSS for a term of ten (10) years.  Upon information and belief, Singer's agreement requires that he open at least one (1) new location each year during the term of the agreement, for a total of ten (10) new locations over the entire term of the agreement.

224.    That upon information and belief, Singer co-signed certain MBE loans issued to the Hagans in connection with store acquisitions because the stores opened by the Hagans helped Singer meet his quota and were necessary for him to renew his Area Franchise Agreement in 2011.

225.    Upon information and belief, once Singer renewed his Area Franchise Agreement, he no longer co-signed loans taken out by the Hagans in connection with any store acquisitions.

### MAXIMUM RETAIL RATES FOR FRANCHISEES

226.    Each of the NYPS Stores' Franchise Agreements incorporates by reference a separate "The UPS Store Franchisee UPS Incentive Program Contract Carrier Agreement"

between UPS and each of the NYPS Stores (the "Contract Carrier Agreement") which are generally executed contemporaneously with the NYPS Stores' Franchise Agreements.

227.   That inherent within the Franchise Agreement is an implied duty of good faith and fair dealing on the part of TUPSS.

228.   That inherent within the Franchise Agreement is an implied duty of good faith and fair dealing on the part of UPS.

229.   That inherent within the Franchise Agreement is an implied duty of good faith and fair dealing on the part of UPSA.

230.   That inherent within the Carrier Contract Agreement is an implied duty of good faith and fair dealing on the part of TUPSS.

231.   That inherent within the Carrier Contract Agreement is an implied duty of good faith and fair dealing on the part of UPS.

232.   That inherent within the Carrier Contract Agreement is an implied duty of good faith and fair dealing on the part of UPSA

233.   The Contract Carrier Agreement incorporates by reference the UPS Tariff and the UPS Terms and Conditions of Service (the "Tariff") in effect at the time of shipment.

234.   The UPS Tariff applies to shipments tendered to UPS for either ground or air transportation.

235.   The UPS Airfreight Terms and Conditions applies to shipments tendered to UPS for air transportation.

236.   Pursuant to the Contract Carrier Agreement, all TUPSS franchisees agree, *inter alia*, that UPS will be their "preferred and recommended carrier of choice for all small package, ground, air, and international shipments."

237.    Pursuant to the Contract Carrier Agreement, all TUPSS franchisees agreed, *inter alia*, that they would not charge customers more than the maximum UPS Retail rates designated by UPS for the various UPS shipping services offered…" (the "Maximum Retail Price").

238.    Upon information and belief, for the 12 months ending December 31, 2012, Defendant UPS's average revenue per package for Next Day Air products was approximately $19.93.

239.    Upon information and belief, for the 12 months ending December 31, 2012, Defendant UPS's average revenue per package for Deferred Air products (i.e. 2nd Day Air, Next Day Air Saver) was approximately $13.06.

240.    Upon information and belief, for the 12 months ending December 31, 2012, Defendant UPS's average revenue per package for standard domestic Ground products was approximately $7.89.

241.    Upon information and belief, for the 12 months ending December 31, 2012, Defendant UPS's average revenue per package for international deliveries was approximately $19.13.

## UPS CODE OF BUSINESS CONDUCT

242.    At all relevant times, UPS had a Code of Business Conduct in effect that required it to amongst other things, "conduct business fairly, honestly and ethically" ("Code of Conduct"). The Code of Conduct also states that: "[w]e do not misrepresent our services or products in any sales or promotional efforts."  The Code of Conduct further goes on to claim, "We communicate clearly, so that our customers understand the terms of our business relationships, including contracts, performance criteria, schedules, prices and responsibilities." **Annexed herewith as**

**EXHIBIT "D" is a true copy of the UPS Code of Business Conduct published at** http://www.ups.com/media/en/code_bus_conduct.pdf**.**

243.    The UPS Code of Conduct also addresses the reporting of unethical conduct and retaliation and states as follows:

> **Duty to Disclose**: Any UPS employee or representative who becomes aware of a situation in which he or she believes our legal or ethical responsibilities are being violated, or feels pressured to violate the law or our ethical responsibilities, is required to notify the company of the concern.

> **No Retaliation**: No employee or representative of UPS will be disciplined, lose a job or contract, or be retaliated against in any way for asking questions or voicing concerns about our legal or ethical obligations when acting in "good faith." Good faith does not mean an individual has to be right; but it does mean that the individual must believe that the information provided is truthful.

*See* **Exhibit "B" at p. 2.**

244.    That at all relevant times, the Code of Conduct applied to shipping transactions originating out of TUPSS franchise locations.

245.    That at all relevant times, UPS had adopted the Code of Conduct.

246.    That at all relevant times, TUPSS had adopted the Code of Conduct.

247.    That at all relevant times, UPSA had adopted the Code of Conduct.

248.    That UPS owes a duty of good faith to their account holders and consumers to honor the Code of Conduct when implementing franchise models, systems, software, training and other services being offered to the public.

249.    That UPSA owes a duty of good faith to their account holders and consumers to honor the Code of Conduct when implementing franchise models, systems, software, training and other services being offered to the public.

250.     That TUPSS owes a duty of good faith to their account holders and consumers to honor the Code of Conduct when implementing franchise models, systems, software, training and other services being offered to the public.

251.     That inherent within the Code of Conduct is an implied duty of good faith and fair dealing.

252.     That TUPSS/UPS adopted a Corporate Code of Conduct with the intent to cause others to rely upon the promise to conduct business "fairly, honestly and ethically."

253.     That the Corporate Code of Conduct required TUPSS/UPS to act fairly, uniformly and justly when enforcing its agreements, including, but not limited to the Franchise Agreement and the Contract Carrier Agreement.

## COUNTER MANIFEST SYSTEM FOR FRANCHISEES

254.     Franchisees are required by the Franchise Agreements to use TUPSS Point of Sale ("POS") and Counter Manifest System ("CMS") systems to process and record all customer transactions including shipments.

255.     At all relevant times and currently, TUPSS franchisees are required by TUPSS to use the iShip CMS ("iShip").

256.     iShip is software licensed to each TUPSS franchisee by iShip, Inc., a wholly-owned subsidiary of UPS.

257.     UPS has the ability to modify the shipping services offered through iShip and periodically updates are made without any assistance from TUPSS franchisees.

258.     At all relevant times, the iShip CMS and POS system were not fully integrated with each other.

259.     At all relevant times, upon entering the customer information, dimensions and weight of a package into the iShip CMS, the franchisee must manually enter the same information into the POS system by typing the price in or using a migration key before a customer receipt can be generated.

260.     At all relevant times, the CMS and POS systems were designed to allow sales associates to save information in iShip CMS and then later manually enter it into the POS system.

261.     At all relevant times, no manager override or key was required to manually enter shipping information and rates into the POS system.

262.     At all relevant times, it was not a violation of the Franchise Agreement to manually enter shipping information and rates into the POS system as long as the maximum UPS retail rate was not exceeded.

263.     At all relevant times, it was not a violation of the Contract Carrier Agreement to manually enter shipping information and rates into the POS system as long as the maximum UPS retail rate is not exceeded.

264.     At all relevant times, there was no reporting mechanism available to TUPSS franchise owners to identify whether the retail rate from iShip CMS has been properly entered into the POS system.

265.     At all relevant times, the iShip CMS calculates higher shipping rates for packages delivered to residential addresses versus commercial addresses for TUPSS retail customers.

266.     At all relevant times, upon entering an address into the iShip CMS system, it automatically calculates the applicable billable weight.

267.    At all relevant times, billable weight for a package is determined based upon a variety of factors, including the type of service selected, the destination and the dimensions and weight of the package.

268.    At all relevant times, on average, dimensional weight is used more frequently to calculate the billable weight for packages shipped via UPS Air services.

269.    At all relevant times, on average, actual weight is used more frequently to calculate the billable weight for packages shipped via UPS Ground services.

270.    At all relevant times, there is no method by which the iShip CMS system can confirm that a Franchisee has entered the actual dimensions of a package in the system at the point of sale.

271.    At all relevant times, the iShip CMS system relies upon the honesty and accuracy of a Franchisee to enter the proper dimensions of a package in order to issue an accurate rate quote.

272.    At all relevant times, a Franchisee can cause a retail rate overcharge by purposely entering the wrong dimensions of a package into the iShip CMS system.

273.    At all relevant times, a Franchisee can potentially cause a retail rate overcharge by purposely entering the wrong weight of a package into the iShip CMS system.

274.    At all relevant times, if a scale is connected, iShip CMS system can confirm that a Franchisee has entered the correct weight of a package into the system.  However, the iShip CMS system is designed to allow for the weight to also be manually entered.

275.    Pursuant to the terms of the Franchise Agreement, Maximum Retail Prices and Incentives may differ among franchisees due to various factors, including the differing costs of doing business with different franchisees.

276.    Pursuant to the terms of the Franchise Agreement, TUPSS has the right to increase or decrease Maximum Retail Prices and Incentives.

277.    That at no time between January 1, 2013 and December 31, 2013 did TUPSS or UPS adjust the Maximum Retail Prices for any of the Manhattan Area Franchisees to reflect differing costs of doing business.

278.    That at no time between January 1, 2013 and December 31, 2013 did TUPSS or UPS adjust the Incentives for any of the Manhattan Area Franchisees to reflect differing costs of doing business.

279.    That between January 1, 2013 and February 5, 2014, all 43 Manhattan Area Franchisees, including the Hagans were subject to the same Maximum Retail Prices.

280.    That between January 1, 2013 and February 5, 2014, all 43 Manhattan Area Franchisees, including the Hagans were subject to the same Incentives.

## UPS SHIPPING SERVICES OFFERED BY FRANCHISEES

281.    Through its Carrier Contract, each TUPSS franchisee has the capability to offer and sell to its customer UPS shipping services that vary, *inter alia*, by delivery time and cost.

282.    UPS guarantees on-schedule delivery of certain UPS Shipping Services including domestic delivery UPS Air Services, UPS 3-Day Select, UPS Hundredweight Service and UPS Ground subject to certain conditions and exclusions in Paragraph 48 of the Tariff.

283.    Per Paragraph 48.1 of the Tariff, UPS's guaranteed delivery schedule is available by referencing UPS's website.

284.    All shipping services offered by TUPSS retail locations should be verifiable by referencing UPS's website.

285.    For example, according to the UPS Website, UPS guarantees that packages shipped via its UPS Next Day Air service will be domestically delivered to the named consignee within one (1) business day.

286.    In another example, according to the UPS Website, UPS guarantees that packages shipped via its UPS Ground service will be delivered to the named consignee within one to five days business days, depending on location of consignee.

287.    The delivery schedule for UPS Ground service is determined by reference to the UPS Ground service map which is generated from the UPS website based on the Zip Code from which the package is shipped and the date and time the package is processed.

288.    Upon information and belief, the UPS website generates the exact same UPS Ground service map for all Zip Codes in Manhattan.

289.    The Ground service Map for Manhattan confirms that most UPS Ground deliveries to adjacent states can be guaranteed within one business day. **Annexed herewith as EXHIBIT "E" is the UPS Ground Service Map for Manhattan, current as of April 1, 2014.**

290.    Neither the Carrier Contract, nor the Tarrif references UPS offering any particular shipping services exclusively to TUPSS franchisees.

291.    At all relevant times, no TUPSS franchisee should be able to sell a customer a shipping product that is not also offered and available via the UPS website.

## CALCULATING RATES FOR UPS SHIPPING SERVICES

292.    Pursuant to the Terms and Conditions of Service, the costs of UPS Air services are determined by applying the UPS service rates and charges in effect on the date of the shipment to the shipment's UPS billable weight (lbs).

293. Pursuant to the Terms and Conditions of Service, the UPS billable weight for a shipment by UPS Air service is the greater of the package's dimensional weight or actual weight.

294. Pursuant to the Terms and Conditions of Service, dimensional weight of a shipment by UPS Air service is determined by multiplying, after rounding each dimension, the length (in) by width (in) by height (in) of each package (the packages "Cubic Size") and dividing by 166 (the "Dimensional Weight").

295. Pursuant to the Tariff, the costs of UPS Ground services are based on UPS service rates and charges in effect on the date of the shipment to the shipment's UPS billable weight (lbs).

296. The billable weight of a shipment by UPS Ground services is the actual weight (lbs) of the package unless the Cubic Size of the package is greater than 5,184 inches in which case the billable weight is greater of the actual or Dimensional Weight.

297. Upon information and belief, UPS advertises and charges customers distinct fuel surcharges for packages shipped via Air, however not all packages shipped via Next Day Air, Next Day Air Saver or 2nd Day Air actually travel on an airplane.

298. Upon information and belief, the fuel surcharge for packages shipped with UPS Air service labels is greater than the fuel surcharge for UPS Ground labels.

299. Upon information and belief, regardless of whether a package shipped with a UPS Air service label ever enters an airplane, UPS charges customers the more expensive air fuel surcharge.

300. Upon information and belief, TUPSS franchisees are pressured by the Counterclaim-Defendants to ship packages with Air labels by whatever means necessary.

301.    That as a direct and proximate result of these practices, UPS collects higher fuel surcharges, in many cases for packages that are shipped in trucks via UPS Ground service.

302.    That UPS also generates higher profits and revenues from packages that are shipped via UPS Air services versus UPS Ground.

303.    That UPS is a publicly traded company on the New York Stock Exchange, trading as NYSE: UPS.

304.    That the combined 4,300 TUPSS franchise locations as a group represent one of UPS's largest corporate shipping accounts.

305.    That UPS regularly reports gross sales and earnings to its shareholders.  Included within the gross sales reported by UPS are shipping revenues originating from TUPSS retail locations in the Manhattan Area and elsewhere across the United States.

## UPS SHIPPING RATE VARIABLES

306.    Upon receipt of a package for shipment, all TUPSS franchisees, must properly weigh and then measure, by-hand, the length, width, and height of all packages processed for shipment.

307.    The aforementioned weight and dimensions of every package must always be accurately entered into the iShip CMS system.

308.    The iShip CMS software automatically calculates whether actual weight or dimensional weight is used as the applicable billable weight for each available UPS shipping service.

309.    Based on the billable weight of the package and the consignee's location, the iShip CMS system will automatically generate and display for the franchisee user a list of

available shipping quotes for each UPS service option, including the maximum retail rate price for each type of UPS service (the "Retail Rate Quotes").

310.     It is possible for the franchisee user to manipulate the Retail Rate Quotes provided by iShip CMS by manipulating the weight or dimensions of the package before entering them into the iShip CMS system.

311.     Unless a customer is provided with a separate iShip CMS receipt or a printed Retail Rate Quote from the iShip CMS system, a TUPSS retail customer will have no way of knowing the precise weight and dimensions the franchisee entered into the iShip CMS system before completing the sale.

312.     It is possible for the franchisee user to manipulate the Retail Rate Quotes provided by iShip CMS by changing the designation of a delivery address for a package to be shipped from "residential" to "commercial" and vice versa.

313.     Upon the franchisee's selection of the UPS service options, the shipment information and pricing data can then be "migrated" or transferred electronically to the point-of-sale system ("POS system"), for the cash register transaction with the customer.

314.     Successful migration to POS requires all information to be properly entered into iShip CMS and for the franchisee to follow specific procedures on the computer.

315.     As an alternative, the POS system allows the franchisee user to directly input a shipment price into the POS system without transferring the data from the iShip CMS.  This feature is permitted to allow a customer to pay for a transaction without waiting for an employee to actually finish packaging the box.

316.     With ability to directly input a shipment price into the POS system, a franchisee user is capable of entering a shipping price that is higher or lower than the published UPS Retail Rates.

317.     It is not a violation of any policy or procedure covered by the Franchise Agreement for a franchisee user to directly input a shipment price into the POS system that is lower than the published UPS Retail Rates.

318.     That when a franchisee user directly inputs a shipment price into the POS system, they are not asked to confirm whether or not that price does not exceed the published UPS Retail Rates.

319.     The POS system provided by TUPSS does not include any software or hardware that requires a manager's override for a franchisee user to directly input a shipment price into POS system.

320.     The POS system provided by TUPSS does not include any software or hardware that reconciles and reports to franchise owners how many times shipment prices have been directly entered into the POS system by users versus the migration method from iShip CMS.

321.     It is not a requirement under the Franchise Agreement for franchisees to provide customers with iShip CMS Retail Rate Quotes prior to completing a retail transaction with a customer.

322.     It is not a requirement under the Franchise Agreement for franchisees to provide customers with iShip CMS receipts, together with POS cash register receipts.

## FRANCHISEE SHIPPING INCENTIVES

323.    The Hagans' Carrier Contract Agreements, and upon information and belief the Carrier Contract Agreements with other TUPSS franchisees, include "Incentives" to the franchisees for shipments originating at each franchisee's Store Center.

324.    All TUPSS franchise locations are issued separate shipping account numbers from UPS and receive monthly billing statements detailing all shipping transactions occurring during the billing cycle.

325.    Each month, the UPS shipping invoices are automatically paid via ACH withdrawals taken directly from a bank account designated by the franchisee.

326.    The Incentives are discounts off UPS Retail Rates charged to the franchisee's account.

327.    The percentage of the Incentives varies based on the type of UPS shipping service being sold to a TUPSS customer.

328.    The incentive discount for UPS Air Products is always higher than the incentive discount for UPS Ground service.

329.    The billing process automatically applies the appropriate UPS Retail Rate and then invoices TUPSS franchisees for said shipping services, less the applicable Incentive discount.

330.    If a franchisee incorrectly under-weighs or under-measures the dimensions of a box causing a shortfall in the billable rate charged to the customer versus the actual billable rate that should have been charged and it is discovered by the UPS laser measurement system at processing, the UPS invoice will reflect a debit adjustment ("Rate Adjustment").

331.   If a franchisee incorrectly over-weighs or over-measures the dimensions of a box causing a overage in the billable rate charged to the customer versus the actual billable rate that should have been charged and it is discovered by the UPS laser measurement system at processing, the UPS invoice will reflect a credit adjustment ("Rate Adjustment").

332.   Upon information and belief, some TUPSS franchisees engage third parties to assist them in obtaining downward Rate Adjustments on their UPS shipping bills.

333.   Upon information and belief, Third-Party Defendant KAPLAN engages a third-party service to assist him in obtaining and in fact does obtain downward Rate Adjustments to the UPS bills for his eight (8) TUPSS locations in the Manhattan Area.

334.   Upon information and belief, other Third-Party Defendants engage third-party services to assist them in obtaining and in fact do obtain downward Rate Adjustments to their UPS shipping bills.

335.   That at no time, did the Hagans ever employ a third-party service to assist them in obtaining downward Rate Adjustments to their UPS shipping bills.

336.   Upon information and belief, if a franchisee or customer does not make a timely request for a downward Rate Adjustment, UPS permanently keeps all fees billed based upon the original transaction amount.

337.   Upon information and belief, if a franchisee or customer does not make a timely request for a downward Rate Adjustment, TUPDS permanently keeps all royalties calculated based upon the original transaction amount.

338.   Upon information and belief, when a Rate Adjustment occurs to a TUPSS account, retail customers are not notified.

339.     Upon information and belief, when a Rate Adjustment occurs, TUPSS does not require franchisees to notify retail customers.

340.     Upon information and belief, when a Rate Adjustment occurs, UPS does not require franchisees to notify retail customers.

341.     Upon information and belief, when a Rate Adjustment occurs, UPSA does not require franchisees to notify retail customers.

342.     Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, Defendant TUPSS does not require franchisees to notify retail customers to tell them a credit was issued to the franchisee's account.

343.     Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, Defendant UPS does not require franchisees to notify retail customers to tell them a credit was issued to the franchisee's account.

344.     Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, Defendant UPSA does not require franchisees to notify retail customers to tell them a credit was issued to the franchisee's account.

345.     Upon information and belief, Defendant UPS has no written policy or procedure that it shares with TUPSS franchisees regarding how to handle Rate Adjustments of consumer transactions.

346.     Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, retail customers are not automatically notified.

347.     Upon information and belief, when a Rate Adjustment occurs resulting in an upward adjustment of the shipping charge, retail customers are not automatically notified.

348.   Upon information and belief, when a Rate Adjustment occurs resulting in a downward adjustment of the shipping charge, Defendant TUPSS does not refund or adjust its corresponding royalty fee downward.

349.   Any Incentive received by a TUPSS franchisee is part of the franchisees' gross profit.

350.   That TUPSS, UPS, UPSA and the Third-Party Defendants have in their possession searchable records which would permit the calculation of the exact amount of money each customer was overcharged, yet not refunded.

351.   That upon information and belief, the TUPSS/UPS and those working in concert with them targeted the Hagans because they stumbled upon the existence of the dimensional overcharge scheme and knew that internal records existed to corroborate everything the Hagans found.

## UP-SELLING TO AIR IS TUPSS BUSINESS MODEL

352.   TUPSS franchisees are repeatedly encouraged to increase revenues by aggressively "up-selling" customers to more costly shipping services and adding accessorial services such as insurance, email notification, delivery confirmation, packing, pick-up and storage.

353.   That in some cases, TUPSS franchisees are encouraged to "up-sell" shipping products that are significantly more expensive, but offer no quantifiable benefit to the customer.

354.   That it is always more expensive to ship a package via UPS Air than UPS Ground, even though in some instances, both services offer the exact same delivery date guarantee.

355.    In some cases, although certain UPS deferred Air shipping services offer the exact same delivery date and time guarantees as UPS Ground shipping services, the UPS deferred Air shipping services are offered and sold by TUPSS franchisees at a higher cost than UPS Ground.

356.    In some cases, although certain UPS deferred Air shipping services such as "2nd Day Air" offer inferior delivery date and time guarantees versus certain UPS Ground shipping services, the UPS 2nd Day Air shipping services are offered and sold by TUPSS franchisees at a higher cost than UPS Ground.

357.    Increased franchisee revenues, result in increased royalties, marketing and advertising fees for TUPSS and Area Franchisees.

358.    That when the Hagans began questioning the "up-selling" methods and practices of TUPSS, they were almost immediately subjected to adverse treatment by the TUPSS.

## THE BUILDING OF THE HAGANS' MCO

359.    Between 2008 and 2012, the Hagans purchased eight (8) existing TUPSS Store Centers and opened three new (3) TUPSS Store Centers in Manhattan as follows:

| Store | Physical Address | Phone | Fax | Date Acquired/Opened |
|-------|------------------|-------|-----|----------------------|
| 1227 | 527 3rd Ave<br>New York, NY, 10016 | (212) 683-9634 | (212) 683-9784 | 8/2004 |
| 0561 | 1636 3rd Ave<br>New York, NY, 10128 | (212) 410-7814 | (212) 410-0927 | 4/2008 |
| 0523 | 1202 Lexington Ave<br>New York, NY, 10028 | (212) 439-6104 | (212) 439-6107 | 4/2010 |
| 1141 | 331 W. 57th Street<br>New York, NY, 10019 | (212) 489-8004 | (212) 489-8011 | 7/2009 |
| 5308 | 342 Broadway<br>New York, NY, 10013 | (212) 842-5383 | (212) 842-4986 | 10/2010 |
| 1382 | 1562 1st Ave<br>New York, NY, 10028 | (212) 861-0581 | (212) 861-0588 | 5/2011 |
| 4311 | 303 Park Ave South<br>New York, NY, 10010 | (212) 477-0211 | (212) 477-7366 | 6/2011 |
| 6280 | 1474 3rd Ave<br>New York, NY, 10028 | (212) 288-1103 | (212) 288-1176 | 1/2012 |
| 6281 | 222 8th Ave<br>New York, NY, 10011 | (212) 365-1050 | (212) 365-1053 | 1/2012 |
| 6283 | 694 10th Ave<br>New York, NY, 10019 | (212) 265-1600 | (212) 265-1611 | 2/2012 |
| 5613 | 328 8th Avenue<br>New York, NY 10001 | (212) 337-3104 | (212) 337-3106 | 10/2012 |

*NOTE: Store 1227 was partially owned by Robert Hagan in August 2004 and thereafter fully acquired by the Hagans in or around July 2008.

360.     The Hagans purchased or opened each of their TUPSS Store Centers in the Manhattan area with the full encouragement, support, approval and direction of TUPSS, UPS, UPSA and the Manhattan Area Franchisee Singer.

361.     Acquiring a Store Center requires certain pre-approvals on the part of TUPSS, including, but not limited to a Buyer Approval Letter.

362.     In or about August 2004, Plaintiff  Robert Hagan, with his then-partner, entered into a franchise agreement to operate TUPSS Store Center at 527 Third Avenue, New York, New York ("Store Center 1227").

363.     In or around 2004, there were approximately 42-44 TUPSS and/or Mailboxes, Etc. franchisees in the Manhattan Area.

364.     It should be noted, that at the time, Mailboxes, Etc. franchisees were not subject to retail rate compliance standards.  More specifically, part of the Mailboxes, Etc. franchise model was that business owners were permitted to set their own margins on shipping products, including services such as UPS Air and UPS Ground.

365.     On or about March 28, 2008, Tom and Robert through their wholly-owned entity 3A, purchased their second TUPSS Store Center in the Manhattan Area and  entered into a ten-year Franchise Agreement with TUPSS's predecessor-in-interest, MBE, to operate Store Center 561 at 1636 Third Avenue, New York, New York ("Store Center 0561").

366.     As of July 1, 2008, Plaintiff Thomas Hagan had bought out the ownership interest of Robert Hagan's partner, and Tom and Robert through their wholly-owned entity, Tanmor,

entered into a new ten-year Franchise Agreement with TUPSS's predecessor-in-interest, MBE, to operate Store Center 1227.

367.    The purchases of Store Centers 561 and 1227 were initially self-funded by Counterclaimants Tom and Robert.

368.    With the purchase of their second TUPSS Store Center, Tom and Robert became an MCO under the terms of the Franchise Agreements.

369.    In 2009 and 2010, TUPSS and Atlantic/ Singer urged Tom and Robert to purchase three (3) underperforming and distressed Store Centers that were not meeting their franchise obligations, including paying royalty fees, shipping fees, taxes, rent and other bills and were thus on the verge of closing and losing their leases.

370.    At no time did the Counterclaim-Defendants, Atlantic or Singer advise the Hagans that the terms of the Franchise Agreement permitted TUPSS to take over these franchise locations, forcibly assign the leases to substitute franchisees or acquire any assets of the franchisors without compensating these former franchisees.

371.    Indeed, TUPSS and Atlantic/Singer advised the Hagans that the only way they could acquire an outgoing franchisees' business and mailbox customer lists, was to enter into an asset purchase agreement to buy same.

372.    The Hagans had no reason to believe that TUPSS or Atlantic/Singer were misleading them, so they proceeded as recommended and purchased the store centers, with Singer serving as an intermediary.

373.    Moreover, to facilitate the purchases of the three underperforming Store Centers, TUPSS and/or its predecessor-in-interest issued to certain of the Hagans three (3) loans totaling approximately $372,000.

374.     On or about July 10, 2009, Ridgepac, 3A, Tanmor, Tom and Robert signed two secured promissory notes in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for a total of $150,000.

375.     On or about April 3, 2010, Ridge Assets, Ridgepac, 3A, Tanmor, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for $150,000.

376.     On or about August 18, 2010, Ridgedown, Ridge Assets, Ridgepac, 3A, Tanmor, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for $72,000.

377.     With the funds borrowed from TUPSS and/or its predecessor-in-interest, on or about July 7, 2009, Tom and Robert through their wholly-owned entity, Ridgepac, entered into a ten-year Franchise Agreement with TUPSS's predecessor-in-interest, MBE, to operate Store Center 1141 at 331 West 57th St., New York, New York ("Store Center 1141").

378.     With the funds borrowed from TUPSS and/or its predecessor-in-interest, on or about March 31, 2010, Tom and Robert through their wholly-owned entity, Ridge Assets, entered into a ten-year Franchise Agreement with TUPSS's and/or its predecessor-in-interest, MBE, to operate Store Center 523 at 1202 Lexington Avenue, New York, New York. ("Store Center 523").

379.     With the funds borrowed from TUPSS and/or its predecessor-in-interest, on or about September 21, 2010, Tom and Robert through their wholly-owned entity, Ridgedown, entered into a ten-year Franchise Agreement with TUPSS and/or its predecessor-in-interest, MBE, to operate Store Center 5308 at 342 Broadway, New York, New York. ("Store Center 5308").

380.    During a telephone call on or about September 2010, Tom informed Singer and TUPSS representatives Steven D'Andrea, TUPSS Regional Vice President at the time ("Dandrea") and Kevin Pignone, TUPSS Vice President of Business Development at the time, that he and Robert wanted to expand their MCO to ten (10) Store Centers in the Manhattan Area.

381.    During the telephone call, TUPSS and Singer enthusiastically supported the proposed expansion of Tom's and Robert's MCO proposed by Tom.

382.    Contemporaneously, the Hagans developed a plan to finance the rapid expansion of their MCO that included financing the development of additional Store Centers with loans from TUPSS/UPS and/or its predecessor in interest MBE and a private equity lender named John Penrose ("Penrose").

383.    The Hagans shared with TUPSS/UPS and Singer the aforementioned plan to finance the expansion of their MCO.

384.    In or about, February 14, 2011, TUPSS issued a press release announcing that, to support the expansion of the TUPSS network, $22.5 million in lending would be available from The Bancorp Inc. ("Bancorp") to fund development of new TUPSS Store Center locations and the transfer of current TUPSS Store Centers to new owners (the "SBA Loan Program").

385.    In or around February 2011, Singer and TUPSS enthusiastically encouraged Tom and Robert to take advantage of the Bancorp SBA Loan Program in connection with the implementation of Tom's and Robert's MCO expansion plan.

386.    In or around March 2011, Tom and Robert received a cash loan of approximately $500,000 from Penrose to fund the development of additional TUPSS Store Centers.

387.   On or about June 8, 2011, in furtherance of the Hagans' MCO expansion in Manhattan, Tom and Robert received from TUPSS and/or its predecessor-in-interest a letter pre-approving them for ownership of up to seven (7) new TUPSS franchise locations.

388.   In or around June 2011, Singer told Tom and Robert that pre-approval of seven (7) locations was a significant departure from TUPSS' normal approval process.

389.   In or around June 2011, Singer told Tom and Robert that pre-approval of seven locations was a good sign that TUPSS/UPS was interested in having them become one of the largest MCO's in the entire TUPSS network.

390.   Between May and June 2011, pursuant to the financing approval confirmed in a June 8, 2011 letter, TUPSS and/or its predecessor-in-interest MBE issued to the Hagans two (2) loans totaling $150,000.

391.   On or about May 6, 2011, Ridge Assets, Ridgepac, Tanmor, Ridge Logistics, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for $90,000.

392.   On or about June 10, 2011, Ridge Assets, Ridgepac, Ridge Logistics, Ridge Pen, Tommys, NYPS, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for $60,000.

393.   Upon information and belief, the two aforementioned promissory notes were co-signed by Atlantic and/or Singer.

394.   The Hagans were never told why the Counterclaim-Defendants required Atlantic and/or Singer to co-sign said promissory notes.  However, based upon information and belief, it now appears to have been connected to Singer's ongoing negotiations at the time with the

Counterclaim-Defendants for the renewal of his Area Franchise Agreement which was expiring on December 31, 2011.

395.    Upon information and belief, Singer's Area Franchise Agreement required that he open at least ten (10) new store centers between January 1, 2001 and December 31, 2011.

396.    Upon information and belief, the new store centers being developed by the Hagans were necessary for Singer to meet the quota under the Area Franchise Agreement expiring on December 31, 2011.

397.    On or about May 31, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Tommys, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to operate Store Center 4311 at 303 Park Avenue South, New York, New York ("Store Center 4311").

398.    On or about, September 28, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Ridge Logistics, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to operate Store Center 1382 at 1562 First Avenue, New York, New York ("Store Center 1382").

399.    In or around September, 2011, Tom was informed by Singer and TUPSS Manager of Finance, Jocelyn Sloan, that based on the operational and financial success of the Hagans' NYPS Stores, TUPSS had issued loans that were in excess of TUPSS lending guidelines and practices.

400.    In or around Fall 2011, TUPSS, Singer approved the development by Tom and Robert of three (3) new Store Centers in Manhattan.

401.    At the request of TUPSS and Singer, the three (3) new Store Centers were competitively positioned to specifically compete with former TUPSS franchises that continued to operate independent pack and ship retail store locations in violation of non-compete agreements that TUPSS and UPS either could not or chose not to enforce.

402.    The three locations were also competitively positioned to compete with market competitors of TUSPS and UPS such as Staples and Fed Ex/Kinkos.

403.    The Hagans agreed to embark on this aggressive expansion plan with TUPSS, in reliance upon their promises to provide financial assistance, enhanced support, that they would work to develop the non-existent MCO model and that they would help the Hagans' grow in the franchise network.

404.    In or about Fall 2011, to facilitate and induce the development of three (3) new Store Centers in Manhattan, TUPSS and/or its predecessor-in-interest issued to certain of the Counterclaimants new loans totaling $300,000.

405.    On or about October 27, 2011, Ridge Assets, Ridgepac, Ridge Logistics, Ridge Pen, Tommys, NYPS, Bigpack, Tompack, Tanmor, Tom and Robert signed two secured promissory notes in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for a total of $240,000.

406.    On or about November 18, 2011, Ridge Assets, Ridgepac, Ridge Logistics, Ridge Pen, Tommys, NYPS, Bigpack, Tompack, Tanmor, Tom and Robert signed two secured promissory notes in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for a total of $60,000.

407.    Upon information and belief, the aforementioned promissory notes were co-signed by Atlantic and/or Singer.

408.    On or about October 21, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Ridge Pen, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to develop and operate Store Center 6280 at 1474 Third Avenue, New York, New York ("Store Center 6280").

409.    On or about October 27, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest and the Penrose loan, Tom and Robert through their wholly-owned entity, Tompack, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to develop and operate Store Center 6281 at 228 Eighth Avenue, New York, New York ("Store Center 6281").

410.    On or about November 21, 2011, with the funds borrowed from TUPSS and/or its predecessor-in-interest MBE and the Penrose loan, Tom and Robert through their wholly-owned entity, Bigpack, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to develop and operate Store Center 6283 at 694 Tenth Avenue, New York, New York ("Store Center 6283").

411.    Between November 2011 and June 2012, the Hagans worked endless hours to diligently build their business and establish new and existing store centers.  Throughout this process, TUPSS and Singer appeared supportive as the Hagans worked to establish a multi-center management model that was still nonexistent within the TUPSS franchise system.

412.    More specifically, the franchise materials, operating manuals, computer software, technical systems and infrastructure at TUPSS were all established to exclusively serve single owner-operated store centers.  This plagued the Hagans, as they faced the known challenges of operating store centers in neighborhoods with strong market competition.

413.    On or about, January 20, 2012, Atlantic and/or Singer issued an "Area Update" in which other Manhattan franchisees were informed that the Hagans were opening their 8th and 9th locations and that their 10th location was due to open in or around February 2012 (the "January 2012 Update").

414.    Shortly after the January 2012 Update was issued, Singer informed Tom that other Manhattan franchisees began lodging complaints about their Store Centers to Singer and TUPSS headquarters.

415.    Singer told Tom that the aforementioned complainers were simply envious of Tom's and Robert's success.

416.    Singer suggested to Tom that Third-Party Defendant Bradley Kaplan, who was previously the largest MCO in Manhattan with eight (8) stores, was one of the franchisees making the aforementioned complaints.

417.    Since the Hagans had received no inquiries from TUPSS headquarters and because all the feedback they were receiving was positive, they paid no mind to Singer's comments.

418.    In July 2012, Tom and Robert went back to Bancorp and successfully refinanced the debt carried by their existing Store Centers from both TUPSS/MBE and Penrose with a $1,200,000 loan guaranteed by the Small Business Association (the "SBA Loan Refinance"). Upon receiving the loan, TUPSS/MBE, Atlantic and/or Singer had zero debt co-signed with the Hagans.

419.    Prior to the refinance, the Hagans were current on all loans from TUPSS and/or its predecessor-in-interest and Penrose.

420.   Prior to the refinance, the Hagans had not made any late payments on the loans from TUPSS and/or its predecessor-in-interest and Penrose.

421.   Upon the refinancing of the debt on Tom's and Robert's NYPS Stores, Penrose agreed to immediately lend up to an additional $1,000,000 to Tom and Robert for them to develop new Store Centers and continue building an MCO management processes to operate eleven Store Centers.

422.   In or around August 2012, during a lunch meeting with Singer and D'Andrea. Plaintiff Tom informed them that Tom and Robert were looking to expand their Manhattan MCO to twenty (20) Store Centers.

423.   Singer and D'Andrea enthusiastically encouraged Tom's and Robert's expansion of their MCO to twenty (20) store centers.

424.   In or about September 2012, Singer approached Robert and Tom with another opportunity to purchase a severely distressed Store Center owned by Teresa Fung at 328 Eighth Avenue in Manhattan (the "Fung Store Center").

425.   Ms. Fung had become delinquent on her financial obligations and was facing the termination of her franchise agreement and eviction by the landlord.

426.   After the Hagans were de-franchised, they learned that TUPSS and Singer had unsuccessfully attempted to pawn the Fung store off on other franchisees and as a last resort, offered it to the Hagans at a highly over-priced rate, knowing full well that Fung was engaged in various non-compliant activities that impacted the veracity of her reported royalty sales and financials.

427.   More specifically, to induce Tom and Robert to purchase the Fung Store Center, TUPSS and Singer distributed "Same Store Sales" comparisons and other financial information

that he knew to be inaccurate, inflated and achievable only through non-compliance, so that Tom and Robert would reach quick and unrealistic conclusions about the Fung Store Center's historical sales.

428.    In reliance upon the information conveyed to Robert and Tom by Defendant TUPSS and Singer, Tom and Robert through their NYPS Store entities, agreed to purchase the Fung Store Center.

429.    Defendant TUPSS and Singer quickly approved the purchase of the Fung Store Center by Tom and Robert.

430.    At no time did the TUPSS, UPS, UPSA or Singer inform the Hagans that they in fact had the ability to terminate Fung's franchise agreement and allow the Hagans to take over the location without compensating her.

431.    In or around September 2012, to facilitate and induce the purchase of the Fung Store Center, TUPSS and/or its predecessor-in-interest quickly approved a loan of $150,000 to the Hagans.

432.    That in connection with the purchase of Store Center 5613, TUPSS issued the Hagans and their purchasing entity a Buyer Approval Letter that was valid as of September 19, 2012.

433.    On or about September 19, 2012, Ridge Assets, Ridgepac, Ridge Logistics, Ridge Pen, Tommys, NYPS, Bigpack, Tompack, Tanmor, Tom and Robert signed a secured promissory note in favor of TUPSS and/or its predecessor-in-interest, MBE, in exchange for a total of $150,000.  Neither Singer, nor Atlantic co-signed this loan.

434.    On or about September 19, 2012, with funds from the additional TUPSS loan and the funds made available by Penrose, Tom and Robert through their wholly-owned entity,

Robpack, entered into a ten-year Franchise Agreement with TUPSS predecessor-in-interest, MBE, to operate Store Center 5613 at 328 Eighth Avenue, New York, New York ("Store Center 5613").

435.    After the purchase of the Fung Store Center, the NYPS Stores comprised approximately 20.4% of all Manhattan Area TUPSS Store Centers.

436.    Almost immediately after purchasing Store Center 5613, the Hagans realized that they had been provided false and inaccurate historical sales information about the location. Moreover, it was discovered that a significant portion of the business conducted at this Store Center was non-compliant and thus not able to be converted by the Hagans upon their purchase. This purchase put a significant financial and operational strain on the Hagans MCO.

437.    In or around January 2013, the Manhattan Area Franchisees were strongly encouraged to offer their employees financial incentives in the form of bonuses, if they meet certain sales thresholds.

438.    In or around the first week of January 2013, Singer contacted Thomas Hagan and attempted to convince him to institute a bonus program which incentivized employees financially to increase revenues at Store Centers.  Singer said he had a detailed spreadsheet that included instructions and sent it to Hagan in an attempt to induce him to adopt it.  **Annexed herewith as EXHIBIT "F" is an electronic mail with attached proposed Bonus Schedule from T. Singer to T. Hagan, dated January 9, 2013**.

439.    The Hagans' refused to implement the bonus program based upon sales because it incentivized and encouraged overly aggressive and unethical sales practices.

440.    Instead, the Hagans focused on creating new revenue streams such as value-added services and bundled transactions for things such as customer pick-ups, messenger services,

custom packing and shipping for customers moving in and out of apartments and other large-scale transactions.   However, the Hagans struggled to reconcile these services with the commercially unreasonable computer software and hardware systems offered by TUPSS that was incapable of handling these project-priced jobs.

441.   On or about April 5, 2013, the Hagans integrated a retail rate compliance policy within its MCO model and employee handbook (the "Pricing Policy").  As part of this program, the written policy document required all employees never to exceed the designated UPS Retail Rate in the iShip CMS system.  All employees were required to acknowledge and sign this policy, which clearly states that the failure to comply will result in disciplinary action, which may include termination of employment.  The Counterclaim-Defendants were made aware of this policy at the time it was created and copies were sent to Singer and circulated within TUPSS.

442.   At all relevant times, Tom and Robert repeatedly informed TUPSS and Singer that the success of the NYPS Stores and the continued growth of their MCO was dependent on receiving proper support from TUPSS and continued credit from private equity lender Penrose.

443.   Upon information and belief, Tom's and Robert's average total cost for purchasing or developing their eleven (11) NYPS Stores was approximately $347,250 each.

**CONCERNS ABOUT THE CMS MIGRATION PROCESS**

444.   On or about April 15, 2013, at the Starbucks at 322 West 57th Street, New York, New York, Tom and an employee of the NYPS Stores, Shahriar Choudhury, met with Singer and Singer's Area Support Representative, Jose Contreras ("Contreras").

445.   At the April 15, 2013 meeting, Singer expressed concern that some of the NYPS Stores were directly entering prices into the POS system instead of migrating them from the

iShip CMS system and, as a result, he believed that the prices were deviating from the UPS Retail Rates.

446.   At the April 15, 2013 meeting, Tom offered one possible explanation: that a price may be directly entered into the POS system if the NYPS Stores were bundling pricing for shipping services, with value added services when moving furniture or equipment, a large profit area for the NYPS Stores.

447.   In instances where UPS shipping services were combined with substantial value-added services, Singer suggested that the NYPS Stores price the shipping and value-added services for large transactions in CMS, migrate the itemized shipping-rate prices to the POS System and then ring in the value-added service amounts, but withhold the actual POS receipt from the customer, unless it is actually requested.

448.   In instances wherein UPS shipping services were combined with substantial value added services, Singer also suggested that the NYPS Stores enter into an alternative project price agreement.

449.   At the April 15, 2013 meeting, Singer insisted that the NYPS Stores migrate CMS data to the POS System, because the POS receipt would then indicate that UPS Retail Rates were charged.  He added that by doing this it would avoid all problems from the TUPSS and UPS.

450.   In or around April 2013, neither Singer, nor the Defendant informed the Hagans that modifying the actual dimensions and/or weight of packages before entering them into the iShip CMS system was considered by TUPSS as an acceptable method of doing business.

451.   However, in or around April 2013, Singer and his operations manager Jose Contreras were training certain Third-Party Defendant Manhattan Area Franchisees and Third-

Party Defendant Manhattan Area Franchisees were in fact adding inches to the dimensions of packages before entering them into the iShip CMS system.

452.    Upon information and belief, in or around April 2013, modifying the actual dimensions and/or weight of packages before entering them into the iShip CMS system was neither seen, nor enforced by TUPSS or UPS as a compliance violation.

453.    In or around April 2013, Singer and his operations manager Jose Contreras were advising and training the Third-Party Defendant Manhattan Area Franchisees to "upsell" higher priced UPS Air products to customers by not disclosing the existence of lower cost UPS Ground services until or unless the customer actually requests the Ground service.

454.    That when shipping UPS Air products such as 2nd Day Air, modifying the dimensions of a package by as little as one inch to the length, width and height, will in most instances cause a higher billable rate to be triggered within the iShip CMS system.

455.    That the Counterclaim-Defendants knew or should have known that franchisees across TUPSS network were systematically exploiting this flaw in the franchise system to increase gross sales and consequently profits.

456.    That even if a customer is provided with an iShip CMS receipt, they would have little chance of ever discovering they were potentially overcharged the true maximum UPS Retail Rate, until or unless they knew the actual weight and dimensions of the package shipped.

457.    At the April 15, 2013 meeting, Tom reminded Singer that Tom and Robert had already begun additional and improved employee compliance training that included the employee's written acknowledgement of their understanding of the policies to prevent employees from entering incorrect iShip CMS prices into the POS system, completion of training, and the consequences for failure to comply with these policies.

458.    Without any assistance from TUPSS or Singer, the Hagans created and instituted training and policies to help prevent the employees of NYPS Stores from entering incorrect iShip CMS prices into the POS system.

459.    Upon information and belief, at no time were the Hagans accused of intentionally and systematically modifying the dimensions or the weight of packages to deceive customers or trigger higher UPS Retail Rates in the iShip CMS system.

460.    By the end of April 2013, all employees of the NYPS Stores had acknowledged in writing receipt of the training on the NYPS Pricing Policy for UPS Shipping ("the Pricing Policy").

461.    Upon information and belief, the Hagans' Stores were the only TUPSS Store Centers in the Manhattan Area to adopt written retail rate compliance policies signed by employees between January 1 and December 31, 2013.

462.    On or about April 19, 2013, Tom emailed Singer copies of the Pricing Policy documents signed by the employees of the NYPS Stores.

463.    On or about April 24, 2013, at a conference of TUPSS MCO owners in Tarrytown New York, attended by Thomas Hagan and TUPSS Vice President of Global Operations and Chief Operating Officer C. James Hillquist ("Hillquist") and TUPSS Vice President of Sales Chris Adkins ("Adkins"), Adkins declared that he would prefer all future franchises be sold to MCO operators like Tom and Robert (the "April 2013 Conference").

464.    At the April 2013 Conference, the Thomas Hagan was asked to make a presentation to the group about their growth and the MCO model they were building.  After the meeting, Adkins and Hillquist asked Thomas if he and his brother would meet with the President

of TUPSS, Tim Davis ("Davis") to discuss their MCO model and the future of the franchise. Hagan agreed.

465. On or about April 25, 2013, Davis travelled to Manhattan with Eric Maida (TUPSS Northeast Regional Vice President) and took a tour of the former Hagan Store Center #1141 on West 57th Street. Thereafter, Tom, Robert, Davis, Maida, Singer and Contreras had lunch at a restaurant known as Kennedys, located on West 57th Street near Store #1141, at which time Tom and Robert shared their model for MCO success (the "April 25th Lunch Meeting").

466. At the April 25th Lunch Meeting, Davis expressed admiration for the Hagans' MCO model and he requested copies of the materials they used in connection with a presentation they made at the April 2013 Conference.

467. On or about May 5, 2013, Tom and Robert emailed Davis a copy of their MCO model presentation from the meeting and other materials. A few hours later, Davis responded to Tom's email: "Thank you, Tom. I really enjoyed spending time with you and Rob. I look forward to sharing your materials with UPS as examples of how your team is raising the standard for managing multiple centers. Regards, Tim." **Annexed herewith as EXHIBIT "G" is a true copy of the email exchanges and attachments from T. Hagan to T. Davis, dated May 5, 2013.**

## THE TOP SECRET INVESTIGATION OF THE HAGANS

468. Upon information and belief, during the same time that the Hagans were continuing to operate their stores in good faith and building their MCO model with what they believed to be the full support of Tim Davis and the rest of the TUPSS executive team, individuals at TUPSS were conspiring to destroy them.

469.     Upon information and belief, in or around July 2013, the Hagans still had no retail rate customer concerns, which led them to believe that their enhanced compliance policies implemented by the end of April 2013 were working.

470.     However, upon information and belief, in or around July 2013, TUPSS launched a top secret investigation against the Hagans and each of their eleven (11) store centers.

471.     Upon information and belief, the existence of this investigation was kept secret by the Counterclaim-Defendants and any individual who discussed the matter with the Hagans would be subjected to disciplinary action, even Singer. **Annexed herewith as EXHIBIT "H" is a true copy of a letter sent from D. Higginson to T. Singer, dated October 3, 2013.**

472.     According to the Counterclaim-Defendants' Verified Complaint, in or around early July 8, 2013, TUPSS claims to have communicated with a "former employee" of the Hagans to obtain "information…concerning alleged unethical sales practices…"  **See Verified Complaint at Paragraph 3.**

473.     Also according to the Verified Complaint, the TUPSS alleges that the "former employee" told TUPSS that employees at the Hagan centers were instructed to "make up [their] own price and to mark up the shipping by at least $20" and that it was a practice not to provide customers with tracking numbers.  **See Verified Complaint at Paragraph 68.**

474.     At no time did Robert Hagan or Thomas Hagan ever instruct employees to make up their own price, mark up the shipping by at least $20 or refuse to provide customers with tracking numbers.  In fact, such would be in direct contravention of the Pricing Policy that all employees were required to sign beginning in April 2013.

475.     That if a "former employee" who came to TUPSS was still employed with the Hagans as of May 1, 2013, they would have executed the same written Pricing Policy that directly contradicts the statements allegedly made to TUPSS set forth in the Verified Complaint.

476.     That if the "former employee" was an individual who was let go by the Hagans as part of their initiative to institute a more stringent compliance module, TUPSS knew or should have known that there was a good reason to suspect the motives and veracity of any claims made by this individual.

477.     That if this "former employee" was terminated, they may have been subject to a confidentiality agreement, and by speaking with them, TUPSS may have tortuously interfered with that agreement by not first notifying the Hagans.

478.     That at no time did the Hagans ever pay employees "a bonus based upon how much they overcharged" customers.

479.     That despite multiple written demands and long outstanding subpoenas in a New York State Supreme Court action, TUPSS and UPS have refused to disclose the name of the alleged "former employee", produce documents or identify the exact statements this employee is claimed to have made in connection with the Hagans' store centers. **Annexed herewith as EXHIBIT "I" are true copies of the Subpoenas Duces Tecum issued and served upon TUPSS and UPS, dated February 6, 2014.  Annexed herewith as EXHIBIT "J" is a true copy of the responses and objections of TUPSS and UPS, dated March 10, 2014.**

480.     That upon information and belief, on or about July 16, 2013, C. James Hillquist, the then Vice President of Operations, traveled to New York City and conducted what he claimed was a personal "mystery shop" at two (2) of the Hagans eleven (11) store centers (the "Hillquist Secret Shops").  Hillquist said nothing about these visits to the Hagans until they

contacted him in November 2013 to schedule a meeting at TUPSS corporate headquarters to mediate claims that had arisen.  Thereafter, Hillquist told the Hagans that he had a "terrible experience" in one of their stores which "felt dirty" and that he was overcharged.  Although Hillquist acknowledged that Hagan brothers were not present during any of his "mystery shops," he inexplicably refused to disclose any particulars about these transactions, including tracking numbers, receipts, the names of employees involved or any other information that would help a franchise owner ascertain exactly what happened.

481.    After Counterclaimants conducted their own internal investigation of the Hillquist Secret Shops, it was determined that the entire matter involved Hillquist's belief that he had been overcharged approximately $4.00 in one of the two transactions.

482.    Because more than thirty (30) days had passed since the dated of the alleged Hillquist transaction and when it was first reported, it was impossible for the Hagans to conduct a proper investigation, which would have included immediately questioning the employee and reviewing surveillance footage of transaction to ascertain exactly what happened.

483.    The Hagans were never provided with a satisfactory answer about why Hillquist as the Vice President of Operations and Chief Operating Officer of TUPSS would take it upon himself to travel across the country to personally secret shop two (2) of the Hagans' store centers instead of simply engaging a credible independent outside investigator to conduct a proper audit and the share the results.

484.    Indeed, according to admissions made by executives at TUPSS, at no time between July 2013 and December 1, 2013, had any outside investigator been engaged by TUPSS or UPS to conduct a compliance audit of any store centers in the Manhattan Area.

485. In the Verified Complaint, the Counterclaim-Defendants allege that in or around August 2013 "TUPSS' Security Departments performed multiple `mystery shops' at each of the Hagans' store centers." Although it is claimed that TUPSS' security personnel were "systematically overcharged for UPS shipping services at nine of the eleven" Hagan store centers, in the almost eight (8) months since these purported "mystery shops" took place, no credible evidence or details surrounding these "mystery shop" transactions has been produced.

486. The one fact that is apparently not disputed by the Counterclaim-Defendants is that they indeed possess the technology and the resources to review samplings of shipping data from various store centers to determine if overcharges occurred.

### THE HAGANS' GOOD FAITH EFFORTS

487. In September 2013, Plaintiff Tom Hagan contacted Hillquist and requested to open a dialogue to discuss issues and obstacles facing the Hagans as they continued to develop their MCO model. Hillquist neither disclosed his "mystery shops," nor any of the purported inquiries by TUPSS' Security Department.

488. On or about September 23, 2013, without the Hagans knowledge, Singer conducted what he later claimed to be an "independent" "mystery shop" of all eleven (11) Hagan Store Centers (the "Singer Mystery Shop"). **Annexed herewith as EXHIBIT "K" is the information produced by T. Singer relating to the Singer Mystery Shop, dated September 23, 2013.**

489. That upon information and belief, Singer and Singer's employee Contreras hired an individual by the name of Dakar Holmes to enter the Hagans' store centers to "mystery shop" them.

490.     That upon information and belief, Dakar Holmes was and still is a longtime friend of Contreras and had worked with him at a store owned by Third-Party Defendant Kaplan, the second-largest competitor MCO in the Manhattan Area.

491.     That upon information and belief, Dakar Holmes worked at one of Third-Party Defendant Bradley Kaplan's store centers approximately five (5) years ago.

492.     That on October 25, 2013, Singer admitted to Robert Hagan that he specifically instructed Contreras to use an individual who was completely unknown to store owners and that had no connection to TUPSS.

493.     That upon information and belief, on or about September 23, 2013, Dakar Holmes went to all eleven (11) of the Hagans' store centers, where he provided false address information and sought to document overcharges at each store center.

494.     Upon information and belief, between September 24, 2013 and September 30, 2013, Dakar Holmes allegedly "mystery shopped" other TUPSS store centers in the Manhattan Area, including two (2) store centers owned by Kaplan.

495.     Upon information and belief, despite Singer claiming that he did the "mystery shop" of the Hagans' store centers to "help them," he transmitted the results of the subjective, flawed and tainted "Singer Mystery Shop" to Hillquist at TUPSS corporate headquarters.

496.     Upon information and belief, the Counterclaim-Defendants sought to permanently conceal the existence of the Singer Mystery Shop from the Hagans.

497.     That on or about October 3, 2013, TUPSS issued Singer a "Violation of Area Franchise Agreement" citing amongst other things, that the disclosure of the Singer Mystery Shop to the Hagans constituted a violation of Atlantic's and Singer's confidentiality obligations

126

as an Area Franchisee and behavior that reflects "unfavorably on the goodwill associated with the TUPPS franchise system and network." **See Exhibit "C".**

498.    Upon information and belief, despite the flaws in the Singer Mystery Shop, the Counterclaim-Defendants relied upon it and took adverse action against the Hagans based in part or in whole upon its existence.

499.    On October 21, 2013, Plaintiff Robert Hagan and his operations manager Shariar Choudhury met with Contreras for an Area Franchise Meeting at Store Center 4311 located at 303 Park Avenue South in the City, County and State of New York ("Contreras Area Franchise Meeting").

500.    That at the Contreras Area Franchise Meeting, Counterclaimants learned that Contreras was aware of serious compliance problems existing within TUPSS Manhattan Area Network.

501.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that "the Ground to Air Ratio for New York City is too sensitive" because if that information was made available "you would know who is making money and who is not."

502.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that the reason shipping rates are not locked into the CMS/POS systems is because "you kill the flexibility of what the system is intended to do."

503.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that he personally observed employees at Hagans' Store Centers undercharging customers and leaving "money on the table."

504.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that the MBE model was more profitable and "there are a lot of holes in the MCO model they threw out years ago."

505.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that the Hagans were a "role model MCO" and that "generally speaking, you guys are doing outstanding."

506.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that "there are some minor things to be worked on," but "the issues are more than reachable."

507.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that when dealing with training "you have your way of showing the guys and I have my way of showing the guys."

508.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that "I teach my guys to add an inch [to the dimensions of each side of a box] because if I lose [referring to the UPS laser measurement system], I'm not going to lose big. But does that become an issue when you're not teaching your guys that?"

509.    That upon information and belief, Contreras' statement about whether it "become[s] an issue" if the Hagans are not teaching their employees to add inches, was referring to the fact that the Hagans had begun drawing attention to the issue of dimensional weight overcharges.

510.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that trying to upsell a

customer away from UPS Ground to an air product is "almost deceiving the customer" and "a nightmare."

511.    That at the Contreras Area Franchise Meeting, Contreras told Plaintiff Robert Hagan in the presence of his operations manager Shariar Choudhury that "if you ship primarily Ground, you will not make money" as a TUPSS franchisee in the Manhattan Area.

512.    On October 22, 2013, Plaintiff Tom Hagan sent Hillquist a follow-up email message requesting an in-person meeting to continue discussing issues relating to building their MCO model.  **Annexed herewith as EXHIBIT "L" is a true copy of the email from T. Hagan to J. Hillquist, dated October 22, 2013.**

513.    On October 28, 2013, Singer informed Plaintiff Robert Hagan that "most of our franchisees do not sell [UPS Ground] as a guaranteed service."

514.    On October 28, 2013, Singer informed Plaintiff Robert Hagan that there is no formal answer to the Ground guarantee from the franchise.

515.    On October 28, 2013, Singer informed Plaintiff Robert Hagan that he does not believe that "ethics questions" regarding consumers and "integrity" are specifically covered by the Franchise Agreement.

516.    On October 28, 2013, Singer informed Plaintiff Robert Hagan that he has not been asked to address the issue of consumer fraud by the Franchisor and he will not.

517.    On October 28, 2013, UPS Store Customer Service was contacted to determine whether or not "UPS Ground" is a guaranteed service option.  A customer service representative named Daniel confirmed to him that "Ground is a guaranteed service option."

518.    On October 28, 2013, TUPSS Customer Service was contacted to determine whether or not "UPS Ground" is a guaranteed service option.  A customer service representative

named Marybeth stated that "Ground is not a guaranteed service" and that it only provides "an expected date of delivery." She also stated, "I promise you sir, I have been doing this business for a long time, you need something overnight and you need something tomorrow, you need Next Day Air." Finally, when asked about why there was a discrepancy between the UPS retail rate and what was charged at a TUPSS, she stated "the rates are different" and "you have to go to a UPS Hub" to obtain one day Ground delivery guarantees.

519.   That upon information and belief, the statements of Marybeth, the Customer Service Representative at TUPSS Corporate Headquarters are a part of the scheme to confuse and deceive consumers who believe they were overcharged.

520.   On October 29, 2013, Plaintiff Robert Hagan sent Tripp Singer an email attaching a sign he wished to place inside all eleven store centers to help engage customers in a fully transparent sales process. **Annexed herewith as EXHIBIT "M" is a true copy of the email with attachments from R. Hagan to T. Singer, dated October 29, 2013.**

521.   On October 30, 2013, Thomas Hagan and Robert Hagan attended a Quarterly Area Meeting with their operations manager Shariar Choudhury and their attorney at the UPS Hub located off the West Side Highway in the City, County and State of New York (the "October 2013 Area Meeting").

522.   At the October 2013 Area Meeting, during a question and answer session, Plaintiff Robert Hagan attempted to ask Singer and Maida questions about the UPS Ground Guarantee and how to sell products in a transparent, compliant manner. Singer abruptly cut Robert off and told him to speak with Maida separately after the meeting.

523.   At the October 2013 Area Meeting, Plaintiff Robert Hagan asked Maida whether UPS Ground was a guaranteed delivery service. After Maida checked with consultant O'Neal,

he responded that "Ground was a guaranteed service" and that he would ask Singer to put something out in a future "Area Update."

524.    On October 31, 2013, Singer told Plaintiff Thomas Hagan on the telephone that "I told you guys a couple of years ago that if I had to deal with Rob, I would rather not grow with you in this business."

525.    On October 31, 2013, Singer warned Plaintiff Thomas Hagan on the telephone that he previously told Robert "I think you are going in the wrong direction," when Robert discussed with Singer his ideas for the Transparent Sales Model.  Singer also stated, "Your revenue will be hurting as a result, I promise you that."

526.    On October 31, 2013, Singer told Plaintiff Thomas Hagan on the telephone, "What I suggest to you Tom, is to have a conversation with Rob about the topic he brought up yesterday about when to sell Ground versus Air.  Because that is a discretionary subject that the individual and their team is involved with on a day to day basis with customers, each circumstance being unique."  He also added, "Rob is trying to philosophize with anyone who will listen while he was trying to get the group's attention. `We should all sell only the cheapest option even if there is a more expensive air option to get it there at the same time.'"  Singer also stated: "It's not his place to legislate how other people should do it.  If you do, you will leave a lot of money on the table. It's not the answer for you and it certainly is not the right answer for other people."

527.    On October 31, 2013, Singer explained to Plaintiff Thomas Hagan on the telephone how to upsell a customer as follows: "If the customer didn't specify `the cheapest way possible' you would give them and say, `I could get it to there tomorrow morning' and you give them the Next Day Air price.  If they have sticker shock, you then say `O.K., no problem', you

would give them the next price down.  This upselling significantly increases your chances of profitability."  Singer also added, "The upselling concept is an assumptive close.  You do this in every case, sell the faster, more expensive option…if you show all the options, people by nature will always take the cheapest option."  Singer concluded with, "all the franchisees who have five or more stores are doing it just the way I described."  Singer suggested to Tom, "Let's not tell Rob."

528.    More specifically, upon information and belief, if the Counterclaim-Defendants were to conduct a proper independent audit of their shipping records for just the Manhattan Area between October 14, 2013 and April 1, 2014, they would likely uncover tens of thousands of overcharges by franchisees caused by things such as: (a) dimensional overcharges (i.e. adding inches to actual the dimensions of boxes to trigger a higher billable weight); (b) overweighing of boxes (i.e. adding weight to the actual weight to trigger a higher billable weight); (c) misclassifying the shipping addresses (i.e. intentionally billing a customer for a residential delivery when the package is being delivered to a commercial address); (d) adding unrequested additional services (i.e. accessorial charges); (e) failing to properly migrate from the iShip CMS System to the POS System and artificially inflating the shipping rate; (f) selling a customer "2nd Day Air", "Next Day Air Saver" or "3 Day Select" for a package being delivered to a residential address when UPS Ground guarantees end of day delivery on the same or an earlier date.

529.    As of the date of the filing of this Complaint, the Counterclaim-Defendants have effectively destroyed the Counterclaimants business.  All eleven (11) store centers have been shut following receipt of termination notices and cease and desist letters threatening imminent injunctive relief if the Counterclaimants' attempt to continue doing business either as a TUPSS or an independent authorized shipping outlet.

## THE HAGANS' ATTEMPTS TO MEDIATE CLAIMS

530.     In late October 2013, the Hagans took affirmative steps to mediate and resolve their disputes with the Counterclaim-Defendants by requesting an in-person meeting at TUPSS corporate headquarters in San Diego, California.   Plaintiff Thomas Hagan contacted Jim Hillquist to request the meeting and it was quickly scheduled for the second week of November 2013.

531.     On November 8, 2013, Plaintiff Robert Hagan sent Jim Hillquist an email attaching a copy of the draft Deck that was going to be used for the meeting in San Diego on November 12, 2013.  **Annexed herewith as EXHIBIT "N" is a true copy of the email and attachments sent from R. Hagan to J. Hillquist, dated November 8, 2013.**

532.     On November 11, 2013, Plaintiff Robert Hagan received an email which appeared to indicate that his in-store sign was going to be approved by the Marketing Help Center in six (6) to ten (10) business days.  **Annexed herewith as EXHIBIT "O" is a true copy of the email from R. Hagan to H. Rowe, dated November 11, 2013.**

533.     On November 12, 2013, Plaintiff Robert Hagan, Plaintiff Thomas Hagan and their counsel met at TUPSS corporate headquarters with TUPSS Vice President James Hillquist, Senior Vice President Don Higginson and TUPSS counsel Chana Parker Barra (the "San Diego Meeting").

534.     The purpose of the San Diego meeting was to mediate and resolve issues that had arisen and created concerns on the part of the Hagans.  More specifically: (a) TUPSS' failure to be transparent regarding their investigations; (b) TUPPS' failure to properly support the Hagans as lead MCOs in TUPSS network; and (c) the damage being caused to the Hagans' relationship with their private equity lender as a result of TUPSS's increasing and unexpected adverse action.

535.    During the first part of the San Diego Meeting, Hillquist asked that the Hagans focus exclusively on the issue of compliance and the efforts being taken to comply with Retail Rate Policies.   The Hagans provided a comprehensive overview of the action taken to date, the challenges inherent within TUPSS franchise model and they requested assistance because compliance is something that all franchisees need to work on every day.   The Hagans also introduced their Transparency Sales Model and advised that they were still waiting for approval on certain aspects of the plan, including some in-store signage that had been submitted to the Marketing Help Center.   In connection with this presentation, the Hagans provided the group with an updated Deck.  **Annexed herewith as EXHIBIT "P" is a true copy of the updated deck distributed at the San Diego Meeting on November 12, 2013.**

536.    The first part of the San Diego Meeting ended on a positive note and it appeared all parties were in agreement that the Transparency Sales Model, if adopted, would fully address the compliance issues raised.   However, the one question raised by Senior Vice President Don Higginson was that if the Hagans were required to adopt such a sales model, wouldn't it have to also be applied to all other franchisees to avoid unfairly prejudicing one franchisee over another. Higginson's question was never answered.

537.    The second part of the meeting involved discussing unique problems experienced by MCOs because TUPSS has not yet built a platform to service multi-center franchise owners. The Hagans explained that because the software and hardware systems in place are intended for single-owner/operated store centers, the management of multiple stores, including compliance supervision, is made exponentially more complicated.   Tom Hagan then provided a full consulting analysis of key systems and processes that are not commercially reasonable to support the MCO platform promoted by TUPSS to franchisees.   The Hagans ended the meeting by

reviewing correspondence attached to the deck received from their private equity lender John Penrose to inform and advise them just how dire the situation had become and how critical it was for TUPSS to retain an open and collaborative dialogue with them.

538.    The Hagans left San Diego with one request, a follow-up in-person meeting or telephone conference call within the next thirty (30) days that included their private equity lender so that his confidence could be restored and the Hagans' access to credit could be re-established. All parties left the room with a clear understanding of the expectations on all sides.

539.    On November 12, 2013, Jim Hillquist sent an email to the Hagans thanking them for meeting and stating that he believed that, "we did find common ground to improve the value of our network collectively." **Annexed herewith as EXHIBIT "Q" is a true copy of the email from J. Hillquist to the Hagans, dated November 12, 2013.**

540.    On November 15, 2013, Plaintiff Robert Hagan contacted Singer to advise him that he had begun implementing the Transparency Sales Model in each of their store centers, which included customers being provided with a Pricing Quote and that in the next few days someone from TUPSS could begin auditing them if need be.  **Annexed herewith as EXHIBIT "R" is a true copy of the email exchange between R. Hagan and T. Singer, dated November 15, 2013.**

541.    On December 6, 2013, after several weeks had passed without any contact from TUPSS headquarters, Thomas Hagan sent a good faith email to Jim Hillquist, Don Higginson and Channa Parker Barra, copying TUPSS President Tim Davis, Northeast Regional Vice President Eric Maida, Consultant Sean O'Neal and Tripp Singer.  The email summarized in relevant part the expectations of the parties following the San Diego Meeting, as well as the efforts undertaken by the Hagans to meet same.  Thomas Hagan was concerned that TUPSS had

not upheld its side of the deliverables. **Annexed herewith as EXHIBIT "S" is a true copy of the email from T. Hagan to J. Hillquist, dated December 6, 2013.**

542.    On December 12, 2013, the Counterclaim-Defendants sent the Hagans a Notice of Default for Store Centers 0523, 0561, 1141, 1227, 1382, 4311, 5308, 6280 and 6281 (the "December 2012 Default Notice"). This notice accused the Hagans of material defaults under the Franchise Agreement in nine (9) of their eleven (11) stores and made multiple mischaracterizations of fact regarding the San Diego Meeting.  The only two store centers owned by the Counterclaimants not included were Centers 5613 and 6283.

543.    Coincidently or not, the Tripp Singer "Mystery Shop" that was performed in a non-objective manner by the former employee of Third-Party Defendant Kaplan, identified overcharges in the exact same nine (9) Hagan stores and found no violations in the exact same two (2) store centers omitted from the December 2012 Default Notice - Store Centers 5613 and 6283. **See Exhibit "K".**

544.    On December 20, 2013, counsel for the Hagans sent a formal written response to the Counterclaim-Defendants' Notice of Default, dated December 12, 2013.   In this response, the Hagans specifically denied that there was a valid and factual basis to hold them in material default of the Franchise Agreements or the Carrier Agreements. **Annexed herewith as EXHIBIT "T" is a true copy of the letter from M. McKew, Esq. to L. Hudson, Esq., dated December 20, 2013.**

545.    Although the McKew letter was intended to put TUPSS on formal written notice of how they violated their own Franchise Agreements and demanded that TUPSS preserve all documents, tangible things and electronically stored information relevant to claims and defenses

arising from the dispute.  The Hagans nevertheless still offered an olive branch and requested a conference call with all parties to take place on or before December 23, 2013.  ***See Id.***

546.    The Counterclaim-Defendants refused to schedule a conference call or meeting with any executives from TUPSS as requested by the Hagans in the December 20, 2013 letter.

547.    On January 3, 2014, the Counterclaimants filed a Summons and Verified Complaint in Supreme Court, New York County against Tripp Singer, Atlantic Mailboxes, Inc. and Bradley Kaplan.  **Annexed herewith as EXHIBIT "U" is a true copy of the Summons & Verified Complaint in the Action entitled 3A, Inc., et al. v. Tripp Singer, et al. (NY. Sup.Ct., NY.Co. Index No. 650013/2014).**

548.    On January 28, 2014, the Counterclaim-Defendants sent a letter entitled "Request to Correct the Record."  This letter attempted to exculpate Singer and Kaplan in the New York State Court action by "assuring" the Hagans that the adverse action taken by them had nothing to do with the "mystery shops" performed at the request of Singer, but instead were based upon other sources which they were unwilling to identify. **Annexed herewith as EXHIBIT "V" is a true copy of the letter from P. Ellis, Esq. to M. McKew, Esq., dated January 28, 2014.**

549.    Ironically, despite the fact that the Hagans' subpoenaed this allegedly exculpatory information from TUPSS and UPS, counsel for Third-Party Defendant Kaplan in the New York State Court action objected to the production of responses to the Hagans.  **Annexed herewith as EXHIBIT "W" is a true copy of the email from R. White, Esq. to M. McKew, Esq., dated April 1, 2014.**

550.    On January 31, 2014, the Hagans responded to the Counterclaim-Defendants "Request to Correct the Record" by serving a "Notice of Material Default, Cease & Desist and Response to Letter," dated January 28, 2014.  Amongst other things, the Hagans set the record

straight regarding the timeline of events and the good faith efforts undertaken to resolve all disputes between the parties.  Moreover, the Hagans notified the TUPSS in writing of the specific business and trade practices that were observed in the Manhattan Area that were making it impossible for them to effectively run their business. Amongst other things, the Hagans' letter alleged that they were selectively targeted, they were repeatedly deceived, they were asked to operate as an MCO with commercially unreasonable processes and systems and they had unreasonable restrictions imposed upon them.  Additionally, the letter advised that TUPSS's conscious disregard for compliance in the Manhattan Area had so badly damaged the brand and decimated customer loyalty, that the Hagans efforts to enforce strict compliance alone could never fully correct the widespread problems in the network. **Annexed herewith as EXHIBIT "X" is a true copy of the letter from M. McKew, Esq. to P. Ellis, Esq., dated January 31, 2014.**

551.    On January 31, 2014, the Counterclaim-Defendants served a Demand for Payment, identifying monies claimed to be owed by the Counterclaimants for past due royalties and shipping fees.  However, at no time did the Counterclaim-Defendants serve a formal request to meet or confer with the Hagans for the purposes of mediating any disputes between the parties.  The only such meeting to have occurred was the one requested by the Hagans that took place at TUPSS corporate headquarters in San Diego, California on November 12, 2013.

552.    On February 5, 2014, the Counterclaim-Defendants unilaterally terminated all eleven (11) store centers without notice or an opportunity to cure.  The Hagans were instructed to cease operations at all former store centers and begin the de-identification process.

**EVIDENCE OF ACTS IN FURTHERANCE OF CONSPIRACY TO
COMMIT UNETHICAL TRADE PRACTICES IN THE MANHATTAN AREA**

553.    At all relevant times, all TUPSS franchisees were encouraged to aggressively and deceptively sell UPS Air products to customers. The methods and systems by which this was to be done are established in the sales materials created by TUPSS as supplemented by Certified Operator Trainers ("COT") who are authorized to provide in-store training to employees in exchange for a fee.

554.    It should be noted that at no time has TUPSS/UPS and/or the Third-Party Defendants ever denied that a pattern of fraudulent and deceptive transactions occurred in the Manhattan Area as described by the Hagans.  Indeed, such a denial, if made under oath, would subject the responding party to penalties, as each and every transaction described is documented with tracking numbers, receipt identification numbers and can be attested to by a licensed private investigator.

555.    Between October 2013 and January 2014, the third-party Defendants, with the knowledge, permission and assistance of TUPSS/UPS committed the following affirmative acts and aided and abetted TUPSS/UPS in de-franchising the Hagans' eleven store centers to permanently conceal the nature of their scheme and the conduct that had been reported by the Hagans.

556.    At all relevant times, the Certified Operator Trainer in the Manhattan Area utilized by franchisees other than the Hagans was Bradley Kaplan.

557.    At all relevant times, the Hagans did not send their employees for COT training, because they had their own certified trainers.

558.    After the Hagans were told by TUPSS corporate executives that the reason why they needed to institute a "zero tolerance" sales model was because TUPSS/UPS had no tolerance for conduct which lacked integrity or could harm the brand, the Hagans were compelled to question and verify whether in fact this was true.

559.    On or about November 8, 2013, all Manhattan Area TUPSS franchisees were advised in a written Area Update that UPS Ground is a guaranteed service.

560.    The Hagans took the November 8, 2013 Area Update seriously and advised all of their sales associates to tell customers that Ground is a guaranteed delivery service and that if UPS fails to complete delivery or attempt delivery by the end of the day on the delivery date promised, the customer should be made aware that they can request a refund of their shipping charges,

561.    The response from some customers after disclosing the true nature and existence of the Ground guarantee was not all positive.  More specifically, on more than one occasion Plaintiff Robert Hagan was told by customers that they will never return to a UPS Store again because they had previously shipped a package at another store center and were told that UPS Ground was not a guaranteed service.  Hagan was also told by customers that they were not receiving the same pricing across different stores and that they felt cheated.  This caused the Hagans to continue investigating what was occurring at other store centers in the Manhattan Area.

562.    On or about November 8, 2013, it was made clear in writing to all Manhattan Area franchisees in an Area Update that where a customer requests a package to be delivered to a one-day Ground delivery zone (i.e. NJ from NY) by the end of the day, Air services should not be sold.

563.   On or about November 22, 2013, all Manhattan Area Franchisees were again reminded in writing that "UPS Ground is a guaranteed service."  Franchisees were also advised that "upselling" to an Air Service is only appropriate "when it adds value."  However, if shipping to a location where both Ground and Air have the exact same guaranteed delivery date and time (i.e. end of day), "it would not be appropriate or ethical to tell the customer that Ground is not guaranteed to arrive on the same date."

564.   On or about December 6, 2013, all Manhattan Area Franchisees were again advised in writing of the importance of "shipping with integrity."  More specifically, all franchisees were advised that "shipping with integrity" includes "not exceeding the UPS Retail Rate" which "could be caused by improperly adding to the actual weight or dimensions of packages" or "entering a higher shipping price directly into the POS rather than being transferred directly from the iShip CMS."  Franchisees were also specifically reminded that exceeding the retail rates via the above methods "would be a material violation of the Franchise Agreement." It was also made clear that misrepresenting the UPS Ground Guarantee by stating that it does not exist or stating there is no guarantee less expensive than Air would be dishonest.

565.   Bradley Kaplan is the owner of eight (8) The UPS Store franchise locations in the City, County and State of New York.  Mr. Kaplan is also a certified trainer operator, which means that TUPSS certified him to train new owners and employees who enter The UPS Store network.  In exchange for these services, Mr. Kaplan is authorized to receive trainer fees paid by franchisees.

566.   On November 20, 2013, Store Center 6341 located at 480 6th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 6341").

567.     On November 20, 2013, a transaction occurred at Kaplan Center 6341 in which a customer was overcharged $14.47 (105%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system (tracking number 1Z19696A0290421872); (b) the employee added enhanced declared value of $300 (additional $4 charge) even though the customer responded "no" to additional insurance; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: When asked by the customer "what is the cheapest way to get it there by Friday" the employee replies "2nd Day, that would be $28.23."; "Ground is 4-5 business days"; "Ground is never guaranteed." Additionally the employee asked "do you need insurance" and the customer answered "no," yet insurance was still charged.

568.     Upon information and belief, on November 20, 2013, Store Center 4419 located at 130 Seventh Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4419").

569.     Upon information and belief, on November 20, 2013, a transaction occurred at Kaplan Center 4419 in which a customer was overcharged $12.26  (89%) above the proper retail

rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee was not wearing a uniform or a name tag; (b) the employee physically measured the box, but entered 12x8x8 as the actual dimensions into the iShip CMS system; (c) the employee weighed the box, but entered 2 lbs. as the actual weight of the box into the iShip CMS system; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: When asked by the customer "what is the cheapest way to get it there by Friday" the employee replied "Guaranteed for Friday is 2nd Day Air, $26.06."  When asked by the customer about Ground service, the employee replies "Ground is not guaranteed for Friday, it is estimated for Monday actually."  The customer asked again if 2nd Day Air is the cheapest option and the employee replied, "to guarantee for Friday, yea [yes] you have to do 2nd Day."   The tracking number for this transaction is: 1ZW4A9330217786841.

570.   On November 20, 2013, Store Center 5472  located at 388 2nd Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5472").

571.   On November 20, 2013, a transaction occurred at Kaplan Center 5472 in which a customer was overcharged $8.96 (65%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a

weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x7x6 as the actual dimensions into the iShip CMS system (tracking number 1ZW63F370267235718); and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: When asked  by the customer "what is the cheapest way to get it there by Friday" the employee replies "the cheapest way to get it there for Friday is $36.55.";  "Ground is expected to arrive  Monday"; and when asked if ground is guaranteed the employee replies, "no, because it is going on a truck."; "the cheapest way to guarantee it by Friday is 2nd Day Air."

572.    On November 20, 2013, Store Center 4769  located at 888 8th  Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4769").

573.    On November 20, 2013, a transaction occurred at Kaplan Center 4769 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on

November 22, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system (tracking number 1Z06R89V0238206945); (c) the employee weighed the box, but entered 2 lbs. as the actual weight of the box into the iShip CMS system; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically the employee also made the following false and misleading statements to the customer: When asked  by the customer "what is the cheapest way to get it there by Friday" the employee replies "Friday guarantee is $24.23 [2nd Day Air].";  "UPS Ground is expected for Monday."

574.   On November 20, 2013, Store Center 5188  located at 1514 Broadway, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5188").

575.   On November 20, 2013, a transaction occurred at Kaplan Center 5188 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee inappropriately measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system (tracking number 1ZE057A70200980046); and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically the employee also made the following false and misleading

statements to the customer: "we can guarantee it there Friday morning that is $24.23, I will be sending it 2nd Day Air"; "ground is never guaranteed"; "3 Day is guaranteed, 2nd Day, and Next Day is guaranteed, Ground is estimated – the real date is actually 3-5 business days."

576.    On November 20, 2013, Store Center 1768  located at 603 West 115th Street, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5188").

577.    On November 20, 2013, a transaction occurred at Kaplan Center 1786 in which a customer was overcharged $8.96 (65%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x7x6 as the actual dimensions into the iShip CMS system (tracking number 1Z5X16W00234461613); (b) the employee weighed the box and entered 2 lbs into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically the employee also made the following false and misleading statements to the customer: In response to the customer asking for the cheapest service by Friday the employee said, "that's 2nd Day Air, it's $22.69."  The customer asks again if that is the cheapest and the employee replies, "for Friday, yea [yes], that's the cheapest."

578.    On November 20, 2013, Store Center 5979  located at 105 West 86th Street, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5979").

146

579.   On November 20, 2013, a transaction occurred at Kaplan Center 5979 in which a customer was overcharged $8.96 (65%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee weighed the box, but entered 2 lbs. as the actual weight of the box into the iShip CMS system; (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. Tracking number for this transaction is 1Z595A770279477174.

580.   On November 20, 2013, Store Center 4386  located at 2753 Broadway, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4386").

581.   On November 20, 2013, a transaction occurred at Kaplan Center 4386 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system

(tracking number 1Z204F130231536267); (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically the employee also made the following false and misleading statements to the customer:   "that is going to be guaranteed 2nd Day Option"; "guaranteed for Friday, your looking at $24.23"; "ground shipping might get it there by Friday, if not the latest by latest Monday."

582.   On November 25, 2013, Store Center 4419 located at 130 7th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4419").

583.   Upon information and belief, on November 25, 2013, a transaction occurred at Kaplan Center 4419 in which a customer was overcharged $115.17 (677%) above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on the scale, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: "The cheapest UPS

Next Day Air Saver will get there Wednesday at end of day for $132.80."  When the customer asks if this is the only way he can guarantee for Wednesday the employee replies, "Yes Sir."; "Next Day Air Saver that is the cheapest."   The tracking number for this transaction is: 1ZW4A9331351514059.

584.    On November 25, 2013, Store Center 5472 located at 388 2nd Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5472").

585.    Upon information and belief, on November 25, 2013, a transaction occurred at Kaplan Center 5472 in which a customer was overcharged $47.33 (277%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x14x12 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on the scale, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; (c) the employee added enhanced declared value without customer consent, adding an additional fee of $12 even though the customer affirmatively stated "I don't need insurance"; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "To guarantee it for Wednesday is $54.29" and "Ground

149

is expected in three business days." The tracking number for this transaction is: 1ZW63F370267269665.

586.    On November 25, 2013, Store Center  5979 located at 105 West 86th Street, in the City, County and State of New York was owned by Bradley Kaplan  ("Bradley Kaplan Center 5979").

587.    Upon information and belief, on November 25, 2013, a transaction occurred at Bradley Kaplan Center 5979 in which a customer was overcharged $30.42 (178%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee placed the box on scale and entered 7 lbs. as the actual weight into the iShip CMS system; and (b) the employee offers 2nd Day Air as the only service option; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   The tracking number for this transaction is: 1Z95A770278807872.

588.    On November 25, 2013, Store Center 4386 located at 2753 Broadway, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4386").

589.    Upon information and belief, on November 25, 2013, a transaction occurred at Kaplan Center 4386 in which a customer was overcharged $44.26 (259%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with

dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x18x12 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box; (c) the employee offered 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  The tracking number for this transaction is: 1Z204F130233147460.

590.    On November 25, 2013, Store Center 1786  located at 603 West 115th Street, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 1786").

591.    Upon information and belief, on November 25, 2013, a transaction occurred at Kaplan Center 1786 in which a customer was overcharged $49.39 (289%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x14x13 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on the scale, but entered 7 lbs. as

the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  The tracking number for this transaction is: 1Z5X16W00267832544.

592.    On November 25, 2013, Store Center 6341 located at 480 6th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 6341").

593.    Upon information and belief, on November 25, 2013, a transaction occurred at Kaplan Center 6341 in which a customer was overcharged $43.23 (253%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee improperly measured the box, but entered 18x14x12 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; (c) the employee charged the customer for $500 of enhanced declared value insurance for $8.00 that was not requested (and it does not appear on the POS receipt); and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements and omissions:  "I told you Ground but that's not a guaranteed service, it's is 4 to 7 business days." The employee asked "any insurance on the package and the customer said, "no." The tracking number for this transaction is:  1Z19696A0290782303.

594.    On December 2, 2013, Store Center 1786 located at 603 West 115th Street, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 1786").

595.    Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 1786 in which a customer was overcharged $20.59 (175%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: When asked by customer what is the cheapest way by tomorrow, the employee replied, "That would be Ground, but it is just not guaranteed for tomorrow"; "it [Ground] is estimated for tomorrow or Wednesday, it is not guaranteed"; and "Let's say they encounter anything inconvenient, an accident, it's a truck going there."  The tracking number for this transaction is: 1Z5X16W00134548219.

596.    On December 2, 2013, Store Center 4386 located at 2753 Broadway, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4386").

597.    Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 4386 in which a customer was overcharged $17.30 (147%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address

using the cheapest method for delivery by the end of the day on December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "We have Ground, it is estimated to get there tomorrow, but it is not guaranteed." The tracking number for this transaction is: 1Z204F131331695860.

598.     On December 2, 2013, Store Center 4419 located at 130 7th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4419").

599.     Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 4419 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; (b) The employee weighed the box and entered 1 lbs. into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also

made the following false and misleading statements to the customer: "The cheapest tomorrow would be $31.03. Arrives Tuesday at the end of the day – UPS Next Day Air Saver."  The tracking number for this transaction is: 1ZW4A9331351802596.

600.    On December 2, 2013, Store Center 4769 located at 888-C 8th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4769").

601.    Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 4769 in which a customer was overcharged $19.18 (163%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered the weight of the box as 2 lbs.; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "The cheapest I can guarantee is $31.03". When customer asks if there is anything cheaper, the employee replied "No."  The tracking number for this transaction is: 1Z06R89V1337011467.

602.    On December 2, 2013, Store Center 5188 located at Toys R Us, 1514 Broadway, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5188")

603.    Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 5188 in which a customer was overcharged $17.42 (148%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) The employee weighed the box and entered 1lbs. into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When asked if the quoted price of $29.15 is definitely the cheapest way for tomorrow any time of day the employee responded "definitely."  The tracking number for this transaction is: 1ZE057A71339844252.

604.    On December 2, 2013, Store Center 5472 located at 388 Second Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5472").

605.    Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 5472 in which a customer was overcharged $17.42 (148%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the

end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When asked for the cheapest price to NJ by tomorrow the employee replies, "you want USPS [United State Post Office], it's going to get there tomorrow?"; "that's our cheapest."; "your telling me cheapest, that's our cheapest, it will take 7-10 business days."; "ok, the cheapest UPS method."; "if you want guaranteed that's Next Day [Air]next day that's $29.15." When asked about ground guarantee the employee states, "it's a high chance, it should get there tomorrow, but guaranteed is Next Day [Air], that's $29.15."  It should be noted that there is no USPS service that take 7-10 business days from Manhattan to NJ.  The tracking number for this transaction is: 1ZW63F371367322862.

606.    On December 2, 2013, Store Center 5979 located at 105 West 86th Street, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 5979").

607.    Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 5979 in which a customer was overcharged $19.18 (163%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, December 3, 2013.  Moreover, the following was observed: (a) the employee improperly measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered the weight of the box

as 1 lbs.; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "Ground usually gets it to NJ within a day, but there is no guarantee"; and "No, there are no guarantees." The tracking number for this transaction is: 1Z595A771312843711.

608.    On December 2, 2013, Store Center 6341 located at 480 6th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 6341").

609.    Upon information and belief, on December 2, 2013, a transaction occurred at Kaplan Center 6341 in which a customer was overcharged $17.42 (148%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) The employee weighed the box and entered 1 lbs. into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When customer asks for the cheapest option for tomorrow, the employee states, "10:30 in the morning is $32.41. For tomorrow guaranteed." When the customer asks about Ground service the employee said, "Ground is 4-5 days."  The tracking number for this transaction is: 1Z19696A1391058725.

610.    On January 27, 2014, Store Center 1786 located at 603 West 115th Street, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 1786").

611.    Upon information and belief, on January 27, 2014, a transaction occurred at Kaplan Center 1786 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "Standard Pack – SB -9" with actual dimensions of 9x7x3; (b) the employee entered 2 lbs. as the actual weight into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimension, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "For Wednesday you have one option [2nd Day Air], $20.99." When customer asks if this is the cheapest the employee replies, "the cheapest [Ground] won't get there by Wednesday – 4-5 business days." The tracking number for this transaction is: 1Z5X16W00235261015.

612.    On January 27, 2014, Store Center 4419 located at 130 7th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4419").

613.    Upon information and belief, on January 27, 2014, a transaction occurred at Kaplan Center 4419 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Nurf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a 9x7x5 box to ship the Nerf Football; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "You need it to arrive by Wednesday"; "So, Wednesday your looking at $20.99, it gets there by the end of the day." When the customer asks if that is the only way to guarantee it by Wednesday, the employee replies, "that is guaranteed."  The tracking number for this transaction is: 1ZW4A9330271072948.

614.    On January 27, 2014, Store Center 4769 located at 888-C 8th Avenue, in the City, County and State of New York was owned by Bradley Kaplan ("Kaplan Center 4769").

615.    Upon information and belief, on January 27, 2014, a transaction occurred at Kaplan Center 4769 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged

in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee was not wearing a TUPSS uniform or name tag; (b) the employee sold the customer a 9x7x5 box to ship the Beverage Koozie; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "if you want it by Tuesday guaranteed, for Wednesday it $20.99." When the customer asks about Ground the employee replies, "Ground is 4-5 business days."  The tracking number for this transaction is: 1Z06R89V0231752153.

616.    That as set forth herein, the customers who were overcharged at the aforementioned Kaplan store centers were in fact private investigators retained by the Hagans.

617.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Kaplan Store Centers overcharged the Hagans' private investigators a total of $590.50.

618.    JOHN WONG is the owner of eight (5) The UPS Store franchise locations in the City, County and State of New York.  Mr. Wong is also a member of the Manhattan Area Accessorial Pricing Committee, which means that he works with other pricing committee members, Tripp Singer and Bradley Kaplan, to establish pricing guideline for boxes and other non-shipping products and services sold through The UPS Store.

619.     On November 20, 2013, Store Center 6404 located at 71 Broadway, in the City, County and State of New York was owned by John Wong ("Wong Center 6404").

620.     On November 20, 2013, a transaction occurred at Wong Center 6404 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x7x7 as the actual dimensions into the iShip CMS system tracking number 1ZR09Y140200325934; (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box in the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically the employee also made the following false and misleading statements to the customer: When asked by the customer "what is the cheapest way to get it there by Friday" the employee replies "Guaranteed service for Friday is 2nd Day Air, $24.23."  When asked by the customer about Ground service, the employee replies "it could get there by then. it is not a guaranteed service, so it could take 4-10 business days."

621.     On November 20, 2013, Store Center 6415 located at 217 Center Street, in the City, County and State of New York was owned by John Wong ("Wong Center 6415").

622.     On November 20, 2013, a transaction occurred at Wong Center 6415 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested.

More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x7x7 as the actual dimensions into the iShip CMS system tracking number 1ZR09Y670203131539; (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box in the iShip CMS system; (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: "Ground is 4-7 days.  If you want it by Friday, today is Wednesday, you got to do 2nd day."

623.    On November 20, 2013, Store Center 4248 located at 305 West Broadway,, in the City, County and State of New York was owned by John Wong ("Wong Center 4248").

624.    On November 20, 2013, a transaction occurred at Wong Center 4248 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically

measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system tracking 1Z3E877R0279120817; (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box in the iShip CMS system; (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically the employee also made the following false and misleading statements to the customer: When asked for the cheapest service to delivery by Friday the employee said, "2nd day Air."; "[2nd day] is the cheapest one for Friday."; When the customer asked about Ground service the employee replies,  "4-7 days for Ground."

625.    On November 20, 2013, Store Center 5388 located at 319 Lafayette Street, in the City, County and State of New York was owned by John Wong ("Wong Center 5388").

626.    Upon information and belief, on November 20, 2013, a transaction occurred at Wong Center 5388 in which a customer was overcharged $12.26 (89%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x7x8 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box in the iShip CMS system; (c) the employee falsely entered the provided residential address as a commercial address in iShip thereby lowering UPS shipping costs to The UPS Store 5388; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed

delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: "Ground is $13.78, it is not guaranteed, but it says it is expected Friday at end of day."  In response to the customer confirming that Ground is the cheapest, but *not* guaranteed, the employee stated "it is not guaranteed."  The customer asked one final time if the employee was sure and the employee replied, "I am sure."  The tracking number for this transaction is: 1Z3E876Y0271949079

627.   On November 20, 2013, Store Center 4190 located at 9 East 8th Street, in the City, County and State of New York was owned by John Wong ("Wong Center "4190").

628.   On November 20, 2013, a transaction occurred at Wong Center 4190 in which a customer was overcharged $12.26 (89%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x8x7 as the actual dimensions into the iShip CMS system (tracking number 1Z6F87830243465536); (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box in the iShip CMS system; (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: "its [Ground] not guaranteed, its 4-7 days."; "usually I tell people its [Ground] it 4-7 business days."; "2nd Day Air that's a guaranteed service."

629.    On November 25, 2013, Store Center 6415 located at 217 Centre Street, in the City, County and State of New York was owned by John Wong ("Wong Center 6415").

630.    Upon information and belief, on November 25, 2013, a transaction occurred at Wong Center 6415 in which a customer was overcharged $37.26 (218%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee appeared unintelligible due to a language barrier; (b) the Owner, John Wong was personally present during the transaction and standing behind the employee; (c) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (d) the employee weighed the box, but entered 7 lbs. as the actual weight of the box; (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the services requested. More specifically, the employee also made the following false and misleading statements and/or omissions to the customer: The customer was offered 2nd Day Air as the only service option; and told, "Ground is not a guaranteed"; "I can't guarantee anything"; and Owner John Wong, added "the cheapest way to guarantee, by when, Wednesday, is 2nd Day Air."  When the customer asks why he cannot guarantee Ground, Wong says, "Ground is only 4 to 7 business days."  The tracking number for this transaction is: 1ZR09Y670203183055,

631.     On November 25, 2013, Store Center 5388 located at 319 Lafayette Street, in the City, County and State of New York was owned by John Wong ("Wong Center 5388").

632.     Upon information and belief, on November 25, 2013, a transaction occurred at Wong Center 5388 in which a customer was overcharged $32.13 (188%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x12x13 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box; (c) the employee offered 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer:  "if you want it guaranteed its $49.32, if you want if through UPS Ground it is expected to get there Wednesday it is $16.54"; "if you want it guaranteed for sure it is $49.32.";"that is why we have guaranteed services [2[nd] Day Air] and not guaranteed services [Ground]."  The tracking number for this transaction is: 1Z3E876Y0273845936.

633.     On November 25, 2013, Store Center 6404 located at 71 Broadway, in the City, County and State of New York was owned by John Wong ("Wong Center 6404").

634.    Upon information and belief, on November 25, 2013, a transaction occurred at Wong Center 6404 in which a customer was overcharged $37.26 (218%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box; (c) the employee offered 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer:  "the guaranteed service we have is 2nd Day Air, that is $54.29."  When the customer asks about Ground Service the employee replies, "the only one that is guaranteed for Wednesday is 2nd Day Air." The tracking number for this transaction is:  1ZR09Y140202917774.

635.    On November 25, 2013, Store Center  4190 located at 9 East 8th Street,  in the City, County and State of New York was owned by John Wong ("Wong Center 4190").

636.    Upon information and belief, on November 25, 2013, a transaction occurred at Wong Center 4190 in which a customer was overcharged $35.37 (207%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimension of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address

using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system and tells the customer "we round up"; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box; (c) the employee offered 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer:  "You could ship it Ground, its 4-7 business days, it's not guaranteed to get there Wednesday."; "So we do 2nd Day Air, its $52.41." The tracking number for this transaction is: 1Z6F87830243517051.

637.    On December 2, 2013, Store Center 4190 located at 9 East 8th Street, in the City, County and State of New York was owned by John Wong ("Wong Center 4190").

638.    Upon information and belief, on December 2, 2013, a transaction occurred at Wong Center 4190 in which a customer was overcharged $21.30 (181%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee

169

physically measured the box, but entered 10x8x7 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered 1 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: In response to the customer asking for delivery "by tomorrow, the cheapest", the employee replies, "$33.13." When customer asks about Ground service the employees states, "it could get there tomorrow, but it's not guaranteed."  The tracking number for this transaction is:  1Z6F87831310253725.

639.    On December 2, 2013, Store Center 5388 located at 319 Lafayette Street, in the City, County and State of New York was owned by John Wong ("Wong Center 5388").

640.    Upon information and belief, on December 2, 2013, a transaction occurred at Wong Center 5388 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered 1 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: When asked

for the cheapest way to ship for tomorrow the employee stated, "tomorrow for 10:30 am is $36.06 and end of the day tomorrow is $31.03."; "that is the cheapest to guarantee it." When asked if ground is guaranteed the employee replied, "No." The tracking number for this transaction is: 1Z3E876Y1307483912.

641.    On December 2, 2013, Store Center 6415 located at 217 Centre Street, in the City, County and State of New York was owned by John Wong ("Wong Center 6415").

642.    Upon information and belief, on December 2, 2013, a transaction occurred at Wong Center 6415 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered 1 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "$31.03, cheapest, tomorrow next day guaranteed next day."; "ground is not guaranteed." When the customer asks when Ground is guaranteed the employee replies, "4-7 business days."   The tracking number for this transaction is:  1ZR09Y671336574621.

643. On December 2, 2013, Store Center 6404 located at 71 Broadway, in the City, County and State of New York was owned by John Wong ("Wong Center 6404").

644. Upon information and belief, on December 2, 2013, a transaction occurred at Wong Center 6404 in which a customer was overcharged $19.18 (163%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered 1 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "The cheapest you're looking at for tomorrow by the end of the day, since it is a residence, it could go to 8:00pm, it could be earlier, you're looking at $31.03." When customer asks if that is the cheapest, the employee responds, "that is the cheapest for tomorrow." The tracing number for this transaction is: 1ZR09Y141303005076.

645. On December 2, 2013, Store Center 4248 located at 305 West Broadway, in the City, County and State of New York was owned by John Wong ("Wong Center 4248").

646. Upon information and belief, on December 2, 2013, a transaction occurred at Wong Center 4248 in which a customer was overcharged $19.30 (164%) above the proper retail

rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 7x9x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered 1 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: When customer asked for the cheapest option for delivery tomorrow, the employee said, "It's going to be $36.06 for tomorrow at 10:30 am." When the customer asked again is that the cheapest the employee replies, "$31.03, that's the cheapest."; "ground it's not guaranteed.";  "Next Day [Next Day Air] is our guarantee.";  " I don't want to give you Ground when it's not guaranteed." The tracking number for this transaction is:  1Z3E877R1348455486.

647.    On January 27, 2014, Store Center 4190 located at 9 East 8th Street, in the City, County and State of New York was owned by John Wong ("Wong Center 4190").

648.    Upon information and belief, on January 27, 2014, a transaction occurred at Wong Center 4190 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at

the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.   Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "Sml Security Box" with actual dimensions of 9x7x3; (b) the employee verbally described the dimensions as 10x7x4; c) the employee entered 10x7x4 as the actual dimensions into the iShip CMS system ; (d) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "by Wednesday, guaranteed, by end of day is going to cost you $20.99 [2nd Day Air]." When the customer inquired about Ground service, the employee said, "2nd Day Air, it's the one that is guaranteed."   The tracking number for this transaction is: 1Z6F87830211083642.

649.   On January 27, 2014, Store Center 5388 located at 319 Lafayette Street, in the City, County and State of New York was owned by John Wong ("Wong Center 5388").

650.   Upon information and belief, on January 27, 2014, a transaction occurred at Wong Center 5388 in which a customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered

guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014. Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "(5) Sml Security Box" with actual dimensions of 9x7x3; (b) the employee entered 10x7x4 as the actual dimensions into the iShip CMS system; (c) the employee shipped the package UPS Ground Service. The tracking number for this transaction is: 1Z3E876Y0378376263.

651.    On January 27, 2014, Store Center 6415 located at 217 Centre Street, in the City, County and State of New York was owned by John Wong ("Wong Center 6415").

652.    Upon information and belief, on January 27, 2014, a transaction occurred at Wong Center 6415 in which a customer was overcharged $9.26 (78%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "6x6x6 box" with actual dimension of 6x6x6; (b) the employee stated that the box purchased had dimensions of  "7x7x7"; (c) the employee entered 7x7x7 as the actual dimensions into the iShip CMS system (d) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (e) the employee affirmatively misrepresented the available

shipping options, the guaranteed delivery dates and the actual costs for the service requested. The tracking number for this transaction is: 1ZR09Y760240767908.

653.   On January 27, 2014, Store Center 6404 located at 71 Broadway, in the City, County and State of New York was owned by John Wong ("Wong Center 6404").

654.   Upon information and belief, on January 27, 2014, a transaction occurred at Wong Center 6404 in which a customer was overcharged $9.26 (78%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "6x6x6 box"; (b) the employee verbally confirms the dimensions as a "6 cube, 6x6x6"; (c) the employee entered 7x7x7 as the actual dimensions into the iShip CMS system (e) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (f) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "There is one service that is [more] likely it should get on Wednesday, you're looking at 2nd Day Air, but your looking at $21.10."; standard [Ground] is $11.87, that could take 4-7 business days."; "Ground is not

guaranteed, it could take 4-7 business days."   The tracking number for this transaction is: 1ZR09Y140206128477.

655.    On January 27, 2014, Store Center 4248 located at 305 West Broadway, in the City, County and State of New York was owned by John Wong ("Wong Center 4248").

656.    Upon information and belief, on January 27, 2014, a transaction occurred at Wong Center 4248 in which a customer was overcharged $9.02 (76%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on January 28, 2014. Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "9x7x3" with actual dimensions of 9x7x3; (b) the employee verbally describes the dimensions of the box as "10x7x4"; (c) the employee entered 10x7x4 as the actual dimensions into the iShip CMS system; (d) the employee weighed the box, but entered 1 lbs. as the actual weight of the box into the iShip CMS system; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimensions, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "$20.99 [2nd Day Air] to guarantee it Wednesday or earlier." The customer asked if there is a cheaper way to get it there and the employee said, "No, Ground takes 4-7 business days." When the customer asks the employee to

confirm the exact measurements of the box used for the shipment, the employee states: "10x7x4."; "when you measure the outside you add an extra inch to each side." The employee then hands the customer his reference guide for adding inches to the dimensions of boxes of various sizes stocked and sold by the UPS store. The tracking number for this transaction is: 1Z3E877R0283055210.

657.    That as set forth herein, the customers who were overcharged at the aforementioned Wong store centers were in fact private investigators retained by the Hagans.

658.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Wong Store Centers overcharged the Hagans' private investigators a total of $333.01.

659.    Ketan Seth is the owner of four (4) The UPS Store franchise locations in the City, County and State of New York.

660.    On November 20, 2013, Store Center 0304 located at 101 West 23rd Street, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 0304").

661.    On November 20, 2013, a transaction occurred at Seth Center 0304 in which a customer was overcharged $12.26 (89%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee was not wearing uniform or a name tag; (b) the employee physically measured the box, but entered 13x8x8 as the

actual dimensions into the iShip CMS system (tracking number 1Z1F487R0232997943); and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: "that's [2nd Day Air] the only guarantee."

662.    Upon information and belief, on November 20, 2013, Store Center 4754 located at 243 5th Avenue, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 4754").

663.    Upon information and belief, on November 20, 2013, a transaction occurred at Seth Center 4754 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee was not wearing uniform or a name tag; (b) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically the employee also made the following false and misleading statements to the customer: "Ground shipping should get it there by Friday, that's $13.78.  For the guaranteed product delivery, it is like $10 more"; "Ground shipping is not guaranteed…85-90% certainty it will get there with Ground"; "I can't use the `G

179

word' [about ground service];" and "its $13.78 [for ground] verses $24.23 [for 2nd Day Air] for

the guarantee." The tracking number for this transaction is: 1Z06R80V0250305519.

664.    On November 20, 2013, Store Center 4619 located at 132 east 43rd Street, in the

City, County and State of New York was owned by Ketan Seth ("Seth Center 4619").

665.    Upon information and belief, on November 20, 2013, a transaction occurred at

Seth Center 4619 in which a customer was overcharged $61.04 (443%) above the proper retail

rate for the services requested. More specifically, the customer brought in a pre-packed box with

dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address

using the cheapest method for delivery by the end of the day on Friday, November 22, 2013. No

additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation,

etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the

end of the day on November 22, 2013. Moreover, the following was observed: (a) the employee

physically measured the box, but entered 13x7x8 as the actual dimensions into the iShip CMS

system; (b) the employee weighed the box, but entered 1.3lbs as the actual weight of the box into

the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping

options, the guaranteed delivery dates and the actual costs for the service requested. More

specifically the employee also made the following false and misleading statements to the

customer: "If you want it guaranteed for Friday, there is a Thursday option – it [the price] jumps

a bunch its $74.95." He further states "if you just want to hope it gets there on Friday there it's

the ground option - its $13." After the customer says again he needs it delivered by Friday the

employee states, "I would do the $74, I would have to bite the bullet" and closes the sale for

Next Day air 10:30 am delivery." Before the customer leaves, he again asks the employee

whether he was provided with the cheapest cost service for guaranteed delivery by Friday and

the employee says, "Right, that's why it costs so much."   The tracking number for this transaction is: 1ZA6161A0195932162.

666.   On November 25, 2013, Store Center 4754  located at 243 5th  Avenue, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 4754").

667.   Upon information and belief, on November 25, 2013, a transaction occurred at Seth Center 4754 in which a customer was overcharged $37.26 (218%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (b) the employee offers the customer 2nd Day Air as the only service option; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: "Guaranteed Wednesday is $54.29".  When the customer asks if that is the cheapest guaranteed service the employee replies, "Yea [yes]."  The tracking number for this transaction is: 1Z06R80V0250560930.

668.   On November 25, 2013, Store Center 0304  located at 101 West 23rd Street, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 0304").

669.    Upon information and belief, on November 25, 2013, a transaction occurred at Seth Center 0304 in which a customer was overcharged $42.38 (248%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x14x14 as the actual dimensions into the iShip CMS system; (b) the employee offers the customer 2nd Day Air as the only service option; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   The tracking number for this transaction is: 1Z1F487RO233143149.

670.    On November 25, 2013, Store Center 5138  located at 1357 Broadway, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 5138").

671.    Upon information and belief, on November 25, 2013, a transaction occurred at Seth Center 5138 in which a customer was overcharged $37.26 (218%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed:

(a) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (b) the employee offers the customer 2nd Day Air as the only service option; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   The tracking number for this transaction is: 1ze093r60228343593.

672.    On November 25, 2013, Store Center 4619  located at 132 East 43rd Street, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 4619").

673.    Upon information and belief, on November 25, 2013, a transaction occurred at Seth Center 4619 in which a customer was overcharged $129.20 (756%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (b) the employee offers the customer Next Day Air as the only service option; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "It's [Ground] only 90% guaranteed. It's a 90% chance, it's not guaranteed." When asked by the customer for the cheapest option for Wednesday the employee replies, "from there it jumps, Tuesday 10:30 am is $146.34."; "There is no Wednesday guarantee. No Wednesday guarantee.

That is your only one. It's the cheapest one too." The overcharge was so significant the customer did not have sufficient funds to purchase the $146.34 Air service. The customer to leave store to get additional funds and return to complete the transaction. The tracking number for this transaction is: 1ZA6161A0196332602.

674.    On December 2, 2013, Store Center 0304 located at 101 West 23rd Street, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 0304").

675.    Upon information and belief, on December 2, 2013, a transaction occurred at Seth Center 0304 in which a customer was overcharged $26.72 (227%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x8 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "The cheapest price is not guaranteed"; "you want it there by tomorrow it will be $38.54." When the customer asks if that is Ground Service the employee replies, "well it is going to go by ground, but it is a speed that will get it there guaranteed, it's going Next Day [Air]."; "Ground is estimated for tomorrow, but it is not guaranteed." The tracking number for this transaction is: 1z1f487ro166594398.

676. On December 2, 2013, Store Center 4619 located at 132 East 43rd Street, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 4619").

677. Upon information and belief, on December 2, 2013, a transaction occurred at Seth Center 4619 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x7x6 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. The tracking number for this transaction is: 1ZA6161A1329456323.

678. On December 2, 2013, Store Center 4754 located at 245 5th Avenue, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 4754").

679. Upon information and belief, on December 2, 2013, a transaction occurred at Seth Center 4754 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the

end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x7x6 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "The expected [for delivery tomorrow] for Ground is $11.77, the guaranteed is $31"; "The guaranteed shipping option for tomorrow is $31.03."   The tracking number for this transaction is: 1Z06R80V1350984917.

680.    On December 2, 2013, Store Center 5138 located at 1357 Broadway, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 5138").

681.    Upon information and belief, on December 2, 2013, a transaction occurred at Seth Center 5138 in which a customer was overcharged $21.30 (181%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x7 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "For tomorrow between the hours of 12:00pm and 6:00pm, which is the latest, will be $33.13." When

the customer asks again if that is the cheapest rate, the employee replies, "um hum [yes], if you do Ground it is estimated, but not guaranteed, it will probably get there 4 days later". The tracking number for this transaction is: 1ZE093R6NW37275392.

682.    On January 27, 2014, Store Center 0304 located at 101 West 23rd Street, in the City, County and State of New York was owned by Ketan Seth ("Seth Center 0304").

683.    Upon information and belief, on January 27, 2014, a transaction occurred at Seth Center 0304 in which a customer was overcharged $9.97 (84%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "#21 STD" with actual dimensions of 9x7x5; (b) the employee entered 10x8x7 as the actual dimensions into the iShip CMS system (c) the employee weighed the box, but entered 3 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimension, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "You said by Wednesday, $21.65 [2nd Day Air rate]." In response to the customer's inquiry about how the package is being shipped, the employee states, "It's going by surface, because it is going to NJ,

Ground." The employee also confirms the actual dimensions of the box for the customer as "9x7x3" although he entered 10x8x7 into iShip for the purpose of calculating the billable weight. The tracking number for this transaction is: 1Z1F487R0271953596.

684.    On January 27, 2014, Store Center 4619 located at 132 East 43rd Street, in the City, County and State of New York was owned by Katan Seth ("Seth  Center 4619").

685.    Upon information and belief, on January 27, 2014, a transaction occurred at Seth Center 4619 in which a customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a 6x6x6 box to ship the Beverage Koozie; (b) the employee verbally confirmed the dimensions as 6x6x6; and (c) the employee entered 7x7x7 as the dimensions in the iShip CMS system. The employee confirmed that ground was in fact guaranteed for end of day the next day.  The package was shipped by UPS Ground.  The tracking number for this transaction is: 1za6161a0330918966.

686.    On January 27, 2014, Store Center 4754 located at 243 5th Avenue, in the City, County and State of New York was owned by Ketan Seth ("Seth  Center 4754").

687.    Upon information and belief, on January 27, 2014, a transaction occurred at Seth Center 4754 in which a customer was overcharged $9.25 (78%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-

breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a 9x7x5 box to ship the Nurf Football; (b) the POS receipt description of the box was "#21 STD" and the employee verbally confirmed dimensions as 9x7x5; (c) the employee entered the dimensions into the iShip CMS system as "10x8x6"; and (d) the employee affirmatively misrepresented the Ground Service Guarantee. More specifically, the employee also made the following false and misleading statements to the customer: When asked by the customer if Ground would guarantee delivery by Wednesday, the employee said, "it's [Ground] not guaranteed though, one is [2nd Day Air] and one [Ground] isn't."; "Guaranteed by Wednesday will be the $21.10 option, that's 2nd Day Air."   The tracking number for this transaction is: 1Z06R800256696177.

688.    On January 27, 2014, Store Center 5138 located at 1357 Broadway, in the City, County and State of New York was owned by Ketan Seth ("Seth  Center 5138").

689.    Upon information and belief, on January 27, 2014, a transaction occurred at Seth Center 5138 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the

Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a 9x7x5 box to ship the Nerf Football; (b) the employee affirmatively misrepresented the Ground Service Guarantee. More specifically, the employee also made the following false and misleading statements to the customer: When asked by the customer if Ground would guarantee delivery by Wednesday, the employee said, "no, it's just an estimate." The tracking number for this transaction is: 1ZE093R60237186595.

690.    That as set forth herein, the customers who were overcharged at the aforementioned Seth store centers were in fact private investigators retained by the Hagans.

691.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Seth Store Centers overcharged the Hagans' private investigators a total of $444.85.

692.    Kevin Panchmia is the owner of four (4) The UPS Store franchise locations in the City, County and State of New York.

693.    On November 20, 2013, Store Center 6374 located at 14 Murray Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center "6374").

694.    On November 20, 2013, a transaction occurred at Panchmia Center 6374 in which a customer was overcharged $35.55 (258%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of

12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, confirmed the actual dimensions of 12x7x7 and entered them into the iShip CMS system; (b) the employee weighed the box, confirmed the weight of 1 lbs 5.3 oz. and entered it into the iShip CMS system (Tracking Number: 1Z8820630222320210); (c) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (d) the customer was provided with a POS receipt for 2nd Day Air residential delivery and was only provided with a TUPSS Reference Number (MMKDM8S1VKKE8); (e) the employee charged above the UPS  retail for 2nd Day Air; and (f) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual costs for the service requested. The employee at the Panchmia Center 6374 also made the following false and misleading statements: In response to the customer's request for the cheapest way to get the package there by Friday, November 22, 2013, the employee replies 'guaranteed Friday is $49"; "[Ground] could take up to a week."  The customer asks for a quote for next day delivery and the employee said "$130", which was 34% above the UPS retail rate of $98.32 for Next Day Air Early AM service.

695.    On November 20, 2013, Store Center 6387 located at 34 Third Avenue, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 6387").

696.    Upon information and belief, on November 20, 2013, a transaction occurred at Panchmia Center 6387 in which a customer was overcharged $12.26 (89%) above the proper

retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee was not wearing a uniform or name tag (instead had a wool cap and a jean jacket with what appeared to be motorcycle patches); (b) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system; (c) the employee weighed the box, but entered  1 lbs. 5.3 oz as the actual weight of the box; (d) the employee enter the address as a commercial address into the iShip CMS system resulting in lower shipping cost to Panchmia Center 6387; (e) the employee did not migrate the price from the CMS system and charged above the UPS retail rate; (f) no tracking number was provided to the customer; and (f) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the services requested.  More specifically, the employee also made the following false and misleading statements to the customer: When asked by the customer for the cheapest option for Friday the employee replies "the slowest and least expensive option is Ground, gets there within a week;" "it's Ground, the slowest and cheapest option, it gets there anywhere within a week for $14.31." When the customer asks if he can guarantee Ground the employee replies "No, anywhere within a week;" "there is no guarantee on Ground"; and "I have 2 Day Air for $26.06, guaranteed for 2 days". The customer asks again "you definitely can't guarantee Ground?" and the employee replies "No. anywhere within a week." In the background another employee can be heard telling another customer who is asking

questions that Ground can take "anywhere up to a week." The tracking number for this transaction is: 1ZA429320236197295.

697.    On November 20, 2013, Store Center 5691 located at One Penn Plaza , in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5691").

698.    Upon information and belief, on November 20, 2013, a transaction occurred at Panchmia Center 5691 in which a customer was overcharged $16.26 (118%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 2lbs as the actual weight of the box into the iShip CMS system; (c) the employee did not migrate the price from CMS system and charged above the UPS retail rate for 2nd Day Air; (d) the employee did not provide a CMS shipping receipt or tracking number; (e) the employee entered the address as a commercial address lowering the shipping cost for Panchmia Center 5691; and (f) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: "Ground is $14.87, which would take about 3-5 days. Could be there sooner, could be there later." When the customer asks a second time what the cheapest way to guarantee delivery is for Friday, the employee responds, "2nd Day Air, $30.09." ;

193

"Ground, it could have got there, but it's not guaranteed, anytime 3-5 days." The tracking number for this transaction is: 1Z1R04840282775354.

699.    On November 20, 2013, Store Center 5958 located at 105 East 34th Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5958").

700.    Upon information and belief, on November 20, 2013, a transaction occurred at Panchmia Center 5958 in which a customer was overcharged $8.82 (64%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, confirmed the actual dimensions of 12x6x6 and entered them into the iShip CMS system; (b) the employee weighed the box, confirmed the weight of 1.35 lbs. and entered it into the iShip CMS system; (c) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (d) the customer was provided with a POS receipt for 2nd Day Air residential delivery and was only provided with a TUPSS Reference Number (MM7UDZM9WRZ5H); (e) the employee did not migrate price from CMS system and charged above the UPS retail rate for 2nd Day Air; (f) after the customer left the store, the employee apparently shipped the package with a UPS Ground Label and entered the address as a commercial address so it would be billed as a less expensive Ground commercial rate, lowering shipping cost to Panchmia Center 5958; and (g) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual

194

costs for the service requested. More specifically, the employee also made the following false and misleading statements: In response to the customer's request for the cheapest way to get the package there by Friday, November 22, 2013, the employee replies 'the cheapest option for Friday, would get it there throughout the day, is $22.69". When customer asks if that is the cheapest way that employee replies "yes sir". Customer replies, "is that Ground". The employee says, "No, 2nd Day Air". When the customer asks how much is Ground service, the employee replies, "Ground will get it there within a week for $13.78". The employee further states "Ground will get it there within a week, it is not guaranteed for any day".  The customer asks again what the cheapest way to guarantee for Friday and the employee closes the sale by stating "that would be 2nd Day Air for $22.69." The tracking number for this transaction is: 1Z595A730352752510.

701.    On November 25, 2013, Store Center 5691 located at One Penn Plaza , in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5691").

702.    Upon information and belief, on November 25, 2013, a transaction occurred at Panchmia Center 5691 in which a customer was overcharged $39.14 (229%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x12x13 as the actual dimensions into the iShip CMS system; (b) the employee placed the box

on the scale, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; (c) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (d) the customer was provided with a POS receipt for 2nd Day Air residential delivery and was only provided with a TUPSS Reference Number (MM045HLC822M3); (e) the employee charged above the UPS  retail for 2nd Day Air; (f) the employee entered the address as a commercial address to lower shipment costs to the Panchmia Center 5691; and (g) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual costs for the service requested. More specifically the employee also made the following false and misleading statements to the customer: "To get it guaranteed there for Wednesday is $56.17."; "that is 2nd Day Air."; "Ground is 2-3 days, it's not guaranteed."  The tracking number for this transaction is: 1Z1R04840283237595.

703.    On November 25, 2013, Store Center 5958 located at 105 East 34th Street , in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5958").

704.    Upon information and belief, on November 25, 2013, a transaction occurred at Panchmia Center 5958 in which a customer was overcharged $47.51 (278%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (b) the customer was provided with a POS receipt for 2nd Day Air

residential delivery and was only provided with a TUPSS Reference Number (MM7UDZM5WQ9LE); (c) the employee charged above the UPS retail for 2nd Day Air; (e) the employee entered the address as a commercial address to lower shipment costs to the Panchmia Center 5958; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual costs for the service requested. More specifically the employee also made the following false and misleading statements to the customer: "Ground gets it there within a week."; "The only Wednesday option is 2nd Day Air, that is $64.32." In the background you can hear another employee engaged in deceptive sales practices with another customer stating, "Ground will get there within a week." The tracking number for this transaction is: 1Z595A730252856017.

705.    On November 25, 2013, Store Center 6374 located at 14 Murray Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 6374").

706.    Upon information and belief, on November 25, 2013, a transaction occurred at Panchmia Center 6374 in which a customer was overcharged $42.38 (248%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday November 27, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x12 as the actual dimensions into the iShip CMS system; b) the employee placed the box on the scale, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; (c) the

employee did not provide the customer with a CMS Receipt or a Tracking Number; (d) the employee charged above the UPS retail for 2nd Day Air; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual costs for the service requested. The tracking number for this transaction is: 1Z8820630289103508.

707.    On November 25, 2013, Store Center 6387 located at 34 Third Avenue, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 6387").

708.    Upon information and belief, on November 25, 2013, a transaction occurred at Panchmia Center 6387 in which a customer was overcharged $50.42 (295%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (c) the customer was provided with a POS receipt for 2nd Day Air residential delivery and was only provided with a TUPSS Reference Number (MMAOOBMDPM4JG); (d) the employee charged above the UPS retail for 2nd Day Air; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual costs for the service requested. More specifically the employee also made the following false and misleading statements to the

198

customer: "should have came last week. To get it there for Wednesday is $67.55. Should have came last week." When the customer asks why the cost is so high, the employee replies, "to get it there in two days you're paying for the express option." The customer asks again if there is anything cheaper and the employee replies, "to guarantee for Wednesday, No."; "should have came last week." At the end of the transaction, the employee openly tells the customer how she charged another customer $80 for next day delivery of a pie. The tracking number for this transaction is: 1ZA429320236468617.

709.    On December 2, 2013, Store Center 5691 located at One Penn Plaza, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5691").

710.    Upon information and belief, on December 2, 2013, a transaction occurred at Panchmia Center 5691 in which a customer was overcharged $21.30 (181%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (b) the employee failed to provide a CMS Shipment receipt or a tracking number on the POS receipt; (c) the employee charged above the retail rate for Next Day Air Saver; (d) the employee entered the address in the iShip system as commercial address resulting in lowered shipping cost for Panchmai Center 5691; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the

employee also made the following false and misleading statements to the customer: "Ground can get it there for tomorrow, but it is not guaranteed." The tracking number for this transaction is: 1ZLR04841383791859.

711.    On December 2, 2013, Store Center 5958 located at 105 East 34th Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5958").

712.    Upon information and belief, on December 2, 2013, a transaction occurred at Panchmia Center 5958 in which a customer was overcharged $21.89 (186%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (b) the employee failed to provide a CMS Shipment receipt or a tracking number on the POS receipt; (c) the employee charged above the retail rate for Next Day Air Saver; (d) the employee entered the address in the iShip system as commercial address resulting in lowered shipping cost for Panchmai Center 5958; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  The tracking number for this transaction is:  1Z595A731352964013.

713.    On December 2, 2013, Store Center 6387 located at 34 Third Avenue, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 6387").

714.    Upon information and belief, on December 2, 2013, a transaction occurred at Pnachmia Center 6387 in which a customer was overcharged $21.89 (186%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (c) the employee failed to provide a CMS Shipment receipt or a tracking number on the POS receipt; (d) the employee charged above the retail rate for Next Day Air Saver; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "I have any time tomorrow for $33.63."; "Ground is not guaranteed tomorrow, anywhere within a week." The tracking number for this transaction is:  1ZA429321336934119.

715.    On December 2, 2013, Store Center 6374 located at 14 Murray Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 6374").

716.    Upon information and belief, on December 2, 2013, a transaction occurred at Panchmia Center 6374 in which a customer was overcharged $38.13 (324%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural)

address using the cheapest method for delivery by the end of the day on December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x5 as the actual dimensions into the iShip CMS system; (b) the employee failed to provide a CMS Shipment receipt or a tracking number on the POS receipt; (c) the employee charged above the retail rate for Next Day Air Saver; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: When the customer asks for the cheapest by tomorrow, the employee says, "tomorrow is not the cheapest"; "the cheapest by tomorrow, afternoon option is $49."; "Ground is not the quickest, it is not guaranteed by tomorrow." The tracking number for this transaction is:  1Z8820631322595207.

717.   On January 27, 2014, Store Center 5691 located at One Penn Plaza, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5691").

718.   Upon information and belief, on January 27, 2014, a transaction occurred at Panchmia Center 5691 in which a customer was overcharged $9.08 (77%) above the proper retail rate for the services requested.   More specifically, the customer brought in an item consisting of non-breakable Nerf Football weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.   The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of

the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "SB-9 Standard Packing"; (b) the employee stated the dimension of the box as 9x7x3; (c) the actual dimensions of the box shipped where "9x7x3"; (d) the employee entered the dimensions into the iShip CMS system as 9x7x4; (c) entered 1 lbs. as the actual weight of the box; (c) the employee failed to provide a CMS shipment receipt; (d) the employee did not migrate transaction from CMS and charged customer above retail rate by entering higher price into POS for 2nd Day Air; (d) the employee entered the address as a commercial address resulting in a lower shipping cost to Panchmia Center 5691; (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "Ground shipping for this area [Ground Shipping within Zone 1] is normally about 3-5 business days.";  "Ground service no matter where it's going is not a Guaranteed service." The tracking number for this transaction is: 1ZLR04840289837355.

719.    On January 27, 2014, Store Center 5958 located at 105 East 34th Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 5958").

720.    Upon information and belief, on January 27, 2014, a transaction occurred at Panchmia Center 5958 in which a customer was overcharged $10.32 (87%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest

method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "21 Standard"; (b) entered 1 lbs. as the actual weight of the box; (c) the employee failed to provide a CMS shipment receipt; (d) the employee did not migrate transaction from CMS and charged customer above retail rate by entering higher price into POS for 2nd Day Air; (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "Ground has no guaranteed date, it will get there any time within a week." The tracking number for this transaction is: 1Z595A730221821184.

721.    On January 27, 2014, Store Center 6387 located at 34 Third Avenue, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 6386").

722.    Upon information and belief, on January 27, 2014, a transaction occurred at Panchmia Center 6386 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on

Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "SB-9 STD"; (b) the employee failed to provide a CMS shipment receipt; (d) the employee did not migrate transaction from CMS and charged customer above retail rate by entering higher price into POS for 2nd Day Air; (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   The tracking number for this transaction is: 1ZA429320209101661.

723.    On January 27, 2014, Store Center 6374 located at 14 Murray Street, in the City, County and State of New York was owned by Kevin Panchmia ("Panchmia Center 6374").

724.    Upon information and belief, on January 27, 2014, a transaction occurred at Panchmia Center 6374 in which a customer was overcharged $11.04 (93%) above the proper retail rate for the services requested.   More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "SB-9 STD" with actual dimensions of 9x6.5x3; (b) the employee weighed the box, but entered .47 lbs. as the actual weight of the box; (c) the employee failed to provide a CMS shipment receipt; (d) the employee did not migrate transaction from CMS and charged customer above retail rate by entering higher

price into POS (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "it [Ground service] could take up to a week [for delivery]" and "the guaranteed Wednesday is $22.92 [2nd Day Air]."  The tracking number for this transaction is: 1Z8820630225034800.

725.    That as set forth herein, the customers who were overcharged at the aforementioned Panchmia store centers were in fact private investigators retained by the Hagans.

726.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Panchmia Store Centers overcharged the Hagans' private investigators a total of $395.12.

727.    Jerome Taylor is the owner of four (4) The UPS Store franchise locations in the City, County and State of New York.

728.    On November 20, 2013, Store Center 2992  located at 2576 Broadway,  in the City, County and State of New York was owned by Jerome Taylor ("Taylor Center 2992").

729.    On November 20, 2013, a transaction occurred at Taylor Center 2992 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x7x7 as the actual dimensions into the iShip CMS system

(tracking number 1Z1V9E320222678552); and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.

730.    On November 25, 2013, Store Center 1052, located at 111 East 14th Street, in the City, County and State of New York was owned by Jerome Taylor ("Jerome Taylor Center 1052").

731.    Upon information and belief, on November 25, 2013, a transaction occurred at Taylor Center 1052 in which a customer was overcharged $35.37 (207%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer:  "ground is not guaranteed for Wednesday, if you want it guaranteed for Wednesday its $52.41." "if you do 2nd Day and it doesn't get there in two days you are entitled to a refund, but if Ground doesn't get there in two days you are not entitled to a refund.";

"because it [Ground] is not guaranteed." The tracking number for this transaction is: 1Z124E850209444389.

732.    On November 25, 2013, Store Center 0526, located at 119 West 72nd Street, in the City, County and State of New York was owned by Jerome Taylor ("J. Taylor Center 0526").

733.    Upon information and belief, on November 25, 2013, a transaction occurred at J. Taylor Center 0526 in which a customer was overcharged $32.30 (189%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x12 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "We have second day for Wednesday it $49.32." When affirmatively asked by customer if that is the cheapest delivery option, the employee replies "the cheapest is Ground, $16.54 and it will get there Wednesday, but it is not for sure. It's not 100%, it will get there Wednesday or Thursday"; "The one we have for Wednesday is $49.32."  The tracking number for this transaction is: 1ZR228V20211165285.

734.    On November 25, 2013, Store Center 4831 located at 366 Amsterdam Avenue, in the City, County and State of New York was owned by Jerome Taylor  ("Jerome Taylor Center 4831").

735.    Upon information and belief, on November 25, 2013, a transaction occurred at Jerome Taylor Center 4831 in which a customer was overcharged $35.20 (206%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x14x12 as the actual dimensions into the iShip CMS system; and (b) the employee offers 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   The tracking number for this transaction is: 1ZRF85220289635579.

736.    On November 25, 2013, Store Center  2992 located at 2576 Broadway, in the City, County and State of New York was owned by Jerome Taylor  ("Taylor Center 2992").

737.    Upon information and belief, on November 25, 2013, a transaction occurred at Jerome Taylor Center 2992 where the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation,

etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x14x14 as the actual dimensions into the iShip CMS system; and (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box. The employee shipped the box by Ground Service. The tracking number for this transaction is: 1Z1V9E320389704897.

738.    On December 2, 2013, Store Center 1052 located at 111 East 14th Street, in the City, County and State of New York was owned by Jerome Taylor ("J. Taylor Center 1052").

739.    Upon information and belief, on December 2, 2013, a transaction occurred at Taylor Center 1052 in which a customer was overcharged $24.25 (206%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (b) the employee put the box on the scale and entered the weight of the box as 1 lbs.; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "Guaranteed for tomorrow is $36.06" and "Ground is never guaranteed." When the customer asks what day

would Ground be guaranteed for the employee says, "it's never really guaranteed." The tracking number for this transaction is: 1Z124E850130728481.

740.    On December 2, 2013, Store Center 2992 located at 2576 Broadway, in the City, County and State of New York was owned by Jerome Taylor ("J. Taylor Center 2992").

741.    Upon information and belief, on December 2, 2013, a transaction occurred at J. Taylor Center 2992 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee/owner physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; (b) the employee/owner weighed the box, but entered 1 lbs. as the actual weight of the box; and (c) the owner affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the owner also made the following false and misleading statements to the customer: "There is no cheap guarantee for tomorrow, there is either a guarantee for afternoon and the morning;" "The cheapest guarantee is $31.03"; "Ground is not guaranteed;" and "Ground is not guaranteed anywhere." The tracking number for this transaction: 1Z1V9E321384149522.

742.    On December 2, 2013, Store Center 4831 located at 366 Amsterdam Avenue, in the City, County and State of New York was owned by Jerome Taylor ("J. Taylor Center 4831").

743.   Upon information and belief, on December 2, 2013, a transaction occurred at J. Taylor Center 4831 in which a customer was overcharged $17.30 (147%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "Cheapest way and tomorrow ain't the same thing." When the customer asks if Ground is guaranteed for the following day, the employee states, "Nope."  The tracking number for this transaction is: 1ZRF85221389721259.

744.   On January 27, 2014, Store Center 2992 located at 2576 Broadway, in the City, County and State of New York was owned by Jerome Taylor ("Jerome Taylor Center 2992").

745.   Upon information and belief, on January 27, 2014, a transaction occurred at Jerome Taylor Center 2992 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation,

etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimension, and the actual costs for the service requested.  The tracking number for this transaction is: 1Z1V9E320223867186.

746.     On January 27, 2014, Store Center 4831 located at 366 Amsterdam Avenue, in the City, County and State of New York was owned by Jerome Taylor ("Jerome Taylor  Center 4831").

747.     Upon information and belief, on January 27, 2014, a transaction occurred at Jerome Taylor Center 4831 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a 9x7x3 box to ship the Beverage Koozie; (b) the employee did not migrate transaction from CMS to the POS system or provide a tracking number; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, and the actual costs for the service requested 1ZRF85220224410512.

748.    That as set forth herein, the customers who were overcharged at the aforementioned Jerome Taylor store centers were in fact private investigators retained by the Hagans.

749.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Jerome Taylor Store Centers overcharged the Hagans' private investigators a total of $192.47.

750.    Mark Taylor is the owner of three (3) The UPS Store franchise locations in the City, County and State of New York.

751.    On November 25, 2013, Store Center  1083 located at 326 East 65th Street,  in the City, County and State of New York was owned by Mark Taylor ("Mark Taylor Center 1083").

752.    Upon information and belief, on November 25, 2013, a transaction occurred at Mark Taylor Center 1083 in which a customer was overcharged $37.26 (218%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box; (c) the employee offered 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More

specifically, the employee also made the following false and misleading statements to the customer: "You want it guaranteed for Wednesday its $54.29"; "Ground is 3-5 business days, it is not guaranteed." In the background another employee can clearly be heard telling another customer that Ground service will take 3-5 business days to deliver a package being shipped to an address in Manhattan. The tracking number for this transaction is: 1Z4R12V70211515463.

753.    On November 25, 2013, Store Center 0745 located at 208 East 51st Street, in the City, County and State of New York was owned by Mark Taylor ("M. Taylor Center 0745").

754.    Upon information and belief, on November 25, 2013, a transaction occurred at M. Taylor Center 0745 in which a customer was overcharged $37.08 (217%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on scale and entered 7 lbs. as the actual weight into the iShip CMS system; (c) the employee offers the customer 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: "Guaranteed for Wednesday is $54.29".   When the customer asks about ground

services the employee states "Ground is not a guaranteed service."  The tracking number for this transaction is: 1Z4R7832NY41487366.

755.    On November 25, 2013, Store Center 0647  located at 1173a Second Avenue, in the City, County and State of New York was owned by Mark Taylor ("M. Taylor Center 0647").

756.    Upon information and belief, on November 25, 2013, a transaction occurred at M. Taylor Center 0647 in which a customer was overcharged $37.26 (218%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x13x13 as the actual dimensions into the iShip CMS system; (b) the employee offers the customer 2nd Day Air as the only service option; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: "Guaranteed for Wednesday is $54.29".  When the customer asks about ground services the employee states "Ground is 2-5 business days, it could get there Wednesday, and it's not guaranteed."  The tracking number for this transaction is: 1Z87X7640210842628.

757.    On December 2, 2013, Store Center 0647 located at 1173A Second Avenue, in the City, County and State of New York was owned by Mark Taylor ("M. Taylor Center 0647").

758.    Upon information and belief, on December 2, 2013, a transaction occurred at M. Taylor Center 0647 in which a customer was overcharged $21.90 (186%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee/owner physically measured the box, but entered 11x9x7 as the actual dimensions into the iShip CMS system; (b) the employee/owner weighed the box and entered 1 lbs. as the actual weight of the box; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "8:00am is $72.00, 10:30am for $39.00 and End of Day for $33.00." In response to the customer requesting the cheapest delivery rates for tomorrow (Tuesday), the employee stated, "that's $33.00."  The tracking number for this transaction is: 1Z87X7641383252537.

759.    On December 2, 2013, Store Center 0745 located at 208 East 51st Street, County and State of New York was owned by Mark Taylor ("M. Taylor Center 0745").

760.    Upon information and belief, on December 2, 2013, a transaction occurred at Taylor Center 0745 in which the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the

217

time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system.  The package was shipped by Ground Service.   The tracking number for this transaction is: 1Z4R78320308585868.

761.    On December 2, 2013, Store Center 1083 located at 326 East 65th Street, County and State of New York was owned by Mark Taylor ("M. Taylor Center 1083").

762.    Upon information and belief, on December 2, 2013, a transaction occurred at Taylor Center 1083 in which a customer was overcharged $19.18 (163%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee was wearing headphones and offered only Next Day Air service; (b) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: The employee quotes "$31.03" as the price for delivery any time next day. When asked if there is anything cheaper, the employee replies "not for tomorrow, Wednesday is $20.59 and Thursday is $15.67."  The

employee clarifies, "3-5 business days" in reference to the $15.67 UPS Ground Rate. The tracking number for this transaction is: 1Z4R12V71345253591.

763.    On January 27, 2014, Store Center 0647 located at 1173a Second Avenue, in the City, County and State of New York was owned by Mark Taylor ("Mark Taylor Center 0647").

764.    Upon information and belief, on January 27, 2014, a transaction occurred at Mark Taylor Center 0647 in which a customer was overcharged $9.26 (78%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "21" with actual dimensions of 9x7x5; (b) the employee entered 10x8x6 as the actual dimensions into the iShip CMS system (c) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimension, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "it [Ground Service] says Tuesday, it says tomorrow, but it is not a guaranteed service, that's why."  The owner was present during the transaction and instructed the employee to use a "21" box, which has dimensions of 9x7x5. The tracking number for this transaction is: 1Z87X7640252737342.

765.    On January 27, 2014, Store Center 0745 located at 208 East 51st Street, in the City, County and State of New York was owned by Mark Taylor ("Mark Taylor Center 0745").

766.    Upon information and belief, on January 27, 2014, a transaction occurred at Mark Taylor Center 0745 in which a customer was overcharged $0.59 (5%) above the proper retail rate for the services requested. More specifically, a customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "21 Std" with actual dimensions of 9x7x5; (b) the employee entered 10x8x6 as the actual dimensions into the iShip CMS system; (c) the employee verbally acknowledges that the dimension of the box purchased are 9x7x5; and (d) the employee weighed the box, but entered 2 lbs. as the actual weight of the box.  The employee shipped the box by Ground Service.   The tracking number for this transaction is: 1Z4R78320313570819.

767.    On January 27, 2014, Store Center 1083 located at 326 East 65th Street, in the City, County and State of New York was owned by Mark Taylor ("Mark Taylor Center 1083").

768.    Upon information and belief, on January 27, 2014, a transaction occurred at Mark Taylor Center 1083 in which a customer was overcharged $9.26 (78%) above the proper retail rate for the services requested. More specifically, a customer brought in an item consisting of

non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box. The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014. Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "21 Std" with actual dimensions of 9x7x5; (b) the employee entered 10x8x6 as the actual dimensions into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimension, and the actual costs for the service requested. The tracking number for this transaction is: 1Z4R12V70211135963.

769. That as set forth herein, the customers who were overcharged at the aforementioned Mark Taylor store centers were in fact private investigators retained by the Hagans.

770. That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Mark Taylor Store Centers overcharged the Hagans' private investigators a total of $171.79.

771. Abu Rahman is the owner of two (2) The UPS Store franchise locations in the City, County and State of New York.

772. On November 20, 2013, Store Center 4163 located at 55 West 116th Street, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 4163").

773.     On November 20, 2013, a transaction occurred at Rahman Center 4163 in which a customer was overcharged $14.74 (107%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x7x7 as the actual dimensions into the iShip CMS system (tracking number 1Z67WE283507296405); (b) the employee added an additional service option for adult signature required resulting in an unauthorized $4.30 charge; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically the employee also made the following false and misleading statements to the customer: "Guaranteed service for Friday, 2nd Day service, is $28.53".  When asked by customer if there is anything cheaper, the employee replies, "for Friday, no."

774.     On November 20, 2013, Store Center 5777 located at 1838 2nd Avenue, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 5777").

775.     On November 20, 2013, a transaction occurred at Rahman Center 5777 in which a customer package was entered with the improper dimensions.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.   No additional charges were requested (i.e. proof of delivery, loss

222

protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 12x6x7 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box into the iShip CMS system; (c) the employee affirmatively misrepresented the guarantee for Ground Service.  More specifically the employee also made the following false and misleading statements to the customer: The employee quotes the price for 2nd Day Air, "22.89". When the customer asks if there is anything cheaper the employee states, "I have one thing cheaper, it is called Ground service. It usually takes 5-7 days, but states like Ohio it gets there in two days, technically. So I see it will get there on Friday even if you do the cheapest route, that's $13.78. But that is not guaranteed, but its 99% it will get there." The package was shipped by Ground service. (tracking number 1ZX30W770310356497).

776.    On November 25, 2013, Store Center 5777 located at 1838 Second Avenue, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 5777").

777.    Upon information and belief, on November 25, 2013, a transaction occurred at Rahman Center 5777 in which a customer was overcharged $35.20 (206%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered

18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box; (c) the employee offered 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   The tracking number for this transaction is: 1ZX30W770277055055.

778.    On November 25, 2013, Store Center 4163 located at 55 West 116th Street, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 4163").

779.    Upon information and belief, on November 25, 2013, a transaction occurred at Rahman Center 4163 in which a customer was overcharged $39.64 (232%) above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on scale and entered 7 lbs. as the actual weight into the iShip CMS system; (c) the employee offers 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When the customer asks for the cheapest service for Wednesday the employee states, "That will be $56.71 [2nd Day Air]".   The customer asks again if there is any

cheaper option and the employee says "No."   The tracking number for this transaction is: 1Z67WE283507481900.

780.    On December 2, 2013, Store Center 5777 located at 1838 2nd Avenue, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 5777").

781.    Upon information and belief, on December 2, 2013, a transaction occurred at Rahman Center 5777 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested.   More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box and entered 1 lbs. as the actual weight into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: "Ground is not guaranteed. 5-7 days is Ground."   The tracking number for this transaction is: 1ZX30W771376334690.

782.    On January 27, 2014, Store Center 4163 located at 55 West 116th Street, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 4163").

783.    Upon information and belief, on January 27, 2014, a transaction occurred at Rahman Center 4163 in which a customer was overcharged $15.55 (131%) above the proper

retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "8 standard packing" with actual dimensions of 8x8x8; (b) the employee failed to provide a CMS shipment receipt; (c) the employee did not migrate transaction from CMS and charged customer above retail rate by entering higher price into POS; (d) the employee added the service option for signature required/delivery confirmation resulting in an unauthorized additional charge of $5.75; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "you said for Wednesday, right, that will be $27.40 [2nd Day Air] plus the box." When the customer asks if that is the cheapest, the employee replies, "that is the cheapest guaranteed service." The tracking number for this transaction is: 1Z67WE283510088446.

784.   On January 27, 2014, Store Center 5777 located at 1838 Second Avenue, in the City, County and State of New York was owned by Abu Rahman ("Rahman Center 5777").

785.   Upon information and belief, on January 27, 2014, a transaction occurred at Rahman Center 5777 in which a customer was overcharged $9.14 (77%) above the proper retail

rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the owner told the customer that the package would be shipped in a 4x4x4 box; (b) the package was never scanned by the UPS driver and was not delivered to customer; and (c) the owner misrepresented the shipping options, the guaranteed delivery dates, and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "$20.99. That's to guarantee it for Wednesday." The tracking number for this transaction is: 1ZX30W770210870950.

786.    That as set forth herein, the customers who were overcharged at the aforementioned Rahman store centers were in fact private investigators retained by the Hagans.

787.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Rahman Store Centers overcharged the Hagans' private investigators a total of $133.57.

788.    Shyam Buxani/Mohan Buxani & Danny Dansignani are the owners of two (2) The UPS Store franchise locations in the City, County and State of New York.

789.    On November 20, 2013, Store Center 1492 located at 244 Madison Avenue, in the City, County and State of New York was owned by Shyam Buxani/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani Center 1492").

790.    Upon information and belief, on November 20, 2013, a transaction occurred at Buxani/Dansignani Center 1492 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x7x7 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer: In response to the customer asking if there was anything cheaper than the 2nd Day Air price quote of $24.23, the employee says "Anything cheaper will not be guaranteed"; and "You can send it Ground but is not guaranteed that it will get there by Friday."  The employee further says that Ground is "expected for Friday, but not guaranteed."  In response to the customer asking once again if Ground is guaranteed, the employee affirmatively lies and states "not at all."  The tracking number for this transaction is: 1Z1XY6210253052046.

791.    On November 25, 2013, Store Center 0444, located at 1040 First Avenue, in the City, County and State of New York was owned by Shyam Buxani/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani Center 0444").

792.    Upon information and belief, on November 25, 2013, a transaction occurred at Buxani/Dansignani Center 0444 in which a customer was overcharged $35.38 (207%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "$52.41 [2nd Day Air] for Wednesday."  When customer ask about Ground service the employee replies, "it's [Ground] not guaranteed for Wednesday."; "if it [Ground] doesn't get there Wednesday it will get there Monday."  The tracking number for this transaction is: 1Z5FX9160233100038.

793.    On November 25, 2013, Store Center 1492, located at 244 Madison Avenue, in the City, County and State of New York was owned by Shyam Buxani/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani" Center 1492").

794.    Upon information and belief, on November 25, 2013, a transaction occurred at Buxani/Dansignani Center 1492 in which a customer was overcharged $35.38 (207%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee was not wearing a TUPSS uniform or name tag; (b) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "We can do guaranteed Wednesday, that is $52.41, the other one is earlier." When the customer asks about Ground service the employee replies, "Ground is $16.54 for Wednesday. Ground is not guaranteed though – I just have to let you know." The tracking number for this transaction is: 1Z1XY6210253220346.

795.    On December 2, 2013, Store Center 0444 located at 1040 1st Avenue, in the City, County and State of New York was owned by Shyam/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani Center 0444").

796.    Upon information and belief, on December 2, 2013, a transaction occurred at Buxani/Dansignani Center 0444 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-

packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x6x8 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements: In response to the customer asking the cheapest way to deliver the package by the end of day on Wednesday, the employee states, "$31.03." The customer again asks is that the cheapest way and the employee responds, "Yes, otherwise tomorrow earlier will be $36." The tracking number for this transaction is: 1Z5FX9161300394209.

797. On December 2, 2013, Store Center 1492 located at 244 Madison Avenue, in the City, County and State of New York was owned by Shyam/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani Center 1492").

798. Upon information and belief, on December 2, 2013, a transaction occurred at Buxani/Dansignani Center 1492 in which the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee

physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system. The package was shipped by Ground service. The tracking number for this transaction is: 1Z1XY6210384279751.

799.     On January 27, 2014, Store Center 0444 located at 1040 First Avenue, in the City, County and State of New York was owned by Shyam Buxani/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani" Center 0444").

800.     Upon information and belief, on January 27, 2014, a transaction occurred at Buxani/Dansignani Center 0444 in which a customer was overcharged $8.90 (75%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee shipped the package in a carrier pack in manner inconsistent with the customer request; (b) the employee entered carrier pack as the actual dimensions into the iShip CMS system; (d) the employee was not wearing a TUPSS uniform or name tag; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: It response to the customer asking for delivery by Wednesday, the employee said, "$20.77 UPS 2nd Day"; "it's a guaranteed service." When the customer asks

about Ground service the employee said, "it should get there, it definitely should, but there is no guarantee for it."  The tracking number for this transaction is: 1Z5FX9160241087539.

801.    On January 27, 2014, Store Center 1492 located at 244 Madison Avenue, in the City, County and State of New York was owned by Shyam Buxani/Mohan Buxani & Danny Dansignani ("Buxani/Dansignani" Center 1492").

802.    Upon information and belief, on January 27, 2014, a transaction occurred at Buxani/Dansignani Center 1492 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee is not wearing a TUPSS uniform or name tag; (b) the employee sold the customer a box identified on the POS receipt as "other" with actual dimensions of 5x5x6; (c) the employee entered 6x6x6 as the actual dimensions into the iShip CMS system; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimension, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: When the customer asks what is the cheapest way to get it there for Wednesday, the employee said, "2nd Day Air, $20.99." When

customer asks about ground service the employee said, "it's not guaranteed." The tracking number for this transaction is: 1Z1XY6210256739684.

803.   That as set forth herein, the customers who were overcharged at the aforementioned Buxani/Dansignani Store Centers were in fact private investigators retained by the Hagans.

804.   That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Buxani/Dansignani Store Centers overcharged the Hagans' private investigators a total of $118.57.

805.   There are 11 The UPS Store Franchise owners who each own one (1) The UPS Store franchise location in the City, County and State of New York.  There is also a single UPS HUB service Center in Manhattan "UPS HUB" that processes retail UPS shipping transactions. The names of the eleven (11) The UPS Store Franchise owners are as follows: Sandra Machado "Store 5565", Tani Sussman "Store 4766", Charmaine Raphael "Store 6166", Mohamad Riaz "Store 5899", Otis Davis "Store 6367", Edward Xu, "Store 5296", Shueb Chowdhury "Store 5865", Danny Spies "Store 4472", Tony Lopez "Store 4768", Sylvester Onuorah "Store 5017", Chad Jaafar "Store 5953".

806.   On November 20, 2013, Counterclaim-Defendants "UPS HUB" Customer Service Center located at 601 West 43rd Street, in the City, County and State of New York was owned and operated by Counterclaim-Defendants, UPS and or UPSA ("The UPS Hub").

807.   Upon information and belief, on November 20, 2013, a transaction occurred at The UPS Hub in which a customer inquired about the proper retail rate for services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method

for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  The employee initially told the customer to use the self-service kiosk, but when the customer requested assistance, a uniformed UPS employee walked over to assist and made multiple the false and misleading statements to the customer during the 7 minute transaction: the employee begins by saying, "if you send it by Ground it will get there by Friday." The customer asks if that service is guaranteed and the employee replies "well guaranteed would be 2nd Day Air." The customer then says, "I can't guarantee it for Friday?" and the employee replies "by Air."  The employee provides both Ground and 2nd Day Air prices and then proceeds to tell the customer on three separate occasions that 2nd Day Air is the guaranteed service option and offers the confusing and misleading statement that "Air is even more guaranteed."  After being repeatedly pressed by the customer on whether UPS Ground is in fact a guaranteed service for Friday delivery, the UPS employee reluctantly turns his computer screen towards the customer and admits, "according to the company, yes, it says Friday…that is what it says on the [computer] screen." When the uniformed UPS employee is asked why The UPS Store locations do not tell customers that Ground is guaranteed, the UPS employee states: "its private [franchise] so they will push guaranteed on you."    The tracking number for this transaction is: 1Z149X010318904773.

808.    On November 20, 2013, Store Center 4766 located at 82 Nassau Street, in the City, County and State of New York was owned by Tani Sussman ("Sussman Center 4766").

809.    Upon information and belief, on November 20, 2013, a transaction occurred at Sussman Center 4766 in which a customer was overcharged $16.26 (118%) above the proper

retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 14x12x6 as the actual dimensions into the iShip CMS system; (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the services requested.  More specifically, the employee also made the following false and misleading statements to the customer: "the cheapest way for Friday will be is 2nd Day, this day [today] is Wednesday. [It] will be $30.09;" and when the customer asks if there is anything cheaper the employee replies, "you can do UPS Ground, it's not for Friday, that will be Monday. Its $13.78."  The tracking number for this transaction is: 1ZRF85310297890574.

810.    On November 25, 2013, Store Center 4766, located at 82 Nassau Street, in the City, County and State of New York was owned by Tani Sussman  ("Sussman Center 4766").

811.    Upon information and belief, on November 25, 2013, a transaction occurred at Sussman Center 4766 in which a customer was overcharged $42.38 (248%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered

guaranteed delivery via UPS Ground by the end of the day on November 27, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x15x13 as the actual dimensions into the iShip CMS system; b) the employee placed the box on the scale, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. The tracking number for this transaction is: 1ZRF85310263828713.

812.    On December 2, 2013, Store Center 4766 located at 82 Nassau Street, in the City, County and State of New York was owned by Tani Sussman ("Sussman Center 4766").

813.    Upon information and belief, on December 2, 2013, a transaction occurred at Sussman Center 4766 in which a customer was overcharged $21.90 (186%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x9x9 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When asked for the cheapest way to ship for tomorrow the employee stated, "for tomorrow we have 8:00 am which is $72.25, 10:30 am which would be $39.10 or 3:00pm -

$33.63." When the customer asks again is that the cheapest for tomorrow the employee replies, "$33.63, yes." The tracking number for this transaction is: 1ZRF85311365716828.

814. On January 27, 2014, Store Center 4766 located at 82 Nassau Street, in the City, County and State of New York was owned by Tani Sussman ("Sussman Center 4766").

815. Upon information and belief, on January 27, 2014, a transaction occurred at Sussman Center 4766 in which a customer was overcharged $9.26 (78%) above the proper retail rate for the services requested More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box. The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014. Moreover, the following was observed: (a) the employee sold the customer a box described on the POS receipt as "IVOX – Sm. Val. B NR"; (b) the employee described the box as a 10x10; (c) the employee entered the dimensions into the iShip CMS system as "10x10x4"; and (d) the employee affirmatively misrepresented the Ground Service Guarantee. More specifically, the employee also made the following false and misleading statements to the customer: When asked by the customer for the cheapest for delivery by Wednesday, the employee said, "2nd Day, that gets it there on Wednesday, two day service." The customer asks again if that is the cheapest way and the employee says, "that's the cheapest for Wednesday." The tracking number for this transaction is: 1ZRF85310266492348.

816.   That as set forth herein, the customers who were overcharged at the aforementioned Sussman Store Center were in fact private investigators retained by the Hagans.

817.   That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Sussman Store Center overcharged the Hagans' private investigators a total of $89.80.

818.   On November 20, 2013, Store Center 6166 located at 30 East 125th Street, in the City, County and State of New York was owned by Charmaine Raphael ("Raphael Center 6166").

819.   On November 20, 2013, a transaction occurred at Raphael Center 6166 in which a customer was overcharged $24.25 (176%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013. Moreover, the following was observed: (a) the owner physically measured the box, but entered 14x7x10 as the actual dimensions into the iShip CMS system (tracking number 1ZA0E248A620612726); (c) the owner weighed the box, but entered 2 lbs. as the actual weight of the box into the iShip CMS system; (e) the owner added an additional service option for adult signature required/delivery confirmation resulting in an unauthorized $10.10 charge; and (f) the owner affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically the owner also made the following false and misleading statements to the customer: When asked by the

customer for shipment by Friday the owner replies "you need it there for Friday, your total in $38.15 [2nd Day Air]"; When asked if there is anything cheaper the owner replies, "not for Friday"; "the next [delivery day] is Monday and that is $33.17."

820.   On November 25, 2013, Store Center 6166, located at 30 East 125th Street, in the City, County and State of New York was owned by Charmaine Raphael ("Raphael Center 6166").

821.   Upon information and belief, on November 25, 2013, a transaction occurred at Raphael Center 6166 in which a customer was overcharged $35.37 (207%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 7 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer:  "you have $26.64 [Ground] but that is not really guaranteed to get there for Wednesday, it's Ground."   "The only [guaranteed] one is that…$52.41 [2nd Day Air]." The employee further states "it says it will get there Wednesday [for Ground], but it might not. That is the chance you will have to take."   On no less

than three (3) separate instances, the employee intentionally misrepresents to the customer that "Ground is not guaranteed for Wednesday" for the sole purpose of inducing the sale of a higher cost and unnecessary 2nd Day Air product.   The tracking number for this transaction is: 1ZA0E2480254045375.

822.   On December 2, 2013, Store Center 6166 located at 30 East 125th Street, in the City, County and State of New York was owned by Charmaine Raphael ("Raphael Center 6166").

823.   Upon information and belief, on December 2, 2013, a transaction occurred at Raphael Center 6166 in which a customer was overcharged $17.42 (148%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee put the box on the scale and entered 1 lbs. as the actual weight of the box; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: When the customer asks for the cheapest way for tomorrow the employee said, "10:30 am that's $31.41, tomorrow end of day that's $29.15." When the customer asks about Ground the employee said, "$21.87" [Note: $21.87 is $10 above the UPS retail rate for Ground Service]. The employee further states,

241

"Ground is not guaranteed." The tracking number for this transaction is: 1ZA0E2481320916413.

824.    On January 27, 2014, Store Center 6166 located at 30 East 125th Street, in the City, County and State of New York was owned by Charmaine Raphael ("Raphael Center 6166").

825.    Upon information and belief, on January 27, 2014, a transaction occurred at Raphael Center 6166 in which a customer was overcharged $7.71 (65%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "#21 9x7x5 std pack"; (b) the employee entered 10x7x4 as the actual dimensions into the iShip CMS system; and (d) the employee added the service option for adult signature w/delivery confirmation resulting in an additional charge of $7.75. The package was shipped by Ground service.   The tracking number for this transaction is: 1ZA0E248A849480473.

826.    That as set forth herein, the customers who were overcharged at the aforementioned Raphael Store Center were in fact private investigators retained by the Hagans.

827.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Raphael Store Center overcharged the Hagans' private investigators a total of $84.75.

828.    On November 20, 2013, Store Center 5899  located at 1397 Second Avenue, in the City, County and State of New York was owned by Mohammad Riaz ("Riaz Center 5899").

829.    On November 20, 2013, a transaction occurred at Riaz Center 5899 in which a customer was overcharged $10.47 (76%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x7x7 as the actual dimensions into the iShip CMS system (tracking number 1Z4F49E20282107711); (b) the employee weighed the box, but entered 2 lbs. as the actual weight of the box into the iShip CMS system; and (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically the employee also made the following false and misleading statements to the customer:  "Friday by the end of day is $24.23 [2nd Day Air]". In response to the customer asking if there is anything cheaper for Friday the employee responds about Ground service as follows, "it could be there on Friday or Monday. It is not guaranteed."

830.    On November 25, 2013, Store Center 5899 located at 1397 Second Avenue, in the City, County and State of New York was owned by Mohammad Riaz ("Riaz Center 5899").

831.    Upon information and belief, on November 25, 2013, a transaction occurred at Riaz Center 5899 in which a customer was overcharged $35.20 (206%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x13 as the actual dimensions into the iShip CMS system; (b) the employee placed the box on scale and entered 7 lbs. as the actual weight into the iShip CMS system; (c) the employee offers 2nd Day Air as the only service option; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  The tracking number for this transaction is: 1Z4F49E20280151560.

832.    On December 2, 2013, Store Center 5899 located at 1397 Second Avenue, in the City, County and State of New York was owned by Mohammad Riaz ("Riaz Center 5899").

833.    Upon information and belief, on December 2, 2013, a transaction occurred at Riaz Center 5899 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the

end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee was not wearing a TPUSS uniform or name tag; (b) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: When customer asked if Ground service is guaranteed the employee said, "most probably it's is going to make it, but it is not guaranteed." The tracking number for this transaction is:  1Z4F49E21382494112.

834.    On January 27, 2014, Store Center 5899 located at 1397 2nd Avenue, in the City, County and State of New York was owned by Mohammed Riaz ("Riaz Center 5899").

835.    Upon information and belief, on January 27, 2014, a transaction occurred at Riaz Center 5899 in which a customer was overcharged $9.26 (78%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs that should have been properly packaged in a 6x6x6 box. The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "#21" with actual dimensions of 9x7x5; (b) the employee entered 10x8x6 as the actual dimensions into the iShip CMS system (c) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (d) the employee failed to

provide a CMS shipment receipt; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically, the employee also made the following false and misleading statements to the customer: "If you want guaranteed delivery for Wednesday that will be about $28 [2nd Day Air]" and "Ground is not guaranteed, with 2nd Day if it does not make it you get your money back." Another employee states, "the guaranteed ones they use the word air." The tracking number for this transaction is: 1Z4F49E20252687839.

836.    That as set forth herein, the customers who were overcharged at the aforementioned Riaz Store Center were in fact private investigators retained by the Hagans.

837.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Riaz Store Center overcharged the Hagans' private investigators a total of $74.23.

838.    On November 20, 2013, Store Center 6367  located at 1732 First Avenue, in the City, County and State of New York was owned by Otis Davis ("Davis Center 6367").

839.    On November 20, 2013, a transaction occurred at Davis Center 6367 in which a customer was overcharged $12.26 (89%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on November 22, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 13x8x8 as the actual dimensions into the iShip CMS system

(tracking number 1Z8772XW0270160279); and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.   More specifically the employee also made the following false and misleading statements to the customer:  "Friday will be $26.06 [2[nd] Day Air]."; "ground is expected delivery by Monday."

840.   On November 25, 2013, Store Center  6367 located at 1372 First Avenue, in the City, County and State of New York was owned by Otis Davis  ("Davis Center 6367").

841.   Upon information and belief, on November 25, 2013, a transaction occurred at Davis Center 6367 where the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x15x13 as the actual dimensions into the iShip CMS system. The employee shipped the box by Ground Service. The tracking number for this transaction is: 1Z8772XW0303860137.

842.   On December 2, 2013, Store Center 6367 located at 1732 1st Avenue, in the City, County and State of New York was owned by Otis Davis ("Davis Center 6367").

843.   Upon information and belief, on December 2, 2013, a transaction occurred at Davis Center 6367 in which a customer was overcharged $19.30 (164%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address

using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x6 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: When customer asks for the cheapest option for tomorrow, the employee states, "$31." When customer asks about Ground service the employee said, "that will get it there too." When asked if ground is guaranteed the employee said, "No, Air is guaranteed."  The customer asked again, "are you sure ground is not guaranteed, even to New Jersey."  The employee replied, "no, it's not." The tracking number for this transaction is: 1Z8772XW1303875531.

844.    On January 27, 2014, Store Center 6367 located at 1732 1st Avenue, in the City, County and State of New York was owned by Otis Davis ("Davis Center 6367").

845.    Upon information and belief, on January 27, 2014, a transaction occurred at Davis Center 6367 in which a customer was overcharged $9.26 (78%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction,

UPS offered guaranteed delivery via UPS Ground by the end of the day on January 28, 2014. Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "(#21F) 9x7x5" with actual dimensions of 9x7x5; (b) the employee entered 10x8x6 as the actual dimensions into the iShip CMS system (c) the employee weighed the box, but entered .35 lbs. as the actual weight of the box; (d) the employee failed to provide a CMS shipment receipt; (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "so you want to land on Wednesday it's $21.10 [2nd Day Air rate]."   The tracking number for this transaction is: 1Z8772XW0204733533.

846.   That as set forth herein, the customers who were overcharged at the aforementioned Davis Store Center were in fact private investigators retained by the Hagans.

847.   That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Davis Store Center overcharged the Hagans' private investigators a total of $40.82.

848.   On November 20, 2013, Store Center 5565 located at 1324 Lexington Avenue, in the City, County and State of New York was owned by Sandra Machado and Joao Machado ("Machado Center "5565").

849.   On November 20, 2013, a transaction occurred at Machado Center 5565 in which a customer was overcharged $11.02 (80%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 12x6x6 and a weight of 1.35 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Friday, November 22, 2013.  No additional charges were

requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 22, 2013.   Moreover, the following was observed: (a) the employee physically measured the box, confirmed the actual dimensions of 12x8x7 and entered them into the iShip CMS system (Tracking Number: 1Z003W230360561421); (b) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (c) the customer was provided with a POS receipt for Ground Residential delivery and was only provided with a TUPSS Receipt ID 83771799208023888276 001); (d) the employee charged above the UPS  retail rate for Ground Service; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual costs for the service requested. The employee at the Machado Center 5565 also made the following false and misleading statements: "Friday guaranteed will cost you $42.69"; "the most economical will get it there for Friday or Monday for $24.78." In response to customer request for anything cheaper the employee replies, "no, just that."

850.    On November 25, 2013, Store Center 5565 located at 1324 Lexington Avenue , in the City, County and State of New York was owned by Sandra Machado and Joao Machado ("Machado Center 5565").

851.    Upon information and belief, on November 25, 2013, a transaction occurred at Machado Center 5565 in which a customer was overcharged $55.37 (324%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss

protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (b) the customer was provided with a POS receipt for 2nd Day Air residential delivery and was only provided with a TUPSS receipt ID (83771799258125888491 001); (c) the employee charged above the UPS  retail for 2nd Day Air; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual costs for the service requested.  Tracking number for this transaction is: 1Z003W230260779501.

852.    On December 2, 2013, Store Center 5565 located at 1324 Lexington Avenue, in the City, County and State of New York was owned by Sandra Machado and Joao Machado ("Machado Center 5565").

853.    Upon information and belief, on December 2, 2013, a transaction occurred at Machado Center 5565 in which a customer was overcharged $30.24 (257%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x8x5 as the actual dimensions into the iShip CMS system (b) the employee weighed the box, but entered 1 lbs. as the actual weight of the box; (c) the employee failed to provide a CMS Shipment receipt and charged above the UPS retail rate

for Next Day Air Saver; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "For tomorrow there are only two options Early Am which is 10:30am or End of Day" and "Ground won't guarantee it for tomorrow." The tracking number for this transaction is: 1Z003W231360995266.

854.    On January 27, 2014, Store Center 5565 located at 1324 Lexington Avenue, in the City, County and State of New York was owned by Sandra Machado and Joao Machado ("Machado Center 5565").

855.    Upon information and belief, on January 27, 2014, a transaction occurred at Machado Center 5565 in which a customer was overcharged $10.97 (93%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee was not wearing a TUPSS uniform or name tag; (b) the employee sold the customer a box identified on the POS receipt as "Standard Packing"; (c) the employee stated the dimension of the box as 6x6x6; (d)  but the actual dimensions of the box shipped where "9x7x5" (e) the employee entered the dimensions into the iShip CMS system as 10x8x6; (f) entered 1 lbs. as the

actual weight of the box; (g) the employee failed to provide a CMS shipment receipt; and (h) the employee did not migrate transaction from CMS and charged customer above retail rate by entering higher price into POS for Ground Service. (i) the employee affirmatively misrepresented the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "Wednesday guaranteed service will cost you $32.77."    The tracking number for this transaction is: 1Z003W230330834531.

856.    That as set forth herein, the customers who were overcharged at the aforementioned Machado Store Center were in fact private investigators retained by the Hagans.

857.    That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Machado Store Center overcharged the Hagans' private investigators a total of $107.60.

858.    On November 25, 2013, Store Center 5296  located at 64 Beaver Street, in the City, County and State of New York was owned by Ed Xu (" Xu Center 5296").

859.    Upon information and belief, on November 25, 2013, a transaction occurred at Xu Center 5296 in which a customer was overcharged $30.42 (178%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed

delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "$47.49"; "you want a guaranteed service [2nd Day Air], this is a guaranteed service." "[Ground] will get there Friday or next week." The customer asks if this is the cheapest way to guarantee for Wednesday and the employee says, "$47.49". Before leaving store the customer asks again if this is the cheapest way and the employee replies, "yes". The tracking number for this transaction is: 1ZR170610224840013.

860. On December 2, 2013, Store Center 5296 located at 64 Beaver Street, in the City, County and State of New York was owned by Ed Xu ("Xu Center 5296").

861. Upon information and belief, on December 2, 2013, a transaction occurred at Xu Center 5296 in which a customer was overcharged $24.25 (206%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x8x6 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: the employee offered Next Day Air AM delivery as the only service option available; when asked if Next Day Air was the cheapest method, the employee said, "You said you want tomorrow, yes,

$36.06". When the customer asks again, "Is that the cheapest?" the employee points at the door and says, "the cheapest is at the Post Office."   The tracking number for this transaction is: 1ZR170610124860253.

862.   On January 27, 2014, Store Center 5296 located at 64 Beaver Street, in the City, County and State of New York was owned by Ed Xu ("Xu Center 5296").

863.   Upon information and belief, on January 27, 2014, a transaction occurred at Xu Center 5296 in which a customer was overcharged $9.14 (77%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "12x9x3", but had actual dimensions of 9x7x3; (b) the employee entered 12x9x3 as the actual dimensions into the iShip CMS system; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "not guaranteed, it's a ground service."; "if you want it guaranteed, I show [sell] you 2nd Day [2nd Day Air]"; "if you want it really guaranteed, you do 2nd day." The employee calls over a UPS driver named "Billy" and explains that the customer wants his packaged delivered to NJ by Wednesday and the UPS driver

says, "you are going to have to do it 2nd Day to guarantee it being there by Wednesday. It will probably be there tomorrow by Ground, but you want a guarantee, 2nd Day Air. That's the only way." The tracking number for this transaction is: 1ZR170610291465044.

864.   That as set forth herein, the customers who were overcharged at the aforementioned Xu Store Center were in fact private investigators retained by the Hagans.

865.   That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Xu Store Center overcharged the Hagans' private investigators a total of $63.84.

866.   On November 25, 2013, Store Center 5865 located at 353 Third Avenue, in the City, County and State of New York was owned by Shueb Chowdhury ("Chowdhury Center 5685").

867.   Upon information and belief, on November 25, 2013, a transaction occurred at Chowdhury Center 5865 in which a customer was overcharged $42.55 (249%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x13x12 as the actual dimensions into the iShip CMS system; (b) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (c) the employee did not migrate the transaction from the iShip CMS system and charged above the UPS retail rate for 2nd Day Air (d) the employee offered 2nd Day Air as the only service option; and (c) the employee affirmatively

misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "You're telling me guarantee, when I hear the word `guarantee,' I am not going to guarantee Ground. Because Ground it could go to the HUB and get lost or ship somewhere else and ship right back. That could be a week."  The employee then tells the customer that the cost for 2nd Day Air shipping is $55.  When the customer sees a charge of $59 and questions it, the employee says "Yeah, with tax, its $59." (sales tax is not legally collected on such a transaction).   The tracking number for this transaction is: 1Z3X2F960212858470.

868.   On December 2, 2013, Store Center 5856 located at 353 Third Avenue, in the City, County and State of New York was owned by Shueb Chowdhury ("Chowdhury Center 5865").

869.   Upon information and belief, on December 2, 2013, a transaction occurred at Chowdhury Center 5865 in which a customer was overcharged $28.36 (241%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 9x8x5 as the actual dimensions into the iShip CMS system; (b) the employee failed to provide a complete CMS Shipment receipt (torn in half to avoid disclosing the retail rate to customer) or a tracking number on the POS receipt; (c) the

employee charged above the retail rate for Next Day Air Saver; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "Ground is not guaranteed for tomorrow."; "you can take a risk on doing Ground."; "or you could definitely get it there tomorrow which would be Next Day Air Saver $39.03." The tracking number for this transaction is: 1Z3X2F961312946792.

870.    On January 27, 2014, Store Center 5856 located at 353 Third Avenue, in the City, County and State of New York was owned by Shueb Chowdhury ("Chowdhury Center 5856").

871.    Upon information and belief, on January 27, 2014, a transaction occurred at Chowdhury Center 5856 in which a customer was overcharged $12.10 (102%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Nerf Football that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "#24 11x9x7"; (b)  the actual dimensions of the box entered into the iShip CMS system where "9x7x3"; (c) the employee failed to provide a CMS shipment receipt – the receipt was torn in half to avoid disclosure of the UPS retail rate to the customer; (d) the employee did not migrate transaction from CMS and

charged customer above retail rate by entering higher price into POS for 2nd Day Air; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  The tracking number for this transaction is: 1Z3X2F960282004493.

872.   That as set forth herein, the customers who were overcharged at the aforementioned Chowdhury Store Center were in fact private investigators retained by the Hagans.

873.   That as set forth herein, between November 20, 2013 and January 27, 2014, the aforementioned Chowdhury Store Center overcharged the Hagans' private investigators a total of $83.01.

874.   On November 25, 2013, Store Center 5017, located at 2214 Fredrick Douglas Blvd., in the City, County and State of New York was owned by Sylvester Onuorah ("Onuorah Center 5017").

875.   Upon information and belief, on November 25, 2013, a transaction occurred at Onuorah Center 5017 in which a customer was overcharged $32.13 (188%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.   No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 18x12x13 as the actual dimensions into the iShip CMS system; and (b) the employee

affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "it's [Ground] not guaranteed." In response to the customer saying she needs the package delivered for Wednesday, the employee replies, "that's going to be $49.32."  The tracking number for this transaction is: 1ZR1705Y0295934816.

876.   On January 27, 2014, Store Center 5017 located at 2216 Frederick Douglas Blvd, in the City, County and State of New York was owned by Sylvester Onuorah ("Onuorah Center 5017").

877.   Upon information and belief, on January 27, 2014, a transaction occurred at Onuorah Center 5017 in which a customer was overcharged $9.26 (78%) above the proper retail rate for the services requested.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a box identified on the POS receipt as "10x10x5"; (b) the employee entered 11x8x5 as the actual dimensions into the iShip CMS system and affirmatively misrepresented the dimensions of the box to the customer; (c) the employee weighed the box, but entered .25 lbs. as the actual weight of the box; (d) the employee tries to induce customer into Next Day Air

through the omission of other available services; and (e) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, box dimensions, and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: In response to the customer asking for all options to get package delivered by Wednesday the employee said, "I have tomorrow for $37.05 [Next Day Air] and Wednesday for $21.10 [2nd Day Air]". When customer questions the employee about the dimensions of the box he just purchased for the shipment, the employee states, "11x8x5". The actual box used in the shipment was "9x7x3" small security box.  The tracking number for this transaction is: 1ZR1705Y0232487918.

878.     That as set forth herein, the customers who were overcharged at the aforementioned Onuorah Store Center were in fact private investigators retained by the Hagans.

879.     That as set forth herein, between November 25, 2013 and January 27, 2014, the aforementioned Onuorah Store Center overcharged the Hagans' private investigators a total of $41.39.

880.     On November 25, 2013, Store Center 5953, located at 551 West 181st Street, in the City, County and State of New York was owned by Chad  Jaafar ("Jaafar Center 5953").

881.     Upon information and belief, on November 25, 2013, a transaction occurred at Jaafar Center 5953 where the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee

physically measured the box, but entered 19x15x13 as the actual dimensions into the iShip CMS system; and (b) the employee shipped the package using Ground service. The tracking number for this transaction is: 1Z58E9000304939427.

882.   On December 2, 2013, Store Center 5953 located at 551 West 181st, in the City, County and State of New York was owned by Chad Jaafar ("Jaafar Center 5953").

883.   Upon information and belief, on December 2, 2013, a transaction occurred at Jaafar Center 5953 in which the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 10x7x9 as the actual dimensions into the iShip CMS system. The package was shipped by Ground service. The tracking number for this transaction is: 1Z8E9000305156922.

884.   On January 27, 2014, Store Center 5953 located at 551 West 181st Street, in the City, County and State of New York was owned by Chad Jaafar ("Jaafar Center 5953").

885.   Upon information and belief, on January 27, 2014, a transaction occurred at Jaafar Center 5953 in which a customer was charged the retail rate for services requested, but the box provided was intentionally over-dimensioned.  More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the

cheapest method for delivery by the end of the day on January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on January 28, 2014.  Moreover, the following was observed: (a) the employee provided the customer a UPS security box with actual dimensions of 9x7x5; (b) the employee entered 10x7x5 as the actual dimensions into the iShip CMS system; and (c) the employee attempted to misrepresent the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer in response to an inquiry about whether UPS Ground is a guaranteed service: "Usually."  The package was shipped via UPS Ground.  The tracking number for this transaction is: 1Z58E9000308190326.

886.    That as set forth herein, the customers who were subjected to fraudulent, deceptive and unethical trade practices at the Jaafar Store Center between November 25, 2013 and January 27, 2014, were in fact private investigators retained by the Hagans.

887.    On November 25, 2013, Store Center 4472, located at 809 West 181st Street, in the City, County and State of New York was owned by Danny Spies ("Spies  Center 4472").

888.    Upon information and belief, on November 25, 2013, a transaction occurred at Spies Center 4472 in which a customer was overcharged $32.30 (189%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS

Ground by the end of the day on November 27, 2013.  Moreover, the following was observed: (a) the employee did not provide the customer with a CMS Receipt or a Tracking Number; (b) the customer was provided with a POS receipt for 2nd Day Air residential delivery and was only provided with a TUPSS reference number (MM3PL5G35TKEV); (c) the employee charged above the UPS  retail for 2nd Day Air; and (d) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, the shipping service sold and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: "2nd Day is $49.49. You want Ground. It may get there but there is no guarantee";"2nd Day will get it there for Wednesday."  The tracking number for this transaction is: 1ZX612370210419047.

889.    On December 2, 2013, Store Center 4472 located at 809 West 181st Street, in the City, County and State of New York was owned by Danny Spies ("Spies Center 4472").

890.    Upon information and belief, on December 2, 2013, a transaction occurred at Spies Center 4472 in which a customer was overcharged $17.42 (148%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "Ground is not guaranteed" and "the

cheapest one is $29.15 [Next Day Air Saver]." The tracking number for this transaction is: 1ZX612371309773995.

891.    That as set forth herein, the customers who were overcharged at the aforementioned Spies Store Center were in fact private investigators retained by the Hagans.

892.    That as set forth herein, between November 25, 2013 and December 2, 2013, the aforementioned Spies Store Center overcharged the Hagans' private investigators a total of $41.39.

893.    On November 25, 2013, Store Center 4768 located at 4768 Broadway, in the City, County and State of New York was owned by Marcos A. Lopez ("Lopez Center 4768").

894.    Upon information and belief, on November 25, 2013, a transaction occurred at Lopez Center 4768 in which a customer was overcharged $42.38 (248%) above the proper retail rate for the services requested. More specifically, the customer brought in a pre-packed box with dimensions of 18x12x12 and a weight of 6.2 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday, November 27, 2013. No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on November 27, 2013. Moreover, the following was observed: (a) the employee physically measured the box, but entered 19x14x14 as the actual dimensions into the iShip CMS system; (b) the employee weighed the box, but entered 6.39 lbs. as the actual weight of the box; (c) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested. More specifically, the employee also made the following false and misleading statements to the customer: "Ground

is not a guaranteed service," adding that "2nd Day [Air] is guaranteed for Wednesday." The tracking number for this transaction is: 1Z06R82V0299831812.

895.    On December 2, 2013, Store Center 4768 located at 4768 Broadway, in the City, County and State of New York was owned by Tony Lopez ("Lopez Center 4768").

896.    Upon information and belief, on December 2, 2013, a transaction occurred at Lopez Center 4768 in which a customer was overcharged $21.90 (186%) above the proper retail rate for the services requested.  More specifically, the customer brought in a pre-packed box with dimensions of 9x7x5 and a weight of .5 lbs. to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Tuesday, December 3, 2013.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on December 3, 2013.  Moreover, the following was observed: (a) the employee physically measured the box, but entered 11x9x7 as the actual dimensions into the iShip CMS system; and (b) the employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested.  More specifically, the employee also made the following false and misleading statements to the customer: When asked for the cheapest way to ship for tomorrow the employee stated, "to get it there tomorrow guaranteed it comes out to $33.63"; "Ground is not guaranteed." The tracking number for this transaction is: 1Z06R82V1300549426.

897.    On January 27, 2014, Store Center 4768 located at 4768 Broadway, in the City, County and State of New York was owned by Tony Lopez ("Lopez Center 4768").

898.    Upon information and belief, on January 27, 2014, a transaction occurred at Lopez Center 4768  in which a customer was overcharged $9.26 (78%) above the proper retail

rate for the services requested. More specifically, the customer brought in an item consisting of non-breakable Beverage Koozie that weighing 0.6 lbs. that should have been properly packaged in a 6x6x6 box.  The Customer requested for the item to be shipped in the smallest box sold at the Store Center to be shipped to a residential (non-rural) address using the cheapest method for delivery by the end of the day on Wednesday. January 29, 2014.  No additional charges were requested (i.e. proof of delivery, loss protection, signature confirmation, etc.) and at the time of the transaction, UPS offered guaranteed delivery via UPS Ground by the end of the day on Tuesday, January 28, 2014.  Moreover, the following was observed: (a) the employee sold the customer a 10x7x4 box to ship the Beverage Koozie; and (b) the employee entered the dimensions as "11x8x5" into the iShip CMS system; (c) the employee failed to provide a CMS shipment receipt; (d) the employee did not migrate transaction from CMS and charged customer above retail rate by entering higher price into POS; and (e) employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates, and the actual costs for the service requested.  The tracking number for this transaction is: 1Z06R82V0287419513.

899.    That as set forth herein, the customers who were overcharged at the aforementioned Lopez Store Center were in fact private investigators retained by the Hagans.

900.    That as set forth herein, between November 25, 2013 and January 27, 2014, the aforementioned Lopez Store Center overcharged the Hagans' private investigators a total of $73.54.

901.    That by virtue of the documentation of the aforementioned transactions the Hagans concluded that the representations made by TUPSS/UPS regarding the status of compliance in the Manhattan Area were in fact false.

902.   That the Hagans had detrimentally relied upon the misrepresentations of fact and omissions of fact by corporate executives at TUPSS, as well as their agents and assigns in connection with taking their threats of compliance enforcement seriously.

903.   That during the same exact period in which the Hagans struggled to determine exactly what TUPSS/UPS was claiming they had done wrong – since they failed to disclose any facts regarding same – TUPSS/UPS sat back and did nothing while the other Manhattan Area Franchisees systematically defrauded the public and overcharged customers.

904.   To date, neither UPS, nor TUPSS has offered the Hagans any plausible explanation for why they would string them along, together with their private equity lender, Bancorp, their landlords and the other major creditors that lined up to support the Hagans based upon TUPSS/UPS's oral and written representations that the Hagans were ideal MCO operators.

## FIRST CLAIM FOR RELIEF AGAINST TUPSS/UPS
### *(Breach of Contract)*

905.   The Hagans incorporate by reference each of the allegations set forth in the preceding paragraphs, inclusive, as if realleged in full herein.

906.   The Hagans and TUPSS/UPS were parties to written contracts with TUPSS/UPS known as the Franchise Agreements and the Contract Carrier Agreements.

907.   TUPSS/UPS also assumed certain obligations under a certain written UPS Code of Conduct published to the Hagans and the general public.

908.   That TUPSS/UPS breached the Franchise Agreement amongst other things, by: (a) wrongfully terminating each of the Hagan's eleven franchise agreements in bad faith without proper cause, notice and opportunity to cure; (b) improperly interfering with the business relations of the Hagans; (b) inducing the third-party defendants to interfere with the business

relations of the Hagans; (c) failing to provide proper training and support in violation of Section 4 of the Franchise Agreement; (d) failing to provide commercially reasonable software, hardware and sales methods and systems; (e) failing to respond to the Hagans' notice of material default; (f) requiring the Hagans to sell higher cost shipping products to customers that offered no quantifiable benefit to customers (e.g. UPS 2nd Day Air at a higher cost when UPS Ground offered same exact same delivery guaranty for significantly lower cost); (f) failing to participate in mediation prior to the Hagans' eviction from the retail spaces, despite the Hagans' repeated requests and demands for same.

909.    That TUPSS/UPS materially breached both the Franchise Agreements and Contract Carrier Agreements by the conduct alleged herein.

910.    That between January 1, 2013 and the present, TUPSS/UPS breached the Franchise Agreements, the Contract Carrier Agreements and the covenants of good faith and fair dealing therein, with the Counterclaimants, including but not limited to the following:

a.    transferring, or purporting to transfer, the Counterclaimants' business, customer lists, goodwill and other valuable assets to Third-Party Defendants without any consideration;

b.    unilaterally declaring the that Counterclaimants were in material breach of the Franchise Agreements based upon incomplete, inaccurate and flawed information;

c.    intentionally formal and informal "cease and desist" and "default" notice letters, even though the Counterclaim-Defendants knew that at the time such documents were issued, the Counterclaimants were not engaged in any wrongful conduct and there was nothing for the Counterclaimants to cure;

d.  failing to have a legitimate and fair compliance audit process in existence so that if compliance issues are raised, franchisees are provided with all relevant information to verify the accuracy and integrity of the audit process (i.e. contemporaneously providing the franchisee with a report detailing the transactions, the POS receipts, the UPS tracking numbers, the actual weight and dimensions of the boxes shipped and audio/video of the transaction to confirm what the customer and auditor said during each such transaction);

e.  imposing upon the Hagans a "zero tolerance" retail rate compliance policy, while at the same time permitting virtually every other Manhattan Area Franchisee to openly engage in fraudulent and deceptive trade practices;

f.  failing and/or refusing to provide Counterclaimants with specific information relating to the origin of and evidence to support that Counterclaimants had in fact materially breached any agreement between the parties;

g.  causing Counterclaimants' business and personal mail to be intercepted by Third-Party Defendant franchisees, despite Counterclaimants specifically instructing all mail to be immediately forwarded to Counterclaimants' counsel;

h.  creating an "in terrorem" environment for the Counterclaimants and using threats, intimidation and other misconduct to force the Counterclaimants to accede to their demands;

i.  demanding royalties, advertising and media payments from Counterclaimants while plotting to destroy them and improperly using those funds and delivering no services;

270

j.   unlawfully retaliating against the Counterclaimants for whistleblowing on fraudulent and deceptive trade practices occurring in the Manhattan Area and elsewhere across the United States;

k.   unlawfully terminating the Counterclaimants' eleven (11) Franchise Agreements and Carrier Contract Agreements, preventing the sale of the former store centers for value to third-parties and preventing the Hagans from earning a living in the pack and ship industry;

l.   attempting to and/or causing the forfeiture of Counterclaimants "goodwill" or the "capital asset value" in each of the eleven (11) Former Store Centers owned by the Hagans;

m.   falsely claiming that certain royalties, advertising and media fees to which Counterclaim-Defendants are not legally entitled to, remain due and owing;

n.   misusing audit and other contract provisions to usurp the Counterclaimants' confidential vendor and customer lists;

o.   remotely accessing Counterclaimants' computers and POS systems without their knowledge and locking Counterclaimants out of those systems, when access to those systems was necessary to prepare royalty reports and tax filings;

p.   misusing termination threats and other misconduct to coerce the Counterclaimants to force them to stop investigating the true nature of the fraudulent and deceptive sales practices occurring within TUPSS network with the approval of the Counterclaim-Defendants;

q.  disparaging the Counterclaimants to third-parties, including the Third-Party Defendants, former employees of the Hagans, commercial landlords and customers who frequented the Hagan store centers;

r.  failing to comply with the mediation/arbitration provision set forth in the Franchise Agreements and instead filing a lawsuit against the Counterclaimants;

s.  failing to participate in good faith mediation and/or arbitration at the request of the Counterclaimants to address the issues and concerns, including, but not limited to the material breaches of the agreements between the parties and overcharges the Hagans reported at other Manhattan Area stores; and

t.  rendering it impossible or impractical for the Hagans to mitigate their damages by selling or transferring one or more Former Store Centers to a purchaser.

911.    As a direct result of the above express breaches of the contracts between the parties, together with the implied covenants of good faith and fair dealing existing therein, the Counterclaimants seek judgment and are entitled to damages in an amount to be established at trial, attorneys' fees, costs and expenses as the prevailing party, in an amount to be determined at trial, but not less than FIFTY MILLION DOLLARS ($50,000,000) together with such other and further relief this Court deems necessary and proper.

## SECOND CLAIM FOR RELIEF AGAINST COUNTERCLAIM-DEFENDANTS
### *(Fraud)*

912.    Counterclaimants incorporate by reference each of the allegations set forth in the preceding paragraphs, inclusive, as if realleged in full herein.

913.     That Singer, Maida and Hillquist all personally told the Hagans on multiple occasions between October 2013 and January 2014 that they were the only franchisees known to have retail rate compliance issues in the Manhattan Area.

914.     That the precise statements and dates such statements were made are already in the possession of the Plaintiffs/Counterclaim-Defendants and will be provided after Coiunterclaimants have had an opportunity to participate in meaningful discovery.

915.     That the statements by Singer, Maida and Hillquist were all false and made with the intent to mislead the Hagans into believing that no other franchisees in the Manhattan Area had retail rate compliance issues.

916.     That this was a material fact relied upon by the Hagans when executives at TUPSS demanded that immediate efforts be taken to completely eradicate even accidental retail rate overcharges at any of the Hagan store centers.

917.     That Singer, Kaplan and Hillquist conspired to conduct a non-objective "mystery shop" of the Hagans' eleven store centers using Dakar Holmes, a former employee of Kaplan for the purposes of telling the Hagans that they had chronic retail rate compliance issues.

918.     That the Singer mystery shop was published to to TUPSS Headquarters in San Diego and utilized by Hillquist as "evidence" of the Hagan's "non-compliance."

919.     That it was not until the Hagans discovered the relationship between Kaplan and Dakar Holmes, that Singer ultimately admitted to the Hagans that the "mystery shop" was improperly conducted.

920.     That when Robert Hagan confronted Third-Party Defendant Bradley Kaplan about whether he recalled employing Dakar Holmes, Kaplan initially lied to Hagan and told him that he did not recognize the name.

921.    That Hillquist acknowledged receiving the Singer mystery shop and cited the same exact overcharges in the Singer mystery shop as a cause for concern about the Hagans' business operations.

922.    That after an in-person meeting with Hillquist in San Diego and confronting Hillquist with the false nature of the Dakar Holmes mystery shop performed at Singer's request, Hillquist sent the Hagans' a written communication stating that "common ground" was reached.

923.    That Hillquist's statement regarding "common ground" was disingenuous, as TUPSS/UPS continued a path towards de-franchising the Hagans and refused to engage in any further contacts with them relating to retail rate compliance within their store centers or the Manhattan Area at large.

924.    That the Hagans were ignorant of the falsity of TUPSS/UPS' misrepresentations and had no choice but to assume them to be true, regardless of whether they could be independently verified at the time they were made.

925.    That TUPSS/UPS made these misrepresentations with the intention of deceiving and defrauding the Hagans.  In particular, TUPSS/UPS made these misrepresentations: (a) to induce the Hagans to not publically report the information they uncovered about the Manhattan Area franchisees to third-parties, including, but not limited to Bancorp, the New York State Attorney General and others who might conduct their own independent investigation; (b) to provide the Hagans with a false sense of security, that their concerns were being addressed; and (c) to cause the Hagans revenues to sharply decrease as a pretext for terminating them in the future based upon their failure to meet financial obligations imposed by TUPSS/UPS.

926.    That in reasonable reliance on TUPSS/UPS misrepresentations, the Hagans were induced to and did in fact implement a Transparency Sales Model in a good faith attempt to

operate their eleven stores with zero retail rate overcharges, regardless of intent, mistake or otherwise.

927.    That upon the Hagans seeking to engage in further dialogue with TUPSS/UPS for the purposes of restoring the confidence of their private equity lender Penrose, TUPSS/UPS refused to participate and instead took affirmative actions to alienate Penrose so that he would creditors of the Hagans, including approved and preferred vendors selected TUPSS.

928.    As a direct and proximate result of the fraudulent conduct of TUPSS/UPS as alleged herein, the Hagans' business was destroyed and TUPSS/UPS forced the closure of all eleven of the Hagan Store Centers.

929.    As a result of the TUPSS/UPS' fraud, the Hagans have suffered and continue to suffer harm to an extent still being ascertained.

930.    The Counterclaimants seek judgment and are entitled to damages in an amount to be established at trial, attorneys' fees, costs and expenses as the prevailing party, in an amount to be determined at trial, but not less than FIFTY MILLION DOLLARS ($50,000,000) together with such other and further relief this Court deems necessary and proper.

## THIRD CLAIM FOR RELIEF AGAINST TUPSS/UPS
### *(Breach of the Duty of Good Faith and Fair Dealing)*

931.    The Hagans incorporate by reference each of the allegations set forth in the preceding paragraphs, inclusive, as if realleged in full herein.

932.    Under the Franchise Agreement, TUPSS/UPS has an implied duty of good faith and fair dealing.

933.    Under the Carrier Agreements, TUPSS/UPS has an implied duty of good faith and fair dealing.

934.    Under the express terms of the UPS Code of Conduct, TUPSS/UPS has imposed upon themselves an ***express*** duty of good faith and fair dealing when dealing with people they do business with, including franchisees and account holders.

935.    That TUPSS/UPS is a government contractor and pursuant to the contractual relationships with the United States Government, TUPSS franchisees act as agents of the United States Postal Service for certain activities and services.

936.    In addition to the express obligations of the Franchise Agreements and Carrier Contract Agreements, TUPSS/UPS owed the Hagans a duty to perform their obligations and act pursuant to the covenant of good faith and fair dealing inherent within the franchise agreements and to take reasonable steps to enable the Hagans to at the very least realize the benefits of their contracts and their reasonable expectations.  In particular, TUPSS/UPS owed a duty to not act to deprive the Hagans of the fruits and benefits under the Franchise Agreements and the Carrier Contract Agreements.  In addition, TUPSS/UPS owed the Hagans a duty to not interfere with their reasonable expectations under the Franchise agreements.  Those reasonable expectations, included but were not limited to, the right to operate as MCO franchisees for the average eight (8) years remaining on their eleven (11) store centers, including renewing each of those franchises for successive ten-year terms, operating peacefully and independently and being able to sell one or more of their franchise locations for full value.

937.    Pursuant to the Franchise Agreements and Contract Carrier Agreements with the Hagans, TUPSS/UPS had a contractual obligation to provide a franchise model that was commercially reasonable, functional, free of fraud, and devoid of unethical business practices. TUPSS/UPS failed to honor this obligation and instead unjustly targeted the Hagans and de-franchised them instead of working with them to fix the massive problems they had uncovered.

938.     Moreover, TUPSS/UPS had an obligation to deal fairly and in good faith with the Hagans as franchisees and account holders.  This obligation includes, at a minimum: (1) ensuring that the franchise model imposed upon with the Hagans was commercially reasonable; (2) ensuring with the Hagans' rights were considered and protected; (3) protecting the Hagans from becoming the targets of retaliation; (4) protecting the Hagans from having unfair conditions imposed upon them and having the Franchise Agreement selectively enforced against them; (5) promptly taking action to carefully investigate potential compliance issues that arise and providing proper notice to Hagans as to the results of said investigation, so that any issues discovered can be properly remediated; (6) providing multiple center owner (MCO) franchisees, such as the Hagans with access to commercially reasonable systems; (7) providing the necessary systems and software to permit MCOs to develop new revenue streams, such as project-pricing for pack-and-ship residential moving jobs and value-added services; and (8) protecting franchisees and account holders from being subjected to fraudulent and deceptive business practices.

939.     By and through the conduct alleged herein, TUPSS/UPS' breached their duty of good faith and fair dealing in that they unfairly interfered with the Hagans' right to receive bargained-for benefits under the Franchise Agreements.

940.     As a direct result of TUPSS/UPS' breach, the Hagans were harmed and deprived of benefits to which they would have otherwise been entitled to under the Franchise Agreements and Carrier Contract Agreements.

## FOURTH CLAIM FOR RELIEF AGAINST TUPSS/UPS
### *(First Amendment)*

941.   The Hagans incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

942.   That TUPSS/UPS is engaged in the shipping and mail industry, which is regulated by the Federal Government, thus making them actors under color of law.

943.   That at all relevant times, TUPSS/UPS had active contracts with the United States Government and more specifically, the United States Postal Service, for which franchisees at TUPSS, including the Hagans, were the points of contact for the public at large.

944.   That at all relevant times, pursuant to an agreement with the United States Postal Service and TUPSS/UPS, TUPSS franchisees are permitted to sell and ship boxes via United States Postal Service and are considered authorized shippers of United States Mail.

945.   That TUPSS/UPS are regulated by the Federal Trade Commission and other governmental bodies that oversee the postal, shipping and transportation industries.

946.   That TUPSS/UPS participate in Federal Government programs and receive special benefits from the United States Government.

947.   That the Counterclaim-Defendants are contractors with the United States Government and as such, information relating to pricing compliance, sales practices and services offered is a matter of public concern.

948.   The TUPSS/UPS violated 42 USC § 1983 and the Hagans First Amendment rights by denying them the ability to ask questions and obtain truthful answers about certain practices occurring at TUPSS.

949.     That the conduct complained of by the Hagans relates directly to the activities for which the United States Government contracts with TUPSS/UPS, namely the shipping of goods via interstate commerce.  All TUPSS franchisees are authorized to re-sell United States Postal services, including, postage and certified mail.

950.     More specifically, as set forth in more detail above, as the Hagans began implementing their Transparency Sales Model and investigating how other Manhattan Area Franchisees were dealing with retail rate compliance issues, the Hagans uncovered what appeared to be a massive pattern of fraudulent and deceptive trade practices occurring in the Manhattan Area and elsewhere with the tacit approval of TUPSS/UPS.

951.     That the Hagans uncovered matters of public concern that go to the heart of the activities for which the United States Government contracts with TUPSS/UPS.

952.     When the Hagans began asking questions about these practices and requested clarification as to the proper and compliant way to sell UPS Air and UPS Ground products, they were threatened and then subjected to escalating adverse action, including the termination of their franchise agreements and contract carrier agreements.

953.     Upon information and belief, the adverse action imposed upon the Hagans at the hands of TUPSS/UPS was in retaliation for destroying TUPSS/UPS's ability to maintain a position of plausible deniability with respect to systematic fraudulent and deceptive trade practices being employed by various franchisees in the Manhattan Area, California and elsewhere across the United States.

954.     That within months after the Hagans' counterclaims were made public, UPS announced changes to the way in which it will be pricing UPS Ground packages, with dimensional weight being used more frequently for all packages effective January 2015.

955.   That at all times alleged herein, TUPSS/UPS had extensive knowledge of the speech and activities the Hagans were engaged in with respect to their efforts to expose unethical sales practices and implement a fully compliant sales model at their store centers.

956.   That despite the good faith efforts undertaken by the Hagans to be and remain compliant, well before any notice was ever served, TUPSS/UPS intended to disrupt and did in fact disrupt and destroy the Hagans business in order to quash their speech and prevent them from discovering additional facts related to the unethical and deceptive trade practices occurring in the Manhattan Area and elsewhere.

957.   That almost immediately after the Hagans notified TUPSS in writing of certain unlawful business practices occurring in the Manhattan Area and elsewhere, they were retaliated against and subjected to adverse action, including the termination of their franchise agreements.

958.   As a result of the conduct alleged herein, TUPSS/UPS wrongfully interfered with the Hagans' constitutional rights.

959.   That the speech and activities by the Hagans constitute protected activities.

960.   That the speech and activities by the Hagans concerned matters of public concern.

961.   Specific examples of the protected speech alleged, occurred during multiple in person meetings described herein and set forth in the multiple emails, letters and phone calls with TUPSS/UPS and their representatives.

962.   That the speech and activities by the Hagans was a motivating factor for the retaliation.

963.   That the Hagans have suffered and continue to suffer harm to an extent still being ascertained.

## FIFTH CLAIM FOR RELIEF AGAINST TUPSS/ UPS
### *(Breach of the N.Y. Franchise Sales Act – N.Y. Gen. Bus. Law § 687)*

964.    The Hagans incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

965.    TUPSS has held itself out as the franchisor.  It is the "alter ego" of Counterclaim-Defendants United Parcel Service of America, Inc. and the other United Parcel Service, Inc. entities. TUPSS/UPS are all subject to the provisions of the New York Franchise Sales Act.

966.    That as a franchisor, TUPSS is required to register with the New York State Attorney General before selling or offering to sell a franchise within the State of New York.

967.    That upon information and belief, TUPSS has not registered with the New York State Attorney General before selling or offering to sell a franchise within the State of New York.

968.    That the New York Franchise Sales Act prohibits franchisors from requiring releases by franchisees that relieve the franchisor from liability under the act.  More specifically, the Act provides that "[i]t is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article."

969.    That at the time an individual executes a TUPSS franchise agreement, TUPSS require all franchisees to agree to execute releases in violation of the New York Franchise Sales Act.

970.    That at the time an individual executes a TUPSS franchise agreement, UPS requires them to execute releases in violation of the New York Franchise Sales Act.

971.     That at the time an individual executes a TUPSS franchise agreement, Section 11.3(i) requires the franchisee to agree in advance as follows if a prospective transfer of the franchise is to occur:

> Franchisee and all Owners shall enter into a general release (in a form prescribed by TUPSS) that will release TUPSS and its Affiliates from any and all suits, claims or causes of action arising from, or in any way connected with, the sale or operation of Franchisee's Center during Franchisee's ownership;

*See* Section 11. Transfer and Assignment.

972.     That upon the Hagans informing counsel for TUPSS/UPS of their intent to sell or transfer one or more franchise locations in order to mitigate damages, they stated that they would not approve any such sale or transfer absent the Hagans executing a general release in favor of the TUPSS/UPS in violation of the New York Franchise Sales Act.

973.     At all relevant times, it was a violation of the New York Franchise Sales Act for a franchisor to offer or sell any franchise to "directly or indirectly…employ any device, scheme or artifice to defraud" or "[e]ngage in any act, practice, or course of business which operates or would operate a fraud or default upon any person."

974.     As a result of the violations of the New York Franchise Sales Act, the Hagans suffered substantial damages, including lost profits, damages to the good will, profitability and value of their franchise business, and lost business reputation, as well as other direct, indirect and consequential damages and were forced to expend time and money, including the payment of court costs and attorneys' fees.

## SIXTH CLAIM FOR RELIEF AGAINST TUPSS/UPS
### *(Violation of the California Franchise Relations Act – Cal. Bus. & Prof. Code § 20020)*

975.     The Hagans incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

976. TUPSS has held itself out as the franchisor. It is the "alter ego" of plaintiff United Parcel Service of America, Inc. and the other United Parcel Service, Inc. entities. Pursuant to the choice of law expressly stated in the Franchise Agreements, the all of the Counterclaim-Defendants are subject to the provisions of the California Franchise Relations Act.

977. On or about February 5, 2014, counsel for TUPSS/UPS sent the Hagans a letter purporting to notify them of alleged defaults and to terminate their franchise agreements for alleged failure to pay and permit an audit inspection.

978. At all relevant times, it was a violation of the California Franchise Relations Act for a franchisor to "terminate a franchise prior to the expiration of its term, except for good cause." "Good cause" includes the franchisee being given notice of the failure of the franchisee to comply with any lawful requirement of the franchise agreement with a reasonable opportunity to cure.

979. That prior to February 5, 2014, TUPSS had put in motion a plan to destabilize the Hagans' business and finances, which included cutting off the Hagans' access to credit, withholding information from Bancorp selectively enforcing the Franchise Agreement against them, artificially escalating customer concerns and claims, imposing requirements on them that were more restrictive than required and causing them to abandon revenue streams that were necessary such as bundled services for value-added transactions and project-based pricing for residential customers because they refused to upgrade commercially unreasonable software and hardware systems.

980. That TUPSS/UPS terminated the Hagans' franchise agreements for each of their eleven (11) store centers without "good cause" in violation of the California Franchise Relations Act.

981.     As a result of the violations of the California Franchise Relations Act, the Hagans' suffered substantial damages, including lost profits, damages to the good will, profitability and value of their franchise business, and lost business reputation, as well as other direct, indirect and consequential damages and were forced to expend time and money, including the payment of court costs and attorneys' fees.

**SEVENTH CLAIM FOR RELIEF AGAINST TUPSS/UPS**
***(Violation of the California Franchise Relations Act – Cal. Bus. & Prof. Code § 17200)***

982.     The Hagans incorporate and reallege the preceding paragraphs as if fully set forth herein.

983.     That as set forth herein, the wrongful actions of the TUPSS/UPS occurred both within the state of California and elsewhere.

984.     The Counterclaimants and Counterclaim-Defendants are "persons" as defined under Calif. Bus. & Prof. Code § 17201. The Counterclaim-Defendants committed unlawful unfair or fraudulent business acts or practices as defined under Calif. Bus. & Prof. Code §§ 17200, 17203 and other applicable statutory provisions of the Calif. Bus. & Prof. Code.

985.     The unlawful, unfair and/or deceptive and fraudulent acts or practices committed by Counterclaim-Defendants jointly and severally were a series of acts and violations that in addition to being separately actionable are part of an actionable pattern of violations and misconduct that include, but are not limited to:

      a.     Failing to disclose at the time that the Counterclaimants initially purchased and/or renewed their franchises, that the business model upon which they based their decision to buy or continue to reinvest would be dramatically altered all in violation of the Federal Trade Commission's so-called Franchise

284

Pre-Sale Disclosure Rule, 16 C.F.R Part 436. and Calif. Corp. Code §§ 31000 et seq.;

b.   Unlawfully and unfairly usurping the Hagans customer lists by the use of iShip, "Mailbox Manager" and other computer software programs remotely controlled by TUPSS/UPS;

c.   Using fraud, deceit, penalties, threats of termination, and coercion to punish franchisees that speak out about unethical business practices within TUPSS/UPS franchise network;

d.   Selectively enforcing the franchise agreement against the Hagans in a long term scheme, conspiracy, plan and/or pattern of misconduct to cause a forfeiture and/or drive down the value of the Hagans' "goodwill" and "going concern" or "capital asset" value of their businesses;

e.   Conjuring up false and bogus claims against the Hagans in a long term scheme, conspiracy, plan and/or pattern of misconduct to acquire for TUPSS/UPS's domination and control over the pack and ship market and to dramatically expand their drop off and shipment network at the expense of the Hagans who invested millions of dollars in their eleven (11) independently owned and operated businesses;

f.   Destroying the consent and mutuality required for the existence of a valid franchise contract under Calif. Civ. Code §§ 1550, 1565-1576, by attempting to transfer the franchise agreements to the Third-Party Defendants without proper notice to or the consent of the Hagans and in violation of the express terms of the franchise agreements;

g. Utilizing artful drafting of franchise contracts of adhesion to carry out and/or facilitate the long term scheme, conspiracy and pattern of activity or misconduct described herein;

h. Unfairly attempting to invoke New York law to enforce the post-term non-competition covenants, which are unenforceable under Calif. Bus. & Prof. Code § 16600, while mandating that California law apply to the balance of the franchise relationship;

i. Abusing the post-termination procedures contained in the franchise agreements to secure information about the franchisees' business operations to which TUPSS/UPS was not lawfully entitled under the franchise contracts of adhesion; and

j. By otherwise participating in the wrongful conduct described herein.

986.    As a result of the above referenced misconduct, TUPSS/UPS was unjustly enriched not just by the unfair collection of royalties, advertising and national media fees from the Hagans and other franchisees during the duration and pendency of the scheme, conspiracy and pattern of misconduct, but by the increase in their own revenues in an amount of up to and possibly exceeding $150 Million for calendar year 2013 and first quarter of 2014 alone, all of which TUPSS/UPS should be ordered to disgorge.

987.    In addition, penalties should be assessed against TUPSS/UPS for each violation as committed multiple times under Calif. Bus. & Prof. Code § 17206.

988.    The Hagans are entitled to declaratory and injunctive relief declaring the franchise agreements and contract carrier agreements with the TUPSS/UPS to be null and void as a result of the alleged misconduct and ordering that the Hagans be entitled to continue to use the The

UPS Store, Inc. tradename and trademarks without any further payments of royalties, advertising or media fees to TUPSS/UPS or without any further interference with their business operations by TUPSS/UPS and those working in concert with them.

989.   The Hagans seek declaratory and injunctive relief declaring that the Franchise Agreements and Contract Carrier Agreements executed by TUPSS franchisees are null and void under California law including but not limited to Calif. Bus. & Prof. Code §§ 17051 and 17046-17048 and as unconscionable contracts of adhesion and preliminarily and permanently enjoining TUPSS/UPS from enforcing those unlawful agreements.

990.   The Hagans are further entitled to an award of attorneys' fees under the common fund doctrine and/or the private attorney general doctrine as enunciated by California law including but not limited to Calif. Code Civ. Pr. § 101.5.

## EIGHTH CLAIM FOR RELIEF AGAINST TUPSS/UPS
### *(Unfair Trade Practices Under California Law)*

991.   Counterclaimants incorporate and reallege the preceding paragraphs as if fully set forth herein.

992.   TUPSS/UPS were engaged in the sale of articles or products including services as defined under Calif. Bus. & Prof. Code §§ 17023 and 17024.

993.   That TUPSS/UPS falsely advertised and represented misleading information to the Counterclaimants and the public regarding the sale of shipping products including UPS Ground and UPS Air services.

994.   The TUPSS/UPS committed unfair and/or deceptive acts or practices as defined under Calif. Bus. & Prof. Code §§ 17000 et seq. and which are actionable under Calif. Bus. & Prof. Code § 17070.

995.   That on or about February 6, 2014, Thomas Hagan, was the victim of these practices on at least one occasion within the State of California, in connection with shipping transactions.

996.   More specifically, on February 6, 2014, Thomas Hagan purchased two (2) boxes with dimensions of 8x8x8 at Store Center 1076, located at 826 Orange Ave, Coronado, California 92118 to ship items to Los Angeles, California.  Hagan packed the boxes and then took them to Store Center 6100, located at One Park Boulevard, San Diego, California.  He requested rate quotes for the package was advised that the package could be guaranteed via 2nd Day Air for next day delivery by the end of the day.  Hagan requested that one box be shipped via the recommended UPS 2nd Day Air and that the other be shipped via UPS Ground.  However, in fact, both services offered the exact same delivery guarantee, one day transit, with guaranteed end of day delivery. The sales associate processed both packages, purported to measure and weigh them and entered the dimensions of both boxes into the iShip CMS System as 9x9x9 with an actual weight of 1.2 lbs.  Although the actual weight of the parcels were 1.2 lbs., the dimensional over-measurements calculated a billable weight of 5 lbs. for the UPS 2nd Day Air delivery and 2 lbs for the UPS Ground delivery. However, upon verifying the rate at www.UPS.com, it was determined that 2nd Day Air was not even a valid shipping product offered by UPS for such a transaction.  Counterclaim Plaintiff Thomas Hagan had been sold a higher-priced shipping product that was not even available that offered him no additional benefit, a practice that virtually mirrors that which was discovered with the Third-Party Defendant Manhattan Area Franchisees. (See POS Receipt ID#s 83384108949885888879 from Store Center #1076 and 83138808946093888047 from Store Center #6100; Tracking Numbers

1ZV285V90215327210 for the 2nd Day Air parcel and 1ZV285V90315326862 for the UPS Ground parcel).

997.   Upon information and belief, both packages shipped by Thomas Hagan traveled the exact same route by UPS Ground, although Hagan was charged a higher shipping fee and fuel surcharge for the parcel shipped via UPS 2nd Day Air (Tracking Number 1ZV285V90215327210).

998.   The unfair and/or deceptive acts or practices committed by the TUPSS/UPS jointly and severally were a series of acts and violations that in addition to being separately actionable are part of a larger pattern of actionable violations and misconduct.

999.   That these acts took place after TUPSS/UPS had been put on actual notice of the fact that 2nd Day Air was unethically being sold through TUPSS store locations exclusively through UPS's iShip program, when UPS Ground offered the same exact delivery guarantee for a lower price.  Moreover, both 2nd Day Air and UPS Ground services were both being shipped via UPS Ground trucks, as evidenced by the tracking information compiled by Thomas Hagan.

1000.  The unfair and/or deceptive acts or practices committed by the TUPSS/UPS and those working in concert with them included, but were not limited to:

    a.   upon information and belief, requiring the TUPSS franchisees to sell articles and products and/or their services to customers in a fraudulent and deceptive manner;

    b.   Upon information and belief, forcing franchisees to sell or use UPS deferred Air shipping products to the public that either do not exist or should not have be offered because they provide inferior delivery guarantees as compared with UPS Ground;

c.  Engaging in the secret payment or allowance of overcharges, the payment of additional incentives, benefits or unearned discounts, or secretly extending to certain franchisees, special services or privileges not extended to all franchisees and the Counterclaimants;

d.  Using threats, intimidation and the imposition of unreasonable operational conditions to turn franchisees against the Counterclaimants and to induce them to participate in all of the aforementioned unfair and/or deceptive trade practices; and

e.  Soliciting the violations and unfair and/or deceptive trade practices and jointly participating in the violations and unfair and/or deceptive trade practices outlined above.

1001.  As a result of the above referenced misconduct, Thomas Hagan was damaged.

1002.  As a result of the above referenced misconduct, the Hagans as Franchisees suffered the following indirect and consequential damages:

f.  Lost out-of-pocket expenses;

g.  Lost business opportunities

h.  Lost profits;

i.  Lost value of their "goodwill" and the "going concern" or "capital asset" value of their businesses;

j.  Lost business reputation; and

k.  Loss of time and money, including the payment of court costs and attorneys' fees.

1003.   That the misconduct of the Counterclaim-Defendants should be preliminarily and permanently enjoined and the executed copies of the Franchise Agreements and the Contract Carrier Agreements should be declared null and void pursuant to Calif. Bus. & Prof. Code § 17051.

### NINTH CLAIM FOR RELIEF AGAINST ALL PARTIES
*(Fraudulent & Deceptive Trade Practices Under New York Law)*

1004.   The Hagans incorporate and reallege the preceding paragraphs as if fully set forth herein.

1005.   That the TUPSS/UPS and the Third-Party Defendant Manhattan Area Franchisees conduct business, trade or commerce in the furnishing of services in the State of New York under N.Y. Gen. Bus. Law §§ 349 and 350.

1006.   That TUPS/UPS committed fraudulent, unfair and/or deceptive acts or practices which are actionable under N.Y. Gen. Bus. Law §§ 349 and 350.

1007.   That Third-Party Defendant Manhattan Area Franchisees committed fraudulent, unfair and/or deceptive acts or practices which are actionable under N.Y. Gen. Bus. Law §§ 349 and 350.

1008.   That the Counterclaim-Defendants and the Third-Party Defendant Manhattan Area Franchisees conduct business, trade or commerce in the furnishing of services in the State of New York under N.Y. Gen. Bus. Law §§ 349 and 350.

1009.   That TUPSS/UPS aided and abetted the Third-Party Defendants in furtherance of a scheme to defraud and overcharge customers in violation of N.Y. Gen. Bus. Law §§ 349 and 350.

1010.   That as alleged herein, on November 20, 2013, November 25, 2013, December 2, 2013 and January 27, 2014, the Hagans' caused boxed to be shipped in the stores of the Third-Party Defendants using a licensed private investigator for the purposes of objectively measuring compliance in the Manhattan Area.

1011.   That prior to and during the period in which the aforementioned transactions were completed, the Hagans notified representatives at TUPSS/UPS that they were verifying compliance in the area and that they had discovered massive fraud in the network.

1012.   At no time did TUPSS/UPS, the Third-Party Defendants or any of their representatives ever tell the Hagans they could not verify compliance in the Manhattan Area utilizing such methods.   Indeed, since Singer had retained a former employee of Third-Party Defendant Kaplan to "mystery shop" all eleven of the Hagan stores without their prior knowledge or permission, it appeared that such inquiries were commonplace.

1013.   That the results of the transactions occurring between November 20, 2013 through January 27, 2014 are set forth as alleged herein.

1014.   The above-described conduct of TUPSS/UPS and the Third-Party Defendants is without any legal justification and constitutes a knowing and willful violation of applicable New York statutory law, including New York General Business Law §§ 349 and 350.

1015.   The said conduct of the Counterclaim-Defendants caused the Hagans undue damage and expense, including attorneys' fees.

1016.   As a result of the above referenced misconduct, the Counterclaimants suffered the following direct, indirect and consequential damages:

l.   Lost out-of-pocket expenses;

m.   Lost business opportunities

n.  Lost profits;

o.  Lost value of their "goodwill" and the "going concern" or "capital asset" value of their businesses;

p.  Lost business reputation; and

q.  Loss of time and money, including the payment of court costs and attorneys' fees.

1017.  That the misconduct of the TUPPS/UPS and the Third-Party Defendants must be preliminarily and permanently enjoined, the Hagans should be awarded the maximum statutory award, treble damages and reasonable attorneys' fees pursuant to N.Y. Gen. Bus. Law § 349(h).

## TENTH CLAIM FOR RELIEF AGAINST ALL PARTIES
### *(Unjust Enrichment)*

1018.  The Hagans incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

1019.  That as a result of their conduct, the Counterclaim-Defendants and the Third-Party Defendants have been unjustly enriched.

1020.  More specifically, TUPSS/UPS and the Third-Party Defendants have been and will continue to be unjustly enriched by virtue of silencing the Hagans and continuing their scheme of systematic overcharges collected from the public in the Manhattan Area and elsewhere.

1021.  Upon the opening of a new store center, TUPSS/UPS receives certain fees from the incoming franchisees.  By virtue of the abrupt termination of the Hagans' franchise agreements and the closure of the Hagans' eleven store centers, TUPSS/UPS has collected and

will continue to collect additional fees from individuals who wish to open store centers in and adjacent to the territories previously held by the Hagans.

1022.  That in addition to paying a franchise fee in the amount of $22,500, TUPSS collects money for software, hardware and other tasks performed in connection with approving and opening a new TUPSS site location.

1023.  That upon the forced closure of the Hagans' store centers, the Third-Party Defendants were immediately unjustly enriched by virtue of the additional overflow business they received.

1024.  That TUPSS/UPS actively aided and abetted the Third-Party Defendants in collecting these overcharges while at the same time exerting undue pressure for the Hagans to adopt a "zero tolerance" retail rate compliance policy.

1025.  That after the Counterclaimants' locations were closed, TUPSS/UPS began distributing the Hagans' customer lists and mailbox customers to the Third-Party Defendants without requiring any payment or consideration to the Hagans.

1026.  That TUPSS/UPS and Third-Party Defendant voluntarily accepted and retained unjust revenues in the form of higher shipping revenues and royalty fees with full knowledge that as a result of their wrongdoing and that by continuing these practices, the Hagans were being wrongfully deprived of the right to own and operate their eleven Store Centers.

1027.  That the Third-Party Defendants have further been unjustly enriched through the increased gross sales they achieved as a result of the closure of the eleven (11) Manhattan Area stores owned by the Hagans.  The Third-Party Defendants have also been enriched in the form of unjustly converting the Hagans' mailbox customers and other goodwill.

1028.   The Third-Party Defendants voluntarily accepted and retained this additional business revenue and upon information and belief have induced many of the Hagans' former mailbox customers to sign new agreements at their store centers, with full knowledge that as a result of their wrongdoing, the Counterclaimants were being permanently deprived of business assets.

## ELEVENTH CLAIM FOR RELIEF AGAINST ALL PARTIES
### *(Tortious Interference)*

1029.   That the Hagans incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged in full herein.

1030.   The Hagans had valid contracts with various third-parties, including, Bancorp/SBA, John Penrose, eleven owners/landlords for the commercial space where each of the former Hagan Store Centers are located, mailbox customers at each of the eleven store centers and various TUPSS-approved vendors that provided credit, goods or services to the Hagans.

1031.   That the aforementioned contracts and business relationships (i.e. lenders, landlords, mailbox customers, vendors) are commonplace within the TUPSS franchise industry.

1032.   At all times alleged herein, the TUPSS/UPS and the Third-Party Defendants had knowledge of the aforementioned contracts between the Hagans and the aforementioned third-parties.

1033.   That the TUPSS/UPS and the Third-Party Defendants intended to disrupt and did in fact disrupt Counterclaimants contractual relationships with the aforementioned third-parties through their wrongful conduct and misrepresentations.

1034.   That the conduct of TUPSS/UPS and the Third-Party Defendants was malicious, without justification and otherwise improper.

1035.   That the conduct of TUPSS/UPS and the Third Party Defendants was specifically responsible for the Hagans no longer receiving additional funding from their private equity lender John Penrose.

1036.   That the conduct of TUPSS/UPS and the Third Party Defendants was specifically responsible for the Hagans commercial landlords failing to extend additional credit and provide them with additional time in which to bring rents current.

1037.   That the Third-Party Defendants were rewarded for their loyalty in rallying against the Counterclaimants and continuing to promote fraudulent and deceptive sales practices in the Manhattan Area.  More specifically, TUPSS/UPS provided the Third-Party Defendants with customer information, mailbox lists and caused mail to be diverted away from the former Hagan store centers to locations owned by themselves.

1038.   In or around February 2014, TUPSS and UPS designated Store Center #4769, owned by Brad Kaplan, located at 888-C 8th Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #6283, located at 694 10th Avenue, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1039.   In or around February 2014, TUPSS and UPS designated Store Center #0304, owned by Ketan Seth, located at 101 West 23rd Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #6281, located at 222 8th Avenue, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1040.   In or around February 2014, TUPSS and UPS designated Store Center #6374, owned by Kevin Panchmia, located at 14 Murray Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #5308, located at 342 Broadway, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1041.   In or around February 2014, TUPSS and UPS designated Store Center #4754, owned by Ketan Seth, located at 243 5th Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #4311, located at 303 Park Avenue South, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1042.   In or around February 2014, TUPSS and UPS designated Store Center #4619, owned by Ketan Seth, located at 132 East 43rd Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #1227, located at 527 Third Avenue, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1043.   In or around February 2014, TUPSS and UPS designated Store Center #6374, owned by Kevin Panchmia, located at 14 Murray Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #5308, located at 342 Broadway, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1044.   In or around February 2014, TUPSS and UPS designated Store Center #4754, owned by Ketan Seth, located at 243 5th Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #4311, located at 303 Park Avenue

South, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1045.  In or around February 2014, TUPSS and UPS designated Store Center #4619, owned by Ketan Seth, located at 132 East 43rd Street, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #1227, located at 527 Third Avenue, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1046.  In or around February 2014, TUPSS and UPS designated Store Center #5565, owned by Sandra Machado, located at 1324 Lexington Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #0523, located at 1202 Lexington Avenue, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1047.  In or around February 2014, TUPSS and UPS designated Store Center #5777, owned by Abu Rahman, located at 1838 2nd Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #6280, located at 1474 Third Avenue, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1048.  In or around February 2014, TUPSS and UPS designated Store Center #5777, owned by Abu Rahman, located at 1838 2nd Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #0561, located at 1636 Third Avenue, in the City of New York, NY.   No consideration was paid to the Counterclaimants for this transfer of business.

1049.  In or around February 2014, TUPSS and UPS designated Store Center #6367, owned by Otis Davis, located at 1732 1st Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #1382, located at 1562 1st Avenue, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1050.  In or around March 2014, TUPSS and UPS designated Store Center #4769, owned by Brad Kaplan, located at 888-C 8th Avenue, in the City of New York, NY to receive all mail previously being delivered to the former Hagan Store Center #1141, located at 331 West 57th Street, in the City of New York, NY.  No consideration was paid to the Counterclaimants for this transfer of business.

1051.  At or around the same time the aforementioned customer transfers were occurring, the Counterclaim-Defendants and Third-Party Defendants began contacting Counterclaimants' landlords to induce them to evict the Hagans and instead put in one of the Third-Party Defendants as a substitute tenant – all done without the consent or approval of the Counterclaimants and without offering any consideration in connection with the proposed transactions.

1052.  That after the Hagans were evicted from the commercial premises located at 331 West 57th Street where Store Center 1141 was located, but before the landlord provided the Hagans with an opportunity to remove their personal property from the premises, Third-Party Defendant Bradley Kaplan entered the premises, took certain computers, security cameras and documents from the premises without the prior consent or knowledge of the Hagans or their counsel.

1053.   That Kaplan's actions were willful, malicious and constituted a circumvention of the Court's explicit stay on all discovery relating to this action.

1054.   That Kaplan willfully entered the premises in order to acquire certain computers and personal documents belonging to the Hagans and others which he had no right to and knew to contain evidence relevant to certain claims and defenses in this action.

1055.   As a result of the conduct alleged herein, the Third-Party Defendants interfered with the Counterclaimants contractual relationships with third-parties, causing irreparable harm.

1056.   That the Counterclaimants have suffered and continue to suffer harm to an extent still being ascertained.

## PRAYER FOR RELIEF

**WHEREFORE**, the Defendants/Counterclaimants/Third Party Plaintiffs pray as follows:

A.   That the Court enter judgment dismissing Plaintiffs' claims against the Defendants in the main action; deny Plaintiffs' request for damages, injunctive relief and attorney's fees and sustain Defendants affirmative defenses in the main action;

B.   That the Court grant Counterclaimants/Third Party Plaintiffs judgment on each and every count of their claims against the Counterclaim-Defendants and Third Party Defendants, in an amount to be determined at trial, together with an award of all damages available under such laws in the minimum amount of FIFTY MILLION DOLLARS ($50,000,000), together with the maximum statutory damages available, punitive damages, treble damages, and the award of costs and attorneys' fees where applicable;

C.   That the Court grant the injunctive and declaratory relief requested herein;

D. For judgment against the Counterclaim-Defendants and Third-Party Defendants on the Counterclaimants/Third-Party Plaintiffs' claims of unjust enrichment, including restitution of the wrongful profits, revenues and benefits received, in an amount deemed appropriate by the Court, but not less than TWENTY-FIVE MILLION DOLLARS ($25,000.00);

E. For punitive damages, attorney's fees and costs of suit including post judgment interest on the entire judgment until paid in full; and

F. For any other and further relief as the Court finds just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

The Counterclaim-Defendants assert their rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with the Federal Rules of Civil Procedure 38, a trial by jury on all issues.

Dated: New York, New York
August 29, 2014
(As Amended)

**STEPHEN J. SAVVA, P.C.**


**By:**_____
Stephen J. Savva, Esq. (SS-2237)

Attorneys for the Defendants/
Counterclaimants & Third Party-Plaintiffs
ROBERT HAGAN, et al.
546 Fifth Avenue, 6th Floor
New York, NY 10036
(212) 245-5820 – Office
(646) 514-3543 – Facsimile
SJSavvaPC@aol.com – Email

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Answer, Counterclaims and Third-Party Complaint has been served upon the attorneys for all parties electronically via the Courts' ECF notification system and for all parties not subscribed to the ECF system by depositing same in the United States Mail in New York, NY, in a sealed envelope with first class postage thereon fully prepaid.

Dated:  New York, New York
         August 29, 2014

| | | |
|---|---|---|
| Leonard E. Hudson, Esq. | Mark D. McPherson, Esq. | Leonard A. Rodes, Esq. |
| Peter M. Ellis, Esq. | Mark. R. McDonald, Esq. | Stephen J. Arena, Esq. |
| REED SMITH, LLP | MORRISON FOERSTER | Trachtenberg, Rodes & Friedberg |
| Attorneys for Plaintiffs | Attorneys for Plaintiffs | Attorneys for Third Party Defts. |
| TUPSS/UPS/UPSA | TUPSS/UPS/UPSA | (Except Chowdhury & Worldwide) |
| 599 Lexington Avenue | 1290 Avenue of the Americas | 545 Fifth Avenue |
| New York, NY 10022 | New York, NY 10019 | New York, NY 10017 |
| Tel: (212) 521-5400 | Tel: (212) 468-8283 | Tel: (212) 972-2929 |
| Fax: (212) 521-5450 | Fax: (212) 468-7900 | Fax: (212) 972-5851 |

and

SHUEB CHOWDHURY         WORLDWIDE SHIPPING, INC.
4232 Judge Street              d/b/a "The UPS Store Center 5685"
Elmhurst, NY 11373-2555      353 Third Avenue
                             New York, NY 10010

**By:**_____
         Stephen J. Savva, Esq. (SS-2237)
         STEPHEN J. SAVVA, P.C.
         Attorneys for the Defendants
         Counterclaimants & Third Party-Plaintiffs
         ROBERT HAGAN, et al.
         546 Fifth Avenue, 6th Floor
         New York, NY 10036
         (212) 245-5820 – Office
         (646) 514-3543 – Facsimile
         SJSavvaPC@aol.com – Email

303