**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE UPS STORE, INC., *et al.*, | 14 CV 1210 (WHP) |
| Plaintiffs/Counterclaim-Defendants, | ECF Case |
| -against- | |
| ROBERT HAGAN, *et al.*, | |
| Defendants/Counterclaimants, | |
| -against- | |
| BRADLEY KAPLAN, *et al.*, | |
| Additional Counterclaim Defendants. | |

**THE UPS PARTIES' AND ADDITIONAL COUNTERCLAIM DEFENDANTS'**
**JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017
(213) 892-5200

*Attorneys for Plaintiffs and Counterclaim*
*Defendants The UPS Store, Inc., United*
*Parcel Service, Inc., and United Parcel*
*Service of America, Inc.*

[Additional Counsel on Signature Page]

ny-1275523

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

STATEMENT OF FACTS ..................................................................... 2

    A.    Identity of the Parties ............................................................. 2

        1.    The Hagans ................................................................ 2

        2.    The Manhattan Franchisees ...................................... 2

        3.    UPS ........................................................................... 4

        4.    TUPSS ...................................................................... 8

        5.    Non-Party Atlantic Mailboxes, Inc. ......................... 8

    B.    TUPSS Learns That Customers Are Being Overcharged at The Hagans' Former Centers, and The Hagans Modify Their Business Practices .............................................................................. 8

        1.    The Hagans' "Transparency Sales Model" ................ 9

        2.    The Hagans' End Their "Move in/Move out" Service ............................. 10

    C.    The Hagans' "Investigation" of Their Fellow Franchisees ................................. 10

    D.    Shipments From The Manhattan Franchisees' Centers ........................... 12

ARGUMENT ....................................................................................... 13

I.    LEGAL STANDARD ................................................................... 13

II.    THE HAGANS' LANHAM ACT CLAIM BASED ON FALSE ADVERTISING ABOUT UPS GROUND SERVICE FAILS ................................... 14

    A.    The Hagans Have No Evidence That They Lost Any Sale Due to Any Misstatement About Whether UPS Ground Service Is Not Guaranteed ................................. 14

        1.    The Hagans Do Not Have Evidence from Any Customer ........................... 15

        2.    Robert Hagan's Testimony Cannot Establish Lost Sales Due to False Advertising by the Manhattan Franchisees ................................. 16

            a.    Robert Hagan's Testimony Is Inadmissible to Prove What a Customer Was or Was Not Told Elsewhere ................................. 16

            b.    Robert Hagan Testified Only That Customers Said They Did Not Know UPS Ground Was Guaranteed ................................. 17

        3.    The Puccini "Investigation" Is Not Evidence That The Hagans Lost Any Sales Due To False Advertising By Manhattan Franchisees ................................. 18

            a.    Puccini's Testimony and the Video-Recordings Are Inadmissible ................................. 18

i

**TABLE OF CONTENTS**
(continued)

Page

    b.    The Secret Shops Are No Evidence That the Hagans Lost Sales Because of False Advertising by the Manhattan Franchisees ........................................................................................ 19

B.    The Hagans' Failure to Provide a Computation of Their Damages Bars Them From Introducing Evidence of Damages ................................ 20

C.    The Manhattan Franchisees Did Not Agree to Engage in an Organized Campaign Falsely to Promote UPS Ground Service ............................. 20

    1.    The Evidence Shows There Was Not an Organized Campaign to Falsely Promote That UPS Ground Is Not a Guaranteed Service .............. 20

    2.    The Evidence Shows There Was Not an Agreement Involving *All* Manhattan Franchisees to Falsely Promote UPS Services ......................... 23

D.    The Hagans Cannot Establish Materiality ................................................. 24

E.    TUPSS and UPS Cannot Be Liable for False Advertising ........................ 25

    1.    Neither UPS nor TUPSS Falsely Advertise that UPS Does Not Offer Money Back on Packages Shipped UPS Ground ....................................... 25

    2.    The UPS Parties Cannot Be Held Vicariously Liable for Any Advertising By The Manhattan Franchisees ................................................ 25

III.    THE HAGANS' CLAIM BASED ON "OVER-DIMENSIONING" FAILS .................... 26

A.    Mis-measuring a customer's package is neither advertising nor a promotion ................................................................................................... 26

B.    The Manhattan Franchisees Did Not Engage in an Organized Campaign to Overstate the Dimensions of Packages ................................. 27

C.    The Hagans Have No Evidence That They Lost Any Sales Due to Over-Dimensioning by Any of the Manhattan Franchisees .................... 27

D.    Neither TUPSS nor UPS Engaged in False Advertising Due to Over-Dimensioning ................................................................................... 28

IV.    THE HAGANS CANNOT OBTAIN DISGORGEMENT OR ATTORNEYS' FEES BECAUSE THERE IS NO EVIDENCE OF WILLFUL MISCONDUCT ............................................................................ 28

CONCLUSION ...................................................................................................... 30

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agric. Ins. Co. v. Ace Hardware Corp.*,
   214 F. Supp. 2d 413 (S.D.N.Y. 2002) ................................................................................. 19

*Allen v. Cuomo*,
   100 F.3d 253 (2d Cir. 1996) ................................................................................................ 13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................................ 13

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
   No. 11 CIV. 8803 AT, 2014 WL 5462547 (S.D.N.Y. Oct. 23, 2014), *aff'd,* 823 F.3d 51 (2d
   Cir. 2016) ............................................................................................................................ 24

*Avon Prods. v. S.C. Johnson & Son*,
   984 F. Supp. 768 (S.D.N.Y. 1997) ..................................................................................... 18

*Cislaw v. Southland Corp.*,
   4 Cal. App. 4th 1284 (1992) ............................................................................................... 26

*Conte v. Newsday, Inc.,*
   No. 06-CV-4859 (JFB) (ETB), 2013 U.S. Dist. LEXIS 35676 (E.D.N.Y. Mar. 13, 2013) ..... 14

*Contemporary Mission, Inc. v. U.S. Postal Serv.*,
   648 F.2d 97 (2d Cir. 1981) ................................................................................................. 13

*Design Strategy, Inc. v. Davis*,
   469 F.3d 284 (2d Cir. 2006) ............................................................................................... 20

*Enzymotec Ltd. v. NBTY, Inc.*,
   754 F. Supp. 2d 527 (E.D.N.Y. 2010) (*citing PDK Labs*, 103 F. 3d at 1112-113) ........... 14, 28

*E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co.*,
   No. 00 Civ. 8670, 2003 U.S. Dist. LEXIS 15364 (S.D.N.Y. Sep. 5, 2003) ............................ 15

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002) ............................................................................................ 20, 23

*Faust Harrison Pianos Corp. v. Allegro Pianos, LLC*,
   2013 U.S. Dist. LEXIS 73992 (S.D.N.Y. Mar. 28, 2013) ....................................................... 13

*International Paint Co. v. Grow Group, Inc.*,
   648 F. Supp. 729 (S.D.N.Y. 1986) ..................................................................................... 18

*Kodak Graphic Commc'ns Canada Co. v. E.I. Du Pont de Nemours & Co.*,
   No. 08-CV-6553-FPG, 2013 WL 5739041 (W.D.N.Y. Oct. 22, 2013).................................... 20

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................. 19

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) .............................................................................. 16

*MapInfo Corp. v. Spatial Re-Eng'g Consultants*,
  No. 02-CV-1008 (DRH), 2006 U.S. Dist. LEXIS 70408 (N.D.N.Y. Sep. 28, 2006).............. 15

*Mattel, Inc. v. Robarb's, Inc.*,
  139 F. Supp. 2d 487 (S.D.N.Y. 2001) ................................................................. 30

*Merck Eprova AG v. Gnosis S.p.A.*,
  760 F.3d 247 (2d Cir. 2014) .............................................................................. 28

*Mobileye, Inc. v. Picitup Corp.*,
  928 F. Supp. 2d 759 (S.D.N.Y. 2013) ................................................................. 20

*Optimum Techs., Inc. v. Home Depot USA, Inc.*,
  No. 1:04 CV 3260 TWT, 2005 WL 3307508 (N.D. Ga. Dec. 5, 2005) ................................. 23

*P&G Pharms., Inc. v. Hoffmann-La Roche, Inc.*,
  06 Civ. 0034, 2006 U.S. Dist. LEXIS 64363 (S.D.N.Y. Sept. 6, 2006) ............................. 29

*Patterson v. Domino's Pizza*, LLC,
  60 Cal. 4th 474,  P.3d 723 (Cal. 2014) ................................................................. 26

*PDK Labs, Inc. v. Friedlander*,
  103 F.3d 1105 (2d Cir. 1997) ............................................................................. 14

*Prof'l Sound Servs., Inc. v. Guzzi*,
  349 F. Supp. 2d 722 (S.D.N.Y. 2004) ................................................................. 23

*Rd. Dawgs Motorcycle Club of the U.S., Inc. v. "Cuse" Rd. Dawgs, Inc.*,
  679 F. Supp. 2d 259 (N.D.N.Y. 2009) ................................................................. 30

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) ........................................................... 19, 24, 25

*Sellify v. Amazon, Inc.*,
  No. 09-civ-10268, 2010 WL 4455830  (S.D.N.Y. November 4, 2010) ................................. 25

*Sussman-Automatic Corp. v. Spa World Corp.*,
  15 F. Supp. 3d 258 (E.D.N.Y. 2014) ............................................................. 14, 26

*Tai-Sun Plastic Novelties, Ltd. v. Haschel Exp. Corp.*,
  03 Civ. 1414 (MP), 2003 U.S. Dist. LEXIS 22655 (S.D.N.Y. Dec. 16, 2003) ....................... 24

*Use Techno Corp. v Kenko USA, Inc.*,
  C-06-02754 EDL, 2007 WL 4169487 (N.D. Cal. Nov. 20, 2007) ................................... 20

*Vann v. City of New York*,
  72 F.3d 1040 (2d Cir. 1995) .............................................................................. 13

iv

**Statutes & Rules**

15 U.S.C. § 1117(a) ............................................................................................ 31

Cal. Penal Code § 632 ........................................................................................ 8

Fed. R. Civ. P. 26(a)(1)(A)(iii) .......................................................................... 19

Fed. R. Civ. P. 56(g) .......................................................................................... 31

Fed. R. Evid. 803(3) ..................................................................................... 14, 15

## INTRODUCTION

When ruling on the Counterclaim Defendants' Motion to Dismiss the Hagans' Lanham Act claim in 2014, this Court had to accept as true the Hagans' far-fetched theory that: (1) all 43 of the independently owned The UPS Store® franchises in Manhattan not owned by the Hagans (the "Manhattan Franchisees") were engaged in a scheme (a) to tell customers that the UPS service guarantee does not apply to UPS Ground service, and (b) to overstate the dimensions of customers' packages; (2) some of those customers later went to do business at one of the Hagans' The UPS Store® centers, where they were told that UPS did guarantee delivery by a certain date for packages shipped Ground; and (3) some of those customers were so upset to learn they had received incorrect information *elsewhere* that the customers declared they would not do business with *the Hagans*, and left without completing the transaction.

After three years of litigation, the Hagans have failed to develop any evidence to support their Lanham Act claim.  The Hagans have no evidence that they lost a single sale because of anything that one of the Manhattan Franchisee's employees said.  The Hagans have not found even one actual customer (i.e. someone not paid by the Hagans) who:  (1) heard false advertising at a Manhattan Franchisee's center; (2) heard different information at the Hagan's Former Centers; and (3) refused to complete a transaction at the Hagan's centers because *others* had provided incorrect information.  Nor is there any evidence that all the Manhattan Franchisees conspired to engage in an "organized campaign" to make misleading statements about UPS services – a conspiracy that the Hagans were somehow never asked to join and never heard about although they owned more The UPS Store® centers in Manhattan than any other owner.  And there is no evidence of the UPS Parties' participation in a false advertising scheme— unsurprising since the UPS Parties' advertising promotes that the UPS service guarantee applies to UPS Ground.

The Hagans believe that they can prove their claim solely through their own self-serving testimony and that of friends the Hagans paid for assistance.  Not so.  Summary judgment for the UPS Parties and Manhattan Franchisees should be granted, ending this case.

## STATEMENT OF FACTS

### A.     Identity of the Parties

1.     **The Hagans.**  Robert Hagan became a The UPS Store® franchise owner in 2004.  (St.[1] ¶ 1.)  Robert and his brother Thomas bought the rights to operate eleven The UPS Store® franchises in Manhattan (the Hagans' "Former Centers") by purchasing existing centers and purchasing the right to open new The UPS Store® franchises.  (St. ¶ 2.)  The Hagans received training from TUPSS on a variety of matters; Thomas Hagan became a certified trainer, with authority from TUPSS to provide training to employees at the Hagans' Former Centers. (St. ¶ 3.)  Neither Thomas nor Robert was trained to tell customers that UPS Ground was not a guaranteed service, or to mis-measure packages.  (St. ¶¶ 4-7.)  Nor were the Hagans asked by the Manhattan Franchisees to join in a campaign to tell customers that UPS Ground is not a guaranteed service, or incorrectly to measure packages.  (St. ¶ 8.)

The Hagans' franchise agreements were terminated on February 5, 2014 because the Hagans had failed to pay their bills to UPS for shipping services.  (St. ¶ 13.)

2.     **The Manhattan Franchisees.**  As of February 2014, there were 43 other The UPS Store® centers in Manhattan (the "Manhattan Franchisees") owned by 21 different individuals (the "Manhattan Franchise Owners").  (St. ¶¶ 14, 15, 41, 42, 68, 69, 95, 96, 122, 123, 149, 150, 176, 177, 203, 204, 230, 231, 257, 258, 284, 285, 311, 312, 338, 339, 365, 366, 392,

---

[1] "St." refers to the UPS Parties' and Additional Counterclaim Defendants' Local Rule 56.1 Statement of Material Facts, dated April 21, 2017, and the declarations and exhibits cited therein.

393, 419, 420, 446, 447, 473, 474; Dkt. 75, TACC ¶¶ 60-61.)  The Hagans' Lanham Act claim is brought against each Manhattan Franchisee and Manhattan Franchisee Owner.

The Manhattan Franchisees are "independently owned and operated" businesses and "independent contractors."  (St. ¶¶ 19, 46, 73, 100, 127, 154, 181, 208, 235, 262, 289, 316, 343, 370, 397, 424, 451, 478, 545.)  A UPS Store franchisee is not an "agent, legal representative, subsidiary, joint venturer, partner or employee of TUPSS for any purpose whatsoever."  (St. ¶ 545.)  The Manhattan Franchisees operate their businesses pursuant to substantively identical Franchise Agreements with TUPSS.  (St. ¶ 542.)  None of the Manhattan Franchise Owners operates any of his or her The UPS Store® centers in concert with any of the other Manhattan Franchise Owners.  (St. ¶¶ 21, 48, 75, 102, 129, 156, 183, 210, 237, 264, 291, 318, 345, 372, 399, 426, 453, 480.)  None of the Manhattan Franchise Owners has entered into any agreement or otherwise coordinated with any other Manhattan Franchise Owners to misrepresent the terms of UPS Ground service or to "over-dimension" customers' packages for shipping.  (*Id.*)  Franchisees must indemnify TUPSS and UPS from any claims "arising out of, or in any way related to the operation of the [Manhattan Franchisee's] Center."  (St. ¶ 546.)

TUPSS and UPS do not train each employee at a franchisee's center.  (St. ¶ 507, 509-11, 513.)  Rather, the franchise owner or a designated employee oversees the franchisee's day-to-day operations.  (St. ¶ 550.)  Each franchisee is required to "ensure that each of [his or her] employees [are] adequately trained."  (St. ¶¶ 547, 561.)  Franchisees must "maintain a sufficient number of competent, conscientious, trained staff to operate Franchisee's Center."  (St. ¶ 548.)  Franchisees have full discretion concerning how they hire, discipline, and fire their employees. (St. ¶ 549.)

Franchisees are required to use software that shows the time-in-transit for a package based on its origin and destination for each service level offered by UPS.  (St. ¶ 569.)  This

software informs franchisees when UPS has suspended the guaranteed service refund for any reason.  (*Id*.)  Franchisees are required to use a software program when shipping packages via UPS that automatically calculates billable weight—and the cost of shipping—for each UPS service level (e.g., Ground, Next Day Air®) based on a package's measurements and scale weight.  (St. ¶ 571.)  Scales are connected to the computer system that automatically input a package's scale weight.  (*Id*.)

Each franchisee also operates under a Contract Carrier Agreement with UPS, whereby UPS agrees to ship packages from The UPS Store® centers pursuant to the terms of that Agreement and the UPS Rate and Service Guide and Tariff/Terms and Conditions (the "Tariff"), which are available at www.ups.com.  (St. ¶ 555.)  The Contract Carrier Agreement provides that each "Franchisee is an independently owned and operated franchisee of TUPSS" and that each "Participating Franchisee is not an employee, agent, joint venturer, or partner of UPS."  (St. ¶¶ 559-560.)  The franchisee "determine[s] the means, methods, or manner of performing its services."  (St. ¶ 560.)

UPS charges each franchisee for shipping services, like it charges other shippers, but UPS provides discounts off the UPS Retail Rate for franchisees.  (St. ¶ 556.)  It is a breach of the Franchise Agreement and Contract Carrier Agreement if a franchisee charges a customer more than the UPS Retail Rate set forth in the UPS Retail Rate and Service Guide, which lists the price for a package of a particular billable weight to be shipped to destinations within different zones.  (St. ¶¶ 562-563.)

> 3. **UPS.**  Although the Hagans suggest that, if a consumer was unaware that the UPS service guaranteed applies to UPS Ground service, it must be due to false advertising by Manhattan Franchisees, that assumption is baseless.  UPS is the world's largest package delivery

4

business.[2]  (St. ¶ 500.)  In 2013, UPS delivered packages each business day for 1.5 million shipping customers to 7.9 million receivers.  (St. ¶ 501.)  There are many ways that customers can access UPS, with over 157,000 domestic and international entry points including:  1,500 customer centers; 4,800 independently owned and operated locations of The UPS Store worldwide; 11,300 Kiala and UPS Access Point locations; 11,400 authorized shipping outlets and commercial counters; 5,500 alliance locations; and 83,900 UPS drivers who can accept packages provided to them.  (St. ¶ 502.)  There are more than 977 staffed locations within 100 miles of Manhattan.  (St. ¶ 503.)

UPS publishes annually a Retail Rate and Service Guide that, among other things, explains UPS's various services, shows the Retail Rate that will apply to a shipment to each "zone" for a particular service, how to determine the billable weight of the package, and the UPS service guarantee.  (St. ¶ 564.)  To determine the zone of any specific zip code, a shipper (*e.g.*, a The UPS Store®) must go the UPS website.  The Rate and Service Guide is available on the UPS website, which also provides numerous tools to customers, including a Calculate Time and Cost tool that allows a customer to determine when a package shipped on a certain day will be delivered to a specific location for each service level option available, and what the cost will be based on the billable weight of the package.  (St. ¶ 555.)  The Hagans do not claim that the Rate and Service Guide or the UPS website provides any incorrect or misleading advertising.

As set forth the in the Rate and Service Guide and as explained on its website, UPS guarantees on schedule delivery of shipments shipped via many of its services, including UPS Next Day Air®, UPS Next Day Air Saver®, UPS 2nd Day Air®, and UPS Ground.  (St. ¶ 504.)

---

[2] Counterclaim Defendant United Parcel Service of America, Inc. is a subsidiary of UPS that holds the intellectual property and trademarks for TUPSS.  UPSA has no contact or relationship with individual The UPS Store® franchisees.  (St. ¶ 520.)

The delivery commitment for Next Day Air® is generally 10:30 a.m. or noon (depending on the specific destination); for Next Day Air Saver® is 3:00 or 4:30; for Second Day Air® is end of the second business day.  The delivery commitment for packages shipped Ground is from one to six days (end of day) depending on the destination.  To determine the number of days, a shipper must go to the UPS website.  The UPS Store franchisees can obtain the number of days through the CMS.

The UPS service guarantee provides:

> In the event UPS fails to attempt delivery within the time published on the UPS website, or as provided when 1-800-PICK-UPS® is called, UPS, at its option, will either credit or refund the transportation charges for each such shipment to the payer only, upon request, provided the conditions set forth in the UPS Service Guarantee are met.

(St. ¶ 568.)  The UPS service guarantee excludes any incidental or consequential damages; only the transportation charge will be refunded.  (St. ¶ 568.)  UPS does not guarantee delivery of packages shipped or to be delivered via UPS Ground on specific dates during Thanksgiving and the winter holiday period.  (St. ¶ 567.)  UPS may suspend guaranteed delivery of packages based on factors such as severe weather conditions.  (*Id*.)

The Rate and Service Guide and the UPS website explain how a customer determines a package's billable weight.  (St. ¶ 564.)  Although the Hagans allege in the TACC that the Manhattan Franchisees were over dimensioning all packages and that UPS knew of the practice because UPS audited every package to determine the true dimensions, the facts are different.  For packages shipped Ground in 2013 – 2014 that were less than three cubic feet, the billable weight was the actual scale weight.  (St. ¶ 572.)  For packages shipped Ground greater than three cubic feet, and for packages shipped Air, the billable weight was the greater of the "dimensional weight" of the package and the scale weight.  (St. ¶ 572.)  The dimensional weight of the

package at that time was calculated by multiplying the height, length, and width (at the largest points) divided by 166.  (*Id.*)

UPS does not weigh and measure packages before accepting a package for shipment from shippers with UPS account numbers (like The UPS Store® franchisees); the shipper is responsible for correctly determining the billable weight and charge.  (St. ¶ 506.)  (UPS may measure and weigh a package brought by a shipper to a UPS customer center.)  (*Id.*)  UPS has equipment that can audit (weigh and measure) packages as a package moves through the UPS system but not every package is audited.  (St. ¶ 665-66.)  Of the 88,843 packages shipped from the Manhattan Franchisees during the time period December 1, 2013 through February 5, 2014 (the "Relevant Time Period" as determined by Magistrate Judge Gorenstein (*see* Dkt. 163)), 62,368 were packages shipped Ground of less than three cubic feet and thus the shipping cost was not based on dimensional weight billing.  (St. ¶ 663.)

During the Relevant Time Period, UPS's computer systems automatically issued credits to shippers, such as the Manhattan Franchisees, each time that UPS determined that a shipper had overpaid UPS for shipping services due to overstating the billable weight of a package.  (St. ¶ 665.)  UPS's computer systems automatically charged shippers whenever UPS determined that a shipper had underpaid UPS for shipping services by understating the billable weight of a package.  (St. ¶ 665.)  UPS collected the information necessary to determine if a franchisee over-dimensioned or under-dimensioned a package on approximately 90% of the package shipped via UPS Air® and 65% of packages shipped via UPS Ground.  (St. ¶ 666.)  Of the 88,843 packages shipped during the Relevant Time Period, UPS issued 776 credits to the Manhattan Franchisees because the Franchisees had ***overstated*** the billable weight of the package and therefore overpaid UPS for shipping.  (St. ¶ 667.)  UPS imposed additional charges in connection with 2,132

packages for which UPS determined that the Manhattan Franchisees had **understated** the billable weight of the packages.  (St. ¶ 668.)

4.      **TUPSS.**  TUPSS, a wholly owned subsidiary of UPS, is the franchisor of The UPS Store® branded postal, packaging, business, communication, and retail service centers throughout the United States.  (St. ¶ 508.)

5.      **Non-Party Atlantic Mailboxes, Inc.**  Atlantic Mailboxes, Inc. ("Atlantic Mailboxes") is the Manhattan Area Franchisee pursuant to an Area Franchisee Agreement with TUPSS.  (St. ¶ 521.)  The "Manhattan Area" is the borough of Manhattan.  (*Id.*)  Tripp Singer is the President of Atlantic Mailboxes; since 2012, Jose Contreras has been the sole employee of Atlantic Mailboxes.  (St. ¶¶ 522-523.)  Tripp Singer is not an employee of UPS or TUPSS.  (St. ¶ 525.)  Atlantic Mailboxes is an independent contractor with limited rights and specific contractual obligations set forth in that agreement.  (St. ¶ 524.)  Neither TUPSS nor UPS control the day to day operations of Atlantic Mailboxes.  (St. ¶ 526.)

B.      **TUPSS Learns That Customers Are Being Overcharged at The Hagans' Former Centers, and The Hagans Modify Their Business Practices**

In the summer of 2013, TUPSS learned from someone who claimed to be the Hagans' former employee that the Hagans had trained him to overcharge customers.  (St. ¶ 9.)  In early November 2013, an officer from TUPSS visited one of the Hagans' centers and concluded he was overcharged.  (St. ¶ 10.)  On November 13, 2013, TUPSS told the Hagans (and their business partner and current counsel of record, Steve Savva) that they had to stop overcharging customers.  (St. ¶ 11.)  The Hagans and Mr. Savva illegally recorded that meeting in violation of California law.  *See* Cal. Penal Code § 632.

Singer told the Hagans that TUPSS might terminate their franchise agreements if TUPSS found further evidence of misconduct.  (St. ¶ 12.)

In December 2013, the Hagans implemented two major changes.

8

### 1.    The Hagans' "Transparency Sales Model"

The Hagans could not personally monitor each clerk's transactions at each of their eleven

centers.  (St. ¶ 575.)  In December 2013, the Hagans instituted a new policy (a "Transparency

Sales Model") requiring each clerk to print and hand to each customer a shipping quote that

showed the delivery commitment to the chosen destination for each UPS service.  (St. ¶¶ 576,

578.)  The Hagans based this policy on a TUPSS training video suggesting use of a printed

quote, belying any suggestion TUPSS wanted franchisees to state there was no delivery

commitment on Ground.  (St. ¶ 581.)

According to Robert Hagan, when customers at the Hagans' Former Centers were

presented with the shipping quote, the customers "had a look of confusion like why am I being

forced, what is this?  I've never had to do this.  I need to send this package, I need to get going.

Their first problem was that it was just more time."  (St. ¶ 582.)  Printing and showing each

customer a shipping quote "slowed things down to a crawl," created "long waits" that

"infuriat[ed]" customers, and frustrated the Hagans' employees.  (St. ¶¶ 583-585.)  Robert

further testified that:

> "we had customers saying . . . I've been shipping through UPS for
> a long time and I have sent stuff and ***I didn't know that I would
> get with UPS guaranteed there in that amount of time***, and
> they've been charging me a lot more than that and that's bullshit.
> And I'm not, I'm taking my package, I'll see you and I'm not
> going to do business with you guys, meaning UPS stores
> anymore."

(St. ¶ 587.) (emphasis added.)  Robert Hagan testified that he could not recall any particular

statements by any particular customers and that "it was basically all the same thing [...] [t]hey

just said I can't believe that I've been told, you know, this is much cheaper than what I've ever

been told.  ***And I didn't know that UPS Ground was guaranteed***, and I've been getting ripped

off.  I'm not doing business with UPS ever again."  (St. ¶ 584.)  Robert did not testify that any

customer said he or she had been told that UPS Ground was not a guaranteed service, and he admits that no customer said they had heard Ground was not guaranteed at a Manhattan Franchisee's center.  (St. ¶¶ 587-590.)

The Hagans never heard any customer say that one of the Manhattan Franchisees "over-dimensioned" a package, and that, as a result, the customer was not going to do business with the Hagans.  (St. ¶ 600.)

### 2.     The Hagans' End Their "Move in/Move out" Service

Also, in or around December 2013, the Hagans discontinued a service (the "move in/move out service)" which involved charging a flat fee to go to a customer's location, pack boxes, and ship those boxes to a destination.  (St. ¶¶ 605-606.)  The flat fee for these "bundled transaction services" was far greater than the fee for simply shipping a package at the UPS Retail Rate.  The Hagans decided "[w]e couldn't do it because we didn't know if we were going to get terminated [by TUPSS] for doing it."  (St. ¶ 610.)  This service was the Hagans' "biggest profit center" and '[w]as critical to our profitability."  (St. ¶¶ 609-610.)  "The cessation of such services caused an immediate and material loss of revenue for [the Hagans'] stores."  (St. ¶ 609.)  The Hagans' Former Centers' revenues dropped by half due to discontinuing this service.  (St. ¶ 608.)

### C.     The Hagans' "Investigation" of Their Fellow Franchisees[3]

In November 2013, the Hagans asked Paul Puccini, a retired police officer and Savva's friend, to assist in a sting operation to conduct "secret shops" at each of the Manhattan Franchisees' centers.  (St. ¶¶ 612-13.)  Puccini contacted five of his friends and/or acquaintances (the "Puccini Investigators")—none of whom were licensed investigators—to engage in transactions on four days between November 20, 2013 and January 27, 2014. (St. ¶¶ 617-18.)

---

[3] As discussed below, section II.A.3.a, the Counterclaim Defendants deny the admissibility of the investigation conducted by the Hagans.

The Puccini Investigators shipped about 200 packages from the Manhattan Franchisees' centers. (St. ¶¶ 629, 633.)  Puccini's December 4, 2015 declaration offered in opposition to the UPS Parties' summary judgment motion on UPS's claims includes information related to only 145 packages (two to four transactions at each of the 43 Manhattan Franchisees).  (St. ¶ 618.) Puccini did not draft his declaration, has "no idea" who did, and does not know why certain transactions were not included in his declaration.  (St. ¶¶ 614, 660-61.)  The reasonable inference is that the author of Puccini's declaration excluded the other 55 transactions because unhelpful to the Hagans' claims.

Puccini is not an expert, has never been qualified as an expert in a civil case, and he is not acting as expert in this case.  (St. ¶ 659.)  Puccini did not personally conduct any of the secret shops.  (St. ¶ 619.)  The Hagans determined how the secret shops would be conducted.  (St. ¶¶ 621-624.)  The Hagans told Puccini "we are going to give you these boxes with an address. We already know what it should cost to get there. We know how long it should take to get there, and we want to see how the other stores are handling it."  (St. ¶ 624.)  Puccini did not confirm the cost of shipping a package.  (St. ¶ 625.)  Puccini told his investigators to say:  "We want to send this package to this date, and we need it here by this time, can you guarantee it?  That was it." (St. ¶ 626.)

Puccini did not video-record any of the transactions; he instructed his investigators to "to video as much of the transaction as they could" using their smartphones or other recording device.  (St. ¶¶ 619, 636.)  The video show Puccini Investigators asking clerks what is the cheapest way to get a package to a particular destination by either the next day or the day after. (St. ¶ 643.)  The destinations selected were destinations where the expected delivery date was the same whether Air or Ground was selected.  Puccini did not instruct the investigators to ask whether they would get a refund if the package did not arrive by the desired date if shipped

11

Ground or to inquire about policies regarding refunds, and they never asked those questions.  (St. ¶ 627.)  Contrary to the allegations in the TACC, clerks did not invariably or generally state that UPS Ground is not a guaranteed service; rather, clerks stated they could not "guarantee" the package would arrive to that particular destination by the Investigator's claimed deadline if shipped Ground.

Neither Puccini nor his investigators weighed or measured any of the packages they shipped.  (St. ¶¶ 630-35.)  The Hagans weighed and measured the packages used on three of the four days of the Hagan secret shops.  On the fourth day, the Puccini Investigators purchased boxes from the Manhattan Franchisees to ship items.  (St. ¶¶ 633.)

### D.    Shipments From The Manhattan Franchisees' Centers

During the Relevant Time Period, the Manhattan Franchisees shipped 88,843 packages by UPS.  (St. ¶ 663.)  Of these 88,843 packages, 66,464 packages (75%) were shipped via UPS Ground.  (St. ¶ 664.)  Of the packages shipped via UPS Ground, 14,174 were shipped to destinations with a one-day time-in-transit (*i.e.*, for delivery the following business day) and 25,365 packages were shipped via UPS Ground to destinations with a one- or two-day time-in-transit (*i.e.*, for delivery within two business days).  (St. ¶¶ 671, 673.)  422 packages were sent via Next Day Air Saver® (which guarantees delivery by either 3:00 p.m. or 4:30 p.m. depending on the specific destination[4]) to destinations that typically carry a one-day (end-of-day) Ground delivery commitment.  (St. ¶ 670.)  848 packages were shipped via Second Day Air® to destinations that typically carry a one- or two-day Ground delivery commitment.  (St. ¶ 672.)  Thus, of the total packages shipped to locations with one-day guaranteed Ground delivery,

---

[4] Magistrate Gorenstein limited the Hagans' discovery to packages shipped Next Day Air Saver® because Next Day Air® guaranteed a 10:00 a.m. delivery, which Magistrate Gorenstein recognized was materially different from end-of-day delivery by Ground.  (April 21, 2016 Hr. Tr. at 19:24-25; St. ¶ 504.)

97.1% were shipped Ground and only 2.9% were shipped via Next Day Air Saver®.  And of the total packages shipped to locations with one- or two-day guaranteed Ground delivery, 96.8% were shipped Ground and only 3.2% were shipped via Second Day Air®.

## ARGUMENT

## I.    LEGAL STANDARD

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Vann v. City of New York*, 72 F.3d 1040, 1048 (2d Cir. 1995) *(citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  "A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  "An opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *See Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n. 14 (2d Cir. 1981) (citation omitted).  "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).  "Unreasonable inferences are insufficient to defeat a motion for summary judgment." *Faust Harrison Pianos Corp. v. Allegro Pianos, LLC*, No. 09-cv-6707(ER), 2013 U.S. Dist. LEXIS 73992, at *45 (S.D.N.Y. Mar. 28, 2013) (citations omitted).

A defendant is liable under the Lanham Act for making:  "(1) a false or misleading statement; (2) in connection with commercial advertising or promotion that (3) was material; (4) was made in interstate commerce; and (5) damaged or will likely damage the plaintiff." *See*

*Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 269 (E.D.N.Y. 2014) (citation omitted).  To establish standing to bring a Section 43(a) claim, a claimant must "prove an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014).

## II.   THE HAGANS' LANHAM ACT CLAIM BASED ON FALSE ADVERTISING ABOUT UPS GROUND SERVICE FAILS

### A.   The Hagans Have No Evidence That They Lost Any Sale Due to Any Misstatement About Whether UPS Ground Service Is Not Guaranteed

To establish both standing and the elements of damages due to false advertising, the Hagans "must submit **specific evidence** that the [the Manhattan Franchisees'] advertising **cause[d] direct harm** to the" Hagans' business.  *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1112-113 (2d Cir. 1997) (emphasis added); *see also Lexmark*, 134 S.Ct. at 1395.  Further, "because [the Hagans] seek[] damages and not an injunction, [the Hagans are] required to show more proof of [their] 'reasonable belief' of the likelihood of injury and causation than would otherwise be required when requesting injunctive relief."  *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 547 (E.D.N.Y. 2010).  Here, the Hagans lack standing and cannot prove damages because they have no such specific evidence demonstrating that they lost sales due to the alleged misrepresentations made by the Manhattan Franchisees.  *Id.*  at 546 (granting summary judgment for lack of standing under the Lanham Act because there was no evidence of a causal connection between alleged injury and alleged false advertising); *Conte v. Newsday, Inc.*, No. 06-CV-4859 (JFB) (ETB), 2013 U.S. Dist. LEXIS 35676, at *46 (E.D.N.Y. Mar. 13, 2013) (granting summary judgment on Lanham Act claim for lack of standing where plaintiff "failed to establish a reasonable basis for causation, as his reasoning 'depends on multiple levels of speculation . . . .'") (internal citations omitted); *E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co.*, No. 00 Civ.

8670, 2003 U.S. Dist. LEXIS 15364, at *98 (S.D.N.Y. Sept. 5, 2003) (Gorenstein, M.J.) (granting summary judgment where counterclaimant "failed to adduce any evidence that shows any harm attributable to [the counterclaim defendant's] allegedly false statements"), *report and recommendation adopted by E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co.*, No. 00 Civ. 8670, 2005 U.S. Dist. LEXIS 3453, at *34 (S.D.N.Y. Mar. 8, 2005); *MapInfo Corp. v. Spatial Re-Eng'g Consultants*, No. 02-CV-1008 (DRH), 2006 U.S. Dist. LEXIS 70408, at *32 (N.D.N.Y. Sept. 28, 2006) (granting summary judgment on Lanham Act claim because "[counterclaimant] has failed to show any damages as a result of [counterclaim defendant's] alleged disparagement.").

To prove their claim, the Hagans need to have not only evidence of false advertising by the Manhattan Franchisee, but false advertising to a very specific audience—customers who later went to one of the Hagans' centers *after* the Hagans implemented the Transparency Sales Model. The Hagans have no such evidence.

### 1.    The Hagans Do Not Have Evidence from Any Customer

Despite three years of litigation, the Hagans do not have evidence from any customer who states that:  (1) the customer was told at one of the Manhattan Franchisee's centers that the UPS service guarantee did not apply to UPS Ground service; (2) the customer later went to one of the Hagan' Former Centers and was told that the UPS service guarantee applies to Ground; (3) the customer was so upset to have received conflicting information about the UPS service guarantee that the customer stated he or she would not do business with the Hagans (or any other The UPS Store®).  (St. ¶¶ 586, 588, 590, 591, 593, 596-99, 601-02.)

In discovery, the Hagans initially identified three customers who allegedly supported their claims: the former Olympic figure skater Tai Babilonia, the comedian David Brenner, and Ray Hayden.  (St. ¶ 594.)  Ms. Babilonia testified that she had never had a bad experience in any

15

The UPS Store® and had no idea why the Hagans would identify her as a witness.  (St. ¶ 595.)

Mr. Brenner is deceased.  Mr. Hayden refused to comply with two deposition subpoenas from

the UPS Parties and won't provide testimony.  (St. ¶ 597.)

> ### 2.    Robert Hagan's Testimony Cannot Establish Lost Sales Due to False Advertising by the Manhattan Franchisees

The TACC alleges customers told Robert Hagan "that they felt deceived and/or confused

by the misrepresentations of other Manhattan Area franchisees that UPS Ground was not

guaranteed.  Indeed, dozens of customers told Robert that they would never again return to a

UPS Store because they felt cheated by UPS."  (TACC ¶ 123.)  Accepting the truth of that

allegation, this Court ruled that an organized campaign to affirmatively misrepresent that "UPS

Ground [is] not guaranteed" could be false advertising and those lost sales could bestow standing

on the Hagans to sue.  It is now clear that that allegation is false.  Further, Robert's testimony

would be inadmissible to prove what any customer heard elsewhere.

> ### a.    Robert Hagan's Testimony Is Inadmissible to Prove What a Customer Was or Was Not Told Elsewhere

A party opposing summary judgment "must proffer ***admissible*** evidence."  *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (emphasis added.)

Robert's testimony about what he heard customers say they were told elsewhere is inadmissible

hearsay to prove what the customer was allegedly told.  The Hagans' assertion that such

testimony is admissible under the "state of mind" exception (Federal Rule of Evidence 803(3)) is

incorrect.  (*See* Dkt. 332.)

Courts in this Circuit have consistently rejected attempts to introduce out-of-court

customers' statements about their ***intent*** as evidence of the customers' ***motive*** in ceasing to do

business with the party alleging lost sales.  In *Chamilia, LLC v. Pandora Jewelry, LLC*, for

example, the plaintiff testified that specific, identifiable customers had told her that they were

canceling orders with plaintiff's company because of statements made by the defendant.  *See* No. 04-CV-6017 (KMK), 2007 U.S. Dist. LEXIS 71246, at *51-55 (S.D.N.Y. Sept. 24, 2007).  The court held that plaintiff's testimony was inadmissible hearsay and could not be used to prove "that customers ceased purchasing Plaintiff's products as a result of Defendant's statements." *See id*.  Similarly, in *Amerisource Corp. v. RxUSA Int'l, Inc*., the court held that "statements explaining why [a] company did not intend to do business with [defendant] are expressly outside the state-of-mind exception" because "in addition to expressing an intent not to do business with [defendant], the statements also express why that decision was made (*i.e.* because [plaintiff] said [defendant] was a bad credit risk)" which falls outside Rule 803(3).  *See* No. 02-CV-2514 (JMA), 2009 U.S. Dist. LEXIS 6864, at *5-6 (E.D.N.Y. Jan. 29, 2009) (noting that courts have consistently held that 803(3) "does not permit the witness to relate any of the declarant's statements as to why [the declarant] held the particular state of mind, or what [the declarant] might have believed that would have induced the state of mind.") (*citing United States v. Joe*, 8 F.3d 1488, 1493 (10th Cir. 1993).  Robert's testimony is not admissible to prove **why** some unknown customers no longer wanted to do business with the Hagans, *e.g.*, because these customers heard someone state that UPS Ground was not guaranteed.

Robert's testimony is admissible to show that he has no reason to believe that the customers who declared they did not want to do business with the Hagans had been at one of the Manhattan Franchisee's Centers because Robert admits he did not ask that question.  (St. ¶¶ 590-91.)

### b.    Robert Hagan Testified Only That Customers Said They Did Not Know UPS Ground Was Guaranteed

Even if Robert's testimony were admissible as evidence of what a customer was or was not told about UPS Ground, his testimony would not show that any customer was told at a Manhattan Franchisee's center that "UPS Ground was not guaranteed."  At deposition, when

17

asked what he heard customers say when they allegedly stormed out vowing never to do business

with the Hagans, Robert testified customers said, "***I didn't know that UPS Ground was***

***guaranteed***, and I've been getting ripped off.  I'm not doing business with UPS ever again."

(St. ¶ 589 (emphasis added).)  Robert also testified that none of these customers said they had

previously done business at any of the Manhattan Franchisee's The UPS Store® centers.

(St. ¶¶ 590-591.)  The fact that a customer "didn't know that UPS Ground was guaranteed" is no

evidence that customer had told that UPS Ground was ***not*** guaranteed, much less told that by a

Manhattan Franchisee.  *Avon Prods. v. S.C. Johnson & Son*, 984 F. Supp. 768, 798 (S.D.N.Y.

1997) ("Avon cannot be held liable under the Lanham Act for failing to state publicly that SSS is

not an effective insect repellent.); *International Paint Co. v. Grow Group, Inc.*, 648 F. Supp. 729

(S.D.N.Y. 1986) ("the Lanham Act imposes no affirmative duty of disclosure").

        And even if Robert had testified that customers said they had heard that UPS Ground was

not guaranteed (and such testimony were admissible), he concedes that no customer said ***where***

the customer heard that statement.  (St. ¶¶ 588-91.)  There is no basis to hold any The UPS

Store® franchisee located in Manhattan (nor all of them) liable with no evidence that the

Hagans' customer even patronized that Manhattan The UPS Store®, much less was told by that

franchisee that "UPS Ground is not guaranteed."  There are tens of thousands of places where a

customer could have had prior contact about UPS services, including nearly 1000 within 100

miles of Manhattan.  (St. ¶ 503.)

        **3.      The Puccini "Investigation" Is Not Evidence That The Hagans Lost
                Any Sales Due To False Advertising By Manhattan Franchisees**

                **a.      Puccini's Testimony and the Video-Recordings Are
                        Inadmissible**

        Puccini did not have any contact with any Manhattan Franchisee and did not make any

video-recordings of any secret shops.  (St. ¶¶ 619-20.)  Puccini's recitation of what others

allegedly told him about the Hagan secret shops is inadmissible hearsay. *See, e.g.*, *Agric. Ins. Co. v. Ace Hardware Corp.*, 214 F. Supp. 2d 413, 416 (S.D.N.Y. 2002) (finding inadmissible a report purporting to describe a construction accident where the report's author "was not an eyewitness to the accident [and] relied on the statements of other eyewitnesses in order to write the Report.")

On the Motion to Dismiss, the Court referred to Puccini as having conducted a "survey." (Dkt. 111, at 13.)  While "consumer survey" evidence presented by an expert can be admissible in some Lanham Act cases to prove consumer confusion, Puccini is not a survey expert (St. ¶ 659), he does not purport to be an expert in this action, and he did not conduct a survey of consumers about their state of mind.  The Puccini Secret Shop methodology—designed by the Hagans, and excluding the Hagans' stores from the shops—is so unreliable that it would be inadmissible even if Puccini were an expert.  *See Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 418-19 (S.D.N.Y. 2014) (excluding expert testimony on summary judgment due to methodological flaws that rendered report inadmissible); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562-63 (S.D.N.Y. 2007) (same).  *See* Declaration of Dr. Dave Stewart, dated April 21, 2017.

> **b.  The Secret Shops Are No Evidence That the Hagans Lost Sales Because of False Advertising by the Manhattan Franchisees**

Even if evidence of the secret shops were admissible, it is no evidence that the Hagans lost sales due to false advertising that a would-be Hagan customer heard at any Manhattan Franchisees' The UPS Store®.  Even if evidence of the secret shops suggested that clerks at various The UPS Store® centers in Manhattan failed to identify UPS Ground as the cheapest way to get a package to a specific destination within a particular time frame with a money back guarantee for the transportation charge, it would not be any evidence that *any* actual customer went to a Manhattan The UPS Store® and had a similar conversation about the expected delivery

19

date to a particular destination, purchased UPS Next Day Air® or UPS Second Day Air® instead of UPS Ground due to incorrect answers from a sales clerk, and then went to one of the Hagans' centers to send a similar package to the same destination as the prior shipment, and learned that UPS provided a money back guarantee if the package were not delivered just as quickly if sent UPS Ground.

### B. The Hagans' Failure to Provide a Computation of Their Damages Bars Them From Introducing Evidence of Damages

If a party seeking damages under the Lanham Act fails to disclose a computation of damages pursuant to Rule 26, it should be barred from offering evidence of damages, and summary judgment should be granted.  *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 293, 295 (2d Cir. 2006); *Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 778 (S.D.N.Y. 2013); *Use Techno Corp. v Kenko USA, Inc.*, C-06-02754 EDL, 2007 WL 4169487, at *3 (N.D. Cal. Nov. 20, 2007); *Kodak Graphic Commc'ns Canada Co. v. E.I. Du Pont de Nemours & Co.*, No. 08-CV-6553-FPG, 2013 WL 5739041, at *5 (W.D.N.Y. Oct. 22, 2013).

Here, the Hagans did not provide *any* calculation of their alleged damages in their initial disclosure or *at any time thereafter*.  (St. ¶ 604.)

### C. The Manhattan Franchisees Did Not Agree to Engage in an Organized Campaign Falsely to Promote UPS Ground Service

#### 1. The Evidence Shows There Was Not an Organized Campaign to Falsely Promote That UPS Ground Is Not a Guaranteed Service

There is no claim of false "*advertising*" here – that is, "widespread communication through print or broadcast media." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).  Nor is there any "*promotion*," that is, "sales presentations to buyers" as part of an "organized campaign to penetrate the relevant market."  *Id.*  The uncontroverted evidence shows there was not such a promotion.

Each of the Manhattan Franchisees has declared that he did not train the clerks working in their centers to tell consumers that UPS Ground was not guaranteed as part of any standardized sales pitch.  (St. ¶¶ 25, 29, 52, 56, 79, 83, 106, 110, 133, 137, 160, 164, 187, 191, 214, 218, 241, 245, 268, 272, 295, 299, 322, 326, 349, 353, 376, 380, 403, 407, 430, 434, 457, 461, 484, 488.)  Each of the Manhattan Franchisees has declared that neither UPS nor TUPSS trained or told them to tell customers that UPS Ground is not guaranteed.  (St. ¶¶ 29, 56, 83, 110, 137, 164, 191, 218, 245, 272, 299, 326, 353, 380, 407, 434, 461, 488.)  The Hagans, who were franchisees from 2004 until 2014, do not claim that they were ever approached about participating in an orchestrated campaign with the Manhattan Franchisees to falsely advertise that UPS did not offer money back on Ground shipments.  (St. ¶ 8.)  Neither UPS nor TUPSS told or trained the Hagans to tell consumers that UPS Ground was not guaranteed.  (St. ¶¶ 4, 507.)  The Area Franchisee did not train the Manhattan Franchisees to tell consumers that UPS Ground was not a guaranteed service, nor did his employee Jose Contreras.  (St. ¶¶ 532, 541.)  The Manhattan Franchisees who received blast faxes to the nationwide The UPS Store network regarding "upselling" did not understand those messages to promote telling customers that UPS Ground was not a guaranteed service.  (St. ¶¶ 31, 58, 85, 112, 139, 166, 193, 220, 247, 274, 301, 328, 355, 382, 409, 436, 463, 490.)  The UPS Calculate Time and Cost tool on the UPS website displays all UPS shipping services, including Ground, and determines the scheduled delivery date and time, as well as the number of days the package will be in transit from any destination to any destination.  (St. ¶5 55.)  During the period July 2013 to February 2014, TUPSS did not receive a single complaint by a customer who was told by a Manhattan Franchisee that UPS Ground service was not a guaranteed service.  (St. ¶¶ 570.)  Despite three years of litigation, the Hagans have not identified a single witness, such a disgruntled former franchisee or a franchisees' former employee, who has validated the Hagans' claim that there was an

21

orchestrated advertising campaign involving all Manhattan Franchisees to falsely advertise that Ground is not a guaranteed service.  Nor have the Hagans identified even one actual customer who claims to have been received a "sales pitch" from any clerk at any of the Manhattan Franchisee's centers that UPS Ground is not a guaranteed service.

The only evidence that the Hagans can point to is the Puccini secret shops.  As discussed above, it is inadmissible.  And even if it were admissible, those secret shops do not show an "organized campaign" to promote that UPS Ground is not guaranteed through "sales presentations."  Lanham Act cases involving solely oral misrepresentations are nearly always based on use of a uniform script by sales representatives as part of an organized sales push.  The secret shops described in Puccini's declaration do not show affirmative "sales presentations" whereby clerks were promoting the idea that UPS Ground was not guaranteed.  At most, they showed clerks were generally failing to look at the CMS system or the UPS website to determine exactly when a package shipped that day, to a particular destination chosen by the Hagans, by UPS Ground would arrive.  As a result these clerks failed to answer correctly the questions posed by the Hagans paid investigator who was seeking evidence for this lawsuit.  Evidence suggesting that clerks did answer the Hagans' quiz questions accurately does not raise a reasonable inference of an organized campaign by the Manhattan Franchise Owners to falsely promote that UPS Ground was not a guaranteed service in "sales presentations" to real customers.

Further, the Puccini Declaration describes 2 to 4 transactions at each of the 43 Manhattan Franchisees over four days, for a total of 145 transactions, which represents less than 3% of all the shipping transactions that took place at the Manhattan Franchisees on those days.  (St. ¶¶ 618.)

Furthermore, because the incorrect information occurred under only specific, and highly unusual conditions – when an investigator asked for the cheapest service to get a package to a

22

destination where the delivery date for Air and Ground were the same – there is no evidence of
"widespread dissemination" of false information.  There is no evidence whatsoever to suggest
real customers commonly asked such a question.  In fact, such a question was extremely rare.
(St. ¶ 644.)  Indeed, the evidence that about 97% of the time Manhattan Franchisee centers chose
UPS Ground rather than Air when shipping to a destination where the Air and Ground delivery
commitments were similar belies any inference that the Manhattan Franchisees were
systematically lying about UPS Ground service.  *See Fashion Boutique*, 314 F.3d at 58
(affirming summary judgment for defendant where plaintiff identified 27 alleged misleading
statements made in face-to-face transactions in a marketplace with thousands of customers);
*Prof'l Sound Servs., Inc. v. Guzzi*, 349 F. Supp. 2d 722, 729 (S.D.N.Y. 2004) (granting summary
judgment because statements to less than 3% of customers  "simply does not meet this standard"
under *Fashion Boutique*.), *aff'd*, 159 Fed. Appx. 270 (2d Cir. 2005); *see also Optimum Techs.,
Inc. v. Home Depot USA, Inc.*, No. 1:04 CV 3260 (TWT), 2005 WL 3307508, at *5 (N.D. Ga.
Dec. 5, 2005) ("The alleged statements made by individual Home Depot sales personnel are not
commercial advertising or promotion because the statements were not sufficiently disseminated
to the purchasing public."), *aff'd in part sub nom.* 217 Fed. Appx 899 (11th Cir. 2007).

### 2.  The Evidence Shows There Was Not an Agreement Involving <u>*All*</u> Manhattan Franchisees to Falsely Promote UPS Services

As discussed above, the Hagans have no evidence of *where* any lost customer may have
heard that UPS Ground was not a guaranteed service.  To hold *any* of the Manhattan Franchisees
liable for the Hagans' lost sales, the Hagans would have to have evidence that *all* of the
Manhattan Franchisees had an agreement among themselves to tell customers that UPS Ground
is not guaranteed, and that the agreement involved having their employees routinely tell
consumers that UPS Ground is not guaranteed.  Each of the Manhattan Franchisees has declared

there was not such an agreement.  (St. ¶¶ 21, 48, 75, 102, 129, 156, 183, 210, 237, 264, 291, 318, 345, 372, 399, 426, 453, 480.)

Again, the Hagans have only the secret shops, and evidence of them is inadmissible.  And even if it were admissible, it does not raise a reasonable inference of an agreement among all the Manhattan Franchisees to falsely advertise that UPS Ground is not a guaranteed service when considered along with all the other evidence that there was no such agreement.  *See, e.g.*, *Tai-Sun Plastic Novelties, Ltd. v. Haschel Exp. Corp.*, No. 03 cv 1414 (MP), 2003 U.S. Dist. LEXIS 22655, at *2 (S.D.N.Y. Dec. 16, 2003) (a court need not "credit unsupported factual allegations and innuendos," "nor make unreasonable inferences from circumstantial evidence proffered by [the] nonmovant.") (citations and internal quotation marks omitted).  Even if clerks across forty-three The UPS Stores in Manhattan failed correctly to answer a quiz question designed by the Hagans, it would not be reasonable to infer that those clerks' employers had agreed to an "organized campaign" to misrepresent UPS Ground as a service that was not guaranteed.  It is inconceivable that such an agreement among all the other The UPS Store® centers in Manhattan could exist without the Hagans at some point being told of the agreement and asked to participate, which the Hagans admit did not occur.

**D.    The Hagans Cannot Establish Materiality**

To be actionable, false advertising must be material; that is, there must be evidence that the false advertising influenced the consumer's decision whether to purchase.  *Apotex Inc. v. Acorda Therapeutics, Inc.*, No. 11 CIV. 8803 (AT), 2014 WL 5462547, at *9 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 823 F.3d 51 (2d Cir. 2016) ("[t]o prevail on a Lanham Act false advertising claim, however, a plaintiff must do more than prove falsity.  The plaintiff must also show materiality, which requires evidence that 'the alleged inaccuracy in the statements at issue would influence the purchasing decisions of consumers'") (citation omitted); *Reed Constr. Data Inc. v. McGraw-*

24

*Hill Cos.*, 49 F. Supp. 3d 385, 419 (S.D.N.Y. 2014) (granting summary judgment "[b]ecause, after much discovery, only one consumer has testified that he was influenced by [defendant's] statements, no reasonable juror could conclude that those statements were material to consumers' purchasing decisions."). Here, the Hagans do not have even one customer who has stated that he or she elected not to engage in a transaction with the *Hagans* because the customer heard at a Manhattan Franchisee's The UPS Store® that Ground was not guaranteed and then heard at one of the Hagans' Former Centers that it was a guaranteed service. Robert's self-serving testimony on that point is inadmissible hearsay.

### E.  TUPSS and UPS Cannot Be Liable for False Advertising

#### 1.  Neither UPS nor TUPSS Falsely Advertise that UPS Does Not Offer Money Back on Packages Shipped UPS Ground

UPS does not falsely advertise that it will not provide a money back guarantee on any package shipped Ground. (St. ¶¶ 564-68.) TUPSS does not advertise that UPS will not offer a money back guarantee on Ground packages. (St. ¶ 510.) To the contrary, both UPS and TUPSS inform consumers that the UPS service guarantee applies to UPS Ground. (St. ¶¶ 512, 564-68.)

#### 2.  The UPS Parties Cannot Be Held Vicariously Liable for Any Advertising By The Manhattan Franchisees

Vicarious liability[5] is determined by reference to state law. *See Sellify v. Amazon, Inc.*, No. 09-civ-10268 (JSR), 2010 WL 4455830, at *2 (S.D.N.Y. Nov. 4, 2010). Here, California law governs the relationship of the parties, as this Court has previously ruled. (*See* St. ¶¶ 542, 553; Dkt. 137 at 4-5.) Under California law, the UPS Parties cannot be held liable for the Manhattan Franchisees' employees actions absent "control over the relevant day to day

---

[5] The Second Circuit has not addressed the issue of vicarious liability for Section 43(a) claims. *See Sellify v. Amazon, Inc.*, No. 09-civ-10268 (JSR), 2010 WL 4455830, at *2 (S.D.N.Y. Nov. 4, 2010). For this Motion only, the UPS Parties do not contest that point.

operations at [the] franchised location[s]" because "[a]ny other guiding principle would disrupt the franchise relationship." *Patterson v. Domino's Pizza, LLC*, 333 P.3d 723, 743 (Cal. 2014), *see also id*. at 738-739 (finding no agency relationship as a matter of law between franchisor and franchisee and rejecting plaintiff's argument that "a comprehensive operating system" governing the franchise network could raise a triable issue of fact on the question of whether an agency relationship existed between the franchisor and franchisee because such an approach "would turn business format franchising 'on its head'"). *Cislaw v. Southland Corp.*, 6 Cal. Rptr. 2d 386, 388 (Cal. Ct. App. 1992) (holding that summary judgment for franchisor was appropriate where franchisee retained control over day-to-day operations and employees).

The uncontroverted evidence is that the UPS Parties do not exercise control over the day-to-day operations of how individual clerks at independently owned franchise locations answer specific questions from customers about the cheapest UPS service to get a package to a particular destination within a stated time period.   (St. ¶¶ 19, 46, 73, 100, 127, 154, 181, 208, 235, 262, 289, 316, 343, 370, 397, 424, 451, 478, 507, 509.)

## III.   THE HAGANS' CLAIM BASED ON "OVER-DIMENSIONING" FAILS

### A.   Mis-measuring a customer's package is neither advertising nor a promotion

Incorrectly measuring a customer's package and thereby charging more that UPS and TUPSS permits a franchisee to charge per the Franchise Agreement and Carrier Agreement is not "commercial advertising or a promotion." *See Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258; *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F. Supp. 360, 367-68 (S.D. Fla. 1996) *aff'd sub nom. Tire Kingdom v. Morgan Tire & Auto*, 136 F.3d 139 (11th Cir. 1998) ("If it is [defendant's] policy to take advantage of customers by charging more than the advertised price, as the Plaintiff alleges, this may constitute unprincipled sales practices, but does not violate the Lanham Act.").

**B.      The Manhattan Franchisees Did Not Engage in an Organized Campaign to Overstate the Dimensions of Packages**

The Manhattan Franchisees did not agree among themselves to "overdimension" packages.  (St. ¶¶ 21, 48, 75, 102, 129, 156, 183, 210, 237, 264, 291, 318, 345, 372, 399, 426, 453, 480.)  The uncontroverted evidence belies any claim of an organized campaign to overstate the dimensions of packages.  Of the 88,843 packages shipped from a Manhattan Franchisee's center between December 1, 2013 and February 5, 2014, UPS found only 776 were over-dimensioned – versus 2,132 that were under-dimensioned even though UPS audited at least 90% of Air packages and 65% of Ground.  (St. ¶¶ 666-668.)  Those facts belie any inference that Manhattan Franchisees were engaged in an organized campaign to overstate the dimensions of packages.

**C.      The Hagans Have No Evidence That They Lost Any Sales Due to Over-Dimensioning by Any of the Manhattan Franchisees**

Assuming for the sake of argument that charging consumers more than UPS and TUPSS allowed franchisees to charge could be false advertising, the Hagans have no evidence whatsoever that it caused *the Hagans* any harm.  The Hagans have not identified one customer who will state that he or she took a package to a The UPS Store® in Manhattan, somehow determined that the package was mis-measured by that franchisee, decided not to do business with *the Hagans* because that *other* The UPS Store incorrectly measured the package, and that customer otherwise would have done business with the Hagans.  (St. ¶¶ 600-02.)  The theory makes no sense, and no evidence supports it.

Robert Hagan concedes that he never heard a customer say that occurred.  (St. ¶ 600.)  Such testimony would not be admissible to prove that the other UPS Store® had in fact mis-measured the package.  *See infra*, Section II.A.2.  Any claim that clerks incorrectly measured packages during the Puccini secret shops is inadmissible.  And even if it were admissible to

27

suggest clerks incorrectly measured packages, it is no evidence at all that any actual customer not only was overcharged, but that the customer realized he or she was overcharged, and then decided not to do business with the Hagans because of it.

Thus, the Hagans cannot prove either standing or damages due to "over-dimensioning." *See infra*, Section II.A.

### D.    Neither TUPSS nor UPS Engaged in False Advertising Due to Over-Dimensioning

TUPSS and UPS did not incorrectly measure any packages.  (St. ¶¶ 506, 513.)  Nor does TUPSS or UPS train franchisees to measure packages other than in compliance with UPS's policies for doing so.  (St. ¶ 513.)[6]  Neither TUPSS nor UPS control the measuring of packages by clerks at independently owned franchise locations.  Thus, TUPSS and UPS cannot be held liable—directly or vicariously—for "over-dimensioning."  *See supra* Section II.E.2.

### IV.    THE HAGANS CANNOT OBTAIN DISGORGEMENT OR ATTORNEYS' FEES BECAUSE THERE IS NO EVIDENCE OF WILLFUL MISCONDUCT

"[A] finding of defendant's willful deceptiveness is a prerequisite for awarding profits" and attorneys' fees under the Lanham Act.  *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d Cir. 2014) (citations omitted); *see also* 15 U.S.C. § 1117(a) (attorneys' fees available only in "exceptional cases").  Although the case should end on summary judgment, if it does not, the Court should enter an order precluding the Hagans from recovering a profits award or attorneys' fees because there is no proof that the Manhattan Franchisees or the UPS Parties engaged in "willful" false advertising.  *See* Fed. R. Civ. P. 56(g).

---

[6] During discovery, the Hagans seized on one version of a TUPSS training manual that incorrectly stated that franchisees should round up to the next whole inch instead of rounding to the nearest inch.  The training guide used by TUPSS's trainers correctly stated the policy to round to the nearest inch.  (St. ¶¶ 515-516.)  Other written training materials likewise stated the correct policy, and those materials were downloaded by 28 of the Manhattan Franchisees and/or their employees.  (*Id.* ¶ 519.)  With only two exceptions, there is no evidence that any Manhattan Franchisee even saw the one incorrect training manual.  (*Id.* ¶ 517.)

First, as shown above, the Manhattan Franchisees did not train any of their store clerks to misrepresent UPS Ground service or "over-dimension" packages. (St. ¶¶ 25, 37, 39, 52, 64, 66, 79, 91, 93, 106, 118, 120, 133, 145, 147, 160, 172, 174, 187, 199, 201, 214, 226, 228, 241, 253, 255, 268, 280, 282, 295, 307, 309, 322, 334, 336, 349, 361, 363, 376, 388, 390, 403, 415, 417, 430, 442, 444, 457, 469, 471, 484, 496, 498.) Rather, the Manhattan Franchisees always instructed their employees to be truthful with customers, to accurately represent the terms and delivery dates of UPS Ground service, and to measure packages in compliance with UPS's policies. If clerks failed to answer questions designed by the Hagans as well as they might, it would not show "willful deceptiveness" by each Manhattan Franchise Owner. Second, the UPS Parties did not engage in any advertising; the allegedly false statements were disseminated by retail employees at the Manhattan Franchisees independent businesses. (*See* St. ¶¶ 504-05, 510.) Nor did the UPS Parties train or otherwise encourage the Manhattan Franchisees to engage in such conduct, which would have violated the terms of their Franchise Agreements and Contract Carrier Agreements. (St. ¶¶ 507, 513, 563.) Third, the Manhattan Franchisee, Atlantic Mailboxes, sent messages to all of the Manhattan Franchisees emphasizing that UPS Ground is a guaranteed service and asking the Manhattan Franchisees to "make sure [their] team[s] understand[] this." (St. ¶¶ 533.)

On these undisputed facts there cannot be a finding that the Manhattan Franchisees or the UPS Parties engaged in willful false advertising. *Cf. P&G Pharms., Inc. v. Hoffmann-La Roche, Inc.*, 06 Civ. 0034 (PAC), 2006 U.S. Dist. LEXIS 64363, at *116 (S.D.N.Y. Sept. 6, 2006) (denying preliminary injunction motion because, *inter alia*, defendant's sales representatives were not instructed to provide misinformation and defendant "made a good faith effort to educate its work force" about the relevant data and "what could and could not be fairly said about it"). Accordingly, the Court can rule on summary judgment that the Hagans are not entitled to recover

profits or attorneys' fees.  *See, e.g.*, *Mattel, Inc. v. Robarb's, Inc.*, 139 F. Supp. 2d 487, 495

(S.D.N.Y. 2001) (granting defendant's motion for partial summary judgment because "[plaintiff]

has failed to raise a genuine issue of material fact as to whether [defendant's] infringement of

[plaintiff's] trademarks was willful."); *Rd. Dawgs Motorcycle Club of the U.S., Inc. v. "Cuse"*

*Rd. Dawgs, Inc.*, 679 F. Supp. 2d 259, 293 (N.D.N.Y. 2009) (holding on summary judgment that

"[plaintiffs] have failed to adduce sufficient admissible record evidence to persuade the Court

that Defendants acted in bad faith or with willful deceitfulness").

## CONCLUSION

For the foregoing reasons, the UPS Parties and Additional Counterclaim Defendants

respectfully request that the Court grant summary judgment in their favor and dismiss the TACC

with prejudice.


Dated:  April 21, 2017                        Respectfully submitted,


By:_____*s/ Mark R. McDonald*_____
     Mark R. McDonald (Admitted Pro Hac Vice)
     MORRISON & FOERSTER LLP
     707 Wilshire Blvd., Ste. 6000
     Los Angeles, California  90017-3543
     Telephone: 213.892.5200
     Facsimile: 213.892.5454

     Mark David McPherson
     Adam J. Hunt
     MORRISON & FOERSTER LLP
     250 West 55th Street
     New York, New York 10025-9601
     Telephone: 212.468.8000
     Facsimile: 212.468.7900


     *Attorneys for Plaintiffs The UPS Store, Inc.,*
     *United Parcel Service, Inc., and*
     *United Parcel Service of America, Inc.*

By:   *s/ Leonard A. Rodes*
      Leonard A. Rodes
      Stephen Arena
      TRACHTENBERG RODES & FRIEDBERG LLP
      545 Fifth Avenue
      New York, New York  10017
      Telephone: 212.972.2929
      Facsimile: 212.972.7581

      *Attorneys for the Additional Counterclaim Defendants*
      *except Shueb Chowdhury and Worldwide Shipping, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2017, I caused to be served a true and correct copy of

The UPS Parties' Memorandum Of Law In Support Of Their Motion For Summary Judgment via

ECF on counsel for Defendants/Counterclaimants/Third Party Plaintiffs Robert Hagan and

Thomas Hagan, et al.


Dated:  Los Angeles, California
        April 21, 2017

                                    *s/ Mark R. McDonald*
                                    Mark R. McDonald
                                    (Admitted Pro Hac Vice)

1