UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
THE UPS STORE, INC., *et al.*,                  :

               Plaintiffs,             :       14cv1210

        -against-                           :       OPINION & ORDER

ROBERT HAGAN, *et al.*,                         :

               Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
WILLIAM H. PAULEY III, United States District Judge:

        The UPS Store, Inc., United Parcel Service, Inc., United Parcel Service of America, Inc., (the "UPS Parties") and the twenty-one owners of Manhattan UPS stores (the "Manhattan Franchisees" and, collectively with the UPS Parties, "Defendants"), move for summary judgment on the sole remaining counterclaim of the original Defendants in this action—Robert Hagan, Thomas Hagan, and their associated corporate entities ("the Hagans"). That counterclaim is for false advertising under § 43(a) of the Lanham Act. Defendants' motion is granted, and the counterclaim is dismissed.

## BACKGROUND

        This Opinion and Order represents this Court's latest effort to sweep out the veritable Augean Stable that is the case of The UPS Store v. Hagan.[1] The UPS Parties' original claims against the Hagans for breach of contract and trademark infringement were adjudicated long ago. In April 2014, however, the Hagans filed a spate of counterclaims that sprawled over a 210-page pleading. (See ECF No. 12.) This Court dismissed those counterclaims with leave to

---

[1] For factual background, this Court assumes familiarity with its prior Opinions. See The UPS Store, Inc. v. Hagan, 99 F. Supp. 3d 426 (S.D.N.Y. 2015); The UPS Store, Inc. v. Hagan, No. 14-CV-1210, 2015 WL 9256973 (S.D.N.Y. Nov. 18, 2015).

1

replead only one, the Hagans' claims under New York General Business Law § 349.  See The UPS Store, Inc. v. Hagan, 99 F. Supp. 3d 426, 442 (S.D.N.Y. 2015).  The Hagans retained new counsel and filed amended counterclaims, adding a count for false advertising under Lanham Act § 43(a).  (See ECF No. 74.)  In 2015, this Court granted Defendants' motion to dismiss the § 349 claim but denied the motion as to the Lanham Act count.  See The UPS Store, Inc. v. Hagan, No. 14-CV-1210, 2015 WL 9256973, at *7 (S.D.N.Y. Nov. 18, 2015).  The parties proceeded to discovery on the Lanham Act claim, and this motion followed.

The Hagans' Lanham Act claim arises from two alleged instances of false advertising by the Manhattan Franchisees and, by extension, the UPS Parties as franchisors.  First, the Hagans claim that the Franchisees conducted a coordinated campaign to incorrectly inform customers that UPS Ground Service was not guaranteed in order to sell higher-margin Air Service instead (the "Ground Guarantee Claims").  Second, the Manhattan Franchisees allegedly conspired to consistently over-dimension packages in order to charge more for shipments priced by size and weight (the "Over-Dimensioning Claims").  The Hagans allege that they declined to participate in these schemes, and that customers who learned from the Hagans that Ground Service was guaranteed subsequently refused to do business with any UPS store—thereby causing the demise of the Hagan franchises.

Discovery on these claims generated two key bodies of evidence.  The first is the testimony of Robert Hagan, which the Hagans rely on to show that the Manhattan Franchisees' false advertising was the proximate cause of the Hagans' injury.  On this point, Robert Hagan stated that many customers left his store in anger, never to return to any UPS franchise, after learning that Ground Service was in fact guaranteed.

Next, the Hagans submitted a declaration from Paul Puccini, a hired investigator who oversaw a series of hidden-camera "secret shops" at the Manhattan Franchisees' stores (the "Puccini Evidence"). Puccini's employees entered each store with a pre-measured package and asked the clerk what the cheapest guaranteed service was for shipment to a particular location. Although Ground Service is guaranteed by UPS, the clerks in the secret shop videos consistently stated that Puccini's investigators should pay extra for Air Service if they want guaranteed delivery in the desired time frame. The Hagans argue that the Puccini Evidence reveals the Franchisees' coordinated campaign to misrepresent the Ground Service guarantee and over-dimension packages.

DISCUSSION

To establish standing under § 43(a) of the Lanham Act, the Hagans must show (1) "economic or reputational injury" to their business that (2) "flow[s] directly from the deception wrought by [Defendants'] advertising." Lemark Int'l, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377, 1391 (2014). The latter prong is satisfied by a showing that "deception of customers cause[d] them to withhold trade from the plaintiff." Lexmark, 134 S.Ct. at 1391.

The Hagans' theory of liability under § 43(a) is that: (1) the Manhattan Franchisees, as part of a coordinated campaign to overcharge for shipping, told customers that Ground Service was not guaranteed and over-dimensioned their packages; (2) the Hagans, in an effort to comply with UPS regulations, did not participate in this scheme; (3) customers came to the Hagans' stores and were shocked to discover that they had been overcharged and misled about the Ground Guarantee at other UPS franchises; (4) these same customers became so

3

incensed that they immediately swore off shipping with UPS forever, thereby costing the Hagans business. Defendants argue that the record cannot support this attenuated chain of events, and that accordingly the Hagans lack standing because they cannot point to any evidence of lost sales caused by the alleged false advertising.

The viability of the Hagans' claim depends on the admissibility of Robert Hagan's testimony and the Puccini Evidence. See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (a party opposing summary judgment must offer admissible evidence). Robert Hagan testified that he witnessed dozens of customers come into his stores, express shock at the Ground Guarantee and the Hagans' lower prices, and then leave his stores exclaiming that they would never ship with UPS again. As evidence of Defendants' coordinated scheme, the Hagans point to Puccini's secret-shop videos, which show clerks at the Manhattan Franchisees' stores consistently stating that Ground Service is not guaranteed. The Puccini Declaration also references receipts and shipping estimates that purport to reveal the over-dimensioning conspiracy.

A. **Robert Hagan's Testimony**

Robert Hagan's testimony is critical to the causation inquiry because the record does not contain a single statement by a former Hagan customer that (1) they felt deceived by the Manhattan Franchisees' misrepresentation and (2) for that reason ceased to do business with the Hagans.[2] A Lanham Act plaintiff "must submit specific evidence that the defendant's

---

[2] The Hagans initially identified three former customers: David Brenner, Tai Babilonia, and Ray Hayden. (Defendants' Rule 56.1 Statement of Material Facts, ECF No. 344 ("56.1 Stmt.") ¶ 594.) Brenner is deceased. (56.1 Stmt. ¶ 594.) Babilonia testified that she never felt deceived by any UPS franchise and that she had no idea why the Hagans had identified her as a witness. (Declaration of Mark R. McDonald ("McDonald Decl."), ECF No. 352, Ex. 7 at 8:4-9; McDonald Decl., Ex. 10 ¶ 3.) Hayden ignored two subpoenas for a deposition and never appeared. (56.1 Stmt. ¶ 597.)

advertising causes direct harm to the product in which the plaintiff claims a pecuniary interest." PDK Labs, Inc. v. Friedlander, 103 F.3d 1005, 1112 (2d Cir. 1997). As the Hagans do not offer any customer testimony or survey, Robert Hagan's testimony is the only piece of evidence that connects the alleged false advertising with his customers' decisions to stop doing business with UPS altogether.

A few examples of Hagan's testimony frame this Court's analysis. After hearing about problems with his new "Transparency Sales Model" (under which his sales clerks were required to explain all of the customer's shipping options, including guaranteed Ground Service), Hagan stated that he visited the store and heard

> customers saying, you know, it's funny . . . I've been shipping through UPS for a long time . . . and I didn't know that I would get [my package shipped] with UPS guaranteed there in that amount of time, and they've been charging me a lot more than that and that's bullshit. And I'm not, I'm taking my package, I'll see you and I'm not going to do business with you guys, meaning UPS stores[,] anymore.

(Declaration of Blair Fensterstock ("Fensterstock Decl."), ECF No. 382, Ex. 5 at 147:24–148:10.) On that same store visit, Hagan claims, "[m]ultiple dozens" of customers made statements to this effect. (Fensterstock Decl., Ex. 5 at 149:21.)

Hagan also testified that another unidentified customer told him "I send this Christmas package all the time and I'm realizing now I could have gotten it there in a much cheaper way than they've been charging me for the last ten years . . . UPS is a bunch of con artists. You've been ripping me off and I'm never doing business here again." (Fensterstock Decl., Ex. 5 at 157:20–158:20.) He could not recall the identity of any particular customer or the details of their shipping needs, but claimed that "that was the gist of" the many complaints he overheard. (Fensterstock Decl., Ex. 5 at 158:22–23.) Hagan also did not know where these

5

anonymous customers heard that Ground Service was not guaranteed because he "[n]ever asked them." (Fensterstock Decl., Ex. 5 at 153:14.)

Defendants argue that this testimony is inadmissible hearsay. As a threshold matter, there can be no dispute that the customer complaints are hearsay; they are out-of-court statements offered for their truth, i.e. that the customer-declarants were misled by the Manhattan Franchisees and thus stopped doing business with UPS altogether. Accordingly, they are inadmissible unless otherwise permitted by the Rules of Evidence. Fed. R. Evid. 802.

First, the Hagans argue in passing that Robert Hagan's testimony is admissible as an eyewitness account of "people being frustrated, confused, and leaving the Hagans' stores, all directly attributable to [Defendants'] false advertising." (Opp. at 20.) The testimony is certainly admissible to prove the former—i.e. that Robert Hagan witnessed customers becoming frustrated in his stores and leaving without shipping their packages—but not for the latter, which goes to the customers' reasons for leaving the store and thus simply restates the Rule 803(3) argument.

As to Hagan's testimony about the reasons why customers left his stores, the Hagans assert that it is admissible under Rule 803(3) to prove the customers' then-existing states of mind. Rule 803(3) provides a hearsay exception for "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition." In Lanham Act cases, hearsay declarations can come in under Rule 803(3) to prove consumer confusion. See, e.g. Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291, 298–99 (S.D.N.Y. 2001) (finding consumer statements "that they were confused" between parties' trademarks admissible "to show the customers' state of mind . . . as opposed to the truth of what they said"). For example, the trial court in Fun-Damental Too, Ltd. v. Gemmy Indus. Corp. allowed

plaintiff's sales manager to testify that "some retail customers complained because they thought [plaintiff] was selling its [product] at a lower price than other retailers."  111 F.3d 993, 1003 (2d Cir. 1997).  The Second Circuit found no hearsay problem because the testimony "was not offered to prove that [plaintiff] was actually selling to some retailers at lower prices, but was probative of the declarant's confusion."  Fun-Damental, 111 F.3d at 1003–04.

In this case, however, the Hagans offer customer statements for more than the simple proposition that their customers were confused by the Manhattan Franchisees' allegedly conflicting statements.  According to the Hagans, these hearsay statements are admissible to prove that the customers stopped doing business with UPS because they had received this misleading information.  This hearsay purpose goes a step beyond proving the customers' then-existing states of mind.  "Evidence regarding [a Lanham Act plaintiff's] lost customers' motives for ceasing to buy [plaintiff's] products is inadmissible unless it is supported by documentary evidence or other evidence that would be admissible at trial."  Chamilia, LLC v. Pandora Jewelry, LLC, No 04-CV-6017, 2007 WL 2781246, at *17 (S.D.N.Y. Sept. 24, 2007).  Hagan's testimony is admissible to prove his customers' motives, then, only if the record contains other evidence to support this causal connection.

The admissibility of Hagan's testimony is thus inextricably bound up with the Puccini Evidence, which the Hagans offer to prove that the Manhattan Franchisees systematically misrepresented the Ground Guarantee and over-dimensioned packages.  If the Puccini Evidence is admissible to prove consumer confusion, it can serve as the factual support to buttress Hagan's hearsay testimony.

B. **The Puccini Evidence**

There are three components of the Puccini Evidence: the "secret shop" hidden-camera videos, the shipping quotes and receipts generated during the secret shops, and the Puccini Declaration outlining the contents of the videos and receipts.

1. The Secret Shop Videos

The secret shop videos themselves are admissible as party admissions. Rule 801(d)(2)(D) provides that a statement is not hearsay if it is offered against a party and is made "by the party's agent or servant concerning a matter within the scope of agency or employment, [and] during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Admissibility under this rule requires a finding of "(1) the existence of [an] agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." Fed. R. Evid. 801(d)(2)(D); Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 537–38 (2d Cir. 1992).

The secret shop videos show employees of the Manhattan Franchisees interacting with Puccini's investigators, who are attempting to ship packages via UPS. There can be no reasonable dispute that the clerks in the videos were agents of the Manhattan Franchisees and that their statements regarding the Ground Guarantee and the prices for shipping were matters within the scope of the agency relationship. Accordingly, the videos themselves are admissible to prove their contents.

2. The Secret Shop Shipping Quotes and Receipts

The Hagans offer the shipping quotes and store receipts from each secret shop as evidence that Puccini's investigators were systematically overcharged by the Manhattan

8

Franchisees. (See, e.g., Declaration of Paul Puccini ("Puccini Decl."), ECF No. 119, at 6 n.3 (directing the reader to an exhibit purporting to be a "true copy of the Shipping Quote detailing the proper retail rate for the transaction, the POS receipt, CMS information and all other information relating to the transaction" for one of the secret shops.)

Defendants argue that these documents are inadmissible because they have not been authenticated, but this objection is improper at the summary judgment stage. The Hagans could conceivably authenticate these documents through the testimony of the investigators who generated them or Puccini himself. Fed. R. Evid. 901(b)(1). Further, the store receipts should survive any hearsay challenge under the business records exception. Fed. R. Evid. 803(6). These exhibits are admissible for their contents.

  3. The Puccini Declaration

The Puccini Declaration presents a more difficult question, however, as Puccini himself did not conduct any of the secret shops. (56.1 Stmt. ¶ 619.) Rather, Puccini hired the secret-shop investigators and supervised the undercover operation at the instruction of the Hagans. (56.1 Stmt. ¶¶ 623–624.) He viewed the videos once during the process of transferring them to the Hagans and acknowledged that he did not draft his Declaration. (56.1 Stmt. ¶¶ 619, 639.) The Hagans offer the Declaration as summary evidence under FRE 1006 or, in the alternative, as a survey of consumers' states of mind under FRE 803(3).

  a. **Admissibility as Summary Evidence**

Rule 1006 allows into evidence "a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. Summary evidence survives a hearsay challenge "as long as the underlying

documents also constitute admissible evidence and are made available to the adverse party."
Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 53 (2d Cir. 1993).

A party offering summary evidence must also, however, establish that "the summary is accurate and nonprejudicial . . . [and can] be properly introduced through the testimony of a witness who supervised its preparation." United States v. Stone, 852 F. Supp. 2d 820, 828 (E.D. Mich. 2012). This finding is necessary because a summary "is admissible to prove its contents," and accordingly "great care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative." Anderson v. Otis Elevator Co., No 11-10200, 2012 WL 5493383, at *3 (E.D. Mich. Nov. 13, 2012).

Leaving aside the fact that Puccini did not draft his 147-page Declaration, the document cannot come in as summary evidence because it is suffused with argumentation. (See, e.g., Puccini Decl. ¶ 17 ("[T]he employee affirmatively misrepresented the available shipping options, the guaranteed delivery dates and the actual costs for the service requested . . . More specifically, the employee also made the following false and misleading statements to the customer . . ..")) The Declaration is not a summary of the videos and receipts, but rather a thinly veiled argument as to the implications of that evidence. Accordingly, it is not admissible under Rule 1006.

b. **Admissibility as Survey Evidence**

Alternatively, the Hagans argue that the Declaration is admissible under Rule 803(3) as a consumer survey offered to prove a specific idea in the public mind. Consumer surveys are routinely admitted under Rule 803(3) in Lanham Act cases to prove confusion as a

result of misleading statements or infringing trademarks. See Schering Corp. v. Pfizer Inc., 189 F.3d 218, 227 (2d Cir. 1999) ("The great majority of surveys admitted in this Circuit, including those used in Lanham Act cases to establish actual confusion or secondary meaning, fall [under Rule 803(3)]: they poll individuals about their presently existing states of mind to establish facts about the group's mental impressions."). Surveys are particularly useful in Lanham Act cases because a plaintiff "need only show—using whatever evidence—that a substantial number of consumers were, in fact, confused by the allegedly misleading statement." Reed Const. Data Inc. v. McGraw-Hill Cos., Inc., 49 F. Supp. 3d 385, 416 (S.D.N.Y. 2014).

Here, Rule 803(3) cannot save the Puccini Declaration because Puccini did not conduct a survey. Although the Hagans are correct that "errors in [a survey's] methodology . . . properly go only to the weight of the evidence," Puccini's investigation cannot be classified as a consumer survey because it did not involve a single consumer of UPS services. Schering, 189 F.3d at 225, 228 (noting that courts assign probative weight to surveys based on, inter alia, whether the "universe [of respondents] was properly defined" and whether "a representative sample of that universe was selected"). The investigation involved Puccini's investigators entering Manhattan Franchisee stores with a package and a list of questions designed to elicit statements about the Ground Guarantee. The only UPS customers appearing in the videos were investigators employed by Puccini, and accordingly the Declaration is not admissible as survey evidence of UPS consumers' then-existing states of mind.[3]

---

[3] The Hagans also argue that the Declaration is admissible under the residual hearsay exception to prove that Defendants engaged in an organized false advertising campaign. Because the videos and receipts underlying the Declaration are admissible, however, the argumentative Declaration is not "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Fed. R. Evid. 807. The Declaration is thus not admissible under the residual hearsay exception.

4. Effect on Robert Hagan's Testimony

The inadmissibility of the Puccini Declaration renders Robert Hagan's hearsay testimony likewise inadmissible. The latter depends on the former for admissibility purposes, as the Hagans offer the Puccini Evidence to prove that the Manhattan Franchisees did in fact systematically misrepresent the Ground Guarantee and over-dimension packages. As discussed above, however, the admissible Puccini Evidence (i.e. the secret-shop videos and associated receipts) reveals nothing about whether any former Hagan customer received misleading information from a Manhattan Franchisee or had a package over-dimensioned at a Manhattan Franchisee store. The Puccini Evidence cannot substantiate Hagan's testimony because it "makes no mention of any customer's reasons for ending his purchases" with UPS and "provides no support for the relevant material fact that these [decisions to cease doing business] were a result of" Defendants' alleged false advertising. Chamilia, 2007 WL 2781246, at *17. Accordingly, Robert Hagan's testimony regarding his former customers' reasons for ceasing to ship with UPS is inadmissible.[4]

C. **Standing Analysis**

Standing to sue under the Lanham Act is a two-part inquiry. First, the plaintiff must "come within the zone of interest" protected by the Act, which requires that the plaintiff "allege an injury to a commercial interest in reputation or sales." Lexmark, 134 S.Ct. at 1390.

---

[4] Even if this testimony were admissible, however, it would not support the Hagans' counterclaim because it does not establish that the customers were misled by any of the Manhattan Franchisees. Rather, these hearsay statements merely show that these particular customers did not know that Ground was a guaranteed service. As Hagan conceded in his deposition, no customer said they had received conflicting information (e.g. that Air was the only guaranteed service) at a Manhattan Franchisee store. "[A] failure to inform consumers of something, even something that they should know, is not per se a misrepresentation actionable under Section 43(a) of the Lanham Act." McNielab, Inc. v. Am. Home Prods. Corp., 501 F. Supp. 517, 532 (S.D.N.Y. 1980).

Second, the cause of action "is limited to plaintiffs whose injuries are proximately caused by violations of the statute." Lexmark, 134 S.Ct. at 1390. Under this prong, a plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." Lexmark, 134 S.Ct. at 1391. And although the parties argue expansively about both steps of this analysis, this Court need not look beyond the proximate-cause prong.

1. The Over-Dimensioning Claims

Defendants argue that the Over-Dimensioning Claims fail because the Hagans offer no evidence that over-dimensioning by the Manhattan Franchisees caused harm to the Hagans' business. The Hagans appear to concede this point, as their only responses are a pair of conclusory sentences, one of which cites to inapposite portions of their Rule 56.1 counter-statement of material facts. (See Opp. at 13 ("The evidence shows that the Hagans lost sales as a direct and proximate result of [Defendants'] organized campaign to misrepresent the Ground guarantee and overdimension packages."); Opp. at 15 ("Here, the evidence shows that the systematic false advertising bolstered by the UPS Parties' forced Model on the Hagans [sic] proximately caused the demise of the Hagans' stores.").) This alone could be dispositive of the Over-Dimensioning Claims. See Shenk v. Karmazin, 868 F. Supp. 2d 299, 311 n.12 (S.D.N.Y. 2012) (arguments not addressed in opposition to summary judgment are conceded).

Briefing aside, however, the Over-Dimensioning Claims fail because the record is devoid of "specific evidence that [the Manhattan Franchisees' over-dimensioning scheme] cause[d] direct harm" to the Hagans' franchises. PDK Labs, 103 F.3d at 1112. First, the Hagans do not identify any customers who could testify that they no longer patronize UPS stores because

13

a Manhattan Franchisee overcharged them for shipping by measuring a package incorrectly. In their Rule 56.1 statement, the Hagans point to a single complaint by Ray Hayden—a customer of one Manhattan Franchisee who complained to UPS Customer Relations that "his box was 11x9x2 and not the 12x10x32 [as measured in the store]" and who "[felt that] he was grossly overcharged due to size." (Fensterstock Decl., Ex. 74.) However, Hayden ignored two deposition subpoenas, and Robert Hagen could not recall whether Hayden was one of the customers who told him that he would never patronize UPS again. (Fensterstock Decl., Ex. 5 at 211:9–212:6.) Thus even if Hagan's testimony were admissible to prove why his customers stopped shipping with UPS (which it is not), he would not be able to connect Hayden's complaint with the injury to the Hagans' business.

The only remaining admissible evidence of a causal connection between the Manhattan Franchisees' over-dimensioning scheme and the Hagans' lost business, then, is the material underlying the Puccini Declaration (i.e. shipping quotes and receipts that purportedly show the Manhattan Franchisees over-dimensioning packages) and records showing that the Hagans' revenue declined after they instituted the Transparency Sales Model. From this record, the Hagans ask this Court to find a genuine issue of material fact as to whether the following occurred: (1) UPS customers had their packages over-dimensioned by the Manhattan Franchisees; (2) those same customers subsequently brought packages to the Hagans' stores for shipment; (3) the Hagans correctly measured those packages; (4) the customers immediately realized they had been cheated by the other UPS stores; and (5) as a direct result of this epiphany, those customers stormed out of the Hagans' stores, never to return to UPS. This causal chain is several bridges too far. Defendants' motion for summary judgment dismissing

14

the Over-Dimensioning Claims is granted.

2. The Ground Guarantee Claims

As to the Ground Guarantee Claims, Defendants again argue that the Hagans cannot show that any customers stopped doing business with them because the Manhattan Franchisees falsely stated that Ground Service is not guaranteed. The evidence on these claims is more substantial than for the Over-Dimensioning Claims, as the record contains statements by UPS employees that the Hagans' declining revenue was at least partially the result of the Hagans selling more Ground Service than Air Service. (See 56.1 Counter-Statement, ECF No. 381 ¶¶ H62–H67.) The Hagans allege that their stores had a higher Ground/Air sales ratio because UPS enforced the Transparency Sales Model on them. Laboring under that model, the Hagans' employees "had to print out a shipping quote for every customer and prominently display all of the available shipping options" for each transaction. (56.1 Counter-Statement ¶ H40.) Robert Hagan testified that the Transparency Sales Model slowed transactions in his stores, creating long lines and causing some customers to leave rather than wait. (56.1 Counter-Statement ¶ H64.)

Although this theory is more plausible than the series of events alleged in connection with the Over-Dimensioning Claims, the Hagans still cannot point to any evidence that they lost business <u>because any Defendant misrepresented the Ground Guarantee</u>. The Lanham Act imposes liability for injuries proximately caused by false advertising, not abusive treatment of franchisees, and the record in this case does not create a genuine dispute of fact as to causation. Although the Hagans correctly observe that identifying specific lost customers "is not a <u>sine qua non</u> of a Lanham Act claim," the inadmissibility of Robert Hagan's testimony renders

15

their proximate-cause argument purely speculative. Grant Airmass Corp. v. Gaymar Indus., Inc., 645 F. Supp. 1507, 1514 (S.D.N.Y. 1986).[5]

Taking the admissible evidence in the light most favorable to the Hagans, a reasonable jury could conclude that: (1) clerks in certain Manhattan Franchisee stores misrepresented Ground Service as not guaranteed (as seen in the Puccini videos); (2) following the institution of the Transparency Sales Model, the Hagan stores sold more Ground Service than Air Service and experienced long lines due to slower transactions (according to the testimony of Robert Hagan and UPS representative Tripp Singer); and (3) the Hagan stores suffered from declining revenue after adopting the Transparency Sales Model (as evidenced by the store sales records). These conclusions, however, are a far cry from the Hagans' § 43(a) theory of liability—i.e. that many dozens of customers, incensed by the Manhattan Franchisees' misrepresentations about the Ground Guarantee, ceased to do business with UPS immediately upon learning the truth at the Hagans' stores.

Summary judgment is especially appropriate here because the Hagans seek monetary damages, which requires them "to show more proof of [their] reasonable belief of the likelihood of injury and causation than would otherwise be required when requesting injunctive relief." Enzymotec Ltd. v. NBTY, Inc., 754 F. Supp. 2d 527, 547–48 (E.D.N.Y. 2010) (granting summary judgment where the "only evidence" of causation was a "vague allegation based on hearsay about an unnamed customer['s]" decision not to purchase a product based on a

---

[5] The Hagans' reliance on Grant Airmass is peculiar, as the plaintiff in that case submitted testimony by one of defendant's salesmen that "he used the [false advertising material] as a selling tool and that it was a factor in the purchasing decision of many [customers]," as well as testimony from "a number of individuals involved in the purchasing decision of [defendant's customers], many of whom stated that they read and relied on [the false advertising material]." 645 F. Supp. at 1514. No such evidence appears in this record.

misleading statement) (internal quotations omitted).  And although a plaintiff need not "indisputably prove the harm" at the summary judgment stage, "mere conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Enzymotec, 754 F. Supp. 2d at 547 (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)).  Because the Hagans submit no evidence connecting Defendants' alleged false advertising with injury to the Hagan franchises, Defendants are entitled to summary judgment.

## CONCLUSION

Defendants' motion for summary judgment dismissing the Hagans' Lanham Act counterclaim is granted because the Hagans lack standing to assert such a claim.[6]  The Clerk of Court is directed to terminate all pending motions and mark this case as closed.

Dated: August 2, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

---

[6] The Hagans' additional arguments regarding Defendants' alleged failure to respond to their "additional material facts" is unavailing.  Local Rule 56.1 does not require a moving party to file a separate counter-statement of material facts in the event that the non-moving party decides to add "additional material facts" to its own counter-statement.